1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. SBN 132099
tboutrous@gibsondunn.com
KATHERINE V.A. SMITH, SBN 247866
ksmith@gibsondunn.com
LAUREN M. BLAS, SBN 296823
lblas@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

MICHELE L. MARYOTT, SBN 191993
mmaryott@gibsondunn.com
ELIZABETH A. DOOLEY, SBN 292358
edooley@gibsondunn.com
MATTHEW T. SESSIONS, SBN 307098
msessions@gibsondunn.com
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

Attorneys for Defendants

KOTCHEN & LOW LLP
DANIEL LOW, SBN 218387
dlow@kotchen.com
DANIEL KOTCHEN (*pro hac vice*)
dkotchen@kotchen.com
LINDSEY GRUNERT
(*pro hac vice*)
lgrunert@kotchen.com
1918 New Hampshire Ave. NW
Washington, DC 20009
Telephone: 202.471.1995
Facsimile: 202.280.1128

YADEGAR, MINOOFAR &
SOLEYMANI LLP
NAVID SOLEYMANI, SBN 219190
soleymani@ymsllp.com
NAVID YADEGAR, SBN 205315
navid@ymsllp.com
1875 Century Park East, Suite 1240
Los Angeles, CA 90067
Telephone: 310.499.0140
Facsimile: 888.667.9576

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

CHRISTY PALMER, VARTAN PIROUMIAN, EDWARD COX, and JEAN-CLAUDE FRANCHITTI,

                Plaintiffs,

        v.

COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION and COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION,

CASE NO. 17-CV-6848 DMG (PLAx)

**JOINT STIPULATION REGARDING SANCTIONS**

Hon. Paul L. Abrams

Hearing
Date: December 15, 2021
Time: 10:00 a.m.
Place: Telephonically
Complaint Filed: September 18, 2017

1

2          Defendants.          Discovery Cut-Off: December 16, 2021
                                 Pre-Trial Conference Date: July 26, 2022
3                                Trial Date: August 23, 2022

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

# **TABLE OF CONTENTS**

I.   INTRODUCTORY STATEMENTS ...................................................1

   A.   **Plaintiffs' Introductory Statement** ..................................1

   B.   **Defendants' Introductory Statement** ................................3

II.  SPECIFICATION OF ISSUES IN DISPUTE ...........................6

III. PARTIES' CONTENTIONS AND POINTS AND AUTHORITIES ...............6

   A.   **Discovery Misconduct Sanctions** ....................................6

      1.      *Plaintiffs' Position* ...............................................6

      2.      *Defendants' Position* ..........................................47

   B.   **Plaintiffs' Entitlement to Sanctions for Cognizant's failure to Disclose Arbitration Agreements**...................................81

      1.      *Plaintiffs' Position*............................................81

      2.      *Defendants' Position* .........................................85

   C.   **Plaintiffs' Entitlement to Sanctions for Improper Communications with Class Members** .....................................89

      1.      *Plaintiffs' Position*............................................89

      2.      *Defendants' Position* .........................................92

   D.   **Cognizant Should be Compelled to Produce Unproduced Responsive Documents and Plaintiffs Should be Permitted to Take Related Discovery.** .............................................100

      1.      *Plaintiffs' Position*..........................................100

      2.      *Defendants' Position* .......................................102

Pursuant to Federal Rule of Civil Procedure 37(a), Local Rule 37-2, and Magistrate Judge Abrams' Procedures, Plaintiffs Palmer, Piroumian, Cox, and Franchitti ("Plaintiffs") and Defendants Cognizant Technology Solutions Corporation and Cognizant Technology Solutions U.S. Corporation ("Cognizant") submit this Joint Stipulation regarding the following issues:  (1) whether Cognizant should be sanctioned for spoliating evidence in this case; (2) whether Cognizant should be sanctioned for providing false discovery certifications regarding the location and existence of relevant ESI; (3) whether Cognizant's late production of arbitration agreements warrants Plaintiffs pursuing follow-up discovery on them; (4) whether Cognizant should be sanctioned for its improper and misleading communications with putative class members; and (5) whether Cognizant should be compelled to produce improperly withheld documents and to provide discovery related to such documents after they are produced.

## I.   **INTRODUCTORY STATEMENTS**

### A.   **Plaintiffs' Introductory Statement**

Discovery in this case has been taxing, for Plaintiffs and the Court alike, with discovery disputes multiplying as more information has come to light about Cognizant's discovery failures.  It has now become apparent that Cognizant has lost a significant number of documents from critical custodians and that key document repositories have not yet been searched.  Cognizant seeks to embark on a new discovery period to search for and produce documents from places that it previously committed to searching, which would be this case's third discovery period.  With the passage of time, and as the scope of its discovery problems have become more apparent, Cognizant has become increasingly disdainful, to the point that it is now suing Plaintiff Edward Cox's widow in New Jersey for repayment of her deceased husband's salary simply because Mrs. Cox seeks substitution in this case—a retaliatory tactic outlawed by Title VII.[1]

---

[1] Cognizant initially sued Plaintiff Cox for having retained his Cognizant email box in anticipation of litigation.  Upon learning of Mr. Cox's death, and receiving

Plaintiffs are in a difficult position.  On one hand, they want to complete this case as quickly as possible and without further burdening the Court with discovery issues.  On the other hand, the discovery events that have transpired are so extensive and prejudicial that pursuing sanctions is the only mechanism available to Plaintiffs to mitigate the prejudice.

Accordingly, Plaintiffs seek five forms of relief in this discovery motion.  First, Plaintiffs seek an adverse inference jury instruction as a consequence for Cognizant's spoliation.  Key documents from critical custodians have been lost and destroyed as a result of Cognizant's intentional actions.  Among other failures, Cognizant substituted a critical ESI custodian with another Cognizant employee with a similar name, and then failed to preserve the correct custodian's files; failed to timely issue litigation holds leading to the loss of evidence; and failed to preserve and collect ESI from shared drives and laptops, leading to the loss of documents.  An adverse inference jury instruction is thus warranted.  If, based on the record below, the Court is not convinced that spoliation has occurred, Plaintiffs alternatively request an order compelling Cognizant to produce forensic images of custodian computers and devices that Cognizant has represented no longer have discoverable information, as Plaintiffs believe expert analyses of these devices will evidence intentional document destruction.

Second, Plaintiffs seek an order compelling Cognizant to produce outstanding custodial ESI, extending the case schedule to allow for discovery associated with these documents, and awarding monetary sanctions to compensate Plaintiffs for the additional time and resources required to secure and pursue another discovery period.

Third, Plaintiffs seek an order allowing Plaintiffs to take discovery of Cognizant concerning 14,850 arbitration agreements it produced on October 14, 2021 (the day before the close of fact discovery).  Because of the late date on which these agreements were produced, Plaintiffs did not have an opportunity to pursue discovery relating to

---

confirmation from his widow that she had *no access* to Mr. Cox's Cognizant emails, Cognizant still chose to sue her, seeking repayment of Mr. Cox's salary as damages.

them by the October 15, 2021 discovery deadline.   Discovery concerning these agreements is critical to exploring their validity and applicability to this case.

Fourth, Plaintiffs seek an order in relation to phone calls Cognizant's counsel has been making to putative class members, some of which were recorded.   On these calls, information was not shared with the putative class members about their interest in this case and that their interests were diametrically opposed to the attorneys with whom they were speaking.   Plaintiffs seek an order preventing Cognizant's counsel from further contacting putative class members and requiring production of recordings and notes of conversations with putative class members.

Fifth, Plaintiffs seek an order compelling Cognizant to search for and produce responsive custodial ESI from shared drives, laptops, and any other previously unsearched locations, as well as extend the case schedule to allow for additional discovery of unproduced documents.

## B.     Defendants' Introductory Statement

Cognizant agrees that discovery in this matter has been taxing—it has produced hundreds of thousands of documents (and collected and searched even more), identified and produced vast troves of data for more than 100,000 employees and even more applicants, responded to numerous written discovery requests, responded to a multitude of informal questions posed by Plaintiffs, and presented high-level employees for depositions.   Yet, ignoring all of that, Plaintiffs have, in 55 pages, 72 exhibits, and more than 100 footnotes (equating to at least half a dozen more single-spaced pages), elevated relatively mundane discovery disputes to a new artform in an effort to malign Cognizant and gain an advantage on the merits.

As depositions and other discovery have revealed, Plaintiffs face significant challenges on the merits.   Indeed, when this case finally reaches the class certification stage, it will be clear that Plaintiffs cannot satisfy Rule 23's requirements.   Whether that is the reason for Plaintiffs' decision to continue to push this case towards a string of discovery battles and a request to extend the schedule rather than proceeding to the

3

merits, however, is beyond the scope of the present dispute; as are Plaintiffs' unfounded and hyperbolic allegations that attempt (in ways wholly unrelated to the present issue before the Court, or even this case) to paint Cognizant monolithically as some bad actor.

Plaintiffs' brand new focus on "margin optimization" as the now allegedly central theory of their case makes this clear. This new focus happens to coincide with an inadvertent and unfortunate error stemming from a typo in the name of a single custodian—Sriram Rajagopal—a mistake that Cognizant discovered and promptly disclosed. Based on that error, which resulted in the production of thousands of documents from the wrong custodian (something Plaintiffs could have also caught), Plaintiffs accuse Cognizant of collecting thousands of documents from the wrong custodian *on purpose*. They also allege that, because Mr. Rajagopal's documents are not available (he left the company before Plaintiffs filed this lawsuit), Plaintiffs have been prejudiced and cannot make their case regarding margin optimization. The facts belie Plaintiffs' contention. Plaintiffs had documents, discovery responses, and other information concerning margin optimization well before Cognizant discovered the custodian mix-up, yet they *never once* sought discovery on this issue; nor did they seek discovery on margin optimization *after* disclosure of the custodian mix-up or seek Mr. Rajagopal's deposition. Indeed, there is not a single document request or interrogatory specifically directed at so-called "margin optimization." Tellingly, Plaintiffs deposed the head of Talent Supply Chain just last month and did not ask a single question related to margin optimization.

While Plaintiffs also point to several document collection glitches to claim that custodial ESI was not properly preserved, *many* litigation holds were sent immediately after this case was filed and others issued as soon as Cognizant became aware of an individuals' relevance to the case. With respect to the migration glitch (about which the parties and the Court are already aware), Cognizant has worked diligently to resolve the issue and provide additional documents from custodian .pst files. And, where the Plaintiffs now complain concerning the scope of documents that should have been

collected and produced for custodians, Cognizant is already proceeding to collect and produce documents from custodian OneDrives and laptops. What is missing from all of the noise Plaintiffs make concerning general custodial ESI, however, is any concrete suggestion of what might have been lost, how it prejudiced them, or that there was any intent to deprive them of the use of such materials. Under those conditions, sanctions are unwarranted.

Discovery has not been perfect—on either side—and Cognizant owns the imperfections in its discovery processes. When issues have arisen, however, Cognizant has taken steps to address them and has been transparent with Plaintiffs about those efforts. Despite Plaintiffs' effort to string together the alleged "wrongs" committed by Cognizant—including issues beyond the scope of this case—and cast Cognizant in the most negative light possible, Plaintiffs have not established that they are entitled to the extremely serious adverse inference jury instruction they seek. Certainly, there have been discovery disagreements along the way, as occurs in most hard-fought litigation, but hyperbole and speculation notwithstanding, Plaintiffs cannot reasonably dispute that Cognizant has produced a massive amount of discovery and has affirmatively disclosed and corrected issues as they have arisen.

The other issues Plaintiffs raise—the allegedly "late" production of arbitration agreements and alleged improper communications with class members—are also addressed below, in turn, but these issues are distinct from the core of this motion and the primary relief that Plaintiffs seek.

Furthermore, Cognizant has already agreed to search for and produce additional custodial ESI, thus mooting Plaintiffs' request to compel production. And Plaintiffs' request for additional time in the present joint stipulation is moot, as Plaintiffs have indicated that they will request such further time from Judge Gee pursuant to Local Civil Rule 7.

The Court should deny Plaintiffs' motion for sanctions.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

## II.   SPECIFICATION OF ISSUES IN DISPUTE

The issues in dispute are: (1) whether Cognizant should be sanctioned for spoliating evidence in this case; (2) whether Cognizant should be sanctioned for providing false discovery certifications regarding the location and existence of relevant ESI; (3) whether Cognizant's late production of arbitration agreements warrants Plaintiffs pursuing follow-up discovery on them; (4) whether Cognizant should be sanctioned for its improper and misleading communications with putative class members; and (5) whether Cognizant should be compelled to produce improperly withheld documents and to provide discovery related to such documents after they are produced.

## III.   PARTIES' CONTENTIONS AND POINTS AND AUTHORITIES

### A.   DISCOVERY MISCONDUCT SANCTIONS

#### 1.   *Plaintiffs' Position*

##### a.   Facts

*EEOC's Investigation of Cognizant's "Pattern or Practice of Discrimination"*

On February 5, 2020, the Equal Employment Opportunity Commission ("EEOC") concluded a multi-year investigation into Cognizant's employment practices by determining that "Cognizant engaged in a nationwide pattern or practice of discrimination against non-Indian applicants and employees."[2]  The EEOC found that "since December 4, 2014, [Cognizant] discriminated against a nation-wide class of non-Indian applicants by refusing to hire them on the basis of their race and national origin and against a nation-wide class of non-Indian employees on the basis of race and national origin by removing them from assignments that they were qualified for, refusing to assign them to new projects, and terminating them when they remained unassigned."  Ex. 1 at 766.

---

[2] *See* Ex. 1 (letters of determination discussing finding of a pattern-or-practice of discrimination).

The EEOC began investigating Cognizant following a 2014 charge of discrimination filed with the commission by ███████████.[3] On March 18, 2015, the EEOC expanded the investigation "to include all [of Cognizant's] hiring and selection processes."[4] Cognizant objected to the EEOC's investigation expansion and declined to respond to questions concerning Cognizant's recruitment of international candidates and criticized the EEOC's request for U.S. applicant and employee data as "an improper fishing expedition."[5]   On September 30, 2015, the EEOC responded to Cognizant's recalcitrance by issuing a Commissioner Charge, in which Commissioner Chai Feldblum, for the period of "January 1, 2012 to the present," charged Cognizant with "unlawfully discriminating against Female, African American (Black) and Hispanic applicants and employees based on their gender, race and national origin."[6] The Commissioner Charge formally initiated a nationwide pattern-or-practice discrimination investigation of Cognizant.[7]

*The Central Role of Cognizant's "Margin Optimization" Initiative in its Practice and Pattern of Discrimination, and Cognizant's Prior Counsel's Recognition of Same.*

---

[3] ███████████████████████████████████████████

███████████████████████████████████████ *See* Ex. 2.

[4] *See* Ex. 3 at 638.

[5] *See* Ex. 4 at 649 ("Consequently, at this time, Cognizant respectfully declines to respond to the requests until the Commission can provide some legitimate bases under applicable law for the requests contained in its March 18 letter."); Ex. 5 at 711 ("Even beyond the fact that the requests constitute an improper fishing expedition, they are wildly overbroad.").

[6] *See* Ex. 6 at 308.

[7] *See* Ex. 1 (letters of determination discussing finding of a pattern-or-practice of discrimination).

7

In early 2015, Cognizant introduced a "Margin Optimization" initiative that involved increasing margins through workforce rationalization.[8]  Cognizant employs a project-based employment model, where employees are initially hired for a specific client project, and then are "benched" once their work on that project ends.  3d. Am. Compl. ¶ 16 (Dkt. 146-1).  From the "bench," employees must find a new position on another Cognizant client project through an application and interview process, just like external applicants.  *Id.*  Per the Margin Optimization initiative, "Cognizant began to more stringently enforce its policy and practice that an employee who has been without billable work for some time is transferred to the Practice Deployment Pool ('PDP'), colloquially known as 'the bench.'"[9]  Once benched, employees have five weeks to be placed in another position within Cognizant before they are terminated.[10]

Cognizant's Margin Optimization initiative led to an exponential increase in individual and class-based EEOC charges filed by non-Indians,[11] spanning geographically dispersed and racially diverse victims that generally shared a commonality:  Cognizant's preference for Indian nationals in employment decisions, with a particular point of emphasis on Cognizant's terminations of benched non-Indian employees, per the Margin Optimization initiative.  *See id.*

Morgan Lewis represented Cognizant before the EEOC with respect to both the EEOC pattern and practice investigation and EEOC charges filed by former and existing employees.  In doing so, Morgan Lewis acknowledged in position statements submitted to the EEOC (a) the relevance of the Margin Optimization initiative in increased

---

[8] Ex. 7 at 501 (noting the plan was designed to "become more profitable"); Ex. 8 at 2 (discussing "improvements" to Cognizant's "Workforce Management Process").

[9] Ex. 7 at 501.

[10] *Id.*

[11] *See* Pre-and-Post Margin Optimization Initiative EEOC Charge Filing Chart, attached as Ex. 9.

terminations of benched employees[12] and (b) Talent Supply Chain's responsibility to place benched employees in U.S. positions.[13]   Cognizant's counsel thus knew, and communicated to the EEOC, that the Talent Supply Chain Group and its Margin Optimization initiative were of key relevance to discrimination allegations made to and by the EEOC.

_____

[12] *See* Ex. 7 at 501 ("In early 2015, the Company had begun to more closely examine its bottom-line and had embarked on a campaign to become more profitable. This initiative, known within Cognizant as 'Margin Optimization,' was aimed at increasing operational excellence and efficiency across the Company.  As a part of this effort, Cognizant began to more stringently enforce its policy and practice than an employee who has been without billable work for some time is transferred to the Practice Deployment Pool ('PDP'), colloquially known as 'the bench.' . . . If the [benched] employee is unable to secure a new assignment within [five weeks,] the individual's employment will be terminated.").

[13] *See*, *e.g.*, *id.* ("Once an employee is placed on the bench, the Company provides placement assistance within Cognizant through its Talent Delivery team.  The Talent Delivery team has access to all project openings Company wide and uses its resources to place individuals in any assignment for which they are qualified, without regard to the line of business to which they are currently assigned."); Ex. 10 at 464 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Ex. 11 at 375 ("Once an employee is placed on the CDP, the Company provides placement assistance through its Talent Supply Chain/Talent Delivery Team.  This team assists individuals on the CDP with securing another assignment within Cognizant.  The Talent Supply Chain team has access to all project openings Company-wide and uses its resources to attempt to place individuals on the CDP in all Company business units – not just the line of business to which they are currently assigned. ████████████████████████████████████████████"); Ex. 12 at 764 (████████████████████████████████████████████████████████████████")

Indeed, the Talent Supply Chain Group had dual priorities that led to the exponential increase in discrimination charges filed after implementation of the Margin Optimization initiative. Specifically, Cognizant created through visa fraud an inventory of Indian employees with U.S. work visas,[14] and the Talent Supply Chain Group was instructed to prioritize placement of these "visa ready" employees in U.S. positions.[15] As a result, non-Indian employees were targeted for release per the Margin Optimization initiative, as they were culturally dissimilar to the Indian visa employees and expendable to achieve profit savings.[16]

In 2015, Sriram Rajagopal was the Global Leader of the Talent Supply Chain Group and directed Cognizant's Margin Optimization initiative. Ex. 8 at 2. During the very time

---

[14] *See* 3d Am. Compl. ¶¶ 17-21 (Dkt. 146-1) (detailing visa fraud scheme); Ex. 13 at 272 ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████")

[15] *See, e.g.*, Ex. 13 at 272 (███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████); Ex. 14 at 243 ("██████████████████████ ███████████████████████████████████████"); Ex. 15 at 852 (████████████████████ ████████████████████████████").

[16] Ex. 8 at 1; Ex. 64 at 356 ("█████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████"); *id.* at 355 (███████████████████████████████████████.."); Ex. 65 at 640 ("██████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████).

that Cognizant was being inundated with EEOC charges alleging improper bench terminations, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.""[17]

*Cognizant's Duty To Preserve Documents*

On September 18, 2017, Plaintiffs filed this existing class action discrimination lawsuit, challenging (among other things) Cognizant's pattern-or-practice of prioritizing visa holders from India for U.S. positions and disproportionately benching and terminating non-Indians—the very two policies and practices that Cognizant's Talent Supply Chain administered under Mr. Rajagopal's leadership.[18]

The EEOC's pattern-or-practice investigation, the EEOC charges filed by victims of Cognizant's discriminatory scheme, including the named Plaintiffs' EEOC charges, and Plaintiffs' pattern-or-practice class action lawsuit triggered Cognizant's duty to preserve documents in three different ways.

First, the EEOC's pattern and practice investigation, beginning with the September 30, 2015 Commissioner Charge, required Cognizant to "preserve all personnel records relevant to the charge," including "employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person[.]"[19]  This obligation included preserving "any and all documents and emails related in any way" to the EEOC's investigation.[20]

---

[17] *Id.*  Plaintiffs have a copy of Ex. 8 only because Mr. Franchitti preserved his files, which Cognizant has since sued him for doing.

[18] *See* Compl. ¶¶ 2, 16-24 (Dkt. 1).

[19] *See* Ex. 6 at 307 (quoting 29 C.F.R. § 1602.14).

[20] *See* Ex. 16 at 294.

Second, Cognizant had a similar duty to preserve documents related to each individual discrimination charge filed with the EEOC.[21]  Preservation of Talent Supply Chain documents were thus of critical importance.  This is particularly true of Mr. Rajagopal's documents, given his role in overseeing the Talent Supply Chain's dual priorities (placing visa ready employees in U.S. roles and rationalizing non-Indians per the Margin Optimization initiative).

Third, Plaintiffs' class action lawsuit triggered document retention obligations. When serving their complaint, Plaintiffs also served on Cognizant a document retention letter setting forth Cognizant's document retention responsibilities associated with the complaint.[22]  All potentially relevant and discoverable documents were required to be preserved.[23]

Finally, separate and apart from EEOC and federal court document retention obligations, Cognizant was also required to preserve documents in connection with its role as a federal contractor, including documentation of its compliance with Affirmative Action Plan ("AAP") requirements, documentation of good faith efforts, impact ratio analyses, implementation of an internal audit and reporting system that tracks the degree to which AAP goals are attained, identification of problem areas, identification and execution of action-oriented programs, adverse impact records, and other documents. *See*

---

[21] *See* 29 C.F.R. § 1602.14 ("Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the ADA, or GINA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected.").

[22] *See* Ex. 17 (Plaintiffs' Document Preservation Letter).

[23] *See id.* at 1-2.

41 C.F.R. §§ 60-2.10(c), § 60-2.32, § 60-1.12, 60-3.4, 60-3.15.  Cognizant was also required by law to retain "personnel or employment record[s]," which would include employee emails, "for a period of not less than two years from the date of the record or the personnel action involved, whichever occurs later." *Id.* § 60-1.12.

*Cognizant's Document Retention Practices*

In two different ways, Cognizant encourages employees to save documents either on laptops (*e.g.*, in personal file folders, "PSTs") or in shared Cognizant folders (*e.g.*, OneDrive, SharePoint, and the "Z" drive).

First, Cognizant imposed size limits on the amount of emails employees could store on email servers, ranging from ▓▓▓▓ for lower-level employees to ▓▓▓▓ for the most senior employees.[24]  Employees could not send or receive emails once they reached their size limit for both sending and receiving messages (ranging between ▓▓▓▓ and ▓▓▓▓),[25] and Cognizant instructed employees to either regularly delete emails or move emails into PSTs on laptops.[26]  At the end of 2017, Cognizant started transitioning employees to an Office 365 server, a process that extended for this case's ESI custodians through the end of 2018.[27]  Cognizant's counsel recently represented that the Office 365 server has no email space limitations, meaning that employees would have been able to send and receive an unlimited number of emails once transitioned to Office 365.[28]  Cognizant's corporate policies, though, reflect that employees were always instructed to either delete emails or

---

[24] *See* Ex. 18 at 2-3 (Corporate E-Mail Usage Policy dated July 15, 2019); Ex. 19 at 2 (Corporate E-Mail Usage Policy dated April 26, 2016).

[25] See Ex. 18 at 1-2 ("Associates cannot send and receive e-mail on crossing the threshold value").

[26] *See* Ex. 20 ¶¶ 5, 6; *id.* at Ex. A (Email from Cognizant to V. Piroumian (Feb. 25, 2016) ("Your mailbox is almost full . . . . Please reduce your mailbox size. Delete any items you don't need from your mailbox and empty your Deleted Items folder.")).

[27] Ex. 21 at 13, 15.

[28] *Id.* at 14.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

store them in PSTs.[29]  In any event, prior to being transitioned to Office 365, once the minimum email server size limitations were reached, emails had to be either deleted or stored in PSTs in order for custodians to continue to send and receive email.

Second, Cognizant imposes strict size limitations on documents that can be emailed as attachments.  Employees cannot email an attachment that exceeds ▮▮▮.[30]  Instead of emailing documents, employees are instructed to save (and access) documents on shared drives.[31]  For example, OneDrive has a file folder named "Affirmative Action" where affirmative action files are stored.[32]  Cognizant restricts which executives/employees can access shared drive folders, but once an individual is granted access to a folder, he/she can store and review the documents stored within the folder.[33]  Cognizant's server-based shared drives of which Plaintiffs are aware include SharePoint, OneDrive, and the "z drive," but there may be others that have not been disclosed.

In addition to encouraging employees to save emails to PSTs and store and access documents in shared drive folders, Cognizant also takes server snapshot images, meaning

---

[29] Ex. 18 at 2 ("Associates are requested to manage their mailboxes efficiently by organizing them in 'Folders', creating rules and moving them to Personal Storage File (PST) on their local system and deleting spam e-mails so that they are not running out of the allocated quota space").

