THEODORE J. BOUTROUS JR., SBN 132099
    tboutrous@gibsondunn.com
KATHERINE V.A. SMITH, SBN 247866
    ksmith@gibsondunn.com
LAUREN M. BLAS, SBN 296823
    lblas@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

MICHELE L. MARYOTT, SBN 191993
    mmaryott@gibsondunn.com
ELIZABETH A. DOOLEY, SBN 292358
    edooley@gibsondunn.com
MATTHEW T. SESSIONS, SBN 307098
    msessions@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone:  949.451.3800
Facsimile:   949.451.4220

Attorneys for Defendants
COGNIZANT TECHNOLOGY SOLUTIONS
CORPORATION and COGNIZANT
TECHNOLOGY SOLUTIONS U.S.
CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CHRISTY PALMER, VARTAN PIROUMIAN,  EDWARD COX, and JEAN-CLAUDE FRANCHITTI,<br><br>Plaintiffs,<br><br>v.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION and COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION,<br><br>Defendants. | CASE NO. 2:17-CV-06848 DMG (PLAx)<br><br>**REDACTED PUBLIC VERSION**<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing:**<br>Date:      July 22, 2022<br>Time:      10:00 a.m.<br>Place:      Courtroom 8C<br>Judge:     Hon. Dolly M. Gee |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II. FACTUAL BACKGROUND ................................................................. 2

    A.    Overview Of Cognizant's Business Model............................................ 2

    B.    Cognizant's Project-Based Model Requires Specialized Talent .............. 3

    C.    Internal Project Staffing Depends On Inputs From Multiple Sources....... 4

    D.    External Hiring Is Decentralized And Individualized ............................ 5

    E.    Cognizant Uses Visas To Supplement Its Workforce............................. 6

    F.    Plaintiffs Misunderstand Cognizant's Hiring Model............................. 7

    G.    Cognizant's Separation Practices Are Highly Individualized ................. 9

III. THE LEGAL STANDARDS GOVERNING THIS MOTION............................ 10

IV. PLAINTIFFS DO NOT COME CLOSE TO SATISFYING RULE 23 ............... 11

    A.    Plaintiffs' Proposed Classes Fail To Meet Rule 23(a)'s Requirements ...................................................................................... 11

        1.    Plaintiffs' Disparate Treatment Claim Presents No Common Questions................................................................... 11

        2.    Plaintiffs' Disparate Impact Claim Presents No Common Questions................................................................... 22

        3.    There Is No Adequate Or Typical Hiring Class Representative ........................................................................ 23

        4.    There Is No Adequate Or Typical Terminations Representative........................................................................ 25

        5.    Concerns Exist Regarding Counsel's Adequacy ........................... 26

    B.    Plaintiffs Fall Far Short Of Meeting 23(b)(3)'s Stringent Standards ...... 27

        1.    Plaintiffs Fail To Prove Predominance For Any Of Their Classes................................................................................. 28

        2.    Plaintiffs Fail To Prove Superiority................................................. 31

        3.    Plaintiffs' Proposed Classes Are Unmanageable ......................... 32

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:17-CV-06848 DMG (PLAx)

V. CONCLUSION ...................................................................................................... 35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

4   **Cases**

5

6   *Allison v. Citgo Petroleum Corp.*,
7       151 F.3d 402 (5th Cir. 1998) ...................................................................33

8   *Am. Exp. Co. v. Italian Colors Rest.*,
9       570 U.S. 228 (2013)................................................................................11

10
11  *Am. Pipe & Const. Co. v. Utah*,
12      414 U.S. 538 (1974)................................................................................34

13  *Amchem Prods., Inc. v. Windsor*,
14      521 U.S. 591 (1997)................................................................................32

15
16  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
17      568 U.S. 455 (2013)................................................................................11

18  *In re Autozone, Inc.*,
19      2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) .........................................30

20
21  *Barnett v. Cty. of Contra Costa*,
22      2007 WL 196678 (N.D. Cal. Jan. 24, 2007)............................................23

23  *Bates v. United Parcel Serv., Inc.*,
24      511 F.3d 974 (9th Cir. 2007) ...................................................................30

25
26  *Beard v. Kenan Transport Co.*,
27      2005 WL 8154710 (N.D. Ga. Nov. 23, 2005)..................................18, 22

28

# TABLE OF AUTHORITIES

**Page(s)**

*Bolden v. Walsh Const. Co.*,
  688 F.3d 893 (7th Cir. 2012) ......................................................... 12

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ....................... 13, 17, 20, 21

*Chen-Oster v. Goldman, Sachs & Co.*,
  325 F.R.D. 55 (S.D.N.Y. 2018) ...................................................... 28

*Chicago Teachers Union v. Board of Education*,
  797 F.3d 426 (7th Cir. 2015) ......................................................... 30

*In re Citric Acid Antitrust Litig.*,
  1996 WL 655791 (N.D. Cal. 1996) ................................................ 24

*Cole v. Lynwood Unified Sch. Dist.*,
  678 F. App'x 595 (9th Cir. 2017) .................................................. 16

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)............................................................ 10, 11, 28, 35

*Creative Montessori Learning Centers v. Ashford Gear LLC*,
  662 F.3d 913 (7th Cir. 2011) ......................................................... 26

*D.C. by & through Garter v. Cty. of San Diego*,
  2018 WL 692252 (S.D. Cal. Feb. 1, 2018)..................................... 34

*Daniel F. v. Blue Shield of Cal.*,
  305 F.R.D. 115 (N.D. Cal. 2014) .................................................. 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND
Case No. 2:17-CV-06848 DMG (PLAx)

## TABLE OF AUTHORITIES

**Page(s)**

*Davidson v. Citizens Gas & Coke Util.*,
   238 F.R.D. 225 (S.D. Ind. 2006) .............................................................................. 27

*Dickerson v. Mack Trucks, Inc.*,
   2013 WL 3507508 (D. Md. July 10, 2013) ............................................................. 32

*Dukes v. Wal-Mart Stores, Inc.* (*Dukes II*),
   964 F. Supp. 2d 1115 (N.D. Cal. 2013) .................................................................. 19

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ............................................................. 28, 29, 30

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ................................................................................... 11

*Feltner v. Columbia Pictures Television, Inc.*,
   523 U.S. 340 (1998) ................................................................................................. 35

*Finley v. UPS*,
   2018 WL 6421693 (D. Ariz. June 5, 2018) ............................................................. 18

*Firefighters Loc. Union No. 1784 v. Stotts*,
   467 U.S. 561 (1984) ................................................................................................. 35

*Furnco Constr. Corp. v. Waters*,
   438 U.S. 567 (1978) ................................................................................................. 22

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011) .................................................................................... 34

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND
Case No. 2:17-CV-06848 DMG (PLAx)

# TABLE OF AUTHORITIES

**Page(s)**

*Gordon v. Sonar Cap. Mgmt. LLC,*
   92 F. Supp. 3d 193 (S.D.N.Y. 2015) .........................................................24

*Handloser v. HCL Techs. Ltd.,*
   2021 WL 879802 (N.D. Cal. Mar. 9, 2021) ..................12, 13, 14, 15, 19, 23, 28, 29

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) .............................................................23, 25

*Hansberry v. Lee,*
   311 U.S. 32 (1940)........................................................................26

*Herrera v. Serv. Emps. Int'l Union Loc. 87,*
   2012 WL 13059697 (N.D. Cal. Apr. 10, 2012)........................................22

*In re Hotel Tel. Charges,*
   500 F.2d 86 (9th Cir. 1974) ...............................................................35

*Int'l Bhd. of Teamsters v. United States,*
   431 U.S. 324 (1977)..............................................................12, 28, 30

*Jimenez v. Domino's Pizza, Inc.,*
   238 F.R.D. 241 (C.D. Cal. 2006)........................................................35

*Kaufman v. American Family Mut. Ins. Co.,*
   2008 WL 1806195 (D. Colo. 2008)......................................................26

*Keegan v. Am. Honda Motor Co.,*
   284 F.R.D. 504 (C.D. Cal. 2012)........................................................24

# TABLE OF AUTHORITIES

**Page(s)**

1

2  *Klay v. Humana, Inc.*,

3      382 F.3d 1241 (11th Cir. 2004) ................................................................ 28

4

5  *Kolstad v. 57 Am. Dental Ass'n*,

6      527 U.S. 526 (1999) .................................................................................. 31

7  *Marlo v. United Parcel Serv., Inc.*,

8      251 F.R.D. 476 (C.D. Cal. 2008) .............................................................. 35

9

10 *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,

11     2015 WL 4537957 (N.D. Cal. July 27, 2015) .......................................... 31

12 *Miller v. Gammie*,

13     335 F.3d 889 (9th Cir. 2003) (en banc) .................................................... 31

14

15 *Miller v. Hygrade Food Prods. Corp.*,

16     198 F.R.D. 638 (E.D. Pa. 2001) ............................................................... 32

17 *Moeller v. Taco Bell Corp.*,

18     2012 WL 3070863 (N.D. Cal. July 26, 2012) .......................................... 31

19

20 *Moore v. Hughes Helicopters*,

21     708 F.2d 475 (9th Cir. 1983) .................................................................... 17

22 *Moussouris v. Microsoft Corp.*,

23     2018 WL 3328418 (W.D. Wash. June 25, 2018) ................... 12, 16, 20, 22

24

25 *Nghiem v. Dick's Sporting Goods, Inc.*,

26     318 F.R.D. 375 (C.D. Cal. 2016) ........................................................ 25, 26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND
Case No. 2:17-CV-06848 DMG (PLAx)

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
   31 F.4th 651 (9th Cir. 2022) (en banc) ........................................ 1, 11, 16, 24

*In re Paxil Litig.,*
   212 F.R.D. 539 (C.D. Cal. 2003) ................................................................ 31

*Plummer v. Western Int'l Hotels Co.,*
   656 F.2d 502 (9th Cir. 1981) ...................................................................... 18

*Ramirez v. DeCoster,*
   194 F.R.D. 348 (D. Me. 2000) .................................................................... 33

*Randall v. Rolls-Royce Corp.,*
   637 F.3d 818 (7th Cir. 2011) ...................................................................... 26

*Robinson v. Tex. Auto. Dealers Ass'n,*
   387 F.3d 416 (5th Cir. 2004) ...................................................................... 34

*Rutstein v. Avis Rent-A-Car Sys., Inc.,*
   211 F.3d 1228 (11th Cir. 2000) .................................................................. 33