[30] Ex. 18 at 2-3.

[31] Ex. 22 at 854 ("Associates should safely store business records on OneDrive for Business."); *id.* at 856 ("Make use of Cognizant authorized and provisioned Microsoft Office 365 strategies such as OneDrive for Business and SharePoint Online for sharing large files internally."); Ex. 23 171:12-174:18 (Kim Dep. Tr.) (testifying that "everyone in Cognizant is supposed to use OneDrive."); *see also*, *e.g.*, Ex. 24 at 045 (sending a link to "Recruiting SharePoint Access & Documents of Interest"); Ex. 25 ("Requesting you to update your comments in SharePoint only and not via emails.").

[32] *See* Ex. 26 ("On the shared drive in the Affirmative Action — Public Folder you will find a short deck with talking points that can be utilized during conversations with your BU at GAP.").

[33] *See* Ex. 27 at 066, attached as Ex. 10 ("Please provide access to the associates below for the following folder: Z:\Affirmative Action – Public Folder.").

---

14

it collects an image of all documents stored on a server at a specific time, and also has backups made of servers.[34]  Cognizant retains its server images and backups for five years.[35]

*Cognizant's Discovery Misconduct*

Plaintiffs first issued discovery requests to Cognizant on January 11, 2019 and the parties exchanged Initial Disclosures on February 11, 2019.[36] [37]

Sriram Rajagopal—the Talent Supply Chain lead overseeing Cognizant's Margin Optimization initiative and visa staffing efforts—was the very first Cognizant executive Plaintiffs named in their Initial Disclosures after listing the Plaintiffs.[38]  Mr. Rajagopal was not identified by name in Cognizant's initial disclosures, but was certainly encompassed within them, as Cognizant incorporated by reference "persons identified in Plaintiffs' initial disclosures."[39]  From the outset, it was thus clear that Mr. Rajagopal would be a critical witness in this case.

Despite Morgan Lewis' identification of the central relevance of the Margin Optimization initiative and the Talent Supply Chain Group to discrimination allegations and despite Plaintiffs' identification of Mr. Rajagopal as the first non-Plaintiff witness in

---

[34] Ex. 28 57:23-58:4 (Fullerton 30(b)(6) Dep. Tr.).

[35] *See id.* 56:22-25 ("Based on my interview with Valerie, the senior manager in our litigation group, Cognizant maintains an image and backups for five years.").

[36] *See* Ex. 29 (Pls.' Initial Disclosures); Ex. 30 (Cognizant's Initial Disclosures).

[37] The parties disputed Plaintiffs' ability to pursue discovery in early 2019, as Cognizant had filed on January 4, 2019 a second Motion to Dismiss directed only at Plaintiffs' disparate impact claims that the Court had not yet decided. *See* Dkt. 48. The Court directed the parties to pursue only mutually agreed-upon discovery areas, such as Initial Disclosures, until it decided Cognizant's second motion to dismiss. *See* Dkt. 53 at 2.

[38] *See* Ex. 29 at 3.

[39] *See* Ex. 30 at 4.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

their initial disclosures, Cognizant has never issued a litigation hold notice—at any point in time—to preserve his documents.[40]

Cognizant's failure to issue a litigation hold on Mr. Rajagopal's files was not the only instance of Cognizant inexplicably failing to include Mr. Rajagopal on a list in what appears to be an effort to shield his files from discovery.  Prior to the parties finalizing custodians, Cognizant sent Plaintiffs an Excel spreadsheet purporting to list "all employees who worked at Cognizant from 2013 to the present and managed one or more individuals" and Mr. Rajagopal's name was nowhere to be found on that list despite his indisputably senior role.  Kotchen Decl. ¶ 1.  Similarly, in a chart responding to Topic 2 of Plaintiffs' 2019 Rule 30(b)(6) deposition notice purporting to list department heads of seven departments—including Talent Supply Chain—from January 1, 2013 forward, Cognizant omitted Mr. Rajagopal's name.[41]  Cognizant later provided a chart listing the supervisors of the department heads it listed in response to Topic 2, and again did not name Mr. Rajagopal.[42]

In addition to failing to issue a litigation hold to Mr. Rajagopal, Cognizant did not send out any litigation hold notices to any custodians in connection with EEOC charges,[43] and waited until years after Plaintiffs filed their complaint to send litigation holds to certain key custodians.  For example, Cognizant waited until 2020 to send litigation holds to either of the individuals in charge of Cognizant's affirmative action program during the class period (Keith Mitchell and Abigail Israel), individuals in Talent Supply Chain and Global Talent (Anand Kabra and Carol Cohen), and the person in charge of Cognizant's

---

[40] *See* Ex. 31 (Cognizant's Litigation Hold List).

[41] *See* Ex. 32 at Topic 2.

[42] *See* Ex. 33 (Topic 2 Reporting Structure (Feb. 18, 2020)).

[43] *See* Ex. 34 at 1 ("Cognizant did not issue litigation holds for each of the individual plaintiffs' EEOC charges.").

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

diversity efforts (Maureen Greene James).[44]  Cognizant will say that it did not send litigation holds to those individuals until 2020 because that was when Plaintiffs sent an official list of custodians, but the centrality of those individuals was clear well before that point.  *See* Kotchen Decl. ¶ 4.

Plaintiffs first grew concerned about document preservation issues on March 7, 2019, when Cognizant sent Plaintiffs a draft ESI Protocol inviting Plaintiffs to negotiate the specific custodian files and ESI categories that Cognizant "should be" preserving.  *See Id*. ¶ 3.  Upon filing their complaint in 2017, Plaintiffs had sent a document preservation letter to Cognizant (Ex. 17), and if Cognizant had any questions as to which documents it "should be" preserving, it should have raised the issue then.  Plaintiffs were also aware of the recent evidence tampering indictment involving Cognizant's Chief Legal Officer and CEO,[45] which raised concerns about fidelity to evidentiary obligations.  Plaintiffs expressed their document preservation concerns to Cognizant, and Cognizant responded that it "has a litigation hold in place."[46]  On March 12, 2019, Plaintiffs asked Cognizant to provide "the specifics of the litigation hold, including to whom the hold was issued, what it covers. . . . [and] how Cognizant has been handling document preservation and production issues in connection with" other matters.[47]  Cognizant declined to provide this information.  *See* Kotchen Decl. ¶ 3.

On August 9, 2019, this Court denied Cognizant's second motion to dismiss.  Dkt. 58.  On August 13, 2019, Plaintiffs issued a Rule 30(b)(6) deposition notice with topics

---

[44] *See* Ex. 31 (listing dates of litigation holds). Litigation holds were not placed on Plaintiffs' email boxes until 2019. *Id.* at 2, 4.

[45] *See* Press Release, DEPARTMENT OF JUSTICE, *Former President and Former Chief Legal Officer of Publicly Traded Fortune 200 Technology Services Company Indicted in Connection with Alleged Multi-Million Dollar Foreign Bribery Scheme* (Feb. 15, 2019), https://www.justice.gov/opa/pr/former-president-and-former-chief-legal-officer-publicly-traded-fortune-200-technology.

[46] *See* Ex. 35 at 3 (Emails Between E. Dooley & D. Kotchen at 3 (Mar. 12, 2019)).

[47] *Id.* at 1.

---

17

concerning, among other things, Cognizant's (a) regular document and data storage locations and (b) steps Cognizant has taken to preserve documents.[48]  Cognizant declined to participate in the deposition and instead provided Plaintiffs with a chart containing responsive information.[49]  During an October 18, 2019 hearing, the parties addressed with the Court whether Plaintiffs' deposition should go forward or whether Plaintiffs should accept Cognizant's chart in lieu of a deposition.  Cognizant understood that the information it provided to Plaintiffs would be used to "frame" Cognizant's "document collection,"[50] and Plaintiffs made clear that they would use the information to discuss with Cognizant the scope of its document production.[51]  After Cognizant represented during the hearing that it filled out the chart "to the best of [its] ability,"[52] the Court encouraged Plaintiffs to accept the chart in lieu of pursuing a deposition.[53]  Plaintiffs agreed.  The Court then reminded the parties of their Rule 16 obligations in connection with information sharing.[54]

---

[48] *See* Ex. 36 at 2 (Pls.' Rule 30(b)(6) Dep. Notice (Aug. 13, 2019)).

[49] *See* Ex. 37 (Chart re Pls.' 30(b)(6) Dep. Notice (Oct. 11, 2019)); Ex. 32 (Am. Chart re Pls.' 30(b)(6) Dep. Notice (Nov. 13, 2019)); Ex. 38 (Am. Chart re Pls.' 30(b)(6) Dep. Notice (Nov. 25, 2019)); Ex. 39 (Am. Chart re Pls.' 30(b)(6) Dep. Notice (Dec. 13, 2019).

[50] Hr'g Tr. 8:22-9:3 (Oct. 18, 2019) ("The 30 B6 notice listed eight topics that were targeted at discovery.  Things like what reports exist?  Where does data reside?  What are the departments that might house the type of information, and documents that they want to collect.  It wasn't merits discovery. ***It's really going towards framing the issues of a document collection***.") (emphasis added).

[51] *Id.* 13:8-10 ("And this is information that we're just trying to get so we can start engaging with [Cognizant] on the scope of production of documents and data.")

[52] *Id.* 9:18-21 ("We put the topics, the subtopics, you know, what are the databases, where are they located, and we filled it out to the best of our ability.")

[53] *Id.* 16:12-13 ("Why don't you use that chart as a springboard for discussion and narrow it down.")

[54] *Id.* 20:21-22 ("I just want to remind all the parties about their Rule 16 obligations.")

In addition to the Rule 30(b)(6) deposition notice, Plaintiffs also issued an interrogatory asking Cognizant to identify by name, location, and content each computer system and electronic database used that related to employment, staffing, and visa issues.[55] In response to these requests, Cognizant was obligated to disclose its use of shared drives, such as OneDrive, SharePoint, or the z drive.

In both its Rule 30(b)(6) chart and interrogatory response, Cognizant identified various programs in which Cognizant stores data, such as Taleo, Peoplesoft, GoPerform, MyCareer, and MyVisa.[56]   But Cognizant omitted from these discovery responses any reference to its use of shared drives.

When Plaintiffs took a Rule 30(b)(6) deposition in August 2021 on document preservation, Cognizant failed to prepare the witness to testify about the use of shared drives, and instructed the witness not to answer questions related to document collection from shared drives.  Ex. 38 38:5-16, 114:14-115:6; Dkt. 153.

Cognizant was required to disclose its use of shared drives because, for example, Cognizant instructs employees to store "business records on OneDrive for Business,"[57] delete business records from laptop hard drives once stored on OneDrive,[58] and use OneDrive link features available in Microsoft Office 365 email (as well as SharePoint Online) to electronically transmit OneDrive files.[59]   A Cognizant executive recently testified about Cognizant's extensive OneDrive use, testifying that "[w]e are instructed

---

[55] *See* Ex. 40 at 19 (Cognizant's Resps. to Pls.' Interrogs., Set 1 at 19 (Aug. 30, 2019)).

[56] *See* Ex. 37 at 1-3; Ex. 40 at 10-12.

[57] *See* Ex. 22 at 854 ("Associates should safely store business records on OneDrive for Business.  For more information visit the Be.Cognizant OneDrive site.").

[58] *Id.* at 855 ("You should then ensure the information is securely stored on OneDrive and delete the information from your hard drive.").

[59] *Id.* at 856 ("Make use of Cognizant authorized and provisioned Microsoft Office 365 strategies such as OneDrive for Business and SharePoint Online for sharing large files internally.").

19

1  [by Cognizant] to save everything [to] this OneDrive [document folder]," and that "I think
2  everyone in Cognizant is supposed to use OneDrive." *See* Ex. 23 171:12-174:18.  And
3  contemporaneous documents reflect that, before OneDrive was implemented, Cognizant
4  used the z drive to share documents.[60]  In addition, Cognizant's server policies precluded
5  emailing any document that exceeded ████ in size, meaning that many power point
6  presentations and other sizeable documents could be shared only via a shared drive.

7         Cognizant argues that it was not required to disclose the OneDrive because it
8  interpreted Topic 4 of Plaintiffs' 2019 Rule 30(b)(6) deposition notice as seeking
9  databases or systems used by *departments* rather than individual people.[61]  Cognizant's
10  semantic argument is form over substance.  Cognizant must authorize individuals to access
11  shared drive folders, and grants access based on the department/unit to which individuals
12  are assigned.[62]  Moreover, many of the custodians were *department heads* who would
13  undoubtedly have used shared drives to store and access documents, as would have their
14  team members.[63]  Mr. Rajagopal, for example, was the Global Lead of the Talent Supply
15  Chain Group.  This group would have had shared drive folders that he and his team
16  members could access that would thus have constituted databases or systems used by a
17  department.  Additionally, Cognizant represented in its 30(b)(6) chart that the storage
18  location was "unknown" for "Departments involved in Affirmative Action."  *See* Ex. 37
19  at 6.  Yet Plaintiffs have learned that both the OneDrive and z drive have a file folder
20  named "Affirmative Action" where affirmative action files are stored.  *See, e.g.,* Ex. 41 at
21  065 ("On the shared drive in the Affirmative Action — Public Folder you will find a short
22  deck with talking points that can be utilized during conversations with your BU at GAP.
23  Z:\Affirmative Action- Public Folder\2015\TAG Decks"); Ex. 42.

24
25      [60] *See* Ex. 41 at 065; Ex. 42.
26      [61] Ex. 21 at 2-3.
27      [62] *See* Ex. 41 at 066; Ex. 43 ¶ 2 (Goldberg Decl.).
28      [63] *See* Ex. 38 at Topic 2.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

Cognizant's explanation is also lacking because Plaintiffs specifically asked Cognizant to supplement its 30(b)(6) chart by providing "complete information" on Topic 4, including by identifying its email server and "other servers containing responsive documents."[64]   On December 13, 2019, Cognizant updated its chart to indicate that "Cognizant maintains emails and responsive documents primarily on Office 365" and identified some on-premises email servers, but again, failed to disclose its use of OneDrive, SharePoint, the z drive, and any other shared drive.[65]   The information provided was not department-specific; it simply omitted Cognizant's use of shared drives.

The parties then undertook the process of negotiating and agreeing upon a corpus of custodians whose files Cognizant would search for responsive documents, using agreed upon search terms.   On February 24, 2020, Plaintiffs sent Cognizant a list of 33 custodians (including all 23 that the parties ultimately agreed upon) and asked Cognizant to confirm that it had "preserved the email boxes and files for these custodians."[66]   Similar to Cognizant's response to Plaintiffs' March 12, 2019 document preservation request, Cognizant again elected not to identify whose files had been preserved.   The process of narrowing the list of 33 custodians was contentious, in large part because Cognizant refused to share information about whose files it had preserved and whose it had not.[67] The parties ultimately agreed that Cognizant would collect and search ESI for 23 custodians, one of whom was Sriram Rajagopal—the Talent Supply Chain lead who oversaw Cognizant's Margin Optimization initiative and visa staffing practices.[68]

---

[64] Ex. 44 (Email from L. Grunert to Cognizant at 1-2 (Oct. 21, 2019)).

[65] Ex. 39 at 22-25.

[66] *See* Ex. 45 at 2-3 (Email from L. Grunert to Cognizant (Feb. 24, 2020)).

[67] *See* Ex. 46 (Emails from L. Grunert and E. Dooley (June 24-July 2, 2020)).

[68] *Id.* at 3 (list of custodians, including Sriram Rajagopa[l], to which Keith Mitchell was later added).

Cognizant then made three decisions without informing Plaintiffs.  First, Cognizant elected not to interview custodians to determine where custodial ESI was stored and accessed,[69] nor did Cognizant collect and image devices used by custodians for searching purposes.[70]

Second, Cognizant elected to limit its custodial document collection to only server-stored emails.  Cognizant had previously committed to Plaintiffs that it would search both files and emails of ESI custodians,[71] and made the same representations to the Court.[72]

Limiting its collection of custodial ESI to only server-based emails ensured that Plaintiffs would not receive any documents stored on shared drives, stored in PSTs, stored on hard drives, or that exceeded ▉▉▉▉ in size, as documents of that size could not be sent via email.  *See* Ex. 18 at 2-3.  The net effect of this approach, as discussed further below, was to skew Cognizant's document production to small documents (*e.g.*, almost entirely emails) created in 2018, 2019 and 2020, well after Plaintiffs filed their complaint and—critically—well after Cognizant's 2015 Margin Optimization initiative, the very initiative that increased exponentially discrimination claims against Cognizant.

Third, Cognizant surreptitiously substituted out Sriram Rajagopal as an ESI custodian and, in his place, substituted in a much more junior custodian who joined

---

[69] *See* Ex. 34 at 1 ("We have confirmed that Cognizant did not conduct custodian interviews regarding the ESI being collected")

[70] Cognizant did not collect laptops until 2021.  *See id.* ("Upon discovering the glitch resulting from the migration, we promptly began identifying the location of and collecting laptops for the custodians").

[71] *See* Ex. 46 at 20 ("Of Plaintiffs' 33 ESI custodians, Cognizant has agreed to search the files and email boxes of just 11 custodians and has objected to the remaining 22.").

[72] *See* Jt. Stip. at 44 (Dkt. 80-1) (agreeing to produce "[w]ith respect to production of custodian ESI, . . . relevant, non-privileged emails of the custodians selected as well as d*ocuments maintained electronically and within their possession, custody, and control*") (emphasis added).

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

Cognizant in 2018 and had a similar name:  Sriram Rajagopalan.[73]  Cognizant then produced Mr. Rajagopalan's documents and claimed they were in fact Mr. Rajagopal's documents.[74]  Cognizant disclosed its custodian substitution only after Plaintiffs identified alarming document production irregularities and issued a Rule 30(b)(6) deposition notice directed at document preservation and collection issues.[75]  By substituting out Mr. Rajagopal as an agreed-upon ESI custodian and substituting in Mr. Rajagopalan, Cognizant ensured that Plaintiffs would be deprived of critical discovery concerning Cognizant's Margin Optimization initiative and its visa staffing practices, both of which Mr. Rajagopal oversaw and directed as the Talent Supply Chain lead.

There is ample evidence that substituting out Mr. Rajagopal was no accident or, at the very least, the result of gross negligence, if not willfulness.  For starters, Plaintiffs' initial proposed list of ESI custodians specifically identified Mr. Rajagopal *of the Talent Supply Chain group*.[76]  Cognizant initially opposed Mr. Rajagopal's inclusion in two sets of counterproposals and during two meet and confer calls.  Kotchen Decl. ¶ 2; Ex. 46 at 15.  On June 11, 2020, Plaintiffs challenged Cognizant as having no "good faith basis" for excluding Mr. Rajagopal as an ESI custodian, and Cognizant thereafter agreed to include Mr. Rajagopal on June 16, 2020.[77]  Given the extended negotiation leading to Mr. Rajagopal's inclusion as an ESI custodian, Cognizant clearly understood *who* he was and his role at Cognizant when it ultimately agreed to include him.

In addition, before Plaintiffs identified document production irregularities in April 2021, Cognizant never sent a litigation hold to preserve files of either Mr. Rajagopal *or*

---

[73] *See* Ex. 47 (Email from E. Dooley to Pls. (July 22, 2021)).

[74] *See* Ex. 48 at 1 ("As noted by email yesterday, today, you will receive a link to download a production that contains ESI from the PST files of fifteen of the twenty-three agreed-upon custodians—[including] . . . Sriram Rajagopa[l]").

[75] *See* Ex. 49 at Ex. 2 to Apr. 22, 2021 letter (Pls.' Rule 30(b)(6) Dep. Notice).

[76] *See* Ex. 29 at 3.

[77] *See* Ex. 46 at 15, 21.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

Mr. Rajagopalan.  Cognizant issued a litigation hold to Mr. Rajagopalan on May 4, 2021— a full year after it had issued legal holds to other custodians—only after Plaintiffs issued a Rule 30(b)(6) document preservation deposition notice in April 2021.[78]  Cognizant's counsel has no explanation for why Mr. Rajagopalan received a litigation hold a full year after any other custodian in this case, and Cognizant's counsel refused to allow questioning about Mr. Rajagopal's documents at the Rule 30(b)(6) document preservation deposition. Ex. 28 27:7-30:24.

Cognizant has claimed that the Mr. Rajagopalan's documents were collected instead of Mr. Rajagopal's because Cognizant's counsel left the "l" off the end of Mr. Rajagopal's name in certain communications.[79]  But Cognizant has refused to disclose who exactly interpreted the name "Rajagopa" to be Mr. Rajagopalan as opposed to Mr. Rajagopal, if there was indeed a misspelling in internal correspondence to document collectors, or why clarification of the misspelled name was never sought.  Presuming the relevant custodian would be Mr. Rajagopalan instead of Mr. Rajagopal makes no sense and is highly prejudicial to Plaintiffs.  While Mr. Rajagopalan is a Hiring Manager for the ████ client project,[80] Mr. Rajagopal was the Global Lead, Talent Supply Chain during implementation of the Margin Optimization initiative—quite likely this case's single most relevant position.  When Plaintiffs tried to obtain information about this issue during the 30(b)(6) deposition, Cognizant wrongfully instructed the witness not to answer.[81]  During a meet and confer call on November 11, 2021, Cognizant's Counsel stated that she "did not know" how the mistake was made or who made it.  Kotchen Decl. ¶ 2.

*Discovery Misconduct Prejudice*

---

[78] *See* Ex. 31 at 4 (Cognizant's Litigation Hold List).

[79] *See, e.g.,* Ex. 48 at 1, Ex. 46 at 3.

[80] *See* Ex. 50 at 384.

[81] *See* Ex. 28 27:1-24, 29:9-30:24.

Cognizant's discovery misconduct has prejudiced Plaintiffs and the Court in at least four distinct ways. First, documents from Mr. Rajagopal have been lost, as Cognizant disclosed that his documents no longer exist.[82] Cognizant will argue that the loss of Mr. Rajagopal's documents is not sanctionable because he resigned from Cognizant five months before Plaintiffs filed this case (but six months after the named Plaintiffs' filed their EEOC charges and two years after the EEOC opened its pattern or practice investigation). Cognizant continued to have a responsibility to preserve Mr. Rajagopal's documents, as Cognizant continued to have custody and control of his documents even after his resignation. For example, by the time Plaintiffs filed their suit, Mr. Rajagopal's documents would have been (a) on Cognizant's server unless immediately wiped, which itself would be indicative of bad faith; (b) captured in server images, which are supposed to be preserved for five years; and (c) captured in server backups, which are also supposed to be preserved for five years. Cognizant's argument that it need not preserve documents of former employees like Mr. Rajagopal is belied by the fact that it issued in this case litigation hold notices instructing its IT department to preserve the files of *twenty* former employees, including each of the Plaintiffs, all of whom departed Cognizant well before Mr. Rajagopal.[83] Clearly Cognizant continues to possess and preserve documents of former employees even after they depart. *See*, *e.g.*, Ex. 31. But that did not happen for Mr. Rajagopal.

Second, documents from other critical custodians were lost. By failing to interview and collect files from custodians early in the discovery process (Cognizant waited until August 2021 to interview custodians), Cognizant allowed the loss of ESI from computers of most of the 23 agreed-upon custodians.[84] Some custodians left Cognizant without

---

[82] *See* Ex. 47 ("Cognizant does not have documents for Mr. Rajagopal.")

[83] *See id.*; Ex. 31 (Cognizant's litigation hold list)

[84] *See* Ex. 51 (chart of production of documents by year and custodian); Ex. 52 (chart of ESI lost from custodian laptops).

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

returning their computers, depriving Plaintiffs of the computer-stored documents.[85]  Other custodians gave their computers to Cognizant's counsel in mid-2021 but, for one reason or another (*e.g.*, no user profile, software error, no .pst file on laptop, hard drive not readable, ransomware attack, etc.), documents could not be collected from the computers.[86]  Other custodians had computers that were simply missing, unable to be located, or that Cognizant's counsel did not know existed even after they were interviewed.[87]  For example, R. Mohan was an immigration executive whose computer apparently could not be located even though he was an existing Cognizant employee, meaning that he was apparently working for an IT company without a computer in his possession.  Mr. Mohan then left Cognizant without his computer ever having been found, such that Plaintiffs and the Court will never know what documents he actually possessed.[88]  In a deposition of Mr. Mohan's immigration colleague, Helen Kim, Ms. Kim was instructed not to answer when asked if Cognizant had terminated Mr. Mohan.[89]

Third, documents from this case's most critical time frame—the design and implementation of the Margin Optimization initiative—have been lost.  By confining its initial search of documents to only server-based emails, Cognizant ensured that Plaintiffs were deprived access to (a) PST files (which had to have been used given email size limits), (b) shared-drive documents, including documents that exceeded ███ in size (as documents of that size could not be emailed), and (c) files stored on laptops.  Plaintiffs

---

[85] Ex. 52 at 1 (Vipul Khanna).

[86] *Id.* at 1-2 (8 custodians).

[87] *Id.* at 1-2 (Venugopal Lambu, R. Mohan); Ex. 23 170:12-24 (Helen Kim testifying to having around 4 Cognizant laptops); Ex. 53 167:5-23 (Padmanabhan Dep. Tr.) (testifying to upgrading laptop every few years and returning older laptops to Cognizant).

[88] Ex. 52 at 1.  Mr. Mohan produced only 414 emails in total, compared to Ms. Kim, who held a similar position and produced 5,286.  *See* Ex. 51 at 1-2.