*Simon v. Ashworth, Inc.,*
   2007 WL 4811932 (C.D. Cal. Sept. 28, 2007) ........................................... 25

*Tabor v. Hilti, Inc.,*
   703 F.3d 1206 (10th Cir. 2013) .................................................................. 13

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ............................................................................... 24

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

*Tria v. Innovation Ventures, LLC*,
    2013 WL 12324181 (C.D. Cal. Feb. 25, 2013) ...........................................................24

*Tull v. United States*,
    481 U.S. 412 (1987) ...........................................................................................................35

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ...................................................................................31, 32

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .........................................1, 2, 11, 12, 14, 18, 20, 21, 22, 30, 31

*Walker v. Gates*,
    896 F.2d 556 (9th Cir. 1990) ...................................................................................17, 18

*Wards Cove Packing Co. v. Antonio*,
    490 U.S. 642 (1989) ...................................................................................................22, 23

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988) ...........................................................................................................22

*White v. City of San Diego*,
    605 F.2d 455 (9th Cir. 1979) ...................................................................................16, 20

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ............................................................................................34

*Wright v. Stern*,
    2003 WL 21543539 (S.D.N.Y. July 9, 2003) ...............................................................18

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND
Case No. 2:17-CV-06848 DMG (PLAx)

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ....................................................................32

**Statutes**

28 U.S.C. § 1746 ...........................................................................................27

42 U.S.C. § 1981a(b)(1) ...........................................................................31, 35

42 U.S.C. § 1988(b-c) ....................................................................................32

42 U.S.C. § 2000e–2(a)(1) ..............................................................................14

42 U.S.C. § 2000e-2(j) ...................................................................................22

42 U.S.C. § 2000e-2(k) ..................................................................................22

42 U.S.C. §§ 2000e-5(e)(1), 12117(a) ...........................................................15

42 U.S.C. § 2000e-5(k) ..................................................................................32

FLSA ..............................................................................................................33

**Rules**

Rule 23 ...........................................................................................1, 11, 24, 28

Rule 23(a) ...........................................................................................11, 24, 27

Rule 23(a) and (b) ..........................................................................................31

Rule 23(b) .......................................................................................................11

Rule 23(b)(3) .............................................................................27, 28, 31, 32

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

Rule 23(b)(3) and (c)(4)..............................................................................34

Rule 23(c)(4) .................................................................................... 1, 31

Rule 30(b)(6) ............................................................................................ 7

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND
Case No. 2:17-CV-06848 DMG (PLAx)

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

In their bid to certify a class, Plaintiffs simply ignore that hiring and terminations decisions at Cognizant are decentralized, highly subjective, individualized processes that rely on the discretion of thousands of decisionmakers (including *clients*).   Because Plaintiffs are seeking to sue about a number of "employment decisions at once," they must establish "some glue holding the alleged reasons for all those decisions together." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011).   There is no "glue" here. There is not and never has been a common mode of decisionmaking or directive that visa holders be favored at Cognizant—a fact that precludes class certification as a matter of law.

Instead of "glue," Plaintiffs offer inadmissible evidence (blatantly flouting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc)), mischaracterize facts, advance a mish-mash of legal concepts, and present a largely meaningless and very flawed statistical analysis.   The alleged "policies" that Plaintiffs cling to also do not offer the requisite "glue" because Cognizant does not have any "policy" to hire visa holders and replace U.S. workers.   Even *if* such a policy existed, it would be inapplicable (even under Plaintiffs' theory) to large swaths of the proposed class, raising further individualized questions.   Their abject failure of proof leads to Plaintiffs' final gambit—an attempted end-run around Rule 23's requirements through reliance on issue certification under Rule 23(c)(4) using the *Teamsters* framework.   But there is no viable path to certification consistent with due process.

The putative hiring class is a sprawling, unwieldy, and altogether disparate class of approximately 169,000 applicants.   Brian Cox is the only Plaintiff who brings a hiring claim (on behalf of his late father) and is the only Plaintiff who can pursue a visa-related theory.   But Ed Cox did not suffer any injury related to this claim, let alone one that is typical of the would-be hiring class.   That proposed class is defined to include "all individuals who are not of South Asian race or Indian national origin and who applied to a Cognizant Class Band position in the U.S. [from September 18, 2013 onward] and

were not offered a position." Mot. at iii.  Ed Cox was, in fact, offered a position and hired by Cognizant in 2014.  And the basis for his 2018 failure to rehire claim involves a position which never materialized and for which *nobody* was hired.  Even if Plaintiffs could overcome all of that, the sheer size of the class, the absence of any corporate policy or directive, and the broad discretion exercised by thousands of people in hiring decisions defeats certification.

Plaintiffs' proposed terminations class and subclass fare no better.  The proposed terminations class is composed of "all individuals who are not of South Asian race or Indian national origin and who were terminated while employed within a Cognizant Class Band . . ." and the bench subclass of those "who were terminated from the bench while employed within a Cognizant Class Band."  *Id.*  There are multiple, highly individualized reasons why employees might be terminated from Cognizant, including decisions made by the employees themselves, thus making class treatment inappropriate.

When all is said and done, Plaintiffs have not provided any "glue" that could supply a "common answer" to the essential question "*why was I disfavored*." *Dukes*, 564 U.S. at 352.  Class certification should be denied.

## II.   FACTUAL BACKGROUND

### A.   Overview Of Cognizant's Business Model

Headquartered in the U.S., Cognizant is a global leader in the provision of information technology and consulting services.  Cognizant has clients in every major industry, including banking and financial services, healthcare, insurance, manufacturing and logistics, retail and hospitality, and communications (referred to at Cognizant as verticals) as well as a host of lines of service focused on particular technologies or processes (referred to as horizontals).   Dec. of K. Smith ("Smith Dec.") Ex. 8, ¶ 3. Cognizant employs more than 40,000 individuals in the U.S., and is an equal opportunity employer that values diversity and does not tolerate discrimination.  *Id.* ¶¶ 3-4; Smith Dec. ¶ 47, Ex. 44.  Like any employer with thousands of employees, Cognizant seeks to ensure that its policies and employment actions comply with the law.  *Id.* ¶ 4.

Gibson, Dunn & Crutcher LLP

Cognizant's U.S. workforce includes individuals who move from client project to client project as demand requires, *i.e.* project-based employees, as well as those who do not, *i.e.* those in corporate departments like Human Resources and in other capacities, like sales.  Smith Dec. Ex. 8, ¶ 7.  Cognizant has 17 commonly used job bands from "intern" to "CEO," but even within the same band, there is enormous variation in job duties and expectations.  *Id.* ¶ 6.

### B.    Cognizant's Project-Based Model Requires Specialized Talent

Because of the variety and scale of the highly technical projects Cognizant takes on, the Company requires a nimble workforce with a wide variety of skills.  Smith Dec. Ex. 6, ¶ 4.  Employees have expertise in different industries and technologies, develop different skill sets, are at differing job levels, and are billed at different rates.  *Id.*  Clients may also impose additional specifications for projects and typically have input into the hiring process, for example, by interviewing candidates and providing feedback.  *Id.*; Smith Dec. Ex. 4, ¶ 9; Schanta Dec. ¶ 8.  During the Class Period, employees in Class Bands serviced ███ different clients.  Smith Dec. Ex. 1, ¶ 26 & fn. 51.

Project-based employees who roll off projects will either move directly to a new project or go to the corporate or practice group deployable pools, colloquially known as the bench.  Smith Dec. Ex. 6, ¶ 5.  During the Class Period, only 31% of employees in the Class Bands were placed on the bench.  Smith Dec. Ex. 1, ¶ 40 & fn. 54.

For any project, the Company's strong preference is to staff existing Cognizant employees in the U.S.  Smith Dec. Ex. 6, ¶ 14.  Cognizant has every incentive to ensure that individuals on the bench, who continue to receive their full salaries, are staffed as quickly as possible to new projects.  *Id.*  This is both efficient and economically sound.  *Id.*  However, in some instances there may not be an employee with the right technical skillset and/or experience on the bench.  In those cases, the position will be flagged for external U.S. local hiring.  When a position is flagged, Cognizant's Talent Acquisition Group ("TAG"), which handles external hiring, will try to fill the position.  *Id.* ¶ 15.  In tandem with the external hiring process, Cognizant continues to look for candidates who

may become available on its U.S. bench and also turns to its existing employees outside the U.S. who already hold visas and who may already be working for the client or in the same service line.  Depending on client demand, visa holders with a particular skillset may be sought to supplement a shortage of that skillset in the United States.  *Id*. ¶ 16.

### C.     Internal Project Staffing Depends On Inputs From Multiple Sources

The process of securing a new project is always collaborative, often *ad hoc*, and reflects a large measure of discretion by managers, account teams, clients, and employees themselves.  Smith Dec. Ex. 6, ¶ 6; Lindberg Dec. ¶ 5; Schanta Dec. ¶ 8; Copeland Dec. ¶¶ 3, 4; Arce Dec. ¶ 4.  Sometimes individuals are staffed informally through word of mouth and internal recommendations, *e.g.*, Smith Dec. Ex. 14 at 43:18-23, 45:16-22, 49:15-50:3, while others might go through a more formal process supported by Talent Supply Chain ("TSC"), a department that primarily assists with allocation of U.S. talent to billable roles on client projects, Smith Dec. Ex. 6, ¶ 6.

Smith Dec. Ex. 6, ¶ 6.

Smith Dec. Ex. 4, ¶ 5.

Smith Dec. Ex. 13 at 44:2-11; 129:22-130:10; *id.* Ex. 15 at 245: 2-25, 281:6-18 (average account interviewing team was 6-8 people); Arce Dec. ¶ 4; Copeland Dec. ¶ 4.

Smith Dec. Ex. 6, ¶ 9; Ex. 15 at 161:2-12.

Dkt. 262-12.  Sometimes an employee may "gracefully exit" a project after

4

1   seeking out a position with another business unit, as Piroumian did with ███     Smith

2   Dec. Ex. 15 at 147:6–157:17, Ex. 18, 19.   Sometimes relocation is not feasible.

3   Moorman Dec. ¶ 9; Benham Dec. ¶ 4; Copeland Dec. ¶ 7.   Client requirements or

4   preferences may affect placements.   Smith Dec. Ex. 6, ¶ 9; Ex. 4, ¶ 9; Schanta Dec. ¶ 8;

5   Copeland Dec. ¶ 8.   And budget constraints or shifting priorities may result in a role or

6   entire project being postponed or cancelled.   Smith Dec. Ex. 6, ¶ 9; Ex. 15 at 96:10-14.