[89] Ex. 23 24:23-26:7.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

have clearly been prejudiced.  For example, even though the discovery period dates back to 2013, 70% of the emails Cognizant has produced in this case were sent in 2018 or later,[90] after Plaintiffs filed suit and after Cognizant had consciously sanitized its written communications to avoid language reflecting discriminatory intent.  *See* Ex. 66 (June 4, 2020 e-mail stating that "we typically do not use any visa references in any written communication.").

Fourth, Cognizant has deprived Plaintiffs the right to structure and sequence discovery in a manner that comports with fair due process.  Had Cognizant disclosed to Plaintiffs at discovery's outset—as required in discovery certifications and disclosures—Cognizant's policy and practice of encouraging storing and sharing of documents via shared drives and limiting the ability of custodians to send and keep documents on laptops, Plaintiffs would have ensured Cognizant timely produced these available documents with enough time for Plaintiffs to conduct follow-on discovery based on that production.  Instead, since Cognizant did not disclose its use of shared drives, Plaintiffs had to rely on Cognizant to search and produce responsive information of these document repositories, which Cognizant unilaterally decided not to do.

Perhaps the best indication of prejudice to Plaintiffs and the Court from Cognizant's discovery misconduct is reflected in how few documents Cognizant produced concerning the Margin Optimization initiative's design and implementation.  While Cognizant produced 532 documents in this case that hit on the term "margin optimization," it is clear that this limited set of documents do not reflect the core of the communications and documents that must have existed for this $300 million initiative.  Most of the documents produced contain merely ancillary references to the Margin Optimization initiative, such as repeated references to a "marginoptimization" email address in documents, numerous resumes, numerous presentations of people petitioning for promotions, a repeated weekly call reference, and other passing or unenlightening references to the initiative.  Kotchen

---

[90] *See* Ex. 51.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

Decl. ¶ 9.   However, the documents that include Mr. Rajagopal that are substantive
highlight the critical importance of his documents.  On January 12, 2015, Mr. Rajagopal
emailed the following, which was produced from the files of Anand Kabra:[91]

*See* Ex. 68 (emphasis added).

This email represents only the absolute tip
of the iceberg of Mr. Rajagopal's communications and documents, particularly
considering that Mr. Rajagopal (a) was the Talent Supply Chain lead, (b) was thus charged
with setting and implementing corporate policy, (c) had numerous direct reports, and (d)
was interfacing with each business unit concerning the Margin Optimization initiative.
Depriving Plaintiffs of his files ensured that smoking gun evidence of illegality from the
files of the corporate policy maker himself would not be discovered.

        **b.**    **Legal Standard**

        **(i)**    **Spoliation**

A party to litigation has "an uncompromising duty to preserve relevant records."
*See Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir. 1996).  Rule 37(e)

---

[91] This email was not sent directly to Mr. Kabra from Mr. Rajagopal, but was
fortuitously forwarded to Mr. Kabra from another employee to whom Mr. Rajagopal
sent the email.

1   allows for sanctions "when a party destroys, significantly alters, or fails to preserve

2   evidence in pending or reasonably foreseeable litigation." *Oppenheimer v. City of La*

3   *Habra*, No. SACV 16-00018 JVS (DFMx), 2017 WL 1807596, at *3 (C.D. Cal. Feb. 17,

4   2017); Fed. R. Civ. P. 37(e).  "If electronically stored information that should have been

5   preserved in the anticipation or conduct of litigation is lost because a party failed to take

6   reasonable steps to preserve it, and it cannot be restored or replaced through additional

7   discovery, . . . the court: [] upon finding prejudice to another party from loss of the

8   information, may order measures no greater than necessary to cure the prejudice."  Fed.

9   R. Civ. P. 37(e).[92]  Further, "upon finding that the party acted with the intent to deprive

10  another party of the information's use in the litigation," the Court may "presume that the

11  lost information was unfavorable to the party," "instruct the jury that it may or must

12  presume the information was unfavorable to the party," or "enter a default judgment."

13  Fed. R. Civ. P. 37(e)(2).

14      In addition, district courts have "the inherent discretionary power to make

15  appropriate evidentiary rulings in response to the destruction or spoliation of relevant

16  evidence" as part of their inherent power to manage their own affairs so as to achieve

17  the orderly and expeditious disposition of cases.  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329

18  (9th Cir. 1993); *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, No.

19  EDCV141926JAKSPX, 2016 WL 6609208, at *16–17 (C.D. Cal. July 12, 2016)

20  ("Having found spoliation of ESI, it is within the Rules and the court's inherent power

21  to impose sanctions. Fed. R. Civ. P. 37(b)(2), (e)").  "Under either authority, sanctions

22  may issue when the aggrieved party shows that "(1) the party having control over the

23  evidence had an obligation to preserve it when it was destroyed or altered, (2) the

24  destruction or loss was accompanied by a culpable state of mind, and (3) the evidence

25  ───────────────

26      [92] The "'applicable standard of proof for spoliation in the Ninth Circuit appears to

27  be by a preponderance of the evidence.'"  *Ramos v. Swatzell*, No.
    EDCV121089BROSPX, 2017 WL 2857523, at *5 (C.D. Cal. June 5, 2017) (citation
    omitted) (finding it more likely than not that there was a failure to preserve).

28

1   that was destroyed or altered was relevant to the claims or defenses of the party that

2   sought the discovery of the spoliated evidence." *Clear-View Techs., Inc. v. Rasnick*, No.

3   5:13-CV-02744-BLF, 2015 WL 2251005, at *7 (N.D. Cal. May 13, 2015) (footnotes

4   omitted).

5        "A party's destruction of evidence need not be in 'bad faith' to warrant a court's

6   imposition of sanctions." *Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1066

7   (N.D. Cal. 2006).  "District courts may impose sanctions against a party that merely had

8   notice that the destroyed evidence was potentially relevant to litigation." *Id*. (citations

9   omitted).  "However, a party's motive or degree of fault in destroying evidence is

10  relevant to what sanction, if any, is imposed." *Id*. at 1066-67 (citations omitted).

11       While "[t]he Ninth Circuit has also yet to clearly articulate the degree of

12  culpability necessary to warrant an adverse inference instruction. . . . courts have found

13  that an adverse inference instruction may be warranted where the destruction was either

14  willful or grossly negligent." *Christoffersen v. Malhi*, No. CV-16-08055-PCT-JJT,

15  2017 WL 2653055, at *5 (D. Ariz. June 20, 2017) (granting request for an adverse

16  inference based on gross negligence in case proceeding under Rule 37(e) and the court's

17  inherent authority); *Doe v. Bridges to Recovery*, LLC, No. 2:20-CV-348-SVW, 2021

18  WL 4690830, at *15 (C.D. Cal. May 19, 2021) (ordering an adverse inference where

19  party's "failure to preserve evidence was at least grossly negligent"); *Surowiec v. Cap.*

20  *Title Agency, Inc.*, 790 F. Supp. 2d 997, 1008-09 (D. Ariz. 2011) (adverse inference

21  instruction based on a finding of gross negligence); *In re Napster, Inc.*, 462 F. Supp. 2d

22  at 1078 (ordering adverse inference instruction where party's destruction of evidence

23  amounted to "gross negligence, if not willfulness, which is sufficient culpability to

24  justify an adverse inference").

25                    **(ii)    False Certifications**

26       Rule 26(g) "imposes an affirmative duty to engage in pretrial discovery in a

27  responsible manner," and is "designed to curb discovery abuse by explicitly encouraging

28  the imposition of sanctions."  *See* Fed. R. Civ. P. 26(g) committee note to 1983

amendment.  Under Rule 26(g), a signature on a discovery response is a certification that that a disclosure is "complete and correct at the time it is made."  In making such a certification, "the investigation undertaken by the attorney and the conclusions drawn therefrom [must be] reasonable under the circumstances."  *Ober v. Cty. of L.A.*, No. C V 10-10032-DMG SHX, 2014 WL 2504504, at *7 (C.D. Cal. Mar. 27, 2014).  If a party later learns that a previous disclosure was incomplete or incorrect, it must take corrective action in a timely manner.  *See Knudsen v. City & Cty. of San Francisco*, No. 12-CV-01944-JST, 2014 WL 295756, at *3 (N.D. Cal. Jan. 27, 2014).

Courts have recognized that Rule 26(g) extends to written correspondence about discovery.  *United States v. Dish Network, L.L.C.*, No. 09-3073, 2015 WL 5970446, at *11 (C.D. Ill. Oct. 13, 2015) (citing *Phinney v. Paulshock*, 181 F.R.D. 185, 204 (D.N.H. 1998)) ("An attorney's letter to opposing counsel that makes representations about a discovery production, . . . is subject to the requirements of Rule 26(g)."); *Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 221 n.28 (S.D.N.Y. 2003), adhered to on reconsideration, No. 00 CIV. 3613 (LAP), 2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004) (citing *Phinney*, 181 F.R.D. at 203-04) ("Sanctions may be imposed under Rule 26(g) for false statements in letters about completeness of disclosure as well as in formal responses to document requests."); *see also Legault v. Zambarano*, 105 F.3d 24, 28 (1st Cir. 1997) (finding Rule 26(g) violated where documents defendants failed to produce were in their possession and would have been located if defendants had conducted a reasonable search).

The Court, "on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both," when a certification violates Rule 26(g)(1) without substantial justification.  Fed. R. Civ. P. 26(g)(3).  "The point of Rule 26(g) is to hold someone personally responsible for the completeness and accuracy of discovery responses."  *HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12CV2884-

1   BAS-MDD, 2015 WL 4714908, at *13 (S.D. Cal. Aug. 7, 2015), *vacated in part on*
2   *other grounds*, 171 F. Supp. 3d 1020 (S.D. Cal. 2016).[93]

3       Moreover, pursuant to Local Rule 83-3.1, "[w]hen alleged attorney misconduct is
4   brought to the attention of the Court, . . . the Court may, in its discretion, dispose of the
5   matter through the use of its inherent, statutory, or other powers; refer the matter to an
6   appropriate state bar agency for investigation and disposition; refer the matter to the
7   Standing Committee on Discipline; or take any other action the Court deems
8   appropriate." L.R. 83-3.1. "These procedures are not mutually exclusive." *Id.*

9       Plaintiffs seek appropriate discovery sanctions against Cognizant because it has
10  repeatedly made false and misleading Rule 26(g) certifications without substantial
11  justification that have prejudiced the Plaintiffs' and the putative classes' ability to fully
12  prosecute their claims.  Cognizant has falsely omitted its use of shared drives and has
13  deceptively chose *not* to include in its custodial production *any* non-email documents
14  and any custodial emails or documents stored in shared drives.

15          c.    **Argument**

16              **(i)    Cognizant Spoliated Evidence**

17              **1)    Cognizant was on Notice of its Duty to Preserve**

18      The duty to preserve evidence runs "from the moment that litigation is reasonably
19  anticipated." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132, 1136 (N.D.
20  Cal. 2012).  Courts are clear that the duty to preserve evidence attaches even before
21  litigation is initiated. *See Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982
22  F.2d 363, 369 (9th Cir. 1992) (upholding district court's exclusion of plaintiff's expert
23  testimony based on evidence destroyed by plaintiff two years before filing suit).
24  Evidence that a party actually foresaw litigation is also probative.  *See Waymo LLC v.
25  Uber Techs.*, No. C 17-00939, 2018 WL 646701, at *15 (N.D. Cal. Jan. 30, 2018).  The
26  duty pertains to documents and information relevant to the claims or defenses of any

27  _____
    [93] The sanctions order in this case was later vacated as moot after the parties
28  settled.  *See HM Elecs., Inc.*, 171 F. Supp. 3d 1020, (S.D. Cal., Mar. 15, 2016).

1    party or prepared by individuals likely to have discoverable information, including

2    "those employees likely to have relevant information—the 'key players' in the case."

3    *Apple*, 881 F.Supp.2d at 1137 (quotation omitted); *see also In re Napster, Inc. Copyright*

4    *Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006) ("[a]s soon as a potential claim is

5    identified; a litigant is under a duty to preserve evidence which it knows or reasonably

6    should know is relevant to the action.") (quoting *Zubulake v. UBS Warburg LLC*, 220

7    F.R.D. 212, 216 (S.D.N.Y.2003).

8        Here, it is clear that a reasonable party in Cognizant's circumstances would have

9    anticipated litigation at least as early as September 30, 2015 (the date of the

10   Commissioner Charge), as well as throughout 2016 and 2017 in connection with

11   numerous EEOC charge filings (including from the named Plaintiffs), and at the very

12   least when Plaintiffs filed their lawsuit on September 19, 2017.  *See* Ex. 6; Ex. 9; *see*

13   *also*, *e.g.*, *Hamilton v. Signature Flight Support Corp.*, C 05-0490 CW (MEJ), 2005 WL

14   3481423, at *5 (N.D. Cal. Dec. 20, 2005) (finding that plaintiff's previous complaint of

15   discrimination put defendant on notice of its duty to preserve); *Montoya v. Orange Cty.*

16   *Sheriff's Dep't*, No. SACV 11-1922 JGB, 2013 WL 6705992, at *8 (C.D. Cal. Dec. 18,

17   2013) (in action alleging discrimination, duty to preserve arose prior to commencement

18   of action, when plaintiff filed a workers' compensation claim alleging injury resulting

19   from ongoing workplace harassment); *Surowiec v. Capital Title Agency, Inc.*, 790 F.

20   Supp. 2d 997, 1005-06 (D. Ariz. 2011) (letter from third party warning that plaintiff

21   might sue sufficient to create a reasonable apprehension of suit).

22       Additionally, Cognizant's retention of counsel in connection with EEOC charge

23   filings shows that it actually anticipated suit.  *Waymo LLC v. Uber Techs.*, No. C 17-

24   00939, 2018 WL 646701, at *15 (N.D. Cal. Jan. 30, 2018) (finding that defendant

25   "*actually* foresaw" litigation where it "consulted and retained [ ] litigation counsel to

26   obtain legal advice regarding potential liability exposure," retained another firm to

27

28

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1    perform "a due diligence investigation," and then asserted privilege over such

2    activities).[94]

3            While Cognizant claims that it did not anticipate the "scope of this case" during

4    the EEOC investigations,[95] this claim is not credible.  First, the EEOC was conducting

5    a pattern-or-practice investigation and at least one charging party made class-wide

6    allegations.[96]   Second, following its Margin Optimization initiative implementation,

7    Cognizant knew that its newly-enforced, margin-enhancing benching and termination

8    policy was leading to an exponential increase in EEOC discrimination charges –

9    including the charges filed by the named Plaintiffs in this case – as reflected by Morgan

10   Lewis' representations to the EEOC.   *See* Section III(A)(1)(a), *supra.* Cognizant thus

11   knew (or should have known) that Margin Optimization documents were required to be

12   preserved.   Finally, Cognizant did not impose *any* litigation holds prior to this

13   litigation.[97]

14                   **2)      Cognizant Breached its Duty to Preserve**

15           "Once a party reasonably anticipates litigation, it must suspend its routine

16   document retention/destruction policy and put in place a 'litigation hold' to ensure the

17   preservation of relevant documents."   *Zubulake*, 220 F.R.D. at 218; *see also*

18   *Oppenheimer*, 2017 WL 1807596, at *3 (To comply with its duty to preserve, a party

19   must "'suspend any existing policies related to deleting or destroying files and preserve

20   all relevant documents related to the litigation.'") (citation omitted).   Further, "the

21   implementation of a litigation hold is only the beginning of compliance with a party's

22   discovery obligations, and [c]ounsel must oversee compliance ... [and] monitor[] the

23   party's efforts to retain and produce the relevant documents."  *Al Otro Lado, Inc. v. Wolf*,

24   _____

25           [94] *See also Zubulake*, 220 F.R.D. at 216 (reasonable anticipation of suit existed
     where "the relevant people" recognized and discussed "the possibility" of a lawsuit).

26           [95] Ex. 9 at 15 (Ltr. from K. Smith to Pls. (Nov. 9, 2021)).

27           [96] *See*, *e.g.*, Ex. 60 at 476 (alleging class-wide discriminatory practices).

28           [97] *See* Ex. 7.

No. 317CV02366BASKSC, 2021 WL 631789, at *6 (S.D. Cal. Feb. 18, 2021) (citations and quotation marks omitted).  There is a "continuing obligation on parties to educate themselves on their document storage[.]"  *City of Colton v. Am. Promotional Events, Inc.*, No. CV0906630PSGSSX, 2011 WL 13223968, at *4 (C.D. Cal. Nov. 28, 2011); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("In short, it is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched."); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 630 (D. Colo. 2007) (noting that although the party implemented a litigation hold shortly after litigation was commenced, counsel did not properly supervise whether the hold led to complete document production).  When parties are sophisticated about ESI and are represented by counsel, they are held to a higher standard of reasonableness in their preservation effort.  Fed. R. Civ. P. 37(e) committee note to 2015 amendment.

Here, Cognizant acted unreasonably in multiple respects.  First, Cognizant never sought to preserve Mr. Rajagopal's documents.

Second, Cognizant waited to send out litigation holds to a subset of custodians on September 27, 2017, and for other custodians (including senior personnel in key departments) waited to send litigation holds until 2019, 2020, and even 2021. *See* Ex. 31; *see also Wolf*, 2021 WL 631789, at *6 ("failure to timely issue a hold notice to [a senior person] is an independent breach of their duty of preservation, because it was incumbent upon defendants' senior personnel to 'communicate' the organization's preservation obligations 'to employees in possession of discoverable materials.'").

Even after implementing a litigation hold, Cognizant did not suspend server size limits and did not alter its policy of encouraging employees to delete emails.  *See* Ex. 20 at Ex. A; Ex. 18 at 2; Ex. 22 at 1; Ex. 34 at 1; *cf. Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 996-97 (N.D. Cal. 2012) (party "destroyed documents after its duty to

preserve had already arisen" where party did not immediately send a litigation hold notice to certain custodians, and "[d]uring that time . . . some employees may have been encouraged to keep the size of their email accounts below certain limits, and moreover may have received automatic notices requesting that they reduce the size of their email accounts.").  Those custodians that did not delete emails stored emails that did not fit on servers on their hard drives, from which Cognizant failed to collect.  *See* Ex. 21 at 14.

Third, Cognizant "failed to conduct timely custodian interviews[;] [a]s a result . . . key repositories of ESI were left unidentified, and substantial data was lost."  *Small v. Univ. Med. Ctr.*, No. 2:13-CV-0298-APG-PAL, 2018 WL 3795238, at *18 (D. Nev. Aug. 9, 2018) (imposing adverse inference instruction and monetary sanctions where, *inter alia*, failure to conduct timely custodian interviews violated "the legal obligation to identify, locate, maintain and produce information relevant to specific, predictable, and identifiable claims and defenses"); Ex. 34 at 1 (admitting that "Cognizant did not conduct custodian interview regarding the ESI being collected" prior to August 2021 interviews).

Finally, Cognizant failed to collect non-emails from shared drives and hard drives despite representing that it would produce non-email files, and did not attempt to collect lost emails from backup tapes.[98]  Any one of these failures would constitute a breach of Cognizant's duty to preserve and to oversee compliance with its litigation hold and document production.

### 3)   Plaintiffs Have Suffered Prejudice from the Loss of Critical Evidence

---

[98] Courts have recognized that the duty to preserve may apply to backup tapes. *U.S. ex rel. Guardiola v. Renown Health*, No. 3:12-CV-00295-LRH, 2015 WL 5056726, at *12 (D. Nev. Aug. 25, 2015). ("no format is inaccessible *per se*"); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 524 (D. Md. 2010); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("[Defendant] had – and breached – a duty to preserve the backup tapes at issue.").

36

"If spoliation is shown, the burden of proof shifts to the guilty party to show that no prejudice resulted from the spoliation[.]"  *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. CIV. 10-0541-GPC WVG, 2013 WL 6159177, at *9 (S.D. Cal. Nov. 25, 2013).  A party suffers prejudice from a failure to preserve evidence where it is deprived of documents that would have been "probative to the claims at issue in th[e] litigation."  *See Apple*, 888 F.Supp.2d at 998 (finding prejudice due to deletion of emails from "key custodians"); *see also 4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 132 (Fed. Cl. 2019) ("Prejudice may appear in many forms, such as [] being 'unable to fully respond to the secondary evidence' or being required to go to great lengths in discovery to fill in the gaps in the evidence."); *Oppenheimer*, 2017 WL 1807596, at *12 (finding prejudice where defendant failed to preserve documents related to Plaintiffs "[b]ecause the electronic information can no longer be recovered, Plaintiffs have lost the ability to present potentially relevant information").

The Ninth Circuit has "repeatedly" rejected the argument that "[b]elated compliance" precludes the imposition of sanctions.  *Lee v. Walters*, 172 F.R.D. 421, 428 (D. Or. 1997) (citing *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986); *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 947 (9th Cir. 1993); *G–K Properties v. Redevelopment Agency of City of San Jose*, 577 F.2d 645, 647–48 (9th Cir. 1978) ("last minute tender of discovery does not cure effects of discovery misconduct")).  The question is whether it is "more likely than not that [Cognizant's] failure to preserve ESI deprived [Plaintiffs] of evidence relevant to a party's claim or defense."  *Blumenthal*, 2016 WL 6609208, at *16.  Courts consider whether the "failure to provide documents and information in a timely fashion prejudiced the ability of [the movants] to prepare their case[.]"  *Id*.

The cumulative effect of Cognizant's failure to implement appropriate litigation holds and to preserve documents from identified custodians is that a significant number of relevant documents have been lost, including documents from critical custodians and a critical time period, such as the Margin Optimization documents and documents from

37

Mr. Rajagopal. *See* Ex. 51; Ex. 52.  In addition, Plaintiffs have been deprived in this case of the opportunity to fairly sequence and structure discovery, including by the belated production of documents.  *See id*; *Currin v. Presidio Networked Sols. Grp., LLC*, No. 3:16-CV-02177-BR, 2018 WL 4825184, at *6-7 (D. Or. Oct. 4, 2018) ("the last-minute production of volumes of relevant material after numerous extensions of time to complete fact discovery has obviously prejudiced Defendants' ability to defend the claims asserted against them and to prosecute their Counterclaim on the current, already-extended case-management schedule.").  For example, had discovery been appropriately conducted in the first instance, Plaintiffs would have had the opportunity to fully explore Mr. Rajagopal's communications and files concerning the Margin Optimization initiative as well as other probative evidence that had a nexus to the exponential increase in discrimination charges filed against Cognizant—all of which would have materially impacted this case's witnesses, strategic direction, and evidentiary foundation.  As it stands, Plaintiffs now must compile their case largely from documents created well after this suit was filed and after Cognizant started sanitizing written communications to mask discriminatory intent.

### 4)   Cognizant's Loss of Evidence was Intentional or, At the Very Least, Grossly Negligent

"A party's destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions." *In re Napster, Inc.*, 462 F. Supp. 2d at 1066 (citations omitted). "District courts may impose sanctions against a party that merely had notice that the destroyed evidence was potentially relevant to litigation." *Id*. (citations omitted). "However, a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *Id*. at 1066-67 (citations omitted).

Here, the circumstances of Cognizant's loss of relevant documents show an intent to deprive Plaintiffs of the use of those documents. *See Blumenthal*, 2016 WL 6609208, at *17-19 (finding party acted willfully and in bad faith even though it was unclear from

the record whether someone intentionally or unintentionally deleted the relevant emails after the party failed to implement a litigation hold, had control over relevant evidence and a duty to preserve it, and misrepresented and delayed searches for the ESI); *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 431-32 (W.D.N.Y. 2017) (finding intent where defendant made no effort over the course of years to preserve relevant documents, including because "defendants' repeated failure over a period of years to confirm that the data had been properly preserved . . . is so stunningly derelict as to evince intentionality"); *Currin*, 2018 WL 4825184, at *6 ("The Court notes Plaintiff argues the fact that she ultimately produced emails and text messages after she learned they had not been produced negates any conclusion that she engaged in purposeful misconduct. On this record, however, the Court concludes the irresponsible inattention of Plaintiff and/or her counsel toward Plaintiff's obligation to provide complete discovery of materials of which she was fully aware are 'tantamount to bad faith.'") (citing *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001)).

Cognizant's intent is most clear with respect to its failure to preserve Mr. Rajagopal's documents.  Cognizant *still* has not imposed a litigation hold on his documents as of this filing, and has provided no explanation for why his documents no longer exist, or when they became lost.  Its explanation for not imposing a litigation hold—because he left the company prior to this litigation—is a clear ruse because Cognizant has imposed litigation holds on many other former employees.

Further demonstrating bad faith, since Cognizant's failures have been brought to light, it has made no effort to mitigate damage and has fought Plaintiffs' efforts to obtain and make use of the belatedly-produced evidence at every step, including contesting an extension of the fact discovery deadline, Dkt. 155, resisting a 30(b)(6) deposition to learn information about same, under-preparing its 30(b)(6) witness when such deposition was compelled, Dkt. 155, and then claiming it was too late for Plaintiffs to raise issue with these collection issues because Cognizant had run out the clock.  Dkt. 175.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

### 5)   Sanctions up to and Including an Adverse Inference are Warranted

The choice of sanctions rests with the discretion of the district court. *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980).   Here, Cognizant's spoliation of documents warrants an adverse inference, and Plaintiffs therefore seek a jury instruction that Cognizant failed to preserve or produce documents from Mr. Rajagopal and other document custodians, so the jury may presume those documents would have been harmful to Cognizant. Plaintiffs also seek monetary sanctions.