7         **D.      External Hiring Is Decentralized And Individualized**

8         If Cognizant is unable to staff an existing internal candidate to a project, it pursues

9   other alternatives, including external hiring.   ████████████████████████████

10  ████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████   Smith Dec. Ex. 5, ¶¶

12  3-4.   Within the Class Period, Cognizant made ████  relevant offers in the United

13  States.   Smith Dec. Ex. 1, ¶ 96.

14        There is no single channel through which resumes and applications come into

15  TAG.   Smith Dec. Ex. 8, ¶ 10.   ████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████   *Id*. at ¶ 19.

20        After recruiters source candidates and cull resumes to ensure they meet the basic

21  requirements for a given position, they send a narrower set of resumes to the hiring

22  managers for that position.   Typically, an applicant will be interviewed by multiple

23  individuals at Cognizant, and for project-based positions, will also often be interviewed

24  by the client.   Smith Dec. Ex. 15 at 34:10-12 (Piroumian: 3 interviews); Ex. 9 at 44:4–

25  45:8 (Franchitti: same); Ex. 8, ¶ 14.   After all interviews and feedback, a final

26  determination is made, and the business team informs the recruiter.   *Id*.

27        The external hiring process involves multiple stakeholders, inside and outside of

28  Cognizant.   Smith Dec. Ex. 8, ¶ 14; Smith Dec. Ex. 9 at 86:23–90:23.   That includes

both the late Ed Cox and Plaintiff Franchitti, both of whom appear to have been involved in sourcing and evaluating external candidates.  Smith Dec. Ex. 9 at 86:20-89:20, 91:23-96:9; Ex. 32-35.  There is no final decisionmaker who reviews or approves all hires.  Smith Dec. Ex. 8, ¶ 14.  There is also no policy instructing recruiters, interviewers, or anyone else, to prefer or prioritize visa holders or South Asian candidates.  *Id.*

### E.   Cognizant Uses Visas To Supplement Its Workforce

The well-documented, intense competition for IT talent in the U.S., along with the short- and long-term relocation requirements that are a staple of many Cognizant projects, means that Cognizant struggles to find U.S. workers to fill all of its hiring needs.[1]  Smith Dec. Ex. 8, ¶¶ 16, 25, 26.  For positions at Cognizant that can be filled by visa holders (many are simply closed to them for a variety of reasons), Cognizant primarily uses H-1B visas and L visas.  *Id.* ¶¶ 16, 18.  L1 visas are permitted *only* for intracompany transfers.  *Id.* ¶ 17. The U.S. Government requires L visa applicants to have worked for Cognizant for one year, but Cognizant requires more.  *Id.*  Moreover, when Cognizant applies for a new H-1B visa, it almost always requires that the proposed visa holder be an employee of a Cognizant affiliate overseas.  *Id.*  Since most of Cognizant's overseas workforce is in India, most of Cognizant's visa-holding workforce is from India too.  *Id.*

███████████████████████████

███████████████████████████████████████████████

█████████████████████████  Smith Dec. Ex. 12 at 21:17–22:13, 27:3–28:23.  ████████████████████████████████████████

███████████████████████████████████████████████

███  *Id.* at 27:1-13. ████████████████████

███████████████████████████████████████████████

---

[1]  Cognizant has invested more than $100 million in STEM education and training programs, including starting a foundation aimed at addressing the skills gap in the United States.  Smith Dec. Ex. 8, ¶ 26.

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Smith Dec. Ex. 4, ¶ 6. ▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

6    Once a Cognizant overseas employee has a valid and stamped visa, they can travel

7 to the United States to work.  At that point, either the individual will fill the position for

8 which the application was submitted, or if the position has changed, Cognizant will file

9 an amendment, as permitted by the U.S. government, Smith Dec. Ex. 12 at 56:1-8.  In

10 some circumstances, the visa holder may not travel at all.  *Id.*

11    **F.    Plaintiffs Misunderstand Cognizant's Hiring Model**

12    At its core, Plaintiffs' claim concerning Cognizant's alleged "visa readiness"

13 policy is not really about discrimination—it is a complaint that Cognizant applies for

14 and receives visas.  And Plaintiffs' characterization of other "policies" that purportedly

15 support a "pattern or practice" of discrimination are equally off base.

16    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiffs claim, citing their Exhibit 50,

17 that "[t]o ensure timely utilization of 'travel ready' resources, ▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. 9.  But no witness has ever endorsed

20 that interpretation—nor could they. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮ Smith Dec. Ex. 30. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮ Smith Dec. Ex. 37 at 92:25-94:9. ▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ E.g., Dkt.

Gibson, Dunn &
Crutcher LLP

7

262-59 at 13 (████████████████████████████████████████████████

████████████████████████████████████████; Dkt. 262-47 at 91 █████████████

████████████████████████████████████████████████████████████████████

████████   In addition, the testimony Plaintiffs adduced from Cognizant's witnesses explained the various ways staffing decisions are made—██████████████████████

████████████   Smith Dec. Ex. 13 at 43:13–46:8, 11:11–13:18; Ex. 24 at 23:9–26:15; Ex. 26 at 50:21–51:16.

████████████████████████   Plaintiffs identify two alleged practices they claim favored visa holders:██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Smith Dec. Ex. 6, ¶ 19 ref. Dkt. 262-12; Ex. 4, ¶ 10; Dkt. 262-67, at 53–56. ██████████████████████████████

███████████████████████████ Smith Dec. Ex. 24 at 44:8–46:7.

**The Alleged 3x3 and Rotation Policy.**   There is no classwide evidence of a "rotation policy" or "3x3 BU policy" designed to replace U.S. workers with visa holders, either.  Smith Dec. Ex. 6, ¶ 18; Ex. 26 at 27:2-7.  Cognizant's 30(b)(6) witness, the only witness Plaintiffs asked about these policies, had "never seen" them and was "not familiar with [them] ever being implemented."  *Id.* Ex. 26 at 69:6–75:7, 87:12–89:19; Dkt. 262-62, 262-65; *see also* Smith Dec. Ex. 3.  Moreover, Plaintiffs' claimed "replacement policy" makes no logical sense nor is it borne out in the data.  If Cognizant intended to replace U.S. workers with visa holders, one would see Cognizant's overall numbers of South-Asians and visa holders *grow* over time.  Instead, they decline.  Smith Dec. Ex. 1, ¶ 150.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.* Ex. 26 at 10:1-6, 26:7-19.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION CLASS CERTIFICATION
Case No. 2:17-CV-06848 DMG (PLAx)

***Opportunity Masking.*** Plaintiffs incorrectly claim "Cognizant's electronic systems were designed to mask job availability to benched U.S. resources."  Mot. 12.

████████████████████████████████████████████████████████████

████████████████████████████████████  Smith Dec. Ex. 6, ¶ 6.[2]  That is the opposite of classwide masking.  ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████  Smith Dec. Ex. 26 at 23:14-24:11.██████

████████████████████████████████████████████████████████████

████████████████  *Id.* at 23:14-15; 50:11-51:19.

## G.  Cognizant's Separation Practices Are Highly Individualized

Employees leave Cognizant for every possible reason.  Some resign to pursue other opportunities.  Others leave for personal reasons.  Some are terminated for poor performance, insubordination, misconduct, job abandonment, and the like.  Smith Dec. Ex. 8, ¶¶ 20-21; Copeland Dec. ¶ 6.  Not every Cognizant employee is eligible for the bench, and terminations of employees who are not on the bench can follow a variety of paths.  Smith Dec. Ex. 8, ¶¶ 20-21; Ex. 6, ¶ 19 ref. Dkt. 262-12.

Even among bench terminations, there is variability and discretion.  Smith Dec. Ex. 8, ¶ 23.  Employees subject to the five-week bench reallocation timeline *might* be terminated if they are still unallocated after five weeks.  But exceptions abound.  ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████  Smith Dec.

---

[2]  Plaintiffs also assert that "so few positions were moved" from the ESA system to Talent Marketplace that "benched U.S. resources submitted applications via Cognizant's external application process (where they had more success)."  Mot. 12–13.  According to Plaintiffs, Cognizant's external hiring data, in a system called Taleo, reflects that "Cognizant's benched employees [] account for 70% of hires."  *Id.*  But this theory is just wrong, and hinges on an incorrect assumption made by Plaintiffs' expert about a single field in Taleo, which is used only for external recruiting (and thus *would not show* "hires" by supposed benched employees).  Smith Dec. Ex. 8, ¶¶ 12-13; Ex. 1, ¶ 115.

Ex. 6, ¶¶ 11-12. █████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 13.

Moreover, there is extensive variation in why an employee may terminate while on the bench, including declining opportunities (whether for location reasons or otherwise), lacking the specific skills required for open positions, or being unavailable for interviews. Smith Dec. Ex. 25; Dkt. 262-2, ¶ 23. Piroumian and the late Ed Cox's own experiences illustrate the individualized nature of terminations from the bench. Piroumian was often on the bench in between projects and was plagued by performance issues, including many flagged by clients. E.g., Smith Dec. Ex. 15 at 219:25–220:4 ("briefly dozed off" during a client meeting); Ex. 20 (email stating "It was not fun to be in [the client's] office today and listening to his assessment of . . . Vartan [Piroumian's] . . . skills"); Ex. 21. Yet, he found another project each time. In mid-2017, however, unbeknownst to Cognizant, Piroumian decided to pursue this lawsuit. And just weeks after stating his intention to do so in a private email, he failed to find another project and was terminated. Smith Dec. Ex. 27. Given his past success in getting allocated, his email raises questions about his motivation (or lack thereof) to find a new position.

Ed Cox began with Cognizant in January 2014 in a Director-level non-billable position as the technical-sales and subject-matter expert for Enterprise customers. Smith Dec. Ex. 7, ¶ 4. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.* ¶¶ 5-6. This timeline was extended to seven weeks, and he continued to interview. *Id.* ¶ 6. Ultimately, he was unable to secure a role and was let go on April 3, 2017 after *ten weeks* on the bench. *Id.*

## III.  THE LEGAL STANDARDS GOVERNING THIS MOTION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). "Rule [23] imposes stringent requirements for

1  certification that in practice exclude most claims." *Am. Exp. Co. v. Italian Colors Rest.*,

2  570 U.S. 228, 234 (2013).  "[A] court's class-certification analysis must be 'rigorous'

3  and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]'"

4  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (quoting

5  *Dukes*, 564 U.S. at 351).  To certify a class, Plaintiffs must prove that there "'are *in fact*

6  sufficiently numerous parties, common questions of law or fact,' typicality of claims or

7  defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast*, 569

8  U.S. at 33 (quoting *Dukes*, 564 U.S. at 350).  In addition, Plaintiffs must "satisfy through

9  evidentiary proof" at least one of the three subsections of Rule 23(b).  *Id.*

10      Earlier this year, the Ninth Circuit, sitting *en banc*, held unequivocally that

11  plaintiffs must establish the elements of Rule 23 with *admissible* evidence.  *Olean*, 31

12  F.4th at 665.  Plaintiffs, however, fail to cite *Olean,* much less follow its holding—no

13  doubt because their filing is supported by rank hearsay, documents that have not been

14  authenticated, and attorney speculation about the role, meaning, or purpose of

15  documents.  *See* Separate Statement of Evidentiary Objections ("Obj."), Dkt. 270.