"An adverse inference instruction may be appropriate where a party's bad faith or gross negligence has resulted in either the spoliation of evidence or failure to turn over relevant evidence." *Karnazes v. Cty. of San Mateo*, No. C 09-0767 MMC (MEJ), 2010 WL 2672003, at *2 (N.D. Cal. July 2, 2010); *In re Napster, Inc.*, 462 F. Supp. 2d at 1078 (ordering adverse inference instruction where party's destruction of evidence amounted to "gross negligence, if not willfulness, which is sufficient culpability to justify an adverse inference").[99]

Further, the circumstances of Cognizant's loss of relevant documents show an intent to deprive Plaintiffs of the use of those documents such that an adverse inference is warranted.  *See Apple*, 881 F.Supp.2d at 1150 (finding adverse inference instruction was the appropriate sanction where defendant "did not [] suspend" an automatic document destruction policy and as a result deleted documents from "key custodians" whose emails would have been "especially probative to the claims at issue"); *Zest*, 2013

---

[99] There are three levels of instructions generally considered: (1) "when a spoliating party has acted willfully or in bad faith, the jury can be instructed that certain facts are deemed admitted and must be accepted as true"; (2) "when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption"; and (3) the least harsh instruction "permits (but does not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party."  *Apple*, 881 F. Supp. 2d at 1150 (citation omitted).

WL 6159177, at *9 (recommending an adverse inference instruction where, because defendant did not implement a litigation hold, "Plaintiff is now forced to go to trial while relying on incomplete evidence.").

Finally, curing the prejudice requires awarding Plaintiffs the fees and costs caused by Cognizant's misconduct (including those associated with filing this motion, and additional discovery required because of the misconduct).

### 6)   Alternatively, or in Addition, Cognizant Should be Compelled to Produce Forensic Images and Backups

Alternatively, or in addition to the above remedies, Plaintiffs seek an order requiring Cognizant to produce forensic images of servers and devices on which custodians (including Mr. Rajagopal) stored potentially responsive ESI for expert analysis pursuant to a protective protocol.[100]  If the Court does not believe that there is enough evidence to impose sanctions, expert analysis of forensic images will enable Plaintiffs to discover the precise causes of lost information, whether document destruction was intentional or reckless, and whether any deleted information can in fact be recovered.

Under the circumstances, such discovery is appropriate.  When a party fails to preserve potentially relevant ESI, courts routinely grant discovery regarding the circumstances surrounding such failures to preserve, including ordering forensic examinations to determine how a loss occurred and whether deleted data can be recovered.  *Currin*, 2018 WL 4825184, at *7 (ordering forensic inspection of electronic devices after finding that the plaintiff's "irresponsible inattention" to discovery obligations was "tantamount to bad faith"); *Ascar v. U.S. Bank, N.A.*, No. 2:13-cv-

---

[100] Specifically, Plaintiffs seek an order requiring Cognizant to comply with Request No. 42 (issued in discovery) and produce a forensic image of: server backup tapes containing documents created or stored by custodians; custodian laptops; and any other devices still in existence used by custodians to create or store documents. *See* Ex. 61 at Req. No. 42 (Pls.' Sixth Set of RFPs).

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

07496, 2014 WL 12639926, at *1 (C.D. Cal. Sept. 25, 2014) (ordering production of a phone, hard drive, and any other relevant electronic devices to opposing counsel for forensic inspection); *Roadrunner Transp. Servs., Inc. v. Tarwater*, No. SACV101534AGMLGX, 2012 WL 12918345, at *2 (C.D. Cal. Aug. 5, 2012) (noting that the magistrate judge ordered the defendant to produce laptops to a third-party information technology expert for forensic imaging); *Bryant v. Mattel, Inc.*, No. C 04-09049 SGL RNBX, 2007 WL 5416681, at *10 (C.D. Cal. Jan. 26, 2007), enforcement granted in part, denied in part, No. CV 04-09049 SGLRNBX, 2007 WL 5430887 (C.D. Cal. June 20, 2007) (ordering party to produce the hard drives of his computers for forensic imaging.); *Garrison v. Ringgold, et al.*, No. 19cv244-GPC(MSB), 2020 WL 6537389, at *2 (S.D. Cal. Nov. 6, 2020) (discussing magistrate judge's order that the defendant to produce his computers for inspection by a "forensic computer expert"). Forensic inspections of devices are appropriate where "serious questions exist both as to the reliability and the completeness of materials produced in discovery." *Advante Int'l Corp. v. Mintel Learning Tech.*, 2006 WL 3371576, at *1 (N.D. Cal. Nov. 21, 2006).

These courts have recognized that discovery about preservation efforts may be necessary to determine what remedies are appropriate under Fed. R. Civ. P. 37(e). *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, No. 14CV1191 JLS (KSC), 2017 WL 2298473, at *6 (S.D. Cal. May 26, 2017) (ordering the plaintiff to "commission a neutral forensic analysis of [the defendant's] servers" to determine whether terminating sanctions were appropriate); *Blumenthal*, 2016 WL 6609208, at *16-17 (where "forensic searches of the individual hard drives undertaken by [party's] experts" showed that other party's "failure to preserve . . . resulted in the loss of some emails," the court found that sanctions for spoliation were appropriate).  Rule 37(e) makes remedies available for the loss of data if it was caused by a failure to take reasonable steps to preserve, if the lost ESI cannot "be restored or replaced through additional discovery," and makes harsher remedies available if the destroying party "acted with the intent to deprive another party of the information's use in the litigation[.]" Fed. R. Civ. P. 37(e).

Plaintiffs should be allowed access to the hard drives and server backups so that they can have a forensic expert determine whether any files can be recovered from those areas. *Net-Com Servs., Inc. v. Eupen Cable USA, Inc.*, No. CV 11-2553 JGB (SSX), 2013 WL 12131178, at *4 (C.D. Cal. July 11, 2013) (ordering production of hard drives to third party vendor for forensic analysis to determine "whether any or all of the files on the hard drives are recoverable"); Fed. R. Civ. P. 37(e) committee note to 2015 amendment ("the initial focus should be on whether the lost information can be restored or replaced through additional discovery").

Cognizant has expressed concerns about intrusiveness (despite the fact that it is similarly seeking a Court order for forensic images in its lawsuit against Mr. Franchitti and Mr. Piroumian). Plaintiffs addressed these concerns by proposing to Cognizant that the parties enter into a stipulation pursuant to FRE 502(d) that would allow Plaintiffs to retain an expert to perform an analysis of the forensic images to assess the document destruction and whether information is in fact recoverable, without any waiver of privilege. Such a stipulation would prevent Plaintiffs from actually viewing any recovered documents until ordered by the Court or agreed to by Cognizant.[101]

Federal Rule of Evidence 502(d) states that "[a] federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court — in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed. R. Evid. 502(d); *see also Advante Int'l*, 2006 WL 3371576, at *1 (ordering forensic inspection pursuant to a protocol to protect privilege and privacy concerns). Accordingly, Plaintiffs respectfully request an order that, pursuant to Fed. R. Evid. 502(d), any inadvertent disclosure or production of any documents or information as a result of Cognizant's production of forensic images in this proceeding shall not

---

[101] In the alternative, Plaintiffs are amenable to the Court appointing a neutral forensic inspector. *See*, *e.g.*, *WeRide Corp. v. Kun Huang*, No. 5:18-CV-07233-EJD, 2020 WL 1967209, at *3 (N.D. Cal. Apr. 24, 2020) (noting that the magistrate judge "ordered the appointment of a neutral forensic inspector" and "a special master to resolve any disputes related to [the forensic inspector's investigation.")

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

constitute a waiver by Cognizant of any privilege or protection applicable to those documents or ESI, including the attorney-client privilege, work product protection, and any other privilege or protection recognized by law.

### (ii)   Cognizant Provided False Certifications

While Cognizant was certainly aware that it used its OneDrive and other shared drives to store emails and other ESI, it has failed to disclose that information, over multiple years, even in response to multiple direct requests from the Plaintiffs for that information, and even after Plaintiffs clarified the information they were seeking.

Cognizant not only failed to disclose its use of shared drives to store relevant ESI, but it unilaterally and surreptitiously chose not to collect custodial emails and other non-email documents saved on that server, even after Plaintiffs raised issue with irregularities and lost ESI from Cognizant's collection of emails from its Office 365 server.  While Cognizant has claimed that both sides understood that it was limiting its custodial document collection to emails (which Plaintiffs dispute), the Court has already rejected this argument.  Dkt. 180 at 9 ("While defendants may have somehow thought they could limit their document collection efforts to email collection and production, there was no reason for plaintiffs to question whether Cognizant had been searching separately for non-email ESI from locations known only to defendants at that time, such as OneDrive.").  Additionally, Cognizant's claims is undercut by its direct representation to the Court that its production of custodian ESI would include documents as well as emails:

> **With respect to production of custodian ESI, which would include relevant, non-privileged emails of the custodians selected as well as documents maintained electronically and within their possession, custody, and control**, Plaintiffs contend 'Cognizant has proposed completing its production of data and documents by October 15.'

Dkt. 80, at 44 (emphasis added).

While Cognizant has argued that Plaintiffs should have divined the limits of its document collection efforts from its May 18, 2021 correspondence, *see* Dkt. 185 at 5-6,

44

this is not a defense to Cognizant making an incomplete production under Rule 26(g). Additionally, Cognizant's response to topic four in its May 18, 2021 letter did not track the full breadth of the topic, *see* Ex. 62,[102] [103] so Cognizant's failure to affirmatively describe it efforts to collect non-email ESI was not tantamount to a disclosure that it was excluding non-email ESI.   Regardless, Plaintiffs did not respond to the letter by acquiescing or accepting Cognizant's statements, but moved forward with its request to depose a Rule 30(b)(6) witness on those topics.   After that deposition was ordered, Cognizant then wrongfully instructed the deponent not to provide any information about Cognizant's document collection.[104]

As a result of Cognizant's failure to disclose its use of the OneDrive or other shared drives and unilateral decision not to collect non-email ESI or any type of files stored on the shared drives they had concealed, Plaintiffs will suffer significant prejudice without an appropriate remedy.   Although this Court has recognized that Cognizant had an obligation to collect and produce ESI from its OneDrive and non-email ESI, the final discovery cut-off is December 15, 2021, *see* Dkt. 163, and Cognizant still has not done so. Kotchen Decl. ¶ 5.  Cognizant's Rule 26(e) violations have prejudiced Plaintiffs because they have been "deprived . . .of the opportunity to use the documents at issue prior to the close of discovery to uncover additional information to support [their] claims." *Knudsen v. City & Cnty. of S.F.*, No. 12-cv-01944-JST, 2014 WL 295756, at *5 (N.D. Cal. Jan. 27, 2014).

---

[102] The May 18, 2021 letter followed a May 13, 2021 meet and confer where Cognizant first disclosed that the reason for document production irregularities was Cognizant's migration to Office 365, so it was reasonable to read Cognizant's response as directed towards its collections of emails specifically.

[103] For example, Cognizant's letter did not directly respond to Plaintiffs' request for information about who was involved in document collection efforts.  Plaintiffs did not read this incomplete response and omission to imply that no one at Cognizant was involved. *See id.*

[104] Ex. 28 65:3-69:2, 97:5-11.

Cognizant will attempt to downplay this prejudice by claiming that the non-email ESI and files on shared drives are likely "duplicative." However, this is not true. First, files exceeding ████ cannot be emailed, so no files over that size would have been included in Cognizant's custodial productions. Second, Cognizant specifically instructed its employees to save emails and electronic documents to its OneDrive *then* to delete those files locally, Dkt. 177-2 at 2-3, so OneDrive is likely to contain responsive ESI that has been deleted from the locations where Cognizant chose to confine its ESI searches.

**(iii)   Remedy for False Certification.**

Further, Rule 26(g) authorizes both evidentiary and monetary sanctions, based on the specific discovery misconduct to be remedied. *See, e.g., Silva v. TEKsystems, Inc.*, No. 12-CV-05347-LHK, 2013 WL 3939500, at *3 (N.D. Cal. July 25, 2013) (awarding attorneys' fees and precluding plaintiffs from using defendants' depositions for any purpose after plaintiff's counsel withheld recording until after their depositions).

Plaintiffs seek the following sanctions to address Cognizant's violations of Rule 26(g):

➢ Cognizant should be compelled to collect and produce non-email ESI from the agreed custodians, including from any shared drives used by those custodians;

➢ The case schedule should be extended to allow Plaintiffs to take discovery related to the late-produced documents, including re-opening depositions related to the late-produced documents; and

➢ Plaintiffs should be awarded monetary sanctions for the reasonable attorneys' fees and costs associated with this motion and its efforts to discover the document repositories Cognizant failed to disclose.

Compelling the documents that Cognizant was required, but failed to produce should not be controversial. This Court already ruled that Cognizant had a duty to supplement its document production that "extends to (but is not limited to) any responsive ESI, including *documents*, on defendants' OneDrive (or elsewhere), that have not previously been produced." Dkt. 180 at 10. Additionally, Cognizant agreed on

46

November 10, 2021 to produce documents from available laptops and OneDrive folders used by custodians.[105]  Notwithstanding Cognizant's agreement, Plaintiffs seek an order to compel because Cognizant should also be required to search other shared drives used by Custodians to store and share documents, such as SharePoint and the "Z drive." Additionally, Cognizant has resisted collecting or producing these documents until the eleventh hour of Plaintiffs' deadline to seek appropriate relief, so it is appropriate to compel that production at this time.

Since Cognizant has not yet produced non-email ESI and from shared drives, and the discovery deadline is rapidly approaching, Plaintiffs also request an extension of the case schedule to permit discovery related to belatedly-produced documents, so that they will have some opportunity to conduct discovery based on those documents.

Finally, Plaintiffs also seek attorneys' fees and costs caused by Cognizant's Rule 26(g) violations, as is expressly authorized by that rule.  *See* Fed. R. Civ. P. 26(g)(3) (stating that court "must impose an appropriate sanction[,]" which "may include . . . attorney's fees, caused by the violation").

## 2. *Defendants' Position*

### a. **Background**

Discovery has not been perfect on either side—Plaintiffs themselves engaged in some of the conduct they now fault Defendants for, and not every bit of discovery has gone smoothly on Cognizant's side.  Cognizant has, contrary to Plaintiffs' assertions, however, sought to identify and remedy issues when they have arisen.  For example, as soon as Plaintiffs identified the production irregularities by year between custodians, Cognizant immediately investigated, discovered the migration glitch, continuously kept Plaintiffs apprised of its efforts to obtain .pst (email) files from custodian laptops, and produced additional emails from those laptops.  And the centerpiece of Plaintiffs' allegations   concerning   lost   or   allegedly   destroyed   evidence—the   inadvertent

---

[105] Ex. 63 (Ltr. from M. Maryott to Pls. (Nov. 10, 2021)).

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1    substitution of Sriram Rajagopalan for Sriram Rajagopal in document collection and

2    production—was something *Cognizant identified* and brought to Plaintiffs' attention

3    several months ago, in July 2021, as soon as it realized the error.  Pls. Ex. 47.

4           Nevertheless, Plaintiffs present two requests for sanctions: (1) an adverse

5    inference jury instruction under Rule 37 as a result of the alleged loss of documents or

6    evidence concerning "margin optimization"; and (2) discovery sanctions under Rule

7    26(g), including compelling production of further non-email custodial ESI (most of

8    which Cognizant has already agreed to produce), extending the case schedule to allow

9    Plaintiffs to take discovery as to late-produced documents (which is a request they also

10   intend to make to Judge Gee), and monetary sanctions.  Plaintiffs' request for an adverse

11   inference jury instruction should be denied because they cannot demonstrate either the

12   requisite intent regarding alleged spoliation or the prejudice they have allegedly suffered

13   as a result.  In the instant motion, they argue that they are prejudiced by a loss of evidence

14   concerning a margin optimization initiative in that began in 2015.   Despite the

15   purportedly now-*central* role of "margin optimization" in their case, they: (1) *never*

16   issued a specific interrogatory or request for production of documents ("RFPs")

17   concerning margin optimization; (2) *never* asked Venugopal Padmanabhan, whom they

18   deposed in October and who has held a variety of roles relating to talent supply since

19   2011 and currently serves as Vice President of Talent Supply Chain, a single question

20   about margin optimization during his deposition; and (3) *never* mentioned the phrase

21   margin optimization once in the nine-page, single-spaced Rule 37 letter that they sent to

22   Cognizant teeing up the issues in this joint stipulation just two weeks ago, *see* Maryott

23   Decl., Ex. 3.   Indeed, they did not raise margin optimization until after Cognizant

24   responded to that Rule 37 letter and noted that, "[p]utting aside for the moment your

25   unfounded assumption that relevant material has been lost or destroyed, your letter does

26   not articulate how Plaintiffs' 'ability to go to trial' has been impaired or 'the rightful

27   decision of the case' has been threatened.  Nor have Plaintiffs articulated any 'plausible,

28   concrete suggestions' about what the supposedly lost information 'might have been.'"

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

Maryott Decl., Ex. 4 at p. 12.  This is consistent with the fact that margin optimization initiatives at Cognizant are not secretive, discriminatory policies.  Plaintiffs boldly posit that "Cognizant's Margin Optimization initiative led to an exponential increase in individual and class-based EEOC charges filed by non-Indians," (J.S. at p. 8) but the exhibit they cite in support of that proposition, Plaintiffs' Exhibit 9, merely contains excerpts from several EEOC charges and the charges themselves.  Margin optimization initiatives at Cognizant are far more mundane than Plaintiffs suggest—they may take many forms, but as the name suggests, all are broadly designed to improve the Company's financial health.  *See* generally Padmanabhan Decl. ¶¶ 3-4.  The type of initiative that Plaintiffs appear to be raising is one that involves ensuring that projects are appropriately staffed, which sometimes involves moving individuals to the bench and then reallocating them to other billable roles.  *Id.* ¶ 4.

Regardless of the imperfect discovery on both sides,[106] it is undisputed that Plaintiffs have received a *substantial* amount of information in this case.  Defendants have produced upwards of 270,000 documents and data concerning more than 100,000

---

[106]   For example, Plaintiffs produced several thousand documents after the depositions of Mr. Piroumian, Ms. Palmer and Mr. Franchitti without offering the opportunity to reopen their depositions, permitted the loss of evidence (specifically testimony from Mr. Cox, whose ultimately fatal diagnosis Plaintiffs' counsel were aware of, but failed to disclose), produced a privilege log for the first time a week before the close of discovery (which was riddled with problems, leading to Plaintiffs now standing by roughly 50 the 238 entries originally on the log after Cognizant challenged numerous entries), and served supplemental initial disclosures setting forth Plaintiffs' damages disclosures for the first time on the last day of discovery.  In addition, Plaintiffs also refused for several days to sequester documents after Cognizant informed them that privileged documents had been inadvertently produced due to a processing error.  More than 700 documents in the production contained the word "privilege," more than 100 had the term "attorney-client" in them, and more than 800 documents included emails with an in-house attorney at Cognizant whose name appears on Cognizant's privilege log in the description field 1,367 times, and in the to/from/cc fields 3,840 times.  Maryott Decl., ¶ 17.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

employees and even more applicants. Maryott Decl., ¶ 2. In addition to custodial documents, Cognizant has responded to Plaintiffs' informal and formal questions in emails and interrogatories regarding numerous topics.  When Plaintiffs have issued specific requests for production of documents or interrogatories that required the further identification of documents, Cognizant either objected or searched for those documents and produced them, regardless of whether they were encompassed by a particular agreed-upon custodian.  By way of example, Cognizant has produced Affirmative Action Plans, EEO-1 reports, documents pertaining to supervised recruitment, various visa-related reports, information concerning bench practices, and more. *Id.*  With respect to Plaintiffs' requests for other sanctions pursuant to Rule 26(g), Cognizant has already agreed to search and produce non-email custodial ESI, from custodian laptops and OneDrive (for those individuals who used OneDrive).  And Plaintiffs have indicated their intention to seek an extension of the schedule from Judge Gee, thus mooting their request here.

### b.    Sanctions are unwarranted under Rule 37(e)

Rule 37(e) permits a Court to issue sanctions under limited circumstances.  For any sanctions to issue, a Court must first find two requirements met: spoliation and prejudice to the party seeking sanctions.  Moreover, a harsher set of sanctions—like the adverse inference jury instruction Plaintiffs seek here—requires a finding of not just spoliation and prejudice, but also of *intent*:

Failure to Preserve Electronically Stored Information.

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

**(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

**(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

> **(A)** presume that the lost information was unfavorable to the party;

> **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or

> **(C)** dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). Plaintiffs cannot meet any of these three requirements—lost information that cannot be restored or replaced through additional discovery, prejudice, or intent. As such, they are not entitled to any sanctions pursuant to Rule 37, let alone sanctions—including an adverse inference jury instruction—that require a finding of intent.

### (i) The Inadvertent Substitution of Mr. Rajagopalan and Alleged Loss of "Margin Optimization" Documents

### 1) Plaintiffs Fail to Establish Spoliation

Plaintiffs posit that there has been spoliation of documents pertaining to a margin optimization initiative, of which they claim Sriram Rajagopal was the mastermind. Plaintiffs are correct that Mr. Rajagopal's documents were not preserved, but that alone does not demonstrate spoliation. Mr. Rajagopal left the company months before the lawsuit was even filed, and his relevance to the lawsuit was not raised by Plaintiffs for the first time until 2019. Maryott Decl., ¶ 9. Where documents are lost prior to anticipation of litigation, it is not spoliation. *See Lamb v. Horbaczewski*, No. CV 17-6210-JAK (KSx), 2020 WL 7978227, at *20 (C.D. Cal. Nov. 17, 2020) (finding no spoliation of text messages that were lost prior to the date of plaintiffs' demand letter because there was no reasonable expectation of litigation prior to the demand); *Price v. Peerson*, No. CV 13-3390 PSG (JEMx), 2014 WL 12558253, at *7–8 (C.D. Cal. Apr. 23, 2014) (finding no spoliation where ESI was overwritten pursuant to routine protocol before litigation was reasonably anticipated).

Moreover, there is *no* indication that there has been a loss of relevant margin optimization documents that could not be restored or replaced through other discovery. There is a simple reason for this—Plaintiffs' invocation of "margin optimization" as playing a "central role" in this case is brand new. As such, Plaintiffs never sought documents related to margin optimization.

Speculation that the inadvertent substitution of Mr. Rajagopalan led to the loss of custodial documents for Mr. Rajagopal is, just that, speculation. Mr. Rajagopal's last day with the company based on company records was June 3, 2017, more than three months prior to this lawsuit being filed, Maryott Decl., ¶ 9. Moreover, he is not named in the Complaint, and the first instance of his name being raised comes in Plaintiffs' initial disclosures served in 2019, almost two years after Mr. Rajagopal left the company. Plaintiffs later identified him as a requested custodian in February 2020, nearly three years after he left the Company.

Moreover, there is *no* indication that documents concerning margin optimization cannot otherwise be obtained. First, Plaintiffs misrepresent Mr. Rajagopal's purview, describing him as "the Talent Supply Chain lead who oversaw Cognizant's Margin Optimization initiative and visa staffing practices" (J.S. at p. 21) by citing to the list of custodians(Pls. Ex. 46), but nowhere is it suggested that Mr. Rajagopal led Cognizant's "visa staffing practices," nor is it clear that Mr. Rajagopal oversaw Cognizant's margin optimization initiatives. Indeed, while Mr. Rajagopal was involved in margin optimization initiatives during his last two years at the Company, 2015-2017, there were many participants in Cognizant's margin optimization initiatives. Pamanabhan Decl., ¶ 7.

Plaintiffs ignore the fact that margin optimization documents and information may be obtained from other sources, even if Mr. Rajagopal's *documents* were unavailable. For example, after Cognizant identified the inadvertent substitution and alerted Plaintiffs to it, Plaintiffs never sought, for example, to depose Mr. Rajagopal, or in any other manner seek further documents or communications concerning margin

optimization (something that Cognizant did not know Plaintiffs conceived to be so central or related to Mr. Rajagopal specifically).  Moreover, there is the simple fact that other custodians for whom documents have been collected would almost certainly have been sent any relevant communications pertaining to margin optimization initiatives that impacted North America Talent Supply Chain.  Given his roles in the Company, Venugopal Padmanabhan, whose documents Cognizant has produced and whom Plaintiffs deposed, would have been included on any important communications concerning major initiatives related to Talent Supply Chain (formerly known as Global Workforce Management or GWFM).  Padmanabhan Decl., ¶ 6.

### 2) There is no prejudice from alleged spoliation of margin optimization documents

Even if Plaintiffs could demonstrate spoliation (they cannot) they suffered no prejudice as a result.  Rule 37(e)(1) *requires* a finding that the nonresponding party has been prejudiced by the loss of the information, which occurs only where its "ability to go to trial" is impaired or "the rightful decision of the case" is threatened by the lost information.  *Youngevity Int'l v. Smith*, No. 3:16-cv-704-BTM-JLB, 2020 WL 7048687, at *3 (S.D. Cal. July 28, 2020) (citation omitted).  To show prejudice, the nonresponding party must come forward with "plausible, concrete suggestions" about what the lost information "*might have been.*"  *Hynix Semiconductor Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939, 981, 984 (N.D. Cal. 2012) (citation omitted) (emphasis in original) (finding no prejudice where plaintiff had not "proffered a plausible, concrete suggestion as to how it may have been prejudiced by the destruction of" licensing documents where other related documents "were maintained at least to a large extent"); *see Matthew Enterp., Inc. v. Chrysler Grp. LLC,* No. 13-cv-04236-BLF, 2016 WL 2957133, at *4 (N.D. Cal. May 23, 2016) (no prejudice where plaintiff offered no suggestions about what lost emails might have contained); *see  Apple Inc. v. Samsung Elecs. Co., Ltd.* (*Apple II*), 888 F. Supp. 2d 976, 994–95 (N.D. Cal. 2012) (noting that "where the parties seeking spoliation sanctions had already 'gathered an enormous amount of discovery—both

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1   from documents and witnesses,' "[u]nless they can show through extrinsic evidence that

2   the loss of the documents has prejudiced their ability to defend the case," a spoliation

3   charge was not warranted) (quoting *Pension Comm. of Univ. of Montreal Pension Plan*

4   *v. Banc of America Sec.*, 685 F. Supp. 2d 456, 479 & n.97 (S.D.N.Y. 2010)).