16  **IV.   PLAINTIFFS DO NOT COME CLOSE TO SATISFYING RULE 23**

17      **A.   Plaintiffs' Proposed Classes Fail To Meet Rule 23(a)'s Requirements**

18          **1.   Plaintiffs' Disparate Treatment Claim Presents No Common**
19              **Questions**

20      Absent proof that the "entire class was subject to the same allegedly

21  discriminatory practice, there is no question common to the class." *Ellis v. Costco*

22  *Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011).  To satisfy this standard here,

23  Plaintiffs must show that thousands of decisionmakers acted under a common policy of

24  discriminatory decisionmaking.  Plaintiffs have not carried their burden.  Cognizant's

25  practices relating to external hiring and termination are ultimately decentralized and

26  discretionary, relying on the determinations of thousands of individuals (including many

27  of the more than ███ *clients* serviced during the Class Period)—and thus defeat

28  commonality under either any theory.

For disparate treatment claims, "proof of discriminatory motive is critical." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).    To show commonality with respect to their disparate treatment claim "post-*Dukes*, the crux of the commonality inquiry for a system of discretion lies in whether lower-level supervisors operate under 'a common mode of exercising discretion'—put differently, whether some company-wide policy provides sufficient 'common direction' such that individual exercises of discretion nonetheless produce a common answer to the question 'why was I disfavored.'" *Moussouris v. Microsoft Corp.,* 2018 WL 3328418, at *16 (W.D. Wash. June 25, 2018), *aff'd*, 799 F. App'x 459 (9th Cir. 2019) (quoting *Dukes*, 564 U.S. at 352, 356).  Plaintiffs fail to establish that any "policies and procedures constrain discretion or follow a 'common direction' from [Cognizant's] management." *Handloser v. HCL Techs. Ltd.*, 2021 WL 879802, at *8 (N.D. Cal. Mar. 9, 2021).    And they offer no evidence at all that anyone, much less everyone, exercised their discretionary authority in a discriminatory manner. *Cf. Bolden v. Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir. 2012) (no common question "when multiple managers exercise independent discretion").  "It is quite unbelievable that all managers would exercise their discretion in a common way without some common direction." *Dukes*, 564 U.S. at 356.  There is no evidence of that direction here.

### a.    Plaintiffs' 169,000-Person Hiring Class Lacks The "Glue" Necessary To Prove Commonality

"[W]here plaintiffs challenge a companywide employment system that empowers hiring managers with discretion to make hiring decisions, plaintiffs must identify 'a common mode of exercising discretion that pervades the entire company.'" *Handloser,* 2021 WL 879802, at *8 (quoting *Dukes*, 564 U.S. at 356).    Plaintiffs here make "essentially no effort to establish that Defendants' employment policies and procedures constrain discretion or follow a 'common directive' from [Defendants'] management." *Id.*  Nor can they as Cognizant's hiring process "empowers a large number of recruiters, HR personnel, and delivery teams with significant discretion to make employment

decisions." *Id.*; *see Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013) ("After [*Dukes*], federal courts reviewing class certification questions have generally denied certification when allegedly discriminatory policies are highly discretionary . . . ."). Cognizant's recruiters, HR personnel, hiring managers, and delivery teams— ███████████████████████████████ over the Class Period—all exercise such discretion. Smith Dec. Ex. 5, ¶¶ 3-5, *see supra* § II.D; *Handloser*, 2021 WL 879802, at *7 (use of 1,800 hiring managers factored against commonality despite allegations that HCL's policy and alleged culture fit interviews favored visa holders).

This already discretionary process becomes even more individualized when one considers that particular hiring processes differ significantly by job level and role. Project-based roles often include a client interview and involve client feedback and discretion; non-project based roles do not. *See supra* § II.C. And depending upon the skillset sought, there could be a technical interview or other test offered. Dangerfield Dec. ¶ 5. Such differences further undermine commonality. *Handloser*, 2021 WL 879802, at *8 ("Members of the putative class will therefore have undergone dramatically different hiring procedures depending on which job they applied for . . . .").

Plaintiffs' counsel has tried (and failed) twice before to certify a hiring class on the same pattern-or-practice theory of alleged prioritization of visa-holding Indian nationals for U.S. jobs. *See Handloser,* 2021 WL 879802, at *3; *Buchanan v. Tata Consultancy Servs., Ltd.*, 2017 WL 6611653, at *20 (N.D. Cal. Dec. 27, 2017). In both cases, the courts found insufficient "glue" to hold these classes of tens or hundreds of thousands together. *Handloser*, 2021 WL 879802, at *8 (even "if the class were only 43,000 individuals, each of these class members represents an individual employment decision that necessarily involved different factual circumstances and decision-making by local hiring managers"); *Buchanan*, 2017 WL 6611653, at *20 (no certification for hiring class that could exceed 250,000). Plaintiffs abandoned a hiring class altogether in a third case, *Phillips v. Wipro*, explicitly noting the prior two losses on the same theory. Case No. 4:18-cv-00821 (S.D. Tex.), ECF No. 173 at 15-16. The hiring class

here suffers the same lack of "glue" and should meet the same end.

### (i)   So-called "policies" are untethered to the proposed class

First, Plaintiffs' core theory—that Cognizant prefers to hire visa holders—cannot prove a disparate treatment Title VII claim on a classwide basis as a matter of law.[3]  To prove such a claim, Plaintiffs must show that a class of individuals was disfavored based on a protected class—for example, race or national origin.  42 U.S.C. § 2000e–2(a)(1).  But Plaintiffs' theory divides both groups:  *if* true, Plaintiffs' theory would mean that Cognizant prioritizes visa holders over South Asians who are U.S. citizens or permanent residents.  Smith Dec. Ex. 36 at 100:10-19.   Put another way, Plaintiffs' theory is tantamount to saying that *sometimes* Cognizant discriminates in favor of *some* (but not other) South Asians based on a characteristic unrelated to their race (visa status).  Such a theory cannot support *any race* or *national origin* disparate treatment claim.

Second, Plaintiffs must prove that the policy caused the class a common harm. *See Dukes*, 564 U.S. at 354–55 (explaining that plaintiffs' expert's testimony did nothing to advance their theory because the expert could not say whether "0.5 percent or 95 percent of the employment decisions at Wal–Mart might be determined by stereotyped thinking"—the purportedly common policy).  Here, Plaintiffs have failed to show that any of the policies they allege even *exist* (*supra* § II.F), but even if such policies did exist, whether or to what extent individuals made employment decisions based on the alleged "policies" cannot be determined on a classwide basis.

Third, for some class members, "Defendant's challenged hiring practices could not have been the cause of the candidate's adverse employment decision" at all. *Handloser*, 2021 WL 879802, at *6.  For example, many positions at Cognizant are not even open to visa holding employees, meaning that any class member applying to such a position could not have been harmed by the alleged policies.  Smith Dec. Ex. 8, ¶ 18;

---

[3]  Although Plaintiffs now use Cognizant's alleged visa policies in support of their disparate *treatment* claim,  they previously described such practices as "'facially neutral' and not facially discriminatory" to preserve their disparate impact claim, Dkt. 50.

*Handloser*, 2021 WL 879802, at *6 (noting same with respect to positions not open to visa holders).  This same logic holds true for: (1) putative class members who applied to a position where there were *no* South Asian applicants considered at all; and (2) putative class members who applied to positions where Cognizant chose a non-South Asian applicant to fill the position.  More than ▆ of putative class members fall into one of these two categories.  Smith Dec. Ex. 1, ¶ 119.  That the only class representative for the hiring claim—Ed Cox (through Brian Cox)—was not passed over for a visa holder when he was not rehired in 2018 (Smith Dec. Ex. 7, ¶ 12), demonstrates this lack of causation.  Indeed, years earlier, Ed Cox *was* hired by Cognizant.  *Id.* ¶ 4.  And Cox is not alone— there are 1,412 individuals who were both rejected for one position and hired for another during the Class Period, and thus experienced two different outcomes.  Smith Dec. Ex. 1, ¶ 120.

Finally, the involvement of clients in the interview and hiring process—40% of all internal and external requisitions explicitly require a client interview, but the actual number is higher, Smith Dec. Ex. 8, ¶ 15—cuts against any finding of commonality.  *See Handloser*, 2021 WL 879802, at *7 ("myriad of individual clients will have exercised their own discretion when interviewing potential candidates during Defendants' hiring process[,]" undermining commonality); *see* Moorman Dec. ¶ 8 ("I have seen clients veto certain candidates . . ."); *cf.* Schanta Dec. ¶ 8 ("There are occasions where the client will say, we do not want this person.").

### (ii)    Statistics Do Not Bridge The Commonality Gap

Plaintiffs' statistical analysis covering a single Class Period (especially one reaching back to September 2013, three years before any hiring class) is meaningless.  The differing statutes of limitations for Plaintiffs' § 1981 and Title VII hiring claims[4]

---

[4]    Plaintiffs' proposed classes are subject to statutes of limitations that limit the class period.  *See* Smith Dec. Ex. 2 (chart of limitations periods).  In California, Title VII claims that occurred more than 300 days before a charge is filed are time-barred.  *See* 42 U.S.C. §§ 2000e-5(e)(1), 12117(a).  The Title VII hiring class cannot extend earlier than

render Plaintiffs' failure to choose a *particular* theory of discrimination problematic.  A disparate impact claim cannot be brought under § 1981.  *If* Plaintiffs' theory is really one of disparate impact, then only the Title VII time period is relevant.  And, even if both disparate treatment and disparate impact theories are still viable, the class period covered by those theories are different.