5          Plaintiffs now (*for the first time*) claim that Cognizant's "'Margin Optimization'

6   initiative" had a "[c]entral [r]ole" in Cognizant's alleged pattern and practice of

7   discrimination, (J.S. at p. 7), and tether almost the entirety of their alleged "prejudice"

8   to the alleged loss of documents concerning this initiative.  But, the claimed "centrality"

9   of the margin optimization program to Plaintiffs' claims is belied by Plaintiffs' own

10  neglect of this program or issue throughout this litigation, despite possessing

11  information concerning this initiative for years.  Indeed, Plaintiffs did not even raise it

12  in the nine-page single spaced letter they sent to initiate the Rule 37 process for this joint

13  stipulation on October 28, 2021.  Maryott Decl., Ex. 3.  Instead, only in response to

14  Cognizant's recitation of the case law concerning sanctions, have Plaintiffs now, for the

15  first time in November 2021, posited the supposedly central role of the initiative in its

16  case.

17         Moreover, prejudice is further negated where the information can still be obtained

18  from other produced ESI, even if not as convenient.  *See Apple II*, 888 F. Supp. 2d at

19  994 (finding that "Apple 'should have been able to glean' much material evidence 'from

20  the documents actually produced, the extensive deposition testimony, and the written

21  discovery between the parties'" and thus a strong adverse inference was not warranted

22  because Apple's ability to go to trial was not "significantly hampered" (citation

23  omitted)); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010) (finding that,

24  although some lost emails were not produced, "the documents that were produced

25  contained numerous email chains in which [that] correspondence was contained" and

26  "Plaintiffs should have been able to glean [the information] from the [2.1 million]

27  documents actually produced, the extensive deposition testimony, and the written

28  discovery between the parties").

1    For the following reasons it is obvious that margin optimization is not the

2    important theory Plaintiffs now belatedly claim and that information concerning the

3    initiative would not reside only in the custodial documents of Sriram Rajagopal.

4    **First**, Plaintiffs have been aware of the margin optimization initiative for some

5    time.  For instance, Plaintiffs point to EEOC position statements as the source of their

6    interest in the margin optimization initiative, and in particular to Plaintiffs' Exhibit 7, a

7    position statement that Cognizant produced to Plaintiffs on December 30, 2020, more

8    than *ten months ago*.  Maryott Decl., ¶ 4.  In support of their extraordinary claim that

9    "non-Indian employees were targeted for release per the Margin Optimization initiative,

10   as they were culturally dissimilar to the Indian visa employees and expendable to

11   achieve profit savings" (JS at p. 10), Plaintiffs cite three documents.  The first document

12   they cite, Plaintiffs' Exhibit 8, is an email from Plaintiff Franchitti's .pst file, which

13   means that Mr. Franchitti has been aware of and in possession of this email since it was

14   sent in May 2016.

15   The other two documents, Plaintiffs' Exhibits 64 and 65, are emails from 2018

16   and 2017, respectively, and have nothing to do with margin optimization.  The emails

17   also *in no way support the proposition* for which they are cited.  Exhibit 8, the email

18   from Mr. Franchitti's .pst file generally discusses the "Demand-Supply program," which

19   may be a part of the "margin optimization" initiative and generally focuses on improving

20   budgeting and forecasting, the fulfillment process, and the workforce management

21   process.  Exhibit 64, an email exchange among individuals in a veterans' group at

22   Cognizant voicing their personal views, was sent in 2018 and has nothing to do with

23   margin optimization, and Exhibit 65 is an email sent in 2017 discussing a promotions

24   list, in ███████████████████████████████████████████████

25   ████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████

27   ██ ███████████████████████████████████████████████████

28   ███████████████████████████████████.  Regardless, it has nothing to do with

1  margin optimization, nor does it stand for the absurd proposition advanced by Plaintiffs.

2  (J.S. at p. 10 & fn. 16).[107]

3      **Second**, despite this long-time awareness of margin optimization, as described in

4  documents either in Plaintiffs' possession or in documents produced more than ten

5  months ago by Cognizant, Plaintiffs have **never** raised margin optimization specifically

6  in written discovery requests.  Maryott Decl., ¶ 6.  This approach to margin optimization

7  stands in sharp contrast to the approach Plaintiffs took in issuing follow-up discovery

8  on a host of other topics between April 2021 and the fact-discovery cut off.  In the wake

9  of production of tens of thousands of emails, Plaintiffs issued a Fourth Set of RFPs on

10 April 6, 2021, a Fifth Set on April 30, 2021, a Sixth Set on August 12, and a Seventh Set

11 on August 26, 2021.  Maryott Decl., Exs. 16-19.  The 17 requests contained within those

12 sets of discovery asked for documents specific to a host of other policies, practices, or

13 initiatives—*e.g.*, supervised recruitment; soft blocking (a bench process);

14 communications with third-parties (McKinsey & Co., Biddle Consulting Group,

15 Berkshire Associates Inc.); documents or data concerning appraisal ratings and job

16 levels; complaints filed against former Cognizant employees for taking company

17 documents; documents and policies concerning sharing of affirmative action or diversity

18 data; and documents concerning Cognizant's content moderation employees.  *Id.*  Not a

19 single request sought documents regarding the margin optimization effort.

20     Plaintiffs also, in that same time period, issued Interrogatories and an RFP

21 requesting production of all documents and data used to answer any interrogatory.  On

22 April 6, 2021, Plaintiffs served their Third Set of Interrogatories (No. 8); on April 30,

23

24 [107]  Plaintiffs' portion of the joint statement is replete with these sort of
mischaracterizations.  Cognizant has not undertaken to walk through each
25 misrepresentation because some are tangential to the relief Plaintiffs have requested and
Cognizant does not intend to overburden the Court with further, unnecessary paper.  The
26 failure to address any particular misrepresentation of a fact by Plaintiffs, however, is not
a concession.  Cognizant trusts that it will be readily apparent upon by review by the
27 Court which documents do not support the statement for which Plaintiffs cite them.
28

2021, Plaintiffs served their Fifth Set of Interrogatories (Nos. 10–16); and on September 15, 2021, the last day to serve timely interrogatories before the discovery cut-off, Plaintiffs served their Sixth Set of Interrogatories (Nos. 17–18).  Maryott Decl., Exs. 20-22.  These interrogatories requested information concerning supervised recruitment; bench policies or practices including soft blocking and masking; Cognizant's "Fast Forward Program"; employees' manner of hire; travel ready reports; Cognizant's compliance with its obligation to pay a prevailing wage; and all facts supporting Cognizant's affirmative defenses.  With the exception of one interrogatory seeking information concerning contractors to which Cognizant objected, Cognizant answered each of the other interrogatories, and where appropriate, produced further documents and data in conjunction with its responses.  Not a single one of these interrogatories requested information concerning margin optimization.

*Third*, despite the connection that Plaintiffs now draw between Cognizant's Talent Supply Chain ("TSC") and margin optimization initiatives, Plaintiffs only sought to depose Venugopal Padmanabhan, even though Mr. Padmanabhan, Anand Kabra, and Sriram Rajagopal were all involved in Talent Supply Chain from 2015 onward. Padmanabhan Decl., ¶ 7; Pls. Ex. 32 .  Notably, Plaintiffs' counsel *never once* asked about margin optimization or about Sriram Rajagopal during Mr. Padmanabhan's deposition on October 12, 2021.  Maryott Decl., ¶ 7.

If, as Plaintiffs contend, they believed Talent Supply Chain played a central role in margin optimization[108] (and Mr. Rajagopal the most significant role), Plaintiffs

---

[108]    Plaintiffs also misrepresent Talent Supply Chain's role generally.  Plaintiffs cite to various EEOC position statements in support of the proposition that it is Talent Supply Chain's "responsibility to place benched employees in U.S. positions."  (J.S. at p. 9). They make this claim despite the fact that one of the position statements to which they cite, Plaintiffs' Exhibit 10, explicitly states: "It bears noting that the *employee is responsible for securing the new assignment, not the Talent Supply Chain team*.  Talent Supply Chain provides assistance, but employees are expected to devote full-time to obtaining an assignment."  Pls. Ex. 10, at p. 3, fn.3 (emphasis added).  Moreover,

presumably would have sought to depose him, but they did not.  Plaintiffs' decision not to pursue the deposition of Mr. Rajagopal or Mr. Kabra cannot be squared with the alleged centrality of margin optimization or Mr. Rajagopal and further negates any alleged prejudice because Plaintiffs *could* have asked them questions concerning margin optimization—they just failed to pursue that opportunity.  While Mr. Rajagopal left the Company several months before this lawsuit was filed, his status as a former employee is not the reason Plaintiffs did not depose him—they have deposed one former employee (Keith Mitchell) and have noticed depositions for two other former employees (Abigail Israel and Colleen Doherty).

As for the decision not to depose Mr. Kabra, it can only mean that Plaintiffs were not interested—as of one month ago—in the line of inquiry that they now claim is central.  Mr. Kabra remained with Cognizant until October 2021.  Plaintiffs' Exhibit 8, an email from 2016 which came from Mr. Franchitti's .pst file and to which Plaintiffs point to explain margin optimization and Mr. Rajagopal's alleged role in it, clearly demonstrates that Mr. Kabra's role in the subject of the email:



Pls. Ex. 8.

Plaintiffs' failure to seek the depositions of Mr. Rajagopal and Mr. Kabra squarely undercuts Plaintiffs' claim of prejudice.  Indeed, "[t]he availability of secondary sources of evidence to compensate for the despoiled evidence lessens any risk of prejudice at

Plaintiffs' understanding of Talent Supply Chain appears to come from position statements filed concerning other individuals that are divorced from this case.

1  trial." *Ahcom, Ltd. v. Smeding*, No. 07–1139 SC, 2011 WL 3443499, at *9 (N.D. Cal.

2  Aug. 8, 2011).   "[C]ourts often decline to impose sanctions for spoliation where the

3  documents withheld are unlikely to material[ly] affect the outcome of the case, insofar

4  as other evidence exists to provide the same information." *Lofton v. Verizon Wireless*

5  *(VAW) LLC*, 308 F.R.D. 276, 288 (N.D. Cal. 2015); *see also Ahcom*, 2011 WL 3443499,

6  at *8–9 (declining to impose adverse inference because "Plaintiff had access to extensive

7  information about the" subjects it suspected had been lost and finding that spoliation

8  was "highly unlikely to have materially impacted the outcome of the case"); *Hamilton*

9  *v. Signature Flight Support Corp.*, No. C 05-0490 CW (MEJ), 2005 WL 3481423, at *8

10  (N.D. Cal. Dec. 20, 2005) (declining to impose adverse inference where plaintiffs had

11  other evidence available to confirm that the evidence they had was accurate and

12  plaintiffs were thus not prejudiced by the lost evidence).

13        **3)      Plaintiffs do not and cannot show the intent required for**

14                    **an adverse inference jury instruction.**

15          An adverse inference permitting or instructing the jury to presume information

16  was unfavorable is only available under Rule 37(e)(2) where the court finds "intent to

17  deprive the opposing party of the information's use in the litigation."   "Negligent or even

18  grossly negligent behavior is insufficient to show intent."   Fed. R. Civ. P. 37(e)(2)

19  advisory committee note to 2015 amendment.   For a court to find intent, there must be

20  evidence, or it must be reasonable to infer, that the evidence was "purposefully

21  destroyed" to "avoid [] litigation obligations." *Porter v. City & Cty. of San Francisco*,

22  No. 16-cv-03771-CW(DMR), 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018).   Thus,

23  for example, the failure to suspend an ESI retention policy quickly enough after

24  litigation, standing alone, is not sufficient to show intent. *See id.* at *4 (no evidence of

25  intent where calls were erased due to 2-year ESI retention policy).   Nor is the mere fact

26  that a litigation hold was not broad enough to encompass the lost information sufficient

27  to find intent. *See Sec. Alarm Fin. Enterp., L.P. v. Alarm Protection Tech., LLC*, No.

28  3:13-cv-00102-SLG, 2016 WL 7115911, at *6 (D. Alaska Dec. 6, 2016) (finding that

failure to prevent files from being overwritten due to limited litigation hold did not amount to intent to deprive the other party of the ESI. Moreover, a finding of intent is not appropriate where defendants have "produced thousands of documents" and "have introduced possible explanations for unintentional deletions." *Youngevity*, 2020 WL 7048687, at *4.

With respect to the (inadvertent) substitution of Sriram Rajagopalan for Sriram Rajagopal as a custodian, Plaintiffs have no evidence of intent to deprive Plaintiffs of documents concerning margin optimization. Significantly, it was *Cognizant* who discovered this inadvertent and unfortunate error and immediately notified Plaintiffs of the same by email dated July 22, 2021. Cognizant was forthcoming concerning this mistake, explaining:

> We write to provide you with information concerning one of the custodians for whom you requested ESI. In the original list of custodians, you had requested ESI from Sriram Rajagopal. Unfortunately, there was a miscommunication in the process of pulling custodial documents, and ultimately documents for a Sriram Rajagopalan were pulled and produced to you. You'll note that the custodian name in the productions is, in fact, Sriram Rajagopalan. Sriram Rajagopal left Cognizant several months prior to the filing of this lawsuit. Cognizant does not have documents for Mr. Rajagopal.

Pls. Ex. 47. The mistake was unfortunate, but it was just that, a mistake—the genesis of which may have been a typo in Mr. Rajagopal's name in an email to Plaintiffs that then became the basis for the final custodian list—specifically, the *l* was left off the end of his name. *See also* Pls. Ex. 48 (April 2021 production letter noting that the production "contains ESI from the PST files of fifteen of the twenty-three agreed-upon custodians . . . Sriram Rajagopa"). Neither Plaintiffs nor Cognizant caught this typo, and Plaintiffs never sought clarification with respect to the list. The documents ultimately pulled and produced were from Sriram Rajagopalan; both the metadata for the documents and the

60

documents themselves contain Sriram Rajagopal*an*'s name. Maryott Decl., ¶ 8.  Despite the fact that production of Mr. Rajagopalan's documents began in December 2020, when Cognizant produced 1,240 documents for him, Plaintiffs did not identify the error then. By mid-April 2021, more than 4,000 of the roughly 4,100 documents ultimately produced for Mr. Rajagopalan had been sent to Plaintiffs, and Plaintiffs also did not notice the error then.  *Id.*   That Mr. Rajagopal has only recently taken on outsized importance in Plaintiffs' case seems readily apparent from a simple fact—Plaintiffs never noticed that approximately 4,100 documents  were for a custodian who was not Mr. Rajagopal.   This is *not* to place the blame on Plaintiffs for not catching an inadvertent error originally made by Cognizant; the point is simply that *if* Mr. Rajagopal was as central to Plaintiffs' case as they now claim—"quite likely this case's single most relevant position" (J.S. at p. 24)—and Plaintiffs timely reviewed even *some* of the documents that they pushed so hard to receive as quickly as possible, it seems inconceivable that they would not have discovered and raised this error prior to Cognizant discovering it in July 2021.

Nor, of course, can Plaintiffs point to any intent to deprive Plaintiffs of margin optimization-related documents more broadly.  Plaintiffs have never requested such documents, asked about margin optimization in depositions, or otherwise indicated they needed such documents; an approach that stands in sharp contrast to their approach to other specific topics, as discussed above.

**(ii)** **Rule 37 sanctions are also unwarranted on the basis of document collection glitches.**

**1)** **Alleged spoliation of custodial ESI**

Separate from Mr. Rajagopal, Plaintiffs speculate that other custodial ESI, which Cognizant had a duty to preserve, was lost for two reasons: (1) allegedly belated litigation hold notices; (2) Cognizant's collection of emails and attendant issues concerning laptops and size limitations of email mailboxes prior to its transition to Office365.  Cognizant addresses each in turn.

61

As an initial matter, Cognizant issued litigation holds immediately following the filing of the lawsuit and then issued additional holds particular custodians' relevance to the litigation became clear.  Litigation hold notices were issued to almost 90 custodians on September 27, 2017, 9 days after Plaintiffs filed this lawsuit; another 35 individuals received litigation hold notices on December 14, 2017.  Pls. Ex. 31.  Additional potential custodians subsequently were placed on litigation holds, including another 41 in 2019, 10 in 2020, and 1 more in 2021.[109]  *Id.*  The holds in 2019 and later reflect the reality that Cognizant did its best to anticipate at the outset which individuals might have relevant information in this matter, but as discovery began in earnest in 2019, and Plaintiffs honed in on other custodians (who did not relate to the named Plaintiffs), Cognizant issued additional litigation holds.

Some of the holds issued on September 27, 2017 were for individuals who ultimately became the 23-agreed upon custodians, *e.g.* David Amsden (hold issued 9/27/2017); Colleen Doherty (hold issued 9/27/2017); Helen Kim (hold issued 9/27/2017); James Lennox (hold issued 9/27/2017); Atish Mitra (hold issued 9/27/2017); Venugopal Padmanabhan (hold issued 9/27/2017); Mohan Ramachandran (hold issued 9/27/2017); NN Srinivas (hold issued 9/27/2017); and Srinivasan Veeraraghavachary (hold issued 9/27/2017).   Pls. Ex. 31.   With respect to other custodians, Cognizant placed them on legal hold upon learning of Plaintiffs' custodian requests or otherwise understanding their involvement in the case.   Indeed, within roughly a week of Plaintiffs sending their proposed list of 33 custodians, legal holds were issued for eventual custodians who were not already on holds.[110]

---

[109]   The single hold issued in 2021 was for Mr. Rajagopalan and is discussed above. It was issued after discovery of the mix-up concerning custodians.

[110]   The only exceptions to the 23 custodians being placed on a legal hold either before they were proposed as custodians or within roughly a week after being proposed were Abigail Israel (whose legal hold issued on May 15, 2020, prior to the custodian list being finalized, but several months after being proposed) and Sriram Rajagopal (who had left

Plaintiffs broadly posit, without specifying particular custodians, that Cognizant's approach was improper because it should have been aware of, at the outset of the litigation, all of the custodians Plaintiffs would ultimately land on.  It was not until discovery began in earnest in 2019 and custodians were proposed by Plaintiffs in 2020 that Cognizant understood the full scope of individuals Plaintiffs thought were relevant to their case.  That nearly half of the eventual custodians were on the initial legal hold list is significant given that Plaintiffs seemed uninterested in including custodians who would have specific personal knowledge regarding the named Plaintiffs.

Even if all of the eventual custodians had been placed on a legal hold list immediately upon the filing of the lawsuit, however, that would still not satisfy Plaintiffs because, they argue, some of the eventual 23 custodians should have been placed on legal hold as a result of the named Plaintiffs' EEOC charges or the Commissioner's pattern-or-practice charge.  Plaintiffs are mistaken.  First, none of the eventual 23 custodians were named in the Plaintiffs' EEOC charges, nor have Plaintiffs pointed to any one of the 23 custodians specifically as being an individual who should have been placed on a legal hold following the filing of their individual EEOC charges.  Second, although Plaintiffs continue to try to make this case the same as the Commissioner's pattern-or-practice investigation, they are not the same.  As even Plaintiffs must concede, the Commissioner's pattern-or-practice investigation did not focus on documents from particular Cognizant employees.  Instead, the EEOC received some employee and hiring data and conducted a small number of interviews.  Maryott Decl., Ex. 6 at pp. 1-2.  This is a fact of which Plaintiffs have been well aware for a year-and-a-half.  *Id*.[111]

---

the company months before Plaintiffs filed the lawsuit and was not placed on a hold). Pls. Ex. 31.

[111]   Relatedly, though again without specifics, Plaintiffs posit that somehow Cognizant should have retained more information than it did on the basis of document retention requirements for federal contractors, but 41 C.F.R. § 60-1.12  does not appear

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

Moreover, although the document collection and production has had a few glitches, it is pure speculation that such glitches have led to any *loss* of relevant documents.  Plaintiffs posit that documents that should have been preserved have been lost in this case, but it is pure speculation that custodial emails (or even documents) were lost after the lawsuit was filed, or, more pertinently, after Cognizant sought to preserve documents for custodians based on its understanding of their relationship to the case.  Plaintiffs primarily point to three potential loss points: the "migration glitch"; emails as a result of email box size limits and laptops from which documents could not be recovered.

*The migration glitch:*

As soon as Plaintiffs alerted Cognizant to the irregularities in documents produced by year, Cognizant promptly investigated and informed Plaintiffs of the migration glitch that resulted in some earlier email files potentially being stored as individual .pst files on laptops and therefore not on the on-premises servers that were migrated to Office365.  At that time, Cognizant promptly proceeded to collect custodian laptops and search them for any available .pst files that could be obtained.  Since that time, Cognizant has kept Plaintiffs apprised of its efforts, which were time and resource intensive.  And those efforts have been successful.  Cognizant has produced upwards of an additional 85,000 documents thus far as a result of this enormous effort, and documents for the final custodian, Atish Mitra, will be forthcoming.  Maryott Decl., ¶ 11. Plaintiffs have failed to show that Cognizant lost documents as result of this misstep that Cognizant identified and corrected.  Moreover, the time period between custodial collection (the second half

---

to mandate what Plaintiffs assert.  The provision requires retention of documents related to hiring actions, such as job applications and personnel files. *Id.* § 60-1.12(a)  *See* Office of Federal Contract Compliance Programs (OFCCP), Federal Contract Compliance Manual at 81.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1  of 2020) and identification of the migration glitch issue (the first half of 2021) was

2  relatively short, further undercutting Plaintiffs' allegations of loss.

3  *Mailbox size:*

4        Plaintiffs claim that Cognizant spoliated evidence because it maintained mailbox

5  size limits, but such mailbox size limits were no longer in place by the time all custodians

6  were identified.  Nor does the evidence suggest that these mailbox size limits in any way

7  caused any of the 23 agreed-upon custodians to lose emails after they were on legal hold.

8  With respect to mailbox sizes, the custodian selection process in this case began on

9  January 17, 2020, when Cognizant sent Plaintiffs a proposed initial list of 17 custodians

10  based on the allegations in the operative complaint as well as proposed date ranges for

11  each custodian and a citation to the paragraph or paragraphs in the complaint supporting

12  that particular date range for each custodian.  Maryott Decl., Ex. 9.  On February 24,

13  2020, Plaintiffs sent their first list of proposed custodians—33 of them—to Cognizant.

14  Maryott Decl., ¶ 12. Following negotiations, the parties landed on the 22-agreed upon

15  custodians (23 if Mr. Mitchell is included)—around late-July 2020.  All 22 were on

16  Plaintiffs' original list of 33.  Importantly, by the time Plaintiffs' custodian list was

17  proposed, *all custodians' emails on the on-premises servers had been migrated to Office*

18  *365 for some time*.  Maryott Decl., Ex. 7.

19        With respect to laptops or emails more generally, a number of custodians had also

20  left Cognizant before the lawsuit was filed or before or around the time of the exchange

21  of custodian lists. E.g., Keith Mitchell (June 2017); Sriram Rajagopal (June 2017);

22  Kaushik Bhaumik (July 2019); Gajakarnan Kandiah (June 2019); Sriniketh Chakravarthi

23  (February 2020); Vipul Khanna (July 2019); Nirav Patel (July 2019); Bhaskar

24  Sambasivan (June 2019); NN Srivinvas (February 2020); Venugopal Lambu (December

25  2019).  Maryott Decl., ¶ 18.  To the extent that custodians left Cognizant prior to being

26  named as potential custodians (where Cognizant did not see their relevance to the case),

27  that some of their materials may have been lost does not amount to spoliation, nor is

28  there any indication (contrary to Plaintiffs' argument) that the alleged email box size

limits on the servers used prior to migration to Office365 resulted in the loss of any custodian emails, much less that the limits were intended to result in loss.  There is nothing wrong with a company having size limits on email boxes.  And email size limits no longer applied once an individual was migrated to Office 365.  At that point, the mailbox storage size was unlimited.  With respect to the custodians at issue in this case, the majority of them were migrated to Office 365 within months of this lawsuit being filed.  As such, whatever emails they possessed as soon as many of them received an initial litigation hold notice on 9/27/2017 were almost certainly there when migrated to Office 365.  And, once migrated, this entire specter of "continued use of low email storage limits," vanished because Office 365 contains no limits.  Maryott Decl., ¶ 13. Plaintiffs are also well aware of the dates upon which custodians were migrated to Office 365, having received them during the August 6, 2021 Rule 30(b)(6) deposition.  Maryott Decl., Ex. 7.  The following eleven custodians were migrated in 2017: Amsden, Doherty, Kabra, Kim, Cohen (Mimon), Mitra, Padmanabhan, Israel, Srinivas, Chakravarthi, and Veeraraghavachary.  And five more were migrated in the first two months of 2018.  As such, any time period between the filing of the lawsuit and migration to Office 365 for the vast majority of the custodians was quite short.