Under any theory, the methodologies of Plaintiff's expert, Dr. Johnson, are highly suspect and will be the subject of a separate *Daubert* motion.  *Olean*, 31 F.4th at 665, n.7 (noting propriety of *Daubert* challenges at class certification).  Even if admissible, Dr. Johnson's report should receive little weight because it is riddled with flaws and inconsistencies.  Among other problems, the report relies on aggregate statistics that do not "conform to the level of decision" for hiring and thus cannot be probative of any alleged disparities in hiring.  *Moussouris*, 2018 WL 3328418, at *24 (rejecting aggregate national statistics where the "relevant level of decision-making" was "the individual manager"); Smith Dec. Ex. 1, ¶¶ 72–73.  When analyzed at the business unit level, for example, hiring outcomes vary—a result consistent with discretionary decisionmaking and wholly contrary to Plaintiffs' theory of a common directive.  *Id.* Ex. 1, ¶ 100.  And Dr. Johnson does not even purport to show causation, which  "undermine[s] the reasonableness of the inference of discrimination" he purports to draw.  *White v. City of San Diego*, 605 F.2d 455, 460 (9th Cir. 1979) (citation omitted); Smith Dec. Ex. 1, ¶ 78.  As Dr. Johnson recognizes, correlation is not causation.  *Id.* Ex. 11 at 71:11–72:9.

Dr. Johnson's report is also flawed because he improperly counts visa holders previously working at Cognizant in India as "new hires" upon their transfer to the United States.  Dkt. 262-2, ¶ 38.  This is the very mistake that led the court in *Buchanan* to

____

October 11, 2017, Dkt. 256-93, and the Title VII terminations class cannot extend earlier than December 15, 2016.  Dkt. 256-92.  As to § 1981, California's two-year personal injury statute of limitations applies to failure to *hire* claims, *Cole v. Lynwood Unified Sch. Dist.*, 678 F. App'x 595, 596 (9th Cir. 2017), which means the § 1981 hiring class cannot extend back further than November 11, 2016, *see* Dkt. 45 (SAC).

conclude that, although the expert's methodology was ultimately admissible (a "close call"), it was entitled to only "minimal weight."  2017 WL 6611653, at *16, *20.

In addition, Dr. Johnson's benchmark to analyze alleged bias in hiring employees is unsupportable.  He uses data from American Community Survey (ACS) to determine the fraction of IT workers across the whole industry who are not South Asian.  Smith Dec. Ex. 1, ¶¶ 89-91.  He then assumes that Cognizant's hiring practices should align with industry averages and any significant deviation is a measure of bias.  But the appropriate benchmark is the set of candidates who actually apply to Cognizant for external positions.  *Id.* Ex. 1, ¶¶ 92-107.  Cognizant can only evaluate and make offers to individuals who actually apply.  *See Moore v. Hughes Helicopters*, 708 F.2d 475, 482 (9th Cir. 1983) ("The best evidence of discriminatory impact is proof that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants.").

When one corrects Dr. Johnson's two core errors by removing the improperly counted visa transferees and using actual applicants as the benchmark, there is no statistical disparity at all.  Instead, "***[i]n aggregate, employment offer rates are higher for non-South Asian applications***."  Smith Dec. Ex. 1, ¶ 86 (emphasis added).  That finding dooms Plaintiffs' attempt to certify any class on the basis of statistical evidence.

### (iii)   Plaintiffs' Anecdotal Evidence Disproves Commonality

As a last resort, Plaintiffs suggest, incorrectly, that the Letter of Determination by the EEOC (the "Letter") substitutes for proof in this case and distinguishes this case from *Handloser* and *Buchannan*.  It does not.  First, the Letter applies to a wholly different class of employees than the Plaintiffs seek to certify, making it probative of nothing.  The two-page Letter refers to "Cognizant discriminat[ing] against a nation-wide class of non-Indian applicants."  Dkt. 256-4.  But that is not Plaintiffs' theory.  Plaintiffs' theory is that Cognizant discriminates against non-visa holders (Mot. ii), which includes individuals of both Indian and non-Indian descent.  While such a letter is neither "binding" nor "conclusive" in the main, it is utterly irrelevant here.  *Walker v.*

*Gates*, 896 F.2d 556, 556 (9th Cir. 1990); *see Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502, 504–05 (9th Cir. 1981) (letters of determination are admissible but "not binding," noting that a "plaintiff has a difficult burden of proof"). Nor does it satisfy Plaintiffs' burden of proof. The entire finding relies on a single paragraph mentioning "[a]n analysis of data collected throughout the investigation," and "statistical analysis show[ing] significant short falls of non-Indian employees within Respondent's work force." Dkt. 256-1. But it is unclear from this Letter what was actually *relied upon* in reaching this determination. As a result, it possesses "very little probative value" here. *Beard v. Kenan Transport Co.*, 2005 WL 8154710, at *9 (N.D. Ga. Nov. 23, 2005) (EEOC letters that did not state what evidence was considered were not probative of discrimination claims ); *see also Walker*, 896 F.2d at 556 (EEOC letter "did not have the benefit of supplemental briefing" and was not probative of plaintiffs' claims); *Finley v. UPS*, 2018 WL 6421693, at *2 (D. Ariz. June 5, 2018) (EEOC determinations "vary in quality and detail" and are "not an adjudication of rights and liabilities").[5]

Plaintiffs' other anecdotal evidence similarly disproves commonality. Piroumian and Ed Cox were both *hired* by Cognizant. Smith Dec. Ex. 15 at 32:10-13; Ex. 7, ¶ 4; *see also* Ex. 9 at 47:1-14; Ex. 14 at 96:20-22. Indeed (and ironically) the only testimony from former employees concerning preference in hiring based on race is speculation that they were hired *because they were white or non-Indian*. *Id.* Ex. 14 at 96:20-22; Ex. 10 at 78:19-79:8. None of this shows alleged discrimination on a classwide basis.

### b. Claims Based On Highly Individualized Terminations Cannot Be Proven On A Common Basis

Plaintiffs likewise identify no "common mode" of making terminations decisions "that pervades the entire company." *Dukes*, 564 U.S. at 356. The delegation of broad guidelines to supervisors in individual business units is "*not* a specific employment

---

[5] *Wright v. Stern*, 2003 WL 21543539, at *6 (S.D.N.Y. July 9, 2003) (Mot. at 22) is not to the contrary. There, the district court held that a later DOJ *lawsuit* "asserting a pattern and practice" of discrimination in addition to central policies and strong statistical evidence supported a finding that "common issues of fact and law exist." *Id.* at *6.

practice supplying a common question sufficient to certify a class." *Dukes v. Wal-Mart
Stores, Inc.* (*Dukes II*), 964 F. Supp. 2d 1115, 1127 (N.D. Cal. 2013); *see Handloser*,
2021 WL 879802, at *8 (no commonality where there is no evidence employment
policies and procedures constrained the discretion of decisionmakers).

Here, Plaintiffs do not even *attempt* to tie any of their purported "policies"
pertaining to visas to terminations of individuals who are not on the bench. Only 31%
of Cognizant Class Band employees were on the bench during the proposed Class
Period. Smith Dec. Ex. 1, ¶ 40. And even Plaintiffs admit that the EEOC Letter "was
primarily directed to terminations of 'benched' employees." Mot. at 22, fn. 64.[6]
Plaintiffs' broader terminations class easily fails commonality on that basis alone.

Moreover, the primary "termination" reasons identified by Plaintiffs' expert for
non-benched employees—"separation agreement," "misconduct," "job abandonment,"
and "unsatisfactory performance"—are all, by their very nature, highly individualized.
Dkt. 262-2. Plaintiffs offer *no* explanation about how non-bench termination decisions
are made, let alone provide the requisite glue to hold a class of all "involuntary"
terminations together. *See Dukes II*, 964 F. Supp. 2d at 1126 (no commonality where
criteria applied by local managers was "so vague . . . that they imposed no real
constraints").

Plaintiffs' bench terminations subclass fares no better. First, as noted, none of the
policies Plaintiffs point to actually exist and function as they have explained, and
Plaintiffs have proffered no common evidence that could prove otherwise. *See supra*
§ II.F. Second, Plaintiffs cannot prove causation on a common basis. They attempt to
do so through an expert, but Dr. Johnson's analysis rests upon allegedly "involuntary"
bench terminations codes, which he has categorized incorrectly. The number one bench

---

[6] Plaintiffs try to fill this gap by asserting that Franchitti's termination, which was not
from the bench, was part of this alleged pattern or practice, but that is not what his letter
said. His letter clearly stated that "credible evidence" supported Franchitti's claim that
he was "discharged in retaliation," *not* because of discrimination. Dkt. 256-4 at p. 8.
Moreover, Franchitti is not seeking to represent the class.

termination reason identified by Dr. Johnson is "location preference," which is, in fact, a *voluntary* termination based on the individual's decision to reject relocation. Smith Dec. Ex. 25; Ex. 1, ¶¶ 133-134.  In other words, his model *disproves* commonality.

Even terminations from the bench for failure to become allocated (whether at five weeks or later) are fundamentally individualized.  The inability to find a position could be the result of dozens of different factors, from an individual employee's skill and effort, to their industry experience (or lack thereof), to billing rate, to client feedback. *See supra* § II.G.  In short, Cognizant's practice of terminating some individuals from the bench after five weeks merely provides a "framework" rather than any "constraint[] on discretion." *Moussouris*, 2018 WL 3328418, at *19.

Plaintiffs try to liken their bench terminations class to that certified in *Buchanan*, but the evidence does not support it.  2017 WL 6611653.  Plaintiffs in *Buchanan* presented documents "describ[ing] a general *corporate policy* of favoring" visa holders "in allocating benched employees to open client projects." *Id.* at *20 (emphasis added). Here, Plaintiffs have offered no such evidence.  Instead, the evidence shows Cognizant does not have policies that operate as Plaintiffs posit.  *See supra* § II.F.  And, even if it did, Cognizant's diffuse and *ad hoc* staffing procedures would not permit such policies to be implemented in any common manner.  *See supra* § II.D.

### (i)    Statistics Don't Solve Plaintiffs' Commonality Problem

Plaintiffs rely on Dr. Johnson's statistical analyses to show a purported disparity in termination rates between South Asians and non-South Asians. That analysis is flawed insofar as it inappropriately aggregates firm-wide data, which is not the decisionmaking level. *Dukes*, 564 U.S. at 356–57; *see Moussouris*, 2018 WL 3328418, at *24; *see supra* §§ II.C, II.D, II.G.  When analyzed at the business unit level, for example, 13 of 25 business units had *lower* terminations rates of non-South Asians, which shows the absence of a firm-wide common practice.  Smith Dec. Ex. 1, ¶¶ 144-145.