Taking, for example, the two employees Plaintiffs have deposed thus far, Ms. Kim and Mr. Padmanabhan, there is no evidence of Cognizant's failure to stop the deletion of documents or continued use of low email storage limits while failing to ensure that ESI custodians saved emails and other ESI in .psts or elsewhere.  Ms. Kim, for example, received a litigation hold notice on 9/27/2017 and was migrated to Office 365 on 11/17/2017.  There is no reason to believe that she deleted anything from her emails between 9/27 when she received the hold and 11/17 when she was migrated (nor was she asked whether that was the case during her deposition).  And there is no evidence that her mailbox was near full at that time.  Mr. Padmanabhan similarly received a litigation hold notice on 9/27/2017 and was migrated to Office 365 on 12/20/2017.  As

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1   with Ms. Kim, there is absolutely no evidence that he deleted emails during that window
2   or that his email was near any storage limit at that time.

3          Moreover, even prior to the migration to Office 365, there is no evidence Mr.
4   Padmanabhan or Ms. Kim lost or deleted any emails.  Their testimony suggests exactly
5   the opposite.  Mr. Padmanabhan testified that he was unaware that Cognizant had limited
6   server space for emails, strongly suggesting that he had not come up against any size
7   limitation in the past.  Maryott Decl., Ex. 13.  Ms. Kim also testified that she saved her
8   emails to a .pst at the end of every year, and when asked "how do you manage bumping
9   up against server limitations," she explained that the "PST takes care of that."  When
10  pressed as to what happens in an *existing* year, *i.e.* before emails are saved to a .pst, Ms.
11  Kim testified that she "ha[d]n't come across any limitations."  Maryott Decl., Ex. 14.[112]
12  *Other custodian documents—laptops and OneDrive:*

13         As Cognizant has made clear to Plaintiffs and the Court [Dkt. 185, 188],
14  Cognizant is proceeding to collect and produce documents from custodian OneDrives or
15  laptops, where available.  OneDrive is a relatively new repository, coming into existence
16  concurrently with Office365.  With respect to laptops, as noted above, many would-be
17  custodians left Cognizant prior to the lawsuit being filed or their relevance being
18  ascertained through Plaintiffs' proposed custodian list or disclosures.  To the extent that
19  laptops predating the lawsuit are unavailable, that is hardly evidence of spoliation.  And,
20  even *if* there were documents missing (something Plaintiffs have not shown), it is
21  impossible to know whether those documents were lost in the normal course of an
22  employee's decisions about what emails, documents, and laptops he or she retains in the
23  normal course of her employment when there are no preservation obligations.[113]  The

24  _____

25      [112]   Plaintiffs' exhibits containing excerpts of the deposition transcripts of
26  Venugopal Padmanabhan and Helen Kim do not contain the excerpts cited by Cognizant
    herein, which are included as Exhibits 13 and 14 to the Maryott Declaration.

27      [113]   Plaintiffs point to only one laptop from an existing employee that could not
28  be recovered--that of Mohan Ramachandran.  Cognizant is still investigating this issue;

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1   existence of litigation holds strongly supports the conclusion that once the hold issued,

2   employees retained their documents as instructed, and continued to do so in accordance

3   with reminders.  Maryott Decl., Ex. 23.

4           **2)      Beyond allegedly lost "margin optimization" documents**

5                   **Plaintiffs have not even tried to show prejudice.**

6           Even *if* documents that should have been preserved were lost, Plaintiffs must still

7   demonstrate prejudice.  *Youngevity*, 2020 WL 7048687, at *3.  They have not even tried

8   to do so.  Aside from allegedly lost margin optimization documents from Sriram

9   Rajagopal, Plaintiffs fail to argue or assert prejudice, and for good reason.  More than

10  270,000 documents were produced from the agreed-upon custodians, and Plaintiffs have

11  failed to come forward with "plausible, concrete suggestions" about what the lost

12  information "*might have been.*"  *Hynix Semiconductor*, 897 F. Supp. 2d 939 at 981, 984

13  (citation omitted) (emphasis in original) (finding no prejudice where plaintiff had not

14  "proffered a plausible, concrete suggestion as to how it may have been prejudiced by the

15  destruction of" licensing documents where other related documents "were maintained at

16  least to a large extent"); *see Matthew Enterp.*, 2016 WL 2957133, at *4 (no prejudice

17  where plaintiff offered no suggestions about what lost emails might have contained).

18  Without any showing of prejudice at all, any sanctions under Rule 37 are improper.

19          **3)      Plaintiffs cannot establish intent in connection with the**

20                  **collection glitches.**

21          As discussed above, without a showing of prejudice, sanctions are unwarranted

22  and any question of *intent* as to collection glitches is moot.  Nevertheless, for the sake

23  of completeness, Cognizant responds to Plaintiffs' assertion that its failure to collect and

24  produce was the result of anything other than a misunderstanding.  Plaintiffs recently

25  have taken the position that they were unclear as to what documents Cognizant was

26

27  Plaintiffs have an upcoming 30(b)(6) deposition on document issues at which time

28  Cognizant may be able to provide additional information.

1    collecting.   And, in fairness, this Court has pointed out the existence of imprecise
2    language used by the parties concerning the contours of the documents to be collected.

3        But even assuming Plaintiffs experienced some genuine confusion concerning the
4    scope of what was being collected at some point in time, any confusion could not have
5    reasonably persisted after May 18, 2021.  In the wake of the discovery of the migration
6    glitch, Plaintiffs asked Cognizant point blank about the "steps Cognizant took to collect
7    documents for review, including the process by which the documents were collected,
8    who was involved in the collection (by title and location), what repositories of
9    responsive documents existed for each custodian, *and what was collected for each*
10   *custodian*." Pls. Ex. 62 at p. 2 (emphasis added).  Cognizant responded: "*As explained*
11   *during our meet-and-confer call on May 13, 2021, Cognizant collected the entirety of*
12   *each of the 20 custodians' email (including all folders) which were available in Office*
13   *365.*  At the time collected, Cognizant understood this to encompass the entirety of each
14   custodian's email, given the large size of the collection. As noted in the cover email
15   accompanying the recent custodian productions, this encompassed 'ESI from the PST
16   files' of these custodians." *Id.* (emphasis added); Pls. Ex. 48 at p. 1 (production letter
17   noting that production contained "ESI from PST files" of custodians).   Plaintiffs'
18   counsel then quoted this precise response in a declaration filed in support of Plaintiffs'
19   portion of a joint stipulation re discovery disputes that was filed on June 23, 2021.  [Doc
20   # 150-1 at pp. 8-9, Declaration of D. Kotchen ISO Joint Stip re Discovery Disputes
21   (quoting May 18, 2021 letter from Cognizant).]  Plaintiffs also did not seem alarmed in
22   any way by this disclosure—if Plaintiffs really understood that Cognizant was collecting
23   more than emails for custodians, it is difficult to imagine that Plaintiffs would not have
24   immediately sought clarification.

25       The parties' detailed email exchange concerning Mr. Mitchell's documents
26   highlights the focus on production of emails.  The collection and production of Mr.
27   Mitchell's documents differed because he left the Company well before this lawsuit was
28   filed and Cognizant therefore did not have access to his email in the same manner as for

other custodians.   Consequently, and as discussed in great detail with Plaintiffs, Cognizant undertook an effort to obtain documents from Mitchell's very old laptop—an endeavor that was time-consuming, expensive, and ultimately successful.  On March 12, 2021, Cognizant informed Plaintiffs' counsel, in writing, that "[w]e are, separately and as previously discussed, reviewing what **emails** can be recovered from his Company laptop. We intend to search ***those documents*** using the previously agreed-upon search terms. We will then review and produce."   Maryott Decl., ¶ 10 (emphasis added). Plaintiffs registered no objection to this approach.

Ultimately, and of its own accord, Cognizant determined that because of the unique nature of Mr. Mitchell's documents, including the fact that it was unsure of whether it had all of Mr. Mitchell's emails, it would *also* search all non-junk files available on his laptop.  Cognizant informed Plaintiffs in writing of this on April 16, 2021: "[S]eparately, *because of the **unique nature** of Mr. Mitchell's document recovery, including an inability to ascertain whether the .pst files recovered constitute his complete .pst file*, we also pulled other non-junk files available from Mr. Mitchell's laptop and ran the custodian search terms . . . over those files.  That resulted in a set of 6,612 documents, which we will also review for responsiveness."  Maryott Decl., Ex. 1 at p. 1 (emphasis added).  In response to these detailed communications between the parties evincing their understanding that custodial collections and productions were focused on emails and attachments, Plaintiffs point to a single sentence from a filing in May 2020, well before the parties had negotiated or finalized the custodial collection and production process, including search terms or custodians.  That filing addressed a myriad of issues, and the sentence to which Plaintiffs point focused on the *timing* of custodial ESI (about which the parties agreed).  [Dkt. 80-1.]  That sentence was overbroad and should have noted "emails and attachments," but that single sentence (which Plaintiffs only recently highlighted), should not be read to encompass the understanding of the parties.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

Regardless, Cognizant is now undertaking to collect, review, and produce documents belonging to the agreed-upon custodians located on those custodians' laptops or their OneDrives (to the extent custodians use(d) OneDrive).  Plaintiff cannot show spoliation, prejudice, or intent related to allegedly lost custodial documents, and for that reason, sanctions should be denied.

           **(iii)**    **Against This Backdrop, Case Law Confirms that Sanctions, Including an Adverse Inference Instruction Are Not Warranted**

Whether under Rule 37 or under the Court's inherent power, sanctions for the aforementioned conduct are unwarranted.  Beyond walking through the required elements for sanctions under Rule 37 (which Plaintiffs cannot meet) a review of the case law that defines the contours of sanctionable conduct puts the type of conduct complained of by Plaintiffs outside its scope.

Even where the court considers sanctions pursuant to its inherent authority, the imposition of sanctions should be "exercised with restraint." *Apple Inc. v. Samsung Electronics Co., Ltd.* (*Apple I*), 881 F. Supp. 2d 1132, 1136 (N.D. Cal. 2012).  Both motive and degree of fault are "relevant to what sanction, if any, is imposed." *See In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1066–67 (N.D. Cal. 2006).  "When relevant evidence is lost accidentally or for an innocent reason, an adverse evidentiary inference from the loss may be rejected." *Medical Lab. Mgm't Consultants v. Am. Broadcasting Cos.*, 306 F.3d 806, 824 (9th Cir. 2002).  Additionally, "[t]he degree of prejudice suffered by the opposing party" is key to the consideration of sanctions. *Apple II*, 888 F. Supp. 2d at 992 (citations omitted).  The prejudice inquiry "looks to whether the [defendant's] actions impaired [the plaintiffs'] ability to go to trial or threatened to interfere with the rightful decision of the case" and whether the missing information would force a party to rely on "incomplete and spotty evidence at trial." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006).  "The test for prejudice is whether there is a reasonable possibility, based on concrete evidence, that access to the evidence which

71

was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to the objecting party." *Hamilton*, 2005 WL 3481423, at *8. This can be demonstrated with extrinsic evidence of the destroyed evidence that "demonstrates the extent to which the materials would have been harmful to the spoliator." *Id.* (citation omitted); *cf. Oppenheimer v. City of La Habra*, No. SACV 16–00018 JVS (DFMx), 2017 WL 1807596, at *12 (C.D. Cal. Feb. 17, 2017) (finding prejudice where other text messages showed that intentionally-deleted text messages from the same thread would have contained relevant evidence); *Zest IP Holdings, LLC v. Implant Direct Mfg.*, No. CIV. 10-0541-GPC (WVG), 2013 WL 6159177, at *6 (S.D. Cal. Nov. 25, 2013) (emails from CEO obtained from third parties showed that the deleted emails supported plaintiff's case). If the moving party does not set forth such evidence and instead relies on "pure speculation" as to content, sanctions are not warranted. *Hamilton*, 2005 WL 3481423, at *8. This is particularly true where "Plaintiffs have other evidence available." *Id.*

*The availability of secondary evidence (or Plaintiffs failure to seek such evidence) counsels against sanctions:*

"The availability of secondary sources of evidence to compensate for the despoiled evidence lessens any risk of prejudice at trial." *Ahcom*, 2011 WL 3443499, at *8–9. "[C]ourts often decline to impose sanctions for spoliation where the documents withheld are unlikely to material[ly] affect the outcome of the case, insofar as other evidence exists to provide the same information." *Lofton*, 308 F.R.D. at 288 (declining to impose Plaintiff's sought spoliation sanctions because the case "d[id] not involve spoliation of an entire swath of evidence with no possible substitution" and an order requiring defendants to pay to reconstruct the data was sufficient); *see also Ahcom*, 2011 WL 3443499, at *8–9 (declining to impose adverse inference because "Plaintiff had access to extensive information about the" subjects it suspected had been lost and finding that spoliation was "highly unlikely to have materially impacted the outcome of the case"); *Hamilton*, 2005 WL 3481423, at *8 (declining to impose adverse inference

72

where plaintiffs had other evidence available to confirm that the evidence they had was accurate and plaintiffs were thus not prejudiced by the lost evidence).  Many of the cases Plaintiffs cite expressly decline to grant an adverse inference sanction where discovery is "voluminous" and the missing information is "not the only source of evidence in support of plaintiff's claims."  *Al Otro Lado, Inc. v. Wolf*, No. 3:17-CV-02366-BAS-KSC, 2021 WL 631789, at *7 (S.D. Cal. Feb. 18, 2021) (declining to grant adverse inference where "hundreds of thousands of other contemporaneous documents" were produced and plaintiffs would not be "'forced to rely on incomplete and spotty evidence' to prove their claims"); *see also Small v. Univ. Med. Ctr.*, No. 2:13-CV-0298-APG-PAL, 2018 WL 3795238, at *71 (D. Nev. Aug. 9, 2018) (declining to grant adverse inference sanction under Rule 37(e)(2) where the lost ESI did "not threaten[] to interfere with the rightful decision of the case on its merits given the large volume of ESI" that was produced)[114]; *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 624, 635–36 (D. Colo. 2007) (declining to grant adverse inference sanction because plaintiff was not "substantially prejudiced by [d]efendants' failure to implement and monitor an adequate record preservation program" where defendant "produced over 50,000 pages of documents" and the failure to preserve was not in bad faith).

Moreover, an adverse inference is not warranted where "secondary evidence" is available to plaintiffs to prove their case and plaintiffs "fail[] to pursue this evidence." *Med. Lab. Mg'mt Consultants, Inc.*, 306 F.3d at 824–25 (finding district court properly declined to grant adverse inference instruction for lost evidence because plaintiff could

---

[114]    Plaintiffs are incorrect in stating that an adverse inference sanction was granted in this case.  The court instead imposed a lesser sanction under Rule 37(e)(1) allowing for presentation of the court's finding of spoliation to the jury and allowing it to consider spoliation.  *Small*, 2018 WL 3795238, at *71.  These are two distinct sanctions with vastly different requirements.  *See* FRCP 37(e)(2) advisory committee note to 2015 amendment (distinguishing between adverse inference instructions under (e)(2) directing or permitting jury to infer lost ESI was unfavorable from sanctions under (e)(1) allowing the parties to present evidence on spoliation and instructing the jury that it may consider that evidence).

1   have analyzed an alternate source of the data and deposed experts regarding the data

2   "but [plaintiff] chose not to"); *see also Knightbrook Ins. Co. v. Payless Car Rental Sys.,*

3   *Inc.*, 43 F. Supp. 3d 965, 983 (D. Ariz. 2014) (declining to grant adverse inference

4   instruction where plaintiffs had not demonstrated bad faith and had "not shown that the

5   requested information was truly lost" because "they could have deposed witnesses from

6   third party entities" who "had knowledge" of the issues "but chose not to do so"); *FTC*

7   *v. Lights of Am. Inc.*, No. SACV 10–1333 JVS (MLGx), 2012 WL 695008, at *5 n.8

8   (C.D. Cal. 2012) (declining to impose sanctions because, "[t]o the extent the [plaintiff]

9   has failed to produce any of these documents," "the fact that these emails were available

10  through other sources lessens the likelihood of prejudice").  It does not matter that the

11  lost evidence may have been easier to analyze than the secondary evidence.  *Med. Lab.*

12  *Mg'mt Consultants*, 306 F.3d at 825.  And where "other, and in some instances . . . better

13  evidence" to support plaintiffs' claims is actually produced in lieu of the lost ESI,

14  plaintiffs are not prejudiced and sanctions are not warranted.  *See Reinsdorf v. Skechers*

15  *U.S.A., Inc.*, 296 F.R.D. 604, 630–31 (C.D. Cal. 2013) (finding sanctions not warranted

16  because plaintiff was not prejudiced where defendant produced "other, and in some

17  instances, identical or better evidence of [defendant's] alleged infringement" and

18  plaintiff "was unable to explain how his case would have been different" if he had

19  received the lost materials).

20       Even where a court finds spoliation, it may, within its discretion, decline to grant

21  sanctions.  *Toppan Photomasks Inc. v. Park*, No. 13–cv–03323–MMC (JCS), 2014 WL

22  2567914, at *4 (N.D. Cal. May 29, 2014).  The court has "broad discretion to make

23  discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial."

24  *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.

25  1992).  Courts can, and do, decline to impose sanctions pursuant to this discretionary

26  authority where plaintiffs are not prejudiced by the lost evidence.  *See Toppan*

27  *Photomasks*, 2014 WL 2567914, at *4 (declining to impose adverse inference for

28  spoliated evidence where plaintiffs were not prejudiced); *Ahcom*, 2011 WL 3443499, at

*9 (same); *Hamilton*, 2005 WL 3481423, at *8 (same).  "The bare fact that evidence has been . . . destroyed does not necessarily mean that the party has engaged in sanction-worthy spoliation." *Zest IP Holdings*, 2013 WL 6159177, at *9.

*Plaintiffs' cases are distinguishable:*

The cases Plaintiffs cite involve egregious failures to preserve evidence—facts simply not present in this case.  In *In re Napster, Inc. Copyright Litigation*, for example, the willful or grossly negligent misconduct at issue included a failure to cease its "policy of deleting *all* emails," and an email  produced at the close of discovery explicitly instructed "recipients to delete all of their Napster-related emails going forward in order to avoid surrendering them." 462 F. Supp. 2d at 1073.  Similarly, *4DD Holdings, LLC v. United States*, involved an instruction to delete information because of the pending litigation paired with a narrow interpretation of the relevant preservation hold.  143 Fed. Cl. 118, 132–33 (Fed. Cl. 2019).  Plaintiffs do not, and cannot, allege that Cognizant directed the destruction of emails or failed to disclose its document retention policies.

*Apple Inc. v. Samsung Electronics Co., Ltd.* (*Apple I*), also involved flagrant and "willful" violations of discovery obligations that have no bearing here.  881 F. Supp. 2d at 1150–51.  Samsung failed to suspend a *bi-weekly* automatic email deletion policy that amounted to "ke[eping] the shredder on" after litigation was anticipated, implemented a litigation hold that required employees to affirmatively undo the automatic deletion of their emails by affirmatively saving them, and completely failed to monitor compliance with the hold.  *Id.* at 1140–43, 1150.  Even upon the court's order, Samsung had not suspended the biweekly email deletion policy.  *Id.* at 1149.  No such "willful" conduct has occurred in this case.   And even despite Samsung's willful spoliation, upon consideration of the magistrate judge's order, Judge Koh granted partial relief from the magistrate judge's order granting an adverse inference, finding that the adverse inference was too harsh where "Samsung produced over 12 million pages of documents, including over 80,000 emails, gathered from more than 380 witnesses" and thus Apple's prejudice was "not particularly strong." *Apple II*, 888 F. Supp. 2d at 994.  Where so much evidence

had been produced, the court "f[ound] it difficult to conclude that Apple's 'ability to go to trial' was significantly hampered." *Id.* (citation omitted).

Many of Plaintiffs' authorities involve complete failures to preserve evidence. For example, the defendant in *Zest IP Holdings, LLC v. Implant Direct Mfg.*, *never* implemented a litigation hold or provided "any affirmative instructions to their employees to preserve potentially relevant documents." 2013 WL 6159177, at *6; *see also Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, No. ED CV 14-1926-JAK (SPx), 2016 WL 6609208, at *11 (C.D. Cal. July 12, 2016) (defendant "*never* instituted a proper litigation hold") (emphasis in original)).  Cognizant has been forthright concerning its document retention policies from the very beginning of this litigation and has worked diligently to preserve relevant documents.

Finally, the cases Plaintiffs cite to support their argument that intentional destruction can be inferred in this case evidence a pattern of deception or dereliction of preservation duties that conflicts with Cognizant's history of diligence in this case.  In *Moody v. CSX Transportation, Inc.*—an out-of-circuit case—the court inferred intentional deprivation from defendant's failure, over the course of *four years*, to ever check that the only recording of the accident that was the subject of the litigation had actually been saved or to attempt to recover the crashed laptop that contained the recording.  271 F. Supp. 3d 410, 431–32 (W.D.N.Y. 2017).  Similarly, *Blumenthal Distributing* involved a pattern of discovery failures, including failure to *ever* implement a litigation hold, violation of court orders to search particular locations for documents, failure to remediate its own computer problems, and making affirmative misrepresentations to the court.  2016 WL 6609208, at *12–14, 16.  And *Currin v. Presidio Networked Sols. Grp., LLC* involved a complete lack of diligence on the part of the plaintiff to ensure documents were received by her counsel and actually produced in discovery, ranging from "forg[etting]" about the existence of an electronic device with relevant information to failure to confirm that an email production was actually received by counsel.  No. 3:16-CV-02177-BR, 2018 WL 4825184, at *6–7 (D. Or. Oct. 4, 2018).

76

Unlike the offending parties in these cases, Cognizant has discharged its discovery obligations throughout this case.

### c.      Sanctions are Not Warranted Under Rule 26(g)

Plaintiffs also separately seek sanctions pursuant to Rule 26(g), apparently as a remedy for allegedly false certifications, but Plaintiffs' request should not be granted. Specifically, Plaintiffs request that Cognizant be compelled to search and produce further custodial ESI (Cognizant has largely agreed), that the case schedule should be extended (Plaintiffs intend to raise this issue before Judge Gee), and that monetary sanctions should be imposed for efforts in this motion and in efforts to discovery the document repositories that Cognizant allegedly failed to disclose based on allegedly false certifications. None of this should be awarded.  With respect to the request for additional documents and an extension of the case schedule, those issues are discussed in greater detail in the final section of this Joint Stipulation, where Plaintiffs address those issues in detail.

With respect to the allegedly false certifications, there is no basis for sanctions. Federal Rule of Civil Procedure 26(g)(1) provides that that upon signing discovery responses, attorneys or parties certify that "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" that the responses are complete and correct and are consistent with the rules governing discovery.  An attorney has conducted a "reasonable inquiry" under Rule 26(g)(1) "if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances."   Fed. R. Civ. P. 26(g)(3) advisory committee note to 1983 amendment.  Attorneys "may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances." *Id.*  In determining reasonableness, courts consider "the totality of the circumstances." *Id.*  "The reasonableness of the inquiry is measured by an objective standard; there is no required showing of bad faith." *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 555 (N.D. Cal. 1987).

Courts should "not only weigh the burdensomeness and importance of the discovery requested, but should also seek to further the just, speedy, and inexpensive determination of every action.'" *Reinsdorf*, 296 F.R.D. at 615 (citation omitted). Cognizant consistently has undertaken to respond to Plaintiffs voluminous document requests, interrogatories, and  informal requests and questions regarding a host of discovery matters, and it has done so in good faith.

When missteps have occurred and a party has taken steps to correct them—as Cognizant has done here— and in some cases raised the misstep itself, sanctions are unwarranted.  "Courts cannot and do not expect that any party can meet a standard of perfection." *Id.* (quoting *Pension Comm. of the Univ. of Montreal Pension Plan*, 685 F. Supp. 2d at 461).

The search and response need not be "error-free"; supplemental productions for inadvertently omitted responsive documents "do not necessarily equate to discovery misconduct," and a party may still be found to have complied in good faith. *Id.*  Where insufficiencies in production are corrected and where counsel confers to correct insufficiencies, sanctions under Rule 26(g) are not warranted.  *See Glad-A-Way, Inc. v. Lynn Mayer's Great Lakes Glads, Inc.*, No. C–93–239 MHP, 1994 WL 69467, at *3 (N.D. Cal. Feb. 23, 1994) (no sanctions warranted where "evasive and incomplete" initial answers were corrected by stipulation and the parties conferred regarding further time for correction of interrogatory responses and document productions).

> ### d.   Alternative or Additional Forensic Examination Sanctions Are Unwarranted.