In addition, Dr. Johnson's analysis cannot reliably demonstrate the *reason* for a particular termination decision or account for individual factors. *See White*, 605 F.2d at

460; Smith Dec. Ex. 1, ¶¶ 125, 131-135.  Dr. Johnson does not analyze causation and concedes the terminations codes themselves do not necessarily reflect the true reasons for termination. *Id.* Ex. 11 at 189:25–190:7, 76:11-77:10; Ex. 1, ¶ 136.  That means, his analysis cannot answer the question, why was I disfavored.[7]  *See Dukes*, 564 U.S. at 354-355.  And notably, when individuals who transferred back to India or elsewhere are included in the analysis, non-South Asian employees were terminated at *lower rates* than South Asian employees.  *Id.* Ex. 1, ¶ 141.  "The impact of this adjustment on Dr. [Johnson's] analysis" is not "*de minimis*" and "impact[s] the statistical significance of his findings." *See Buchanan*, 2017 WL 6611653, at *9 n.14.

Termination trends at Cognizant do not otherwise support Plaintiffs' theories.  First, Plaintiffs' theory that non-visa holders are disproportionately allocated to the bench is belied by the fact that South Asian employees are more likely to be allocated to the bench.  Smith Dec. Ex. 1, ¶ 149.  Second, the South Asian and visa-holding proportion of Cognizant's workforce has declined over time, which is inconsistent with Plaintiffs' theory that Cognizant is disproportionately terminating non-South Asians.  *Id.* at ¶¶ 150-151.  If Cognizant were favoring South Asians and visa holders, fewer South Asians and visa holders should be sent to the bench, and their proportion of Cognizant's workforce should increase over time.  *Id.* at ¶¶ 146-148.  Not so here.  Plaintiffs have shown nothing more than a policy of delegated discretion, and their aggregate statistics are thus insufficient to support commonality.  *Dukes*, 564 U.S. at 357.

### (ii)   Anecdotal Evidence Is Sparse And Unpersuasive

Plaintiffs' anecdotal evidence of discrimination does not constitute the requisite "substantial proof" required to establish commonality.  Plaintiffs submit a smattering of EEOC charges and internal employee complaints alleging various types of discrimination.  These hearsay statements "cannot support class wide adjudication." *See*

---

[7] Dr. Johnson incorrectly classifies all of these terminations codes as involuntary.  *Compare* Dkt. 262-2, ¶ 23, *with* Smith Dec. Ex. 25.  Plaintiffs' entire explanation of what constitutes an involuntary termination rests on a single document lacking foundation or reliability—Exhibit 9 to Westphal's deposition. *See* Dkt. 262-2, ¶ 23.

*supra* § IV.A.I.a.iii; *Herrera v. Serv. Emps. Int'l Union Loc. 87*, 2012 WL 13059697, at *6 (N.D. Cal. Apr. 10, 2012). Even if considered, these few anecdotal complaints in a company with more than 40,000 U.S. employees do not rise to the level of a "general, companywide policy of discrimination." *Moussouris*, 2018 WL 3328418, at *25 (9 declarations for 8,360 class members "not sufficiently representative of the entire culture"); *see Dukes*, 564 U.S. at 358; *Herrera*, 2012 WL 13059697, at *6 ("handful" of anecdotes describing discriminatory conduct insufficient). And the EEOC Letter is of no more value here than on the hiring claim, for the same reasons. *Dukes*, 564 U.S. at 358; *Beard*, 2005 WL 8154710, at *9; *see supra* § IV.A.1.a.iii.

### 2.    Plaintiffs' Disparate Impact Claim Presents No Common Questions

Disparities are not unlawful—Title VII imposes no quotas on employers. *See* 42 U.S.C. § 2000e-2(j); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992 (1988); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978). To prove a disparate impact claim, plaintiffs must show that a specific policy or practice caused an alleged race or national origin disparity. *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 657 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(k). Plaintiffs have no evidence to prove that a common policy or practice caused these alleged disparities.

The record establishes Cognizant's practice of allowing discretion by managers over hiring and termination decisions, and merely showing that a "policy of discretion has produced an overall [race]-based disparity does not suffice." *Dukes*, 564 U.S. at 357. The Supreme Court was unequivocal on this point in *Dukes*—delegated discretion is "just the opposite of a uniform employment practice that would provide the commonality needed for a class action," as well as "a very common and presumptively reasonable way of doing business." *Id.* at 355. No preference for visa holders was implemented at all, much less consistently across business units, managers or clients, and, therefore, Plaintiffs cannot establish commonality.

Even if plaintiffs could identify a specific employment policy that was actually implemented, they would have to prove that it caused a complained-of disparity. *Wards Cove*, 490 U.S. at 657.   As Plaintiffs' expert concedes, "I am not presenting an expert opinion on the causality in this case."  Smith Dec. Ex. 11 at 77:6-7.  Nor do Plaintiffs offer any other evidence of causation.  This is fatal to Plaintiffs' disparate impact claim.

### 3.    There Is No Adequate Or Typical Hiring Class Representative

Even if the Court were to find commonality is satisfied, the only proposed class representative for the hiring class is (potentially) Brian Cox.[8]  But Brian Cox is not a typical or adequate class representative for a hiring class.

To start, although Plaintiffs claim 169,000 individuals were subject to Cognizant's alleged preference for visa holders in hiring, they have failed to proffer even *one* proposed class representative who lost a job to an Indian, South Asian, or visa holding candidate, including Ed Cox himself.  Ed Cox applied for, was offered, and took a position at Cognizant in 2014—during the Class Period.  He was not hired for a proposed role in 2018 because (1) the position was never formally requisitioned, opened to applications, or internally approved, and (2) it was decided that, if the position was someday opened, it would be filled by an internal—not external—applicant, and (3) Cognizant decided to forego the position entirely.  Smith Dec. Ex. 7, ¶¶ 7-12; *see also* Dkt. 266 (pending motion for partial summary judgment of Cox's rehire claim).  Ed Cox therefore "could not have been harmed by Defendants' alleged practice of favoring visa-ready Indian candidates" in hiring because he was actually hired in 2014,  Smith Dec. Ex. 1, ¶ 120; Ex. 7, ¶ 4.  *Handloser*, 2021 WL 879802, at *9-10 (denying certification and finding no typicality where plaintiff was rejected but "[Defendant] did not fill the open position" based on client input); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("The test of typicality 'is whether other members have the

---

[8]   The parties stipulated to the substitution of Brian for Ann Cox, but the Court has yet to rule on this stipulation.  Dkt. 265.  If the stipulation is not granted, there is *no* representative for a hiring class and certification should be denied. *Barnett v. Cty. of Contra Costa*, 2007 WL 196678, at *1 (N.D. Cal. Jan. 24, 2007).

Gibson, Dunn & Crutcher LLP

1   same or similar injury, whether the action is based on conduct which is not unique to the

2   named plaintiffs, and whether other class members have been injured by the same course

3   of conduct.'") (citation omitted); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208

4   (2021).

5          Not only are Ed Cox's claims atypical and subject to an analysis that illustrates

6   the individualized decisions at issue in this case, but Brian Cox is also an inadequate

7   representative.   Rule 23's adequacy requirement "is widely considered the most

8   important of the Rule 23(a) factors because it directly implicates the due process rights

9   of absent class members who will be bound by the judgment." *Gordon v. Sonar Cap.*

10  *Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015).   Plaintiffs bear the burden of

11  demonstrating through admissible evidence that Brian Cox is adequate. *Olean*, 31 F.4th

12  at 665.   In particular, Plaintiffs must show that he (1) has critical knowledge of the case,

13  and (2) has not abdicated all control to counsel. *Keegan v. Am. Honda Motor Co.*, 284

14  F.R.D. 504, 525 (C.D. Cal. 2012).   They have shown neither.

15        ***First***, Plaintiffs offered ***no*** evidence from either Ann or Brian Cox with their

16  motion, thereby effectively conceding that they lack the requisite knowledge to properly

17  represent a class.   Even if the Court *could* consider evidence outside Plaintiffs' moving

18  papers that bears on Brian Cox's knowledge—specifically, his declaration filed with

19  Plaintiffs' notice of Ann Cox's impending death—it is insufficient because it fails to

20  attest he has *any* particular knowledge of Ed Cox's claims. Dkt. 257-1.   By failing to

21  articulate any understanding of the case beyond the fact that Ed Cox was pursuing a

22  "class discrimination claim," Brian Cox shows he is not "familiar with the basic

23  elements of [the] claim[s]" he seeks to represent. *In re Citric Acid Antitrust Litig.*, 1996

24  WL 655791, at *4 (N.D. Cal. 1996).

25        ***Second***, Ed Cox's successors have abdicated all control of this case to counsel,

26  violating the requirement that class representatives "not simply len[d] their names to a

27  suit controlled entirely by the class attorney." *Tria v. Innovation Ventures, LLC*, 2013

28  WL 12324181, at *7 (C.D. Cal. Feb. 25, 2013), *adopted by* Dkt. 169.   Ann Cox did not

notify Plaintiffs' counsel of her husband's death for four months after his passing, claiming she "did not know the name of the firm representing [Mr. Cox] in the lawsuit." Dkt. 164-2 at 2.  Even more telling, *Plaintiffs' counsel* did not notice Ed Cox's absence during those four months, even though the parties were discussing dates and locations for his deposition, Cognizant served interrogatories on him, and Plaintiffs filed two motions—one for an extension of the case schedule and another about discovery.  Smith Dec. ¶ 40.  Apparently, Plaintiffs' counsel was so accustomed to operating without Mr. Cox's input that they did not notice his absence.  This, combined with a record devoid of any evidence that Ed, Ann, or Brian Cox made any substantive decisions in this case, demonstrates a "fail[ure] to take even minimal interest" in the action.  *Simon v. Ashworth*, *Inc.*, 2007 WL 4811932, at *3 (C.D. Cal. Sept. 28, 2007).

### 4.     There Is No Adequate Or Typical Terminations Representative

For the same reasons noted above, Ed Cox's successors are inadequate representatives of any terminations class.  His termination claim is also atypical: he was removed from only one assignment, a nonbillable role, and placed just once on the bench; he was sent there as a result of a margin optimization program that cut his position; and as part of that program, he could only be proposed for billable roles.  Smith Dec. Ex. 7, ¶¶ 5-6.  Because of these differences, Mr. Cox's interests do not "align[] with the interests of the class."  *Hanon*, 976 F.2d at 508.