In addition to or as an alternative to the sanctions discussed above, Plaintiffs ask this Court to authorize a fishing expedition of Cognizant's servers, laptops, and other devices that *might* contain responsive ESI.  Although discovery has not been perfect, forensic imaging is reserved for "extreme situations," *Memry Corp. v. Kentucky Oil Tech., N.V.*, No. C04-03843 RMW (HRL), 2007 WL 832937, at *3 (N.D. Cal. Mar. 19, 2007), where the requesting party presents "specific, concrete evidence of concealment

1   or destruction of evidence," *Advante Int'l Corp. v. Mintel Learning Tech.* (*Advante I*),
2   No. C 05-01022 JW (RS), 2006 WL 1806151, at *1 (N.D. Cal. June 29, 2006).  For
3   example, production of "materially-different versions" of the same email, indicating that
4   the email may have been affirmatively "altered," might be sufficient.  *Advante Int'l*
5   *Corp. v. Mintel Learning Tech.* (*Advante II*), No. C 05-01022 JW (RS), 2006 WL
6   3371576, at *1 (N.D. Cal. Nov. 21, 2006)

7        Plaintiffs have pointed to no such circumstances here.  Instead, the record reveals
8   that Cognizant has produced upwards of 270,000 documents and vast troves of data, has
9   responded to discovery requests and informal questions, and has actively participated in
10  the meet-and-confer process with Plaintiffs.  As discussed in detail above, Cognizant
11  has identified and disclosed certain issues, including the inadvertent substitution of
12  Sriram Rajagopalan for Sriram Rajagopal.  And, where Plaintiffs have pointed out
13  issues, Cognizant has immediately sought to investigate and remedy the issue, as it did
14  in the wake of the migration glitch.  Plaintiffs appear to contend that Cognizant simply
15  has not *tried* hard enough in the wake of the migration glitch to collect documents from
16  custodian laptops, but that is pure speculation.  Cognizant has devoted substantial
17  employee and attorney time to recovering additional .pst files from custodian laptops
18  and producing additional documents over the past few months.

19       The cases Plaintiffs cite as justification for forensic examination simply highlight
20  the sort of extreme conduct necessary for such sanctions and bolster the conclusion that
21  such sanctions are unwarranted here.  For example, the court in *CrossFit, Inc. v. Nat'l*
22  *Strength & Conditioning Ass'n*, 2017 WL 2298473, at *5–6 (S.D. Cal. May 26, 2017),
23  ordered a forensic analysis of defendants' servers on the basis of "plainly sufficient
24  evidence to find willfulness, bad faith, or fault on the part of the [defendants] in
25  withholding the recently discovered documents and in lying under oath."  Other cases
26  Plaintiffs cite involve abject inattention to discovery obligations so blatant as to amount
27  to concealment.  In *Ascar v. U.S. Bank, N.A.*, No. 2:13–cv–07496–DSF–VBK, 2014 WL
28  12639926, at *1 (C.D. Cal. Sept. 25, 2014), for example, the court ordered forensic

imaging where plaintiff failed to respond to discovery requests, to meet and confer, or to participate in the parties' Rule 37 joint stipulation and ignored the court's order to compel.  In *Currin v. Presidio Networked Sols. Grp., LLC*, 2018 WL 4825184, at *4, 7, the court ordered forensic imaging of plaintiff's electronic devices where she produced only 556 total documents before discovery closed and claimed she did not realize that a vast number of documents had not been produced.  And, in *Garrison v. Ringgold*, No. 19-cv-0244 GPC-DEB, 2020 WL 6537389, at *2 (S.D. Cal. Nov. 6, 2020), the court ordered forensic imaging where defendant claimed he had nothing to produce because his relevant accounts had been "hacked" and his hard drive "fried," and then ignored plaintiffs' efforts to meet and confer.

Other cases Plaintiffs cite are inapposite because they deal with cases in which a forensic examination of computers is warranted because the *computers* or *hard drives* had a special connection to the lawsuit itself.  The computers at issue here merely belonged to custodians who Plaintiffs posit are relevant to their claims of discrimination, which stands in sharp contrast to the cited cases.  *See Ingrid & Isabel, LLC v. Baby Be Mine, LLC*, No. 13-cv-01806-JCS, 2014 WL 1338480, at *9 (N.D. Cal. Apr. 1, 2014) ("The production of hard drives is a remedy that is typically ordered only in cases that 'involve an extreme situation . . . where computers have a special connection to the lawsuit.'" (citation omitted)); *see Roadrunner Transp. Servs., Inc. v. Tarwater*, No. SACV 10–1534 AG (MLGx), 2012 WL 12918345, at *2 (C.D. Cal. Aug. 5, 2012) (forensic examination appropriate because movant alleged non-movant used the devices to transfer stolen data); *Bryant v. Mattel, Inc.*, No. C 04–09049 SGL RNBX, 2007 WL 5416681, at *10 (C.D. Cal. Jan. 26, 2007), *enforcement granted in part, denied in part*, 2007 WL 5430887 (C.D. Cal. June 20, 2007) (forensic examination of hard drive appropriate where non-movant allegedly misused movant's property to secretly aid competitor in violation of employment agreement).

Plaintiffs' allegations here fall far short of "specific, concrete evidence of concealment or destruction."  *Advante I*, 2006 WL 1806151, at *1.  As explained in

80

detail above, Plaintiffs' complaints stem from differing views as to when certain custodians should have been placed on hold, an inadvertent error concerning a single custodian that *Cognizant* caught and disclosed, and apparent misunderstandings regarding the source of Cognizant's initial document collection. None of these disputes raise questions as to the reliability and completeness of Cognizant's discovery, but instead represent disagreements or discovery issues that routinely plague massive cases like this one.

Plaintiffs' second theory that forensic imaging is warranted to determine appropriate sanctions is unsupported by their cited cases. The court in *CrossFit, Inc. v. National Strength & Conditioning Association*, 2017 WL 2298473, at *6, did not order plaintiff to "commission a neutral forensic analysis . . . to determine whether terminating sanctions were appropriate," as Plaintiffs claim. JS at p. 42. Instead, the court ordered forensic imaging only *after* it determined sanctions were warranted. Likewise, in *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 2016 WL 6609208, at *7–8, 27–28, the court determined that sanctions were warranted only *after* a forensic analysis conducted at the agreement of the parties demonstrated documents had been lost.

Plaintiffs simply have not justified the intrusive imposition of forensic imaging.

### B.   PLAINTIFFS' ENTITLEMENT TO SANCTIONS FOR COGNIZANT'S FAILURE TO DISCLOSE ARBITRATION AGREEMENTS

### 1.   *Plaintiffs' Position*

#### a.   Legal Standard

Rule 26 requires a party to provide, "without awaiting a discovery request, . . . a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(ii). Parties are obligated to supplement their disclosures, and any request for production, "in a timely manner if the party learns that

81

in some material respect the disclosure or response is incomplete." Fed. R. Civ. P. 26(e). Moreover, when producing documents in response to a discovery request, "[t]he production must . . . be completed no later than the time for inspection specified in the request or another *reasonable time* specified in the response." Fed. R. Civ. P. 34(b)(2)(B) (emphasis added).

Cognizant neglected to disclose the existence of 14,850 arbitration agreements with putative class members—identifying them as relevant documents that Cognizant "may use to support its claims and defenses" for the first time their October 5, 2021 Supplemental Initial Disclosures, served ten days prior to the close of discovery. Kotchen Decl. ¶ 6; Ex. 54 at 9 (Cognizant's Supp. Initial Disclosures).  Cognizant then produced the arbitration agreements at the very close of discovery, thereby prohibiting Plaintiffs from taking any follow-up discovery on them. Kotchen Decl. ¶ 6.

### b.   Background

Cognizant provided its Rule 26 Initial Disclosures to Plaintiffs on February 11, 2019, which was the agreed-upon deadline for their production.  Ex. 30; Fed. R. Civ. P. 26(a)(1)(C).  The disclosures made no mention of arbitration agreements with putative class members.  *Id.*  On October 15, 2021, *over 2.5 years later*, Cognizant supplemented the disclosures, identifying for the first time the existence of "[a]rbitration agreements entered into by putative class members."  Ex. 54.

The arbitration agreements were also subject to a document request issued to Cognizant in January 2019.  Request No. 17 to Plaintiffs' First Set of Requests sought documents relating to Cognizant's affirmative defenses:

**REQUEST NO. 17:** Documents and ESI relating to each denial and affirmative defense raised in Cognizant's Answer (including any amended Answer).

*See* Ex. 55 at Req. No. 17 (Pls.' First Set of RFPs). Cognizant served the following response to this Request on August 30, 2019:

**RESPONSE TO REQUEST NO. 17:** Defendants incorporate their preliminary statement and general objections as if fully set forth in response to this Request. Defendants further object to this Request to the extent that

it seeks information that is not relevant to the subject matter of this litigation or seeks information disproportionate to the needs of the case and of such marginal relevance that its probative value is substantially outweighed by the burden imposed on Cognizant in having to search for and provide such information. Defendants object to this Request on the ground that it is overly broad in its use of the term "relating to." Defendants object to this request as overly broad and unduly burdensome. Defendants further object to this Request on the ground that it calls for information that is proprietary, trade secret, or otherwise confidential.

Subject to and without waiver of any of the foregoing general and specific objections, Defendants respond as follows: Subject to entry of a suitable Protective Order, Defendants will produce documents, electronically stored information, and tangible things that are in its possession, custody, or control, and which it may use to support its claims or defenses, unless the use would be solely for impeachment.

*See* Ex. 56 at Answer No. 17 (Cognizant's Resp. to RFPs).[115]

In its response, Cognizant explicitly agreed to produce responsive documents, and did not state that any responsive documents were being withheld subject to its objections. *See id.*; Fed. R. Civ. P. 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection.").

### c.   Argument

On October 14, the day before the close of fact discovery, *see* Order at 2 (Dkt. 157), Cognizant produced 14,850 arbitration agreements. Kotchen Decl. ¶ 6. Cognizant was required to identify these agreements in its initial disclosures, but chose not to do so, instead waiting to disclose them until October 5, 2021, 11 days before the close of discovery.  *See* Ex. 30 (initial disclosures); Ex. 54 (supplemental disclosures); Fed. R. Civ. P. 26(a)(1)(ii) (requiring disclosure of documents used to support a party's defenses).  In doing so, Cognizant precluded Plaintiffs from taking follow-up discovery regarding the agreements and the agreements' enforceability.  As a result, Plaintiffs now have no way of knowing, *inter alia*, when and why Cognizant instituted the arbitration agreements; whether signing the agreement is a mandatory condition for employment or

---

[115] A protective order was entered on September 24, 2019. *See* Dkt. 64.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

continued employment; whether the agreements are presented to applicants, employees, or both; how many individuals have been asked to sign these agreements; how many agreements have been signed by putative class members; how many individuals declined to sign the agreements, and those individuals' fates; whether the language in the agreements has changed over time and why; and whether Cognizant informed individuals of this class action lawsuit prior to requiring them to sign the agreements.[116]

While it appears from a preliminary review that the arbitration agreements are dated between 2019 and the present, Plaintiffs have no way of knowing when Cognizant introduced the agreements without reviewing each agreement. That information is not apparent from the metadata, which lists each agreement's "master date," "created date," and "modified date" as October 9, 2021, regardless of when the agreement was signed. Kotchen Decl. ¶ 6. This is presumably the date on which the agreements were gathered or when Cognizant ran the production. Even assuming, *arguendo*, that Cognizant began using arbitration agreements in 2019, it should have started producing them on a rolling basis that year. But instead, Cognizant failed to disclose the agreements for over 2.5 years and produced the 14,850 arbitration agreements on October 14, 2021, foreclosing Plaintiffs from taking discovery on them. Plaintiffs should therefore be afforded the opportunity to take discovery concerning the arbitration agreements.

Cognizant's argument that Plaintiffs lack standing to challenge the arbitration agreements is unavailing. "[T]he Ninth Circuit has not issued a published case addressing whether a plaintiff who does not sign an arbitration agreement has standing to challenge the agreement in a class action proceeding . . . and the district courts that

---

[116] While Cognizant argues in its November 9, 2021 letter that Plaintiffs too withheld documents which it produced near the close of discovery, the vast majority of the documents were solicitations from recruiters to Plaintiff Piroumian (supplementing his prior document production from December 2019 forward), and updated income information for Plaintiffs for 2020 and 2021, for which no follow-up discovery is required. Ex. 21 at 21; Kotchen Decl ¶ 8. Additionally, all but 44 documents have been produced from Plaintiffs' privilege log. Kotchen Decl. ¶ 8.

84

have encountered the argument have refused to limit discovery on th[e] basis [of standing]." *Urena v. Central Cal. Almond Growers Ass'n*, No. 1:18-cv-00517, 2019 WL 2390042, at *4, 6, 7 (E.D. Cal. June 6, 2019) (ordering Defendant to respond to discovery and compelling production of contact information of all putative class members and "whether or not those class members signed an arbitration agreement"). Had the arbitration agreements been timely disclosed Plaintiffs would have been able to take follow-up discovery on them to determine, e.g., whether they are unenforceable. *See id.* at *5 ("find[ing] that Plaintiff makes a colorable argument that the post-litigation [arbitration] agreements are impermissible: to the extent the post litigation arbitration agreements do not provide notice of the present suit or otherwise accurately apprise the putative class members of their rights in this suit" and ordering follow-up discovery); *see also Sansone v. Charter Comm'ns, Inc.*, No. 17-cv-01880, 2019 WL 460728, at *8-9 (S.D. Cal. Feb. 6, 2019) (finding contact information of putative class members that had signed arbitration agreement relevant because "[b]y communicating with putative class members, Plaintiffs will be able to gather information related to the enforceability of the arbitration agreement, which may be an issue during the certification stage").

## 2. *Defendants' Position*

On October 5, 2021, Cognizant supplemented its initial disclosures and added "[A]rbitration agreements entered into by putative class members" to its list of potentially relevant documents that it might rely upon to support its claims and defenses." Pls. Ex. 54 at pp. 8-9. Cognizant made this timely disclosure in the ordinary course of determining information it *may* rely upon at some point in the case.

The disclosure requirements of Rule 26(a)(1)(A) "are designed to . . . help focus the discovery that is needed[] and facilitate preparation for trial or settlement." Fed. R. Civ. P. 26, advisory committee's note to 1993 amendment. Thus, the rule should "be applied with common sense in light of the principles of Rule 1, keeping in mind the salutary purposes that the rule is intended to accomplish." *Id.* In line with the pragmatic flexibility underpinning its purpose, Rule 26 calls for supplementation of initial

disclosures "in a timely manner" where additional information becomes available after the initial disclosures have been made. Fed. R. Civ. P. 26(e)(1)(A). The rule does not mandate a timeline, and supplemental disclosures made prior to the close of discovery are timely. *See Fabric Selection, Inc. v. NNW Import, Inc.*, 2018 WL 1779334, at *3 (C.D. Cal. Apr. 11, 2018) (finding documents disclosed "only days before the close of discovery" were timely under Rule 26(a)); *Jackson Family Wines, Inc. v. Diageo N. Am., Inc.*, 2014 WL 104902, at *3 (N.D. Cal. Jan. 9, 2014) (finding photos produced a week before the close of fact discovery were timely under Rule 26); *Kirby v. Homax Prods., Inc.*, 2007 WL 2600838, at *3 (W.D. Wash. Sept. 7, 2007) (finding supplemental disclosure made "nine days before the close of discovery and well in advance of trial" was timely under Rule 26(a)); *Broadband iTV, INC. v. Hawaiian Telcom, Inc.*, 2015 WL 12776596, at *3–4 (D. Haw. Sept. 10, 2015) (finding expert disclosure made "just days before the discovery deadline" was timely under Rule 26(a)); *Jackson v. United Artists Theatre Cir., Inc.*, 278 F.R.D. 586, 592 (D. Nev. 2011) (finding disclosures did not violate Rule 26(a)(1)(A)(ii) where supplemental disclosure had been served on the last day of discovery).

Bare assertions that "the disclosures should have been provided sooner" do not change the fact that the disclosures were made before the fact discovery cut-off. *See Kirby*, 2007 WL 2600838, at *3–4; *Werbicky v. Green Tree Serv., LLC*, 2014 WL 5470466, at *3 (D. Nev. Oct. 27, 2014) ("Defendant's bare assertions that Plaintiffs provided at the close of discovery documents that should have been provided as an initial disclosure (or earlier supplement) is simply insufficient to carry its burden of showing good cause to reopen discovery.").

It bears noting that Plaintiffs should not be heard to complain when they too produced documents equally close (and in some instances closer) in time to the October 15, 2021 discovery cut-off and also served supplemental initial disclosures on the final day of discovery, thereby precluding Cognizant from "further discovery." Specifically, Plaintiffs produced nearly 3,800 documents from the named Plaintiffs one week before

the October 15 deadline along with a 238-entry privilege log, having never previously noted additional documents would be forthcoming or that they were withholding any documents from prior productions on the basis of privilege.  On the final day of discovery, October 15, Plaintiffs also sent Cognizant supplemental disclosures calculating Plaintiffs' alleged damages for the first time, despite damages disclosures being specifically required as part of the initial disclosures under Rule 26(a)(1)(A)(iii).

With respect to the surprise privilege log, Cognizant initially elected not to raise the privilege log issues with the Court, understanding the discovery deadline to be October 15.  However, in light of Plaintiffs' argument that the deadline for all discovery motions is December 16, Cognizant sent Plaintiffs a Rule 37 letter regarding the numerous obvious deficiencies in Plaintiffs' late-produced privilege log.  Maryott Decl., Ex. 12.  In response to these obvious issues, Plaintiffs admitted that of the 238 privilege log designations, they would only continue to stand by 53 of them (Plaintiffs initially listed 59 on the letter they sent in response to Cognizant, but there appear to only be 53 remaining).[117]

With respect to the produced documents themselves, Plaintiffs contend that because  "the vast majority of the [roughly 3800] documents were solicitations from recruiters to Plaintiff Piroumian (supplementing his prior document production from December 2019 forward), and updated income information for Plaintiffs for 2020 and 2021, for which no follow-up discovery is required," their production just before the close of discovery is permissible.  JS at p. 84.  But, Plaintiffs' productions (including documents produced only as a result of Cognizant pointing out obvious problems with Plaintiffs' privilege log) are highly probative.  One document, for example, is an email

---

[117]   There were some issues in several versions of the revised privilege logs sent by Plaintiffs, including a version sent with some filters set on an Excel to obscure the type of claimed privilege that Cognizant primarily challenged.  The parties are working through these issues, but that may have been the reason for the unclear number of privilege log entries that Plaintiffs continue to stand by.  Regardless, 75-80% of the original entries on the log were obviously overbroad.

between one named Plaintiff and the EEOC.   Another involves communications regarding one Plaintiff's attempts to be allocated prior to his termination.  And another document is an email between Plaintiff Piroumian and reporter Sara Blackwell, Maryott Decl., Ex. 11.  That final email is particularly probative as it was written while Piroumian was still at Cognizant (and prior to his termination), noting that "*I am at Cognizant for another four weeks as I'm on CDP . . . big surprise, eh?!  I will be participating in the law suit that Daniel Kitchen is preparing*."  Maryott Decl., Ex. 11.  This email goes directly to whether Mr. Piroumian was even attempting in good faith to be allocated to a new project in his final weeks, as he seemed to concede that he would automatically be terminated within four weeks.  Regardless, Cognizant was prevented from asking Piroumian questions about this document in his deposition, or conducting any follow up discovery, without any explanation for why this June 2017 email was only produced on October 8--roughly a year and a half after Piroumian's other documents were produced.  Similarly, the idea that Cognizant would not need to conduct further discovery into Plaintiffs' damages calculations or claims is obviously incorrect.

As for the arbitration agreements, Plaintiffs' engagement on this issue reveals their true goal—it is not to obtain discovery concerning the arbitration agreements, but to preclude their use entirely.  Plaintiffs for the first time in this joint stipulation identify discovery that they claim would be necessary concerning the arbitration agreements.  Yet, they have not asked Cognizant to include those topics in the upcoming substantive Rule 30(b)(6) deposition.  *See Fabric Selection Inc.*, 2018 WL 1779334, at *3 (rejecting plaintiff's request for exclusion of documents disclosed before the discovery cut-off when plaintiff had "fail[ed] to seek follow-up discovery with ten days remaining before the cut-off.").

Finally, with respect to the questions of standing to challenge the arbitration agreements or the enforceability of the agreements, those are issues that will be properly addressed if, or when, Cognizant offers the arbitration agreements in support of its

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

defenses.  If it does not ultimately elect to utilize them to support its defenses, then the Court will not need to rule on those issues.

### C.   PLAINTIFFS' ENTITLEMENT TO SANCTIONS FOR IMPROPER COMMUNICATIONS WITH CLASS MEMBERS

**1.   *Plaintiffs' Position***

**a.   Legal Standard**

While defense attorneys may generally contact absent putative class members prior to class certification, "courts have limited pre-certification communications with potential class members after misleading, coercive, or improper communications were made."  *Mevorah v. Wells Fargo Home Mortg., Inc.*, No. C 05-1175 MHP, 2005 WL 4813532, at *3 (N.D. Cal. Nov. 17, 2005).  Courts have "broad" power under Rule 23(d) to ensure the integrity of class actions, including taking prophylactic action with respect to communications.  *Marino v. CACafe, Inc.*, No. 16-CV-6291 YGR, 2017 WL 1540717, at *2 (N.D. Cal. Apr. 28, 2017).  At a minimum, the defense attorney must disclose who they are representing and that their client's interests are adverse to the putative class members.  *Mevorah*, 2005 WL 4813532, at *5.  If the court finds, based on the communications between the defense attorney and one putative class member that the employee was misled, "it is reasonable to assume that other employees, . . ., may have been [or may be] misled."  *Id.* at *5.

**b.   Argument**

Cognizant has acknowledged that it has been contacting members of the putative class to "identify potential witnesses to support denial of class certification as to any class Plaintiffs may seek to certify."[118]  However, Cognizant claims its communications were not misleading because it told each such person (a) that they were part of the putative class and (b) that their interests could be adverse to Cognizant.  *Id*.  Cognizant also claims that it "has not made settlement offers to any putative class members in this

---

[118] Ex. 21 at 8.

1    case." *Id.*   However, Cognizant's representations are false and Cognizant has

2    improperly destroyed evidence in its possession that is capable of confirming this.

3         George Pelosi is a member of the putative class.  He worked for Cognizant from

4    May 16, 2016 to March 29, 2021.[119]  He is non-Indian and Cognizant failed to promote

5    him, and underpaid his bonus during this employment.  *Id.* ¶ 3.  His employment ended

6    under circumstances that could constitute a constructive termination.  *Id.*

7         Cognizant's Associate General Counsel, Jared Barcenas, contacted Mr. Pelosi on

8    September 24, 2021, notifying him that attorneys for Gibson, Dunn & Crutcher ("Gibson

9    Dunn" may contact him because they were interested in speaking with current and

10   former employees about their experience with the company.  *Id.* ¶ 4.  After Mr. Pelosi

11   asked further about the subject matter of the call, Mr. Barcena stated that Cognizant was

12   defending a discrimination class action lawsuit and that Mr. Pelosi shared "certain

13   characteristics . . . in common with the named plaintiffs."  *Id.*

14        When Mr. Pelosi spoke with the Gibson Dunn attorneys, they did not disclose the

15   details of the class action lawsuit, that they represented Cognizant, or that their client's

16   interests were potentially adverse Mr. Pelosi's.  *Id.* ¶ 5.  Indeed, Mr. Pelosi was initially

17   under the impression that Gibson Dunn were representing the plaintiffs because they

18   wanted to "get [his] side" of why he left Cognizant.  *Id.*

19        Mr. Pelosi also indicates that he was "repeatedly asked" if he had supervisory

20   responsibilities, and when he said no, whether he was "positive" he had no such

21   responsibilities.  *Id.* ¶ 6.  He was also asked if he left Cognizant of his "own free will."

22   *Id.*

23        Mr. Pelosi also specifically confirms that Gibson Dunn did not tell him he was

24   part of the putative class or that he would not be penalized or retaliated against if he did

25   not want to talk.  *Id.* ¶ 9.

26

27   ────────────────

28        [119] Ex. 57 ¶ 2 (Pelosi Decl.).

According to Mr. Pelosi, the Gibson Dunn attorney informed him at the "very end of the call" that they "had recorded the call and they may or may not use the recording in the lawsuit." *Id.* ¶ 8.  When Mr. Pelosi expressed concern about whether the recording might be used against him, the attorney responded that he "was not in trouble." *Id.*

After receiving information about this call from Mr. Pelosi, Plaintiffs' Counsel asked Defendants' Counsel to confirm they were recording calls with putative class members.[120]  Defendants' Counsel denied that they had recorded the call with Mr. Pelosi, but admitted that multiple calls with other putative class members were recorded. However, they claimed that a junior attorney had recorded that call without authorization, and had "deleted the recordings promptly after completing the interview summaries."[121]  Defendants' Counsel did not respond to follow-up questions from Plaintiffs' Counsel. Kotchen Decl. ¶ 7.

Mr. Pelosi's account of his call with Gibson Dunn attorneys merits the Court's supervisory intervention for multiple reasons.  First, Mr. Pelosi was not told—and did not realize—who Gibson Dunn was representing and that his interests were adverse until halfway through the call. Ex. 57 ¶¶ 5, 9.  Second, Gibson Dunn did not provide Mr. Pelosi with sufficient information about the lawsuit, so that he might ascertain that his interests were adverse on his own.  *Id.* ¶ 5.  Finally, it is concerning that Gibson Dunn surreptitiously recorded the call with Mr. Pelosi and only told him at the very end of the call that they might use it against him in the lawsuit.  *Id.* ¶ 8.  Although Defendants' Counsel denies recording the call with Mr. Pelosi, Mr. Pelosi's account is corroborated by the fact that Cognizant admitted that other calls were recorded.  *See* Ex. 59.

Defendants' Counsel's statement that recordings were destroyed is also concerning because once Counsel decided to record the call, they had an obligation to preserve that recording. Those recordings would be particularly helpful here because

---

[120] Ex. 58 (Email from D. Kotchen to Cognizant (Nov. 3, 2021)).

[121] Ex. 59 (Email from M. Maryott to Pls. (Nov. 4, 2021)).

Cognizant is claiming to have provided admonitions to every putative class member, which Mr. Pelosi denies receiving.