Piroumian, the only other would-be representative of the terminations class, is also inadequate and atypical because his credibility and motives threaten to become "[t]he major focus of this litigation."  *Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 383 (C.D. Cal. 2016) (named plaintiff atypical and inadequate where "he and his counsel [would] have to devote most of their time and resources trying to refute Defendants' attacks on his character and his motivations for filing and litigating this lawsuit").  Two days into his final stint on the bench, Piroumian sent an email to the founder of Protect US Workers stating that he was "at Cognizant for another four weeks" and indicating that he "w[ould] be participating in the law suit that Daniel Kitchen [*sic*]

is preparing." Smith Dec. Ex. 27.  This email calls into question whether Piroumian was even attempting to be allocated or instead "welcomed and hoped for" his termination from the bench to "fabricate[] this lawsuit." *See Nghiem*, 318 F.R.D. at 382 (no typicality where there were questions about whether the would-be class representative had opted into a text message program to manufacture the lawsuit).  In addition, Piroumian made several derogatory comments about South Asians, calling into question his motivations for filing suit.  Smith Ex. 22 ("I'm not one of your Indian visa workers"); Ex. 23 ("Insulting . . . Must be run by Indians . . . . Hey dude, Namaste . . . ."); Ex. 21.

Piroumian also cannot bring a claim predicated upon any visa theories.  *See* Dkt. 42 at 8 (dismissing Piroumian's Title VII "disparate impact claims arising out of Cognizant's practice of applying for visas"); Dkt. 58 at 3 (dismissing claims "again").

Finally, intra-class conflicts also prohibit certification of the proposed classes.  At the very least, individuals at the Manager level and above participate in the types of employment decisions Plaintiffs challenge.   Copeland Dec. ¶¶ 5-6; Schanta Dec. ¶ 8.  Where claimants "participate[ ] in" challenged employment decisions, there is "a conflict of interest between the plaintiffs and unnamed members of the class" that defeats adequacy.  *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011); *see Hansberry v. Lee*, 311 U.S. 32, 44-46 (1940).

### 5.      Concerns Exist Regarding Counsel's Adequacy

"Misconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification."  *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011).  Plaintiffs' counsel's conduct in this case has put into question their ability to competently and ethically bring the matter to trial.  Smith Dec. ¶¶ 41-46; *Kaufman v. American Family Mut. Ins. Co.*, 2008 WL 1806195, at *6 (D. Colo. 2008) (counsel's adequacy undercut when they violated protective order regarding contact information of potential class members).  Plaintiffs' counsel have repeatedly flouted their ethical obligations with respect to privileged materials.  In October 2021, Cognizant discovered that many

privileged documents had been produced due to a vendor error, but Plaintiffs' counsel never alerted Cognizant and refused to sequester the documents for six days after Cognizant discovered the issue. Smith Dec. ¶¶ 41-43. More recently, Plaintiffs' counsel refused to sequester two privileged documents submitted with the instant motion, solely because they disagreed with the claim of privilege. *Id.* ¶¶ 44-45. And, despite ultimately agreeing to sequester the documents, they subsequently provided a lengthy analysis of those very documents to this Court, in violation of the Protective Order entered by the Court (Dkt. 63, 64) and their ethical duties. *Id.* ¶ 46. Such conduct (particularly in light of the other failings detailed in the Smith Declaration) falls well short of the ethical standards expected of would-be class counsel.

On multiple occasions, Plaintiffs' counsel has failed to meet and confer prior to filing motions (Dkts. 153, 258), filed untimely briefs (resulting in dismissal) (Dkts. 172, 253), and ignored the Court's and the Central District's Local Rules regarding sealing, requiring Cognizant to file two ex parte applications to protect confidential information (both granted) (Dkts. 94, 98, 109, 116). Counsel even failed to follow the rules on this very motion, resulting in their entire under-seal filing being rejected. Dkt. 258.

Counsel's other failures also warrant a finding of inadequacy. Counsel failed to demonstrate that any of their clients are adequate class representatives; neglected or decided outright not to have their clients sign their declarations under penalty of perjury (in contravention of 28 U.S.C. § 1746); jettisoned swaths of employees from the proposed class; and, after five years of litigation, failed to find a single class member who was not hired to a position that actually came to fruition and can thus represent the hiring class, which makes up **over 97%** of the putative class members. *Davidson v. Citizens Gas & Coke Util.*, 238 F.R.D. 225, 232 (S.D. Ind. 2006) (finding absence of adequacy based in part on "[c]ounsel's demonstrated deficiencies in performance").

**B.    Plaintiffs Fall Far Short Of Meeting 23(b)(3)'s Stringent Standards**

In addition to Rule 23(a)'s prerequisites, Plaintiffs must *also* satisfy Rule 23(b)(3)'s predominance and superiority requirements. They fail to do so.

### 1.      Plaintiffs Fail To Prove Predominance For Any Of Their Classes

The "more demanding" predominance standard of Rule 23(b)(3) requires that there be "generalized evidence which proves or disproves [the] issue or element on a simultaneous, class-wide basis" such that it "obviates the need to examine each class members' individual position." *Comcast*, 569 U.S. at 34; *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 537 (N.D. Cal. 2012) ("Mere allegations of a pattern or practice of discrimination do not *per se* satisfy [] predominance" because they still "must be subject to generalized proof.").

Plaintiffs here seek to proceed under the *Teamsters* pattern or practice framework. In Phase I, Plaintiffs must establish discrimination was "the company's standard operating procedure." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 360–61 (1977).  If the employer is unable to show that plaintiffs' "proof is either inaccurate or insignificant," or if it cannot "offer[] some legitimate, nondiscriminatory reason" for the statistical disparity, class members are entitled to an "inference" in Phase II that employment decisions were made pursuant to that policy.  *Id.* at 358.  In Phase II, the employer may rebut this inference by raising individual defenses or demonstrating that the employment decision was made "for lawful reasons."  *Id.* at 362.

Plaintiffs try to skirt Rule 23's predominance requirement by asking the Court to completely ignore the individualized inquiries that are required at both Phase I and Phase II in order to establish liability under Title VII and § 1981.  This misuse of *Teamsters* is the same gambit the plaintiffs in *Dukes* tried, and the Supreme Court rejected.  564 U.S. at 366–67 (rejecting trial by formula).  Plaintiffs' approach—focusing solely on certain questions in Phase I—cannot support class certification here because it does not eliminate the need for individualized inquiries.  *Handloser*, 2021 WL 879802, at *11; *see Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), *abrogated in part on other grounds by Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021) (If "after adjudication of the classwide issues" plaintiffs must still introduce "a great deal of individualized proof" for liability, certification is improper.); *Chen-Oster v. Goldman,*

1    *Sachs & Co.*, 325 F.R.D. 55, 81 (S.D.N.Y. 2018) (predominance not satisfied for pattern
2    or practice claim regarding "boy's club" culture); *Davis*, 2021 WL 2556012, at *12
3    (same for hiring class).  This question of common proof for liability is distinct from the
4    unremarkable proposition that "the presence of individualized questions regarding
5    *damages*" does not necessarily preclude a finding of predominance. *Ellis*, 285 F.R.D. at
6    539 (emphasis added).

7           Plaintiffs presented this same theory—certification only of certain questions in
8    Phase I—to the court in *Handloser* (No. 5:19-cv-01242-LHK, Dkt. 163 at 1), but the
9    court rejected it out of hand, noting many *highly individualized* inquiries would need to
10   occur to proceed and not even mentioning *Teamsters*, let alone phases.  *See Handloser*,
11   2021 WL 879802.  *Handloser* explained, for example, that for "putative class members,
12   an individual inquiry into the client interview and evaluation process will predominate
13   over questions of law or fact common to the class as a whole." *Id.* at *11.  Similarly,
14   "[d]etermining Defendants' liability will . . . require an individual inquiry into whether
15   the position that a putative class member applied for was restricted to United States
16   citizens or green card holders." *Id.*  And, even in assessing the threshold commonality
17   standard, it found that the "putative class lack[ed] a common hiring experience that could
18   tie their individual employment decisions together," noting "dramatically different
19   hiring procedures depending on which job they applied for. . . ." *Id.* at *8.

20          The same is true here.  For each putative class member in the hiring class, there
21   must be individualized determinations of:  how a candidate applied (*e.g.*, external
22   sources or referral); what the candidate's application process was like; whether the
23   position was restricted to U.S. citizens or green card holders; whether the client was
24   involved in the process; whether the candidate met the job qualifications; whether the
25   position was ultimately filled; and if the position was filled, whether it was filled with a
26   current Cognizant employee or a visa holder.

27          Individualized considerations abound for the terminations class as well, including
28   whether a termination was voluntary or involuntary, whether the employee was replaced

by a visa holder, or whether the employee's position was eliminated altogether.  For bench terminations, questions as to whether decisions by class members themselves—rejecting a position, refusing to relocate, refusing to travel, or being unavailable or unresponsive to potential opportunities—resulted in the termination will predominate; as will questions of whether there was even any available position for which they were qualified or whether they were passed over for visa-holding employees.

Such individualized considerations take this case outside of Plaintiffs' authorities. Unlike in *Chicago Teachers Union v. Board of Education*, putative class members here have not "suffered the same injury at the same time as the result of the same [] process by the same central decision-maker." 797 F.3d 426, 444 (7th Cir. 2015).  Nor have Plaintiffs identified a "common nationwide [] system" causing any alleged disparity. *Cf. Ellis*, 285 F.R.D. at 538.

Even if Plaintiffs could establish an "inference" that employment decisions were made pursuant to a discriminatory policy in Phase I, *Teamsters*, 431 U.S. at 362, Cognizant would "have the right to raise any individual affirmative defenses it may have, and to 'demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.'" *Dukes*, 564 U.S. at 367 (quoting *Teamsters*, 431 U.S. at 362); *In re Autozone, Inc.*, 2016 WL 4208200, at *15 (N.D. Cal. Aug. 10, 2016) (rejecting argument that defenses speak only to damages, not liability).  Similarly, Cognizant is entitled to present evidence that any policies and practices that had a disparate impact were justified by a "business necessity."  Mot. 34.  As to that question, different justifications may have existed over time, and individual trials would be necessary to sort that out. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 989 (9th Cir. 2007).

The same is true of punitive damages.  Given the number of decisionmakers here, deciding whose conduct should subject the Company to punitive damages will require individualized inquiries. *See supra* §§ II.C, II.D, II.G.  Moreover, in addition to proving intentional discrimination (punitive damages are only available for disparate treatment claims), class members must "make an additional 'demonstrat[ion]' of their eligibility

1  for punitive damages." *Kolstad v. 57 Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)

2  (alteration in original) (citing 42 U.S.C. § 1981a(b)(1)).