Cognizant's claim that it has "not made settlement offers to any putative class members in this case" is also incorrect. Ex. 21 at 20. On October 4, 2021, Cognizant terminated Eric Goldberg's employment. Ex. 43 ¶ 2 (Goldberg Decl.).  On October 6, 2021, Cognizant asked him to sign a severance agreement that released his claims, without disclosing the existence of this lawsuit to him. *Id.* ¶ 3.

Plaintiffs request the Court order the following sanctions at this time pursuant to Federal Rule of Civil Procedure 23(d):

> ➢ Order Defendants to cease communicating with putative class members;
> ➢ Order Defendants to provide a list of all contacts with putative class members, so Plaintiffs can investigate whether further curative relief is appropriate;
> ➢ Order Defendants to produce a copy of any written communications with putative class members;
> ➢ Order Defendants to produce any recordings or summaries of its call with Mr. Pelosi;
> ➢ Order Defendants to produce any recordings it made of interviews or other communications with putative class members;
> ➢ Order Defendants to produce summaries of any interviews with putative class members that it recorded, but thereafter deleted the recording;  and
> ➢ Order Defendants to produce any releases or opt-out agreements obtained with putative class members.

Cognizant should be restricted from further communications with putative class members because its communications with Mr. Pelosi demonstrate the potential for significant abuse. While Plaintiffs are not seeking other relief at this time, such as a curative notice, Plaintiffs ask for lesser relief, so that it can investigate whether additional court intervention is appropriate.

## 2.    *Defendants' Position*

As an initial matter, Plaintiffs failed to comply fully with Rule 37 regarding the relief they now seek.  In their Rule 37 letter dated October 28, 2021, they did not raise the

1    issue of recordings and with respect to Rule 23(d) advised Cognizant that they intended,

2    with respect to communications with putative class members, to seek an order "for any or

3    all of the following, in addition to sanctions: . . . requiring a curative notice to be sent to

4    putative class members, and prohibiting Cognizant from continuing to communicate with

5    putative class members."  Maryott Decl., Ex. 3.

6         On November 3, 2021, Plaintiffs raised the issue concerning Mr. Pelosi's claim that

7    his phone conversation with attorneys from Gibson Dunn had been recorded, and

8    Cognizant promptly responded with complete transparency.   Specifically, Cognizant

9    informed Plaintiffs' counsel that the two attorneys who had been on the call with Mr.

10   Pelosi confirmed that they did not record the call with Mr. Pelosi and did not tell him the

11   call was recorded, but that a third attorney who was not on the call with Mr. Pelosi had

12   recorded calls with other witnesses to aid in preparing interview summaries.  The parties

13   engaged in meet and confer calls on November 9, 10 and 12, but at no time did Plaintiffs'

14   counsel initiate a discussion regarding the issues concerning Mr. Pelosi, the recordings or

15   the relief they now seek, which includes a request that Cognizant turn over its work

16   product—namely, the identities of every putative class member that Cognizant

17   interviewed in preparing its defense to class certification and all interview notes.  Maryott

18   Decl., ¶ 14.  Notably, the only conversation that took place regarding Mr. Pelosi was a

19   conversation initiated by Cognizant's counsel to Daniel Kotchen explaining the situation

20   and asking him to please consider the potential impact on this young lawyer if Plaintiffs

21   persisted in making this tangential and innocent lapse in judgment an issue.  Maryott Decl.

22   ¶ 14.  Plaintiffs therefore failed to properly meet and confer regarding any relief tied to

23   the assertions made by Mr. Pelosi.

24        As for the relief about which Plaintiffs did confer, *i.e.*, concerning communications

25   with putative class members in general, Plaintiffs request this Court to strip Cognizant of

26   its due process rights to defend itself by precluding Cognizant from having *any* additional

27   contact with putative class members.  The facts do not warrant the extraordinary relief

28   they seek.

93

As even Plaintiffs now concede, it is black letter law that "[b]efore a class is certified in a class action, counsel for both plaintiffs and defendants may communicate with the putative class, *ex parte*, about the lawsuit." *Woolley v. Ygrene Energy Fund, Inc.*, No. 17-cv-01258-LB, 2020 WL 999846, at *1 (N.D. Cal. Mar. 2, 2020) (*quoting Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)); *see Trujillo v. Chef's Warehouse W. Coast LLC*, No. 2:19-cv-08370 DSF (MAAx), 2020 WL 7315346, at *19 (C.D. Cal. Oct. 19, 2020) ("[I]t long has been the rule that, in class actions, 'before class certification has taken place, all parties are entitled to equal access to persons who potentially have an interest in or relevant knowledge of the subject of the action, but who are not yet parties.'" (citation omitted)); *Soto v. O.C. Commc'ns, Inc.*, 319 F. Supp. 3d 1165, 1167 (N.D. Cal. 2018) ("[L]awyers are perfectly entitled to reach out to potential collective members . . . without first seeking court approval.").

The Supreme Court has held that courts may limit such communications only upon "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co.*, 452 U.S. at 101. Under that standard, the moving party must provide "a *particular* and *specific* demonstration of fact, as distinguished from stereotyped and conclusory statements." *Id.* at 102 n.16 (emphasis added). The Supreme Court has warned that "[t]here certainly is no justification for adopting [a communications ban] in the absence of a clear record and specific findings of need." *Id.* at 104. The Ninth Circuit has accordingly reversed district court orders limiting communication with potential class members when the district court failed to make specific findings of potential abuse. *See, e.g.*, *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1439 (9th Cir. 1984); *see also Williams v. U.S. Dist. Ct.*, 658 F.2d 430, 436 (6th Cir. 1981) (holding that a district court's "gag" order was invalid under *Gulf Oil Co.* because it was not supported by "evidence of any abuse or potential abuse").

Plaintiffs nevertheless urge this Court to ignore this binding precedent and sanction Cognizant for its communication with current and former Cognizant employees—without providing any evidence that restrictions on that communication are warranted. Plaintiffs

94

present plenty of unsubstantiated allegations about the impropriety of these communications.  Yet they fail to acknowledge that "[t]he mere possibility of abuse, without evidence that class counsel engaged in or plans to engage in such abuse, is insufficient to block all communications with potential class members." *Nguyen v. Baxter Healthcare Corp.*, 275 F.R.D. 503, 506 (C.D. Cal. 2011); *see Cram v. Elec. Data Sys. Corp.*, No. 07cv1842-LAB (NLS), 2008 WL 178449, at *3 (S.D. Cal. Jan. 17, 2008) ("A mere possibility of confusion is insufficient to justify the district court's exercise of supervisory authority over parties' communications with potential class members."). By failing to offer credible evidence of "the particular abuses by which [they are] threatened," therefore, Plaintiffs necessarily fail to carry their burden that would permit this court to limit communications between Cognizant and putative class members. *Gulf Oil Co.*, 452 U.S. at 102; *see Amaraut v. Sprint/United Mgmt. Co.*, No. 3:19-cv-411-WQH-AHG, 2020 WL 1820120, at *2 (S.D. Cal. Apr. 10, 2020) ("The court cannot issue an order [limiting communication with putative class members] without *evidence* that a potential for serious abuse exists." (emphasis added) (citation omitted)).

In its communications with putative class members, Cognizant's attorneys gave admonitions that conveyed the purpose and nature of the interview.  Notably, Plaintiffs have not even asked Cognizant for the content of the admonitions given to the putative class members, a reasonable first step before making accusations and requesting the extreme sanction sought here.  Cognizant's attorneys who conducted interviews signed and dated admonition forms to create an internal record that the admonitions had been given in full prior to asking any questions.  The full text of the admonition, which is attached to the Declaration of Raquel Sghiatti, is set forth here for the Court's convenience:

> 1.    I am an attorney representing Cognizant in a lawsuit filed by four former employees:  Christy Palmer, Vartan Piroumian, Edward Cox, and Jean-Claude Franchitti (the "Plaintiffs"). These Plaintiffs bring the lawsuit (known as the *Palmer* lawsuit) on their own behalf and as a proposed class action under federal law.

2.    The Plaintiffs are seeking at this time to represent a class of all persons who are not of South Asian race or Indian national origin and who applied for positions with (or within) Cognizant and were not hired, who were not promoted after being in a position at least 12 months, and/or who were terminated from Cognizant, from September 18, 2013 to the present.

3.    The Plaintiffs allege that Cognizant discriminated against non-Indian or non-South Asian employees and applicants in hiring, internal staffing, promotion, and termination, and are seeking damages and other relief. Cognizant disagrees and believes that at all times it has treated all employees fairly regardless of race or national origin and has at all times had a strict policy against discrimination of any kind, including but not limited to discrimination based on race, ethnicity, or national origin. The Court has not yet determined whether the lawsuit can proceed as a class action or whether any of Plaintiffs' claims against Cognizant have merit. A decision on whether the lawsuit can proceed as a class is expected in Spring of 2022.

4.    Cognizant has asked me to investigate these claims and to help the Company prepare its defense. I am interviewing a number of employees like you to gather evidence to assist Cognizant in defending against Plaintiff's efforts to certify a class. I should also tell you that you fall within the group of individuals who the Plaintiffs seek to represent in this class action and that Cognizant's interests in this case could become adverse to you or other employees that are currently encompassed in the proposed class.  I also need to let you know that any information that you share with us could be used in the Company's interests.

5.    Before we start, I would like to go over a few preliminary matters:

6.    Are you represented by an attorney concerning your employment with Cognizant? [*If "yes," thank the employee and end the interview*]

7.    Cognizant appreciates that you have agreed to speak with me, but you should understand that your participation today is completely voluntary. You are under no obligation to speak with me and may discontinue the interview at any time.

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

8.     You should also know that you will not be given any extra benefit for participating in this interview, nor will you be penalized or retaliated against in any way if you decide you would rather not talk to me.

9.     As I mentioned, we are counsel that has been retained in connection with the defense of the *Palmer* case. We represent Cognizant, the corporate entity. To assist us in that defense, we are interviewing employees on behalf of Cognizant. We want to make clear that we do not represent any individual employee at Cognizant, and consistent with that, we do not represent you and cannot provide you with any legal advice, do you understand that?

10.   I would ask that provide me with complete and truthful responses to any of the questions I may ask today, but if there are any questions you do not want to answer, you do not have to do so.

11.   You may be contacted by one of the Plaintiffs' attorneys about this case.   It is entirely up to you whether you want to speak with them. However, like today's interview, you are under no obligation to speak to them.

12.   Are you comfortable answering my questions at this point?

Declaration of Raquel Sghiatti ("Sghiatti Decl."), Ex. A.

This is precisely the admonition that Cognizant's attorneys read to Mr. Pelosi before asking him any questions.   Sghiatti Decl., ¶¶ 3-4.   That Mr. Pelosi, who is clearly a disgruntled employee, claims not to have understood is not something about which Cognizant can do much now.   But the claim that he was told the inyouterview was recorded is simply not true.   The attorneys who spoke with him did not record the interview and did not tell him it was recorded.   Sghiatti Decl., ¶ 6 ("I did not record the call with George Pelosi, and I did not tell him the call was recorded.");   Roges Decl., ¶ 2.   Mr. Pelosi appears to have also confused a statement made by Mr. Barcenas via email that Mr. Pelosi was "not in any kind of trouble," Pls. Ex. 57, Ex. A, with his discussion with the Gibson Dunn attorneys, because the subject of "trouble" did not come up during the interview.   Sghiatti Decl., ¶ 5.

97

On November 3, 2021, Plaintiffs' counsel wrote to Cognizant's counsel advising they "underst[ood] that Gibson Dunn attorneys recorded phone calls with putative class members" and asking Gibson Dunn to preserve all recordings and provide copies to Plaintiffs.  Maryott Decl., Ex. 15 at p. 5.  In response, Cognizant's counsel promptly responded that nobody had been directed or authorized to record any phone conversations, but that they would look into the matter promptly, and requested additional information to assist in an effort to determine if anyone had deviated from protocol.  Plaintiffs then identified George Pelosi and noted that he had informed them that he had been told his call was being recorded.  *Id.* at p. 4.

Cognizant confirmed that neither of the attorneys who spoke with Mr. Pelosi had advised him that the call was recorded or recorded the call.  And both confirmed that the full admonition had been given to Mr. Pelosi.  However, in the course of conducting diligence in response to Plaintiffs' counsel's inquiry, one of Gibson Dunn's new attorneys *who was not on the call with Mr. Pelosi* shared that he had used a recording feature on his phone during some conversations to aid in preparation of  interview summaries, and that he had deleted the recordings promptly after completing the interview summaries.  He did not recall which interviews he had recorded or how many.  Maryott Decl., ¶ 15.  Although Plaintiffs' counsel had inquired about Mr. Pelosi specifically and this attorney had not been on the call with Mr. Pelosi, Cognizant's counsel shared all of this information in the interest of full transparency.

Even if Plaintiffs had complied with Local Civil Rule 37 (they did not), the relief they seek would not be warranted.  As reflected above, Cognizant's counsel provided detailed admonitions to putative class members with whom they spoke.  There is no need for any curative communication.  Nor is there any basis for an order prohibiting Cognizant from speaking with putative class members.  Plaintiffs request this "relief" because they want to foreclose Cognizant from presenting declarations from putative class members in opposition to class certification, an outcome that would infringe on Cognizant's due process rights.  *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014)

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1   (recognizing that defendants have a "due process right to present individualized

2   defenses"); *cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (reinforcing

3   employer's right to due process in class actions brought under Title VII).

4         Plaintiffs' request to be provided with all of the names of the individuals contacted

5   by Cognizant's counsel and all interview summaries also reflects a transparent effort to

6   secure Cognizant's work product—*i.e.*, the identities of individuals Cognizant chose to

7   interview in the course of preparing its defense in this case and the information gained

8   through the industry of Cognizant's counsel, which would not otherwise be known to

9   Plaintiffs.  This request should not be granted.  It is black letter law that "the identity of

10  witnesses interviewed by opposing counsel is protected" work product because disclosure

11  of the identities of persons interviewed would allow "opposing counsel [to] infer which

12  witnesses counsel considers important, revealing mental impressions and trial

13  strategy." *Ferruza v. MTI Tech.*, 2002 WL 32344347, at *3 (C.D. Cal. June 13,

14  2002).  Likewise, "[n]otes and memoranda of an attorney . . . from a witness interview are

15  opinion work product entitled to almost absolute immunity." *O'Connor v. Boeing N. Am.,*

16  *Inc.*, 216 F.R.D. 640, 643 (C.D. Cal. 2003) (citation omitted); *see Upjohn Co. v. United*

17  *States*, 449 U.S. 383, 399–401 (1981) (finding attorney "memoranda based on oral

18  statements of witnesses" were protected work product).  Cognizant's "evaluations,

19  impressions, and strategy" from these interviews "are at the heart of the work product

20  rule." *MTI Tech.*, 2002 WL 32344347, at *3.

21        Plaintiffs for their part cite no authority suggesting that an appropriate remedy

22  would be a court-sanctioned invasion of Cognizant's work product.  In contrast, numerous

23  courts have rejected sanctions of the type Plaintiffs seek here.  *See Bryant v. Serv. Corp.*

24  *Int'l*, No. C 08–01190 SI, 2010 WL 2231871, at *1–2 (N.D. Cal. June 1, 2010) (denying

25  plaintiff's motion to compel because identities of defendant's witnesses and contents of

26  their statements were protected work product); *In re Ashworth, Inc. Sec. Litig.*, 213 F.R.D.

27  385, 389 (S.D. Cal. 2002) (denying motion to compel production because identities of

28  persons interviewed during pretrial investigation were protected work product); *MTI*

*Tech.*, 2002 WL 32344347, at *3 (same); *see also McIntyre v. Main St. & Main Inc.*, No. C-99-5328 MJJ (EDL), No. C-99-5328 MJJ (EDL), 2000 WL 33117274, at *2 (N.D. Cal. Sept. 29, 2000) (denying motion to compel production of defendant's witness interview notes because they "are absolutely protected under the work product doctrine"); *Mitchell Eng'g v. City & Cty. of San Francisco*, No. C 08–04022 SI, 2010 WL 1853493, at *1–2 (N.D. Cal. May 6, 2010) (denying motion to compel production because defendant investigator's witness interview notes were protected work product); *O'Connor*, 216 F.R.D. at 643 (same); *Hatamian v. Advanced Micro Devices, Inc*, No. 14-cv-00226-YGR(JSC), 2016 WL 2606830, at *3 (same). "How a party, its counsel and agents choose to prepare their case, the efforts they undertake, and the people they interview is not factual information to which an adversary is entitled." *MTI Tech.*, 2002 WL 32344347, at *3 (citation omitted).

### D. COGNIZANT SHOULD BE COMPELLED TO PRODUCE UNPRODUCED RESPONSIVE DOCUMENTS AND PLAINTIFFS SHOULD BE PERMITTED TO TAKE RELATED DISCOVERY.

#### 1. *Plaintiffs' Position*

##### a. Legal Standard

Under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Relevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on,' any party's claim or defense." *Kajeet, Inc. v. Qustodio*, No. CV 18-1519-JAK(PLAx), 2019 WL 8060078, at *1 (C.D. Cal. Oct. 22, 2019) (citation omitted) (Abrams, J.). "Moreover, '[t]he party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections.'" *Id.* (citation omitted). When a motion to compel discovery is granted, the Court "must . . . require the party . . . whose conduct necessitated the motion . . . to pay

the movant's reasonable expenses incurred in making the motion, including attorneys' fees."  Fed. R. Civ. P. 37(a)(5)(A); Fed. R. Civ. P. 37, 1970 adv. comm. notes ("expenses should ordinarily be awarded").

### b.    Background

As discussed above, Cognizant agreed to produce ESI from agreed upon custodians, including non-email ESI,[122] but failed to produce non-email files, and failed to produce e-mails from locations other than its email servers, even though discovery in this case closed on October 15 (with some exceptions).  Cognizant also failed to interview custodians to determine where they store relevant files.  Cognizant does not dispute that non-email files and e-mail files from non-server locations are relevant and responsive to Plaintiffs' document requests.

### c.    Argument

This Court already ruled that Cognizant had a duty to supplement its document production to include "any responsive ESI, including documents, on defendants' OneDrive (or elsewhere), that have not previously been produced."  Dkt. 180 at 10.  And Cognizant recently agreed to produce documents from available laptops and OneDrive folders used by custodians, but has not committed to a production date, or to producing as SharePoint and the "Z drive."[123]

Cognizant should be compelled to interview custodians to determine where they stored potentially responsive ESI.  *Small v. Univ. Med. Ctr.*, No. 2:13-CV-0298-APG-PAL, 2018 WL 3795238, at *43, 62 (D. Nev. Aug. 9, 2018) ("The special master required the [custodian] interviews to be conducted a second time because the initial custodian interviews conducted by counsel were inadequate.").

---

[122] *See* Ex. 46 at 20 ("Of Plaintiffs' 33 ESI custodians, Cognizant has agreed to search the files and email boxes of just 11 custodians and has objected to the remaining 22."); Jt. Stip. at 44 (Dkt. 80-1) (agreeing to produce "[w]ith respect to production of custodian ESI, . . . relevant, non-privileged emails of the custodians selected as well as documents maintained electronically and within their possession, custody, and control").

[123] Ex. 63 (Ltr. from M. Maryott to Pls. (Nov. 10, 2021)).

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

In addition, Cognizant should be compelled to collect and produce non-email ESI from the agreed custodians, including from any shared drives used by those custodians, as well as all e-mail ESI from the agreed custodians, including any unsearched non-server locations.  Further, Plaintiffs should be permitted to take discovery related to the late-produced documents, including re-opening depositions to allow questioning related to the late-produced documents.  This will require a significant extension to the case schedule given that Cognizant has not yet committed to any deadline for producing these documents.  (Alternatively, meaningful discovery sanctions as requested above could obviate the need for additional discovery.)  Good cause exists to extend the case schedule under Fed. R. Civ. P. 16 (b)(4) because Plaintiffs have diligently pursued this discovery and were unable to obtain it because Cognizant concealed it from Plaintiffs, not because of any lack of diligence on the part of Plaintiffs.

Finally, Plaintiffs should be awarded monetary sanctions for the reasonable attorneys' fees and costs associated with this motion under Fed. R. Civ. P. 37(a)(5)(A), as Cognizant's failure to timely produce the documents was not substantially justified and no other circumstances make an award of fees unjust.

### 2. *Defendants' Position*

Cognizant has already agreed to, and represented to the Court that it will, search the laptops and OneDrive (for those who used OneDrive) for the agreed-upon custodians. [Dkt. 185, 188.]  That effort is underway.  Maryott Decl., ¶ 16.  Plaintiffs' request for an order compelling production of this ESI is therefore unnecessary.  Plaintiffs' request that Cognizant search all shared drives to which custodians had *access*, however, should not be granted because it is both time-barred and disproportionate to the needs of the case.  Plaintiffs served their first request for production of documents in 2019.  In response, Cognizant served objections and responses, and the parties thereafter conferred about the manner in which to proceed with discovery.  The parties agreed to a custodian-based approach (commonly used in litigation), identified the custodians, negotiated the search terms over many months, and

then Cognizant proceeded to pull the Office365 files, run the search terms, conduct a responsiveness review and produce responsive, non-privileged documents.  Both before and after Cognizant began producing custodian emails and attachments, Plaintiffs identified *other* types of documents and data in which they were interested that fell outside the scope of what might be located in custodial ESI; and Cognizant produced most of those, including: EEO-1 reports, Affirmative Action Plans, documents pertaining to supervised recruitment, reports pertaining to visas and visa holders, communications with the EEOC, finance reports, lists of individuals subject to certain bench practices, internal employee grievances (Convercent) complaints, and hiring, termination, promotion, allocation, bench, and visa data.  Throughout this process, Cognizant has produced more than 270,000 documents along with data for more than 100,000 employees and even more applicants.  Maryott Decl., ¶ 2.

While Plaintiffs' intense focus on discovery disputes would suggest otherwise, as a substantive matter this case is actually not document-centric.  By way of example, despite insisting that Cognizant's visa program was a critical part of their case, and having received 14,592 documents from custodian Helen Kim, the head of Global Mobility at Cognizant, Plaintiffs used only 16 documents at Ms. Kim's deposition. Maryott Decl., Ex. 14. Of the more than 30,000 documents produced for custodian Venugopal Padmanabhan, Vice President of Talent Supply Chain, Plaintiffs used only 17 exhibits at his deposition, and one of those documents does not appear to have been produced by Cognizant.  *Id.*, Ex. 13  The disproportionality is staggering.  And now, after having structured the discovery to be custodian-based, Plaintiffs want to take a new approach and require Cognizant to run search terms through all documents located in shared folders to which the custodians had *access*.  This would be a monumental departure from the approach to which the parties agreed.  And the notion that Plaintiffs were not aware until recently that Cognizant used shared drives or Sharepoint is not plausible.  The four named Plaintiffs were technology consultants who surely knew how they performed their own work and the manner in which documents could be shared at

1    Cognizant.     It is difficult to square Plaintiff' request that Cognizant undertake the

2    substantial amount of work to determine which custodians might have accessed certain

3    sites at any time during their employment with Plaintiffs' own failure to identify their

4    use of such sites during their employment.

5              As Judge Gee noted recently, discovery has to end at some point.  [Dkt. 157 at p.

6    1 ("Defendant . . . aptly points out that discovery must come to an end at some point.").]

7    Plaintiffs seek to conduct more discovery and want more time to conduct it, but there is

8    no basis—particularly considering the volume of data and documents already produced

9    and Cognizant's agreement to search for documents on custodian laptops and

10   OneDrive—to  essentially restart discovery and force Cognizant to research all shared

11   locations to which 23 custodians may have had access over a span of more than eight

12   years.

13             Finally, Plaintiffs have indicated their intent to file a request with Judge Gee to

14   extend the case schedule.  As such, this Court need not entertain that request.  Judge Gee

15   recently took a similar approach when Plaintiffs requested that she issue an Order

16   clarifying the timeliness of requests for documents from OneDrive, and Defendants

17   noted the issue was moot since this Court had already ruled on it.  Judge Gee agreed:

18   "Moreover, as Cognizant notes, Judge Abrams ruled two days after Plaintiffs filed their

19   RFC that the OneDrive issue "is related to the late-discovered migration to Office 365."

20   [Doc. # 180.] Cognizant does not dispute that discovery related to its OneDrive share

21   drive is subject to the December 16, 2021 discovery cut off.  The Court therefore

22   DENIES as moot Plaintiffs' RFC."  Maryott Decl., Ex. 10 at p. 1.

23

24

25

26

27

28

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)

1

2    DATED: November 23, 2021        **KOTCHEN & LOW LLP**

3

4                                    By: /s/ Daniel Kotchen
5                                    Daniel Kotchen

6                                    Attorney for Plaintiffs

7

8    DATED: November 23, 2021        **GIBSON, DUNN & CRUTCHER LLP**

9

10                                   By: /s/ Michele Maryott
11                                   Michele L. Maryott

12                                   Attorney for Defendants

13

14

15              **SIGNATURE ATTESTATION**

16

17        Pursuant to Local Rule 5-4.3.4(a)(2), I attest that concurrence in the filing of this

18   document has been obtained from the other signatories.

19

20   DATED:  November 23, 2021       By: /s/Daniel Kotchen
21                                   Daniel Kotchen

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Court's CM/ECF system.

DATED:  November 23, 2021              By: /s/Daniel Kotchen
                                       Daniel Kotchen

JOINT STIP. RE: DISCOVERY DISPUTE
Case No. 17-CV-6848 DMG (PLAx)