3        Nor can Plaintiffs rely on issue certification under 23(c)(4) "to fix manifest Rule

4  23(b)(3) predominance problems presented where key issues going to liability require

5  individualized proof." *Moeller v. Taco Bell Corp*., 2012 WL 3070863, at *6 (N.D. Cal.

6  July 26, 2012).  To the extent that Plaintiffs rely upon the Ninth Circuit's decision in

7  *Valentino v. Carter-Wallace, Inc.* to suggest that issue certification pursuant to Rule

8  23(c)(4) is appropriate "[e]ven if the common questions do not predominate over the

9  individual questions," 97 F.3d 1227 (9th Cir. 1996), that proposition does not survive

10  *Dukes*, 564 U.S. 338.  The Supreme Court in *Dukes* held that plaintiffs must satisfy both

11  Rule 23(a) and (b) in order to obtain certification (*id.* at 345) and specifically rejected

12  the argument that class certification was appropriate "[w]hen the plaintiff seeks

13  individual relief . . . after establishing a pattern or practice of discrimination" because

14  the district court "must usually conduct additional proceedings . . . to determine the

15  scope of individual relief," *id.* at 366.  Because *Valentino*'s reasoning "is clearly

16  irreconcilable with the reasoning or theory of intervening higher authority" in *Dukes*,

17  *Valentino* has been "effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 893 (9th

18  Cir. 2003) (en banc).  Even if *Valentino* survives after *Dukes,* Plaintiffs must still prove

19  that the "adjudication of the certified *issues*" will "*significantly advance* the resolution

20  of the underlying case, thereby achieving judicial economy and efficiency." *Valentino*,

21  97 F.3d at 1229 (emphasis added).  Courts therefore refuse to certify Rule 23(c)(4) issue

22  classes where, as here, "the common issues are inextricably tied to the individual issues,"

23  or "where the individual issues still make the case unmanageable." *In re Paxil Litig*.,

24  212 F.R.D. 539, 543 (C.D. Cal. 2003); *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, 2015

25  WL 4537957, at *12 (N.D. Cal. July 27, 2015).

26        **2.**     **Plaintiffs Fail To Prove Superiority**

27        Plaintiffs also cannot show that a class action is "superior" to other available

28  methods for adjudicating this controversy because Title VII and § 1981 individual

lawsuits are a realistic and feasible alternative.  Fed. R. Civ. P. 23(b)(3); *Valentino*, 97 F.3d at 1234–35 (class action is "superior method for managing litigation if no realistic alternative exists").

Although damages class actions often involve claims with "relatively paltry potential recoveries," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (citation omitted), potential recovery in Title VII and § 1981 may not be.  *See, e.g.*, *Miller v. Hygrade Food Prods. Corp.*, 198 F.R.D. 638, 643 (E.D. Pa. 2001) (Title VII plaintiffs can receive up to $300,000).  The availability of attorneys' fees under both statutes, 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988(b-c), also undermines Plaintiffs' argument that there are "significant resource barriers required to pursue a case."  Mot. 31.  And this isn't merely a hypothetical possibility, as five former employees (including Franchitti) are currently pursuing individual Title VII or § 1981 actions against Cognizant.  And Plaintiffs' fear of retaliation argument (Mot. at 31), is implausible given that the class definitions exclude current Cognizant employees.  *See Dickerson v. Mack Trucks, Inc.*, 2013 WL 3507508, at *4 (D. Md. July 10, 2013).

### 3.    Plaintiffs' Proposed Classes Are Unmanageable

Class certification is inappropriate under Rule 23(b)(3) "[w]hen the complexities of class action treatment outweigh the benefits of considering 5 issues in one trial." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).  The quintessential "unmanageable" scenario arises when "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually." *Id.*

### a.    *Teamsters* Does Not Render The Proposed Classes Manageable

Plaintiffs principally propose to manage this case using the two-part *Teamsters* framework, claiming that in Phase I, a jury can decide if a "pattern or practice" of discrimination exists and thereby establish a "presumption" of discrimination; and, then in Phase II, the court and the parties can choose from a menu of five proposals that they claim, incorrectly, will make the remaining individualized issues manageable.  Mot. 32-

33; Dkt. 256-112 ("Phase II Procedures").

As discussed, *supra* § IV.B.1, however, a determination in Phase I of *Teamsters* as to "whether Cognizant engaged in a pattern or practice of discrimination" (Mot. 34), does not "significantly advance" the resolution of the litigation because Cognizant will have a right to present its defenses to liability consistent with due process *in both phases*. As such, the *Teamsters* framework provides no basis to certify a class under any rule.

Plaintiffs' additional brief (Exhibit 109) confirms that mini-trials are in fact the only way to resolve these claims. Acknowledging that a favorable Phase I finding for Plaintiffs results only in a "rebuttable presumption" of discrimination, Plaintiffs suggest (among other unworkable alternatives discussed in § IV.B.4, *infra*) potentially tens of thousands of Phase II individual trials, during which Cognizant would be entitled to individualized determinations of liability and damages. Ex. 109 at 7. This is exactly what the class action process is engineered to avoid, and numerous courts have denied class certification on superiority grounds in these circumstances.[9] *Allison v. Citgo Petroleum Corp*., 151 F.3d 402, 420 (5th Cir. 1998) (no certification of 1,000+ person pattern/practice class because "success of these claims will turn ultimately on the special circumstances of each individual's case"); *Ramirez v. DeCoster*, 194 F.R.D. 348, 354 (D. Me. 2000) (no certification of 1,000-member class noting, "[t]he predominance of individual issues ultimately to be tried to a single jury in Phase 2 lessens any potential superiority the class mechanism could have in resolving" Section 1981 claims based on pattern or practice theory); *see also Rutstein v. Avis Rent-A-Car Sys*., *Inc*., 211 F.3d 1228, 1239 (11th Cir. 2000) (similar).

### b. Plaintiffs Offer No Manageable Way To Resolve Phase II

Acknowledging that Phase II will require individualized inquiries, Plaintiffs offer

---

[9] Plaintiffs' reliance on *Bell v. PNC Bank*, which certified a class of 286 people despite the need for subsequent individual trials (Mot. at 30), is misplaced. Not only was that class less than 1% the size of the proposed classes here, but it was also a wage-and-hour FLSA matter, not a discrimination case using the *Teamsters* framework.

a menu of five "Phase II Procedures" which they claim will satisfy Rule 23(b)(3) and (c)(4)'s manageability requirements.  But courts have resoundingly rejected this kind of "figure-it-out-as-we-go-along-approach" to certification.  *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 425 (5th Cir. 2004).  And for good reason:  A "district court must . . . consider in every case" whether certification will "bring in thousands of other possible claimants, all of whom may assert individualized claims requiring mini-trials with juries" because that fact, if true, would nullify "the justification of class certification."  *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 69 (4th Cir. 1977).

None of Plaintiffs' options works.  The first two—settlement and ADR—require Cognizant's consent, which it is not obligated to give.  *D.C. by & through Garter v. Cty. of San Diego*, 2018 WL 692252, at *4 (S.D. Cal. Feb. 1, 2018) (rejecting the "speculative" theory "that the case might settle" as a grounds to certify a class).  So too with the third option—appointment of a special master—which would "divest [Cognizant] of its [constitutional] right to a jury trial and due process rights to present individualized defenses" as to each class member.  *Id.*

The fourth proposal—"individual or group hearings" or "subclasses"—is similarly unworkable to the extent it calls for group litigation.  In adjudicating a class action, one cannot simply "assume[] away relevant variations" among class members. *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 267 (3d Cir. 2011); *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 125 (N.D. Cal. 2014) (rejecting subclasses "where ascertaining class membership necessitates an unmanageable individualized inquiry").

The final proposal—end the case after Phase I and "allow class members to individually pursue remedial claims" (Dkt. 256-112 at 6)—introduces more problems than it solves.  This method for resolving liability would require thousands of mini-trials to be overseen by numerous adjudicators—a result that would undermine "the efficiency and economy of litigation[,] which is a principal purpose of the [class action] procedure."  *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974).  Indeed, given the claimed size of the putative classes, if the Court could try one putative class

member's claim per weekday, it would take 665 years to try them all.  *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974) (no certification where individual issues would "splinter" case into "thousands" of trials requiring "years to litigate").  Not only would this process not make liability determinations manageable, it does nothing to demonstrate "that damages are susceptible of measurement across the entire class"—a showing Plaintiffs must also make as a prerequisite to certification.  *Comcast*, 569 U.S. at 35.  In short, there is no way to avoid what would inevitably follow if a Phase I class were certified—namely, thousands of mini-trials in Phase II.  *See Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 486 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011); *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 253 (C.D. Cal. 2006).

Plaintiffs' proposal also violates Cognizant's Seventh Amendment right to have a jury decide the entire case.  The Seventh Amendment, which guarantees the right to a jury trial, also preserves Cognizant's right to have its defenses resolved by the same jury that decided liability.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998); *Tull v. United States*, 481 U.S. 412, 422–23 (1987).

Finally, every case litigated under Title VII requires individualized determinations before punitive damages can be awarded, because only an "aggrieved individual" can collect punitive damages.  42 U.S.C. § 1981a(b)(1).  And Title VII unequivocally precludes any monetary award to nonvictims.  *See id.* § 2000e-5(g)(2); *Firefighters Loc. Union No. 1784 v. Stotts*, 467 U.S. 561, 580 (1984).  Thus, these issues too would have to be individually litigated for every class member.

Plaintiffs' proposal must be rejected.

## V.  CONCLUSION

Plaintiffs' Motion for Class Certification should be denied.

1  Dated:  June 10, 2022

2                                         THEODORE J. BOUTROUS JR.
3                                         MICHELE L. MARYOTT
                                          KATHERINE V.A. SMITH
4                                         LAUREN M. BLAS
5                                         ELIZABETH A. DOOLEY
                                          MATTHEW T. SESSIONS
6                                         GIBSON, DUNN & CRUTCHER LLP

7

8                                         By:  /s/ Michele L. Maryott
                                               Michele L. Maryott
9

10                                        Attorneys for Defendants
                                          COGNIZANT TECHNOLOGY SOLUTIONS
11                                        CORPORATION and COGNIZANT
                                          TECHNOLOGY SOLUTIONS U.S.
12                                        CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson,  Dunn  &
Crutcher LLP