# EXHIBIT 1

08:42:22

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

CHRISTY PALMER, et al.,      )
                             )
        Plaintiffs,          )
                             )
        vs.                  )
                             )   2:17-CV-6848-DMG
COGNIZANT TECHNOLOGY SOLUTIONS )
CORPORATION, et al.,         )
                             )
        Defendants.          )
_____

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME I

Los Angeles, California

Tuesday, June 13, 2023

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1        APPEARANCES OF COUNSEL:

 2

          For the Plaintiffs:
 3

 4                     KOTCHEN & LOW LLP
                       By:  Daniel Kotchen, Attorney at Law
 5                          Daniel Low, Attorney at Law
                            Lindsey Grunert, Attorney at Law
 6                          Mark Hammervold, Attorney at Law
                            Amanda Burns, Attorney at Law
 7                     1918 New Hampshire Avenue NW
                       Washington, D.C. 20009
 8

 9

10

11        For the Defendants:

12

                       GIBSON DUNN & CRUTCHER LLP
13                     By:  Richard Doren, Attorney at Law
                            Lauren Blas, Attorney at Law
14                          Katherine Smith, Attorney at Law
                       333 South Grand Avenue
15                     Los Angeles, California 90071

16

17                     GIBSON DUNN & CRUTCHER LLP
                       By:  Michele Maryott, Attorney at Law
18                          Elizabeth Dooley, Attorney at Law
                       3161 Michelson Drive
19                     Irvine, California 92612

20

21

22

23

24

25
```

15:59:29   Wages go through the roof, right?  You have more bargaining

15:59:32   power.

15:59:33            In this case, what happened with the actual wages

15:59:35   for those types of workers?  Wages dropped by 10 percent.

15:59:39   That indicates there is no shortage of those workers.

15:59:41   Q. Based on your study of Cognizant's business, what is your

15:59:47   view as to why Cognizant has relied on the U.S. visa program?

15:59:51            MS. MARYOTT:  Objection, lacks foundation.

15:59:54   Q. Dr. Hira, have you studied Cognizant's business and its

15:59:58   reliance on the visa program?

15:59:59   A. I have.

16:00:00   Q. What have you done to study that?

16:00:01   A. I looked at Cognizant's documents on its policies and

16:00:04   practices, its staffing approach.

16:00:09   Q. And based on your review of those documents, what is your

16:00:12   analysis as to why they have relied on the U.S. visa program

16:00:16   for staffing purposes?

16:00:18            MS. MARYOTT:  Same objection, Your Honor, still

16:00:20   lacks foundation.

16:00:20            THE COURT:  Overruled.

16:00:22            THE WITNESS:  So examining their approach to using

16:00:26   the visa program, they have a cultural preference.  So not

16:00:31   just -- they are not just looking for visa workers, they are

16:00:34   looking for visa workers who are South Asian, of Indian

16:00:37   origin.

1 16:00:38            It's a very sort of striking preference.  And so

2 16:00:44    they -- the -- the visa program basically facilitates that

3 16:00:49    cultural preference for South Asians of Indian origin.

4 16:00:52    Q. Have you reviewed expert analysis of what percentage of

5 16:00:57    Cognizant's visa employees are of a specific race and

6 16:01:01    national origin?

7 16:01:02    A. Yes.

8 16:01:02    Q. Which expert analysis did you review?

9 16:01:04    A. Dr. Johnson's report.

10 16:01:05    Q. And what does Dr. Johnson say as to that?

11 16:01:08    A. He says that 99 percent of all of the visa workers

12 16:01:12    they've got are South Asian of Indian origin.

13 16:01:17            And if you look -- I don't know if the chart is

14 16:01:20    still up, but if you remember the chart, there is, I mean,

15 16:01:23    tens of thousands -- there is 47,000, I think, new H-1B

16 16:01:28    visas, right?  99 percent of those workers are South Asian of

17 16:01:32    Indian origin.  That is quite striking.

18 16:01:37    Q. And why do you find that quite striking?

19 16:01:39    A. Because -- for a couple of reasons.

20 16:01:43            First, you know, talent is distributed all

21 16:01:46    throughout the world.  You know, I'm a proud Indian, but I

22 16:01:48    don't think we have a stranglehold on all the technology

23 16:01:51    work.  And so H-1B visas are, you know, eligible to anybody,

24 16:01:57    you know, from any country.

25 16:01:59            And so you could be hiring -- and we look at this in

08:26:44

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

```
CHRISTY PALMER, et al.,          )
                                 )
          Plaintiffs,            )
                                 )
          vs.                    )
                                 )   2:17-CV-6848-DMG
COGNIZANT TECHNOLOGY SOLUTIONS    )
CORPORATION, et al.,             )
                                 )
          Defendants.            )
_____
```

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME II

Los Angeles, California

Wednesday, June 14, 2023

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 09:39:53  achieve a preference for South Asians of Indian descent?

2 09:39:57          MS. MARYOTT:  Objection, leading.

3 09:39:59          THE COURT:  Overruled.

4 09:40:00          THE WITNESS:  So this is entirely consistent with

5 09:40:04  what we've just walked through in terms of their business

6 09:40:07  model.

7 09:40:07          You remember that they targeted 12,000 of their

8 09:40:13  positions for Visa holders.  All of those Visa holders,

9 09:40:18  99 percent, virtually all, are South Asian of Indian origin.

10 09:40:24  So you've already got this huge pool that is the majority of

11 09:40:27  the hires that they are going to do, planning for 2018.

12 09:40:31          Then they are storing those Visa workers offshore,

13 09:40:37  the Indian workers, offshore, and they are driving

14 09:40:42  utilization rates.  So they are pushing for the business

15 09:40:45  units to place those workers in the U.S. on on-site projects.

16 09:40:52          In addition, a large share of the H-1B workers that

17 09:41:00  they hire in the U.S. -- or they hire a large share of

18 09:41:06  workers on H-1Bs in the U.S., not just in India, so they are

19 09:41:11  pulling from the H-1B pool in the U.S., virtually all of

20 09:41:15  those workers are also South Asian of Indian origin.

21 09:41:18          So everything about the business practices, the --

22 09:41:22  as the statement goes, the recruitment, the selection, the

23 09:41:26  hiring, the on-boarding process, but also the placement and

24 09:41:29  the driving of the Visa holders, right, the preferential

25 09:41:34  placement of those holders, is consistent with preferring

| | |
|---|---|
| 1 09:41:41 | South Asians of Indian origin. |
| 2 09:41:42 | MR. KOTCHEN:  Thank you, Dr. Hira. |
| 3 09:41:43 | THE COURT:  All right.  Before we go to |
| 4 09:41:45 | cross-examination, we'll take our morning break, and we will |
| 5 09:41:48 | return at 10:00. |
| 6 09:41:50 | (Thereupon, the jury retired from the courtroom.) |
| 7 09:42:21 | (Thereupon, there was a brief recess.) |
| 8 10:04:03 | (Thereupon, the jury returned to the courtroom.) |
| 9 10:05:21 | THE COURT:  All right.  Ms. Maryott, you may begin. |
| 10 10:05:26 | MS. MARYOTT:  Thank you, Your Honor. |
| 11 10:05:26 | CROSS-EXAMINATION |
| 12 10:05:28 | BY MS. MARYOTT: |
| 13 10:05:28 | Q. Good morning, Dr. Hira. |
| 14 10:05:29 | A. Good morning. |
| 15 10:05:29 | Q. You are not claiming to be an expert on Cognizant |
| 16 10:05:33 | specifically, are you? |
| 17 10:05:34 | A. I'm -- I have become an expert on Cognizant. |
| 18 10:05:43 | Q. Okay.  So you have become an expert on Cognizant, but |
| 19 10:05:47 | besides with -- besides conversations with plaintiffs' |
| 20 10:05:51 | counsel, you've never spoken with anyone at Cognizant, is |
| 21 10:05:56 | that correct? |
| 22 10:05:56 | A. No, I have not. |
| 23 10:05:56 | Q. You have not spoken with anyone? |
| 24 10:05:58 | A. I have not. |
| 25 10:05:59 | Q. Thank you. |

1   10:06:00          You never interviewed anyone from Cognizant in

2   10:06:03   connection with preparing your report in this case?

3   10:06:05   A. That's correct.

4   10:06:06   Q. And you prepared two reports in this case.  Do you recall

5   10:06:10   that?

6   10:06:10   A. Yes.

7   10:06:10   Q. Okay.  And those two reports set forth the entirety of

8   10:06:14   your opinions, correct?

9   10:06:15   A. Yes.  Well, I mean, obviously, my industry expertise, my

10  10:06:22   expertise around the Visa programs and the policies.

11  10:06:23   Q. Those two reports set forth your opinions that you are

12  10:06:27   providing in this case, correct?

13  10:06:28   A. Yes.

14  10:06:29   Q. You received about 40 documents specific to Cognizant to

15  10:06:34   prepare your first report in this case, is that right?

16  10:06:37   A. I believe so.

17  10:06:39   Q. And you were provided those 40 documents by plaintiffs'

18  10:06:43   counsel, is that right?

19  10:06:44   A. Yes.

20  10:06:44   Q. Isn't it true, Dr. Hira, that you did nothing to confirm

21  10:06:49   that the documents you received were, in fact, representative

22  10:06:53   of the documents regarding Cognizant's practices?

23  10:06:56   A. I asked for a range of documents that gave the practices,

24  10:07:02   the staffing practices.

25  10:07:04   Q. And it's true that you did nothing on your own to confirm

10:07:07  1   that the documents you received were, in fact, representative

10:07:11  2   of the documents regarding Cognizant's business, is that

10:07:14  3   true?

10:07:14  4    A. I did not do anything additional except for ask for the

10:07:20  5   range of documents.  And, of course, I was deposed, too.

10:07:23  6    Q. And for the second report, you reviewed about 80

10:07:27  7   documents, is that right?

10:07:27  8    A. That sounds about right.

10:07:29  9    Q. And you did nothing with respect to that group of

10:07:33 10   documents to confirm that the documents were, in fact,

10:07:36 11   representative of Cognizant's practices, isn't that correct?

10:07:40 12    A. Yes.

10:07:42 13    Q. And when you take out the duplicate documents, it's about

10:07:47 14   130 documents in total that you reviewed, is that right?

10:07:51 15    A. I don't know what the number would be.  Of course, I

10:07:55 16   reviewed also the class certification documents, do there is

10:07:59 17   a number of documents associated with that.

10:08:00 18    Q. And you asked plaintiffs' attorneys to provide you with a

10:08:03 19   representative sample of the staffing processes, correct?

10:08:07 20    A. Yeah.  I asked for a range of documents.

10:08:09 21    Q. And it was important to your analysis that the documents

10:08:12 22   be representative of Cognizant's business practices, right?

10:08:15 23    A. Well, I'm not sure how you are using the term

10:08:18 24   "representative."  I mean, I think these are policy

10:08:20 25   documents.  When it says this is the immigration policy, and

1 10:16:19   what the practices are.  So you draw your opinion based on

2 10:16:22   multiple documents.  There is lots of documents that one

3 10:16:25   looks at.

4 10:16:26   Q. So you did some skimming and some search words --

5 10:16:30   searching of keywords for Mr. Westphal's deposition.  Is that

6 10:16:33   how you handled Mr. Padmanabhan's deposition as well?

7 10:16:36   A. I don't recall if I read the whole thing or if I did a

8 10:16:40   similar process.

9 10:16:40   Q. Okay.  Well, you testified that you did some skimming and

10 10:16:45   some search words, is that correct?

11 10:16:47   A. If that is -- if that is what I said, then that must be

12 10:16:51   correct.

13 10:16:52   Q. And the depositions you reviewed, those were also

14 10:16:55   provided to you by plaintiffs' counsel?

15 10:16:57   A. Correct.

16 10:16:58   Q. You don't know how they were selected, right?

17 10:17:00   A. I do not.

18 10:17:01   Q. And you didn't ask for a representative sample of

19 10:17:03   deposition testimony, correct?

20 10:17:04   A. I asked for a range of documents that describe the

21 10:17:08   staffing practices.

22 10:17:09   Q. And you didn't ask for the deposition testimony of

23 10:17:12   Cognizant's employee who is knowledgeable about Visa

24 10:17:14   practices, isn't that right?

25 10:17:15   A. I believe that Venugopal Padmanabhan was familiar with

110:17:22  it.  I think there was discussion around that.  And same with

210:17:24  Eric Westphal.

310:17:25   Q. But not Helen Kim, the head of Global Mobility?

410:17:30   A. No.

510:17:36   Q. Dr. Hira, you testified about a Visa readiness policy at

610:17:42  Cognizant.  Have you actually seen a policy called Visa

710:17:46  Readiness Policy?

810:17:48   A. It's in the documents that talk about immigration.  You

910:17:52  see that there is Visa readiness and travel readiness.

1010:17:55       MS. MARYOTT:  Objection, move to strike as

1110:17:57  nonresponsive.

1210:17:58       THE COURT:  Overruled.

1310:18:00   Q. Now, you reached the conclusion that Cognizant had a,

1410:18:03  quote, unquote, Visa readiness policy based on the handful of

1510:18:08  cherry-picked documents that counsel provided to you,

1610:18:10  correct?

1710:18:11   A. I -- they are based on the documents that are produced by

1810:18:16  Global Mobility, which is in charge of Visa policies, right?

1910:18:20  As well as e-mail chains that show, and it's very logical

2010:18:25  what they are doing with that, they use that term throughout

2110:18:30  various different documents.

2210:18:31   Q. And Global Mobility referring to Helen Kim's group?

2310:18:35   A. The immigration group, yes, Global Mobility, Mr. Mohan's

2410:18:39  group.

2510:18:39   Q. Now, a few moments ago, you testified about a Visa

1  10:18:43   utilization policy.

2  10:18:44           MS. MARYOTT:  That is Exhibit 321, if we could pull

3  10:18:47   that up, please.

4  10:18:55   Q. Do you recall testifying about this document, Dr. Hira?

5  10:18:57   A. Yes.

6  10:18:57   Q. Okay.  Did you make any inquiry into whether this

7  10:19:04   document, this policy, was actually implemented?

8  10:19:07   A. I know it came up at the deposition, and I saw that there

9  10:19:13   were e-mail exchanges that talked about this Visa utilization

10 10:19:17   policy.  And included some of the same language in there.

11 10:19:21   Q. Did you actually make an inquiry into whether the policy

12 10:19:29   was implemented?

13 10:19:30   A. An inquiry to whom?

14 10:19:32   Q. To anyone.

15 10:19:33   A. So there was a discussion during the deposition, one of

16 10:19:37   the depositions that I went through, which asked the same

17 10:19:41   kinds of questions, and as I said, there were confirmation

18 10:19:46   e-mails that this policy was implemented.

19 10:19:50           MS. MARYOTT:  Objection, move to strike as

20 10:19:51   nonresponsive.

21 10:19:52           THE COURT:  Overruled.

22 10:19:53   Q. So it's your position you made it such an inquiry?

23 10:20:01   A. I didn't need to make an active inquiry since there was

24 10:20:06   confirmation of this Visa policy, this utilization policy,

25 10:20:11   being implemented.

11:02:16  Q. You don't know how many actual people this is about,

11:02:20  right?

11:02:20  A. Well, we do know the new ones are 47,000 workers,

11:02:26  individual workers, but the continuing approvals are

11:02:30  different types of workers, some of those new workers that

11:02:33  get renewed or through amendments or hiring from other

11:02:37  places.  So you can't say specifically that the 133,000

11:02:40  continuing approvals is 133,000 individual workers.  In fact,

11:02:46  there is going to be one worker that might have multiple

11:02:49  continuing approvals associated with them.

11:02:51  Q. So you don't know how many people the continuing

11:02:54  approvals is actually about, is that true?

11:02:56  A. I do not.

11:03:01  Q. Dr. Hira, you are aware that this case is about

11:03:04  terminations from the bench, right?

11:03:06  A. That's my understanding, yes.

11:03:08  Q. And you've not examined the circumstances of any

11:03:11  particular termination, have you?

11:03:12  A. Not of specific terminations.  That was outside the scope

11:03:16  of what I was asked to examine.

11:03:18  Q. Yet, it's your opinion that there was an increase in

11:03:22  bench terminations as Cognizant implemented its policies and

11:03:26  practices concerning staffing, right?

11:03:28  A. Correct.

11:03:29  Q. And what policies do you refer to when you offer that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  11:03:35  opinion?

2  11:03:35  A. So it's a prioritization of the Visa holders and placing

3  11:03:41  them and the various different utilization, so we talked

4  11:03:46  about the different business practices.

5  11:03:49  Q. You are referring to what you called the Visa readiness

6  11:03:52  policy?

7  11:03:53  A. Visa readiness, increasing of Visa utilization policies.

8  11:03:58  Q. And Dr. Hira, isn't it true that the only documents you

9  11:04:01  relied on to determine there was a Visa readiness policy was

10  11:04:07  a couple of e-mails regarding employees in the United

11  11:04:11  Kingdom?

12  11:04:11  A. No.  There is discussion about Visa readiness and Visa

13  11:04:16  utilization.  We went through one of those exhibits,

14  11:04:19  actually, earlier today.

15  11:04:20  Q. Well, in your report, Dr. Hira, you cited two e-mails

16  11:04:27  regarding employees in the U.K. to say there was a Visa

17  11:04:31  readiness policy.  Are you saying you've done more work since

18  11:04:34  your report was provided?

19  11:04:35  A. Well, we just looked at the example of Visa utilization

20  11:04:40  and Visa readiness through this document whenever we walked

21  11:04:44  through the 12,000 workers and what-not.

22  11:04:46  Q. Well, but the policy you are referring to was the Visa --

23  11:04:49  draft Visa utilization policy.  You haven't actually seen a

24  11:04:52  Visa readiness policy, have you?

25  11:04:53  A. Well, we saw that Visa utilization policy.  I'm missing

1 11:05:00   something.

2 11:05:00   Q. Oh, so you think the Visa utilization policy that you are

3 11:05:03   describing is the same thing as a Visa readiness policy?

4 11:05:06   A. Well, it's a combination.  The utilization is you've got

5 11:05:11   Visa-ready workers, right?  They work together.

6 11:05:14   Q. Have you laid eyes on a policy document that says "Visa

7 11:05:23   readiness policy"?

8 11:05:23   A. That is titled that?

9 11:05:24   Q. Yeah.

10 11:05:24   A. I don't recall seeing the title on a document.

11 11:05:28   Q. Now, you testified earlier about a document that had the

12 11:05:47   words "rotation policy" on it.  Do you recall that testimony?

13 11:05:50   A. I do.

14 11:06:07       MS. MARYOTT:  Okay.  If we could pull up Exhibit 30.

15 11:06:25   Q. Dr. Hira, did you ever look at the cover e-mail for

16 11:06:29   Exhibit 30?

17 11:06:29   A. I don't recall seeing that.

18 11:06:32   Q. Okay.  Well, I'll represent to you, and then we can show

19 11:06:37   it to you, that trial Exhibit 29 -- understood you don't have

20 11:06:42   this in front of you -- identifies this PowerPoint as a

21 11:06:46   draft.  So is it fair to say you weren't aware that this

22 11:06:49   document was a draft?

23 11:06:50   A. I don't recall.  There might have been.  I don't know.

24 11:06:56       MS. MARYOTT:  Maybe we should go ahead and pull up

25 11:06:57   Exhibit 29, and with a blackout screen, please.

1 11:07:04          THE CLERK:  It's ready.

2 11:07:13     Q. Dr. Hira, do you see where it says, "Please find attached

3 11:07:19     slides for our discussion today.  Staff aug approach, draft

4 11:07:24     rotation policy"?

5 11:07:24     A. I do.

6 11:07:25     Q. Okay.  So draft means that folks are working through

7 11:07:33     issues, right?

8 11:07:34     A. Typically.

9 11:07:36     Q. Did you speak with anyone about Exhibit 30?

10 11:07:40     A. Speak with anyone?

11 11:07:45     Q. At Cognizant?

12 11:07:45     A. No.

13 11:07:46     Q. Okay.  Did you read any testimony about Exhibit 30?

14 11:07:49     A. I -- I don't recall.

15 11:07:53     Q. Did you inquire whether there was a final version of this

16 11:08:12     slide deck?

17 11:08:13     A. I did not.

18 11:08:22          MARYOTT:  Let's take a look at -- and this has

19 11:08:25     already been admitted -- Exhibit 39, please.

20 11:08:37     Q. Now, you testified about a few select pages out of this

21 11:08:43     PowerPoint this morning.  Do you know if this is a draft?

22 11:08:47     A. I do not.

23 11:08:48     Q. And if you could look at page 2 of the exhibit.  At the

24 11:08:58     lower left-hand corner, it's very small, but it says,

25 11:09:03     "Source:  Bain analysis, industry practices, industry and

1 11:09:08   management interviews."  Do you see that?

2 11:09:10    A. Correct.

3 11:09:11    Q. So you don't know whether the information here is

4 11:09:17   information that was being suggested by a consultant, right?

5 11:09:21    A. I do not.

6 11:09:23    Q. And you don't know what, if any, of this was actually

7 11:09:35   implemented, right?

8 11:09:36    A. I do not.  I know that there are confirmation e-mails

9 11:09:41   about a number of the different policies we've looked at.

10 11:09:43    Q. And who are those from?

11 11:09:44    A. I don't recall the specifics right now.

12 11:09:47    Q. Can you identify anyone on an e-mail about that?

13 11:09:53    A. With a Visa utilization, I believe Milan was involved in

14 11:09:59   one.

15 11:09:59    Q. I'm talking specifically about Exhibit 39.

16 11:10:02    A. I don't recall.

17 11:10:06    Q. Now, you testified about page 9, if we could go there.

18 11:10:20          Dr. Hira, you don't know exactly who is being

19 11:10:23   discussed in terms of these blueprinting objectives, right?

20 11:10:27    A. Could you be a little bit more specific?

21 11:10:32    Q. It doesn't say this is all about Visa holders, right?

22 11:10:35    A. No.  It's the aging of these workers.

23 11:10:38    Q. And, in fact, a lot of the information in this exhibit is

24 11:10:43   very general, right?

25 11:10:44    A. Correct.

11:10:45  Q. So it's not necessarily about Visa holders; it's about

11:10:51  everyone, the entire global workforce, isn't that right?

11:10:54  A. Well, there is a specific in terms of the rotation in,

11:10:59  which are targeting the U.S. Visa -- the Visa-ready workers.

11:11:04  So in that case, there is a specific that the folks that are

11:11:07  going to come in are going to be the Visa holders.

11:11:10  Q. Well, that makes sense, the people who would transfer

11:11:13  from Cognizant in India would be Visa holders.

11:11:16          Let's look at page 12.

11:11:18  A. Well --

11:11:19  Q. Okay.  So there are no references to Visa holders on this

11:11:31  page, are there, Dr. Hira?

11:11:32  A. Correct.

11:11:33  Q. Okay.  And if you look down at the bottom, there is a

11:11:37  note.  It says, "EG, resources on longer-term client

11:11:42  contracts 30 months."  Do you see that?

11:11:44  A. Correct.

11:11:45  Q. It's your understanding that Cognizant contracts and

11:11:49  projects can last that long, right?

11:11:51  A. It looks that that is so, yeah.

11:11:55  Q. Let's turn to -- give me a second here -- Exhibit 261.

11:12:41          You don't know who actually prepared this document,

11:12:45  is that right, Dr. Hira?

11:12:47  A. Well, the document has the names Mohan and Kim on it.

11:12:52  Q. But you don't know who actually prepared it, right?

11:12:55    A. Well, I assume that they are the ones who authored it,

11:13:00    but I don't know for sure.

11:13:01    Q. You don't know?

11:13:02    A. They are putting their names on there.

11:13:04    Q. You don't know for sure who prepared this document.

11:13:08        And you never spoke to anyone about this document,

11:13:10    right?

11:13:10    A. No.

11:13:12    Q. You never read any testimony about this document?

11:13:14    A. I don't recall.

11:13:18    Q. Well, you didn't read Helen Kim's testimony, right?

11:13:21    A. Correct.

11:13:22    Q. Now, let's turn to page 8.  Dr. Hira, you had a lot to

11:13:37    say about this page, and given the fact that you didn't ask

11:13:44    anyone at Cognizant about it, you didn't read any testimony

11:13:48    from Helen Kim about it, everything you've said about this

11:13:53    page is based on what you read, right?

11:13:58    A. Correct.

11:14:01    Q. And you don't know who plugged these numbers in or why?

11:14:06    A. No, but I don't think the numbers matter as much as what

11:14:11    the intent is.

11:14:13    Q. And the intent is to plan ahead to fill the skills gap,

11:14:18    right?

11:14:18    A. The plan is to fill growth and head count with Visa

11:14:25    workers.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:17:42   Q. If you look at the next row in the exhibit, what does

2 13:17:45   4.1 percent represent?

3 13:17:46   A. So that is the probability, the proportion of non-South

4 13:17:55   Asian employees who are on the bench, who are involuntarily

5 13:17:58   terminated.

6 13:17:58   Q. And what about 0.5 percent?

7 13:18:02   A. That is the comparable probability for South Asians, the

8 13:18:07   probability that a South Asian who was on the bench would be

9 13:18:10   involuntarily terminated.

10 13:18:12   Q. How do those two termination rates compare?

11 13:18:15   A. Well, again, there is -- there is a difference favoring

12 13:18:20   South Asians.  Non-South Asians were 3.6 percentage points

13 13:18:25   more likely.  In terms of a relative probability, 4.1 percent

14 13:18:31   is more than 8 times a half percent.  So they are more

15 13:18:36   than -- 8 times more likely to be terminated from the bench

16 13:18:39   involuntarily than a South Asian.

17 13:18:41   Q. And what was your finding with respect to standard

18 13:18:44   deviations for bench terminations?

19 13:18:47   A. Again, the standard deviation result associated with this

20 13:18:52   disparity is far in excess of conventional levels to reject

21 13:18:57   that South Asians and non-South Asians are terminated with

22 13:19:02   equal probability.

23 13:19:04        It's extremely unlikely, less than a 1 in a billion

24 13:19:09   probability, such a result could occur by chance.

25 13:19:12   Q. If you could turn to tab 7, which is a demonstrative

1 13:31:37    think of as an involuntary termination.  And I list those at

2 13:31:40    the bottom of that.  Candidate did not join, doesn't sound

3 13:31:43    like they were terminated.  Just sounded like they never got

4 13:31:44    hired.  Maybe it was somewhere in the middle of the process.

5 13:31:49    This background check one again, again sounds like it never

6 13:31:52    really got to that point.

7 13:31:54           So those, they were minor -- they weren't common

8 13:31:58    termination codes, so they didn't really have an effect on my

9 13:32:01    analysis, but it seemed more accurate to categorize them that

10 13:32:04    way.

11 13:32:04    Q. Was assignment completion in the involuntary termination

12 13:32:09    code?

13 13:32:10    A. No, it's not.  Cognizant doesn't categorize that as an

14 13:32:14    involuntary -- involuntary termination.  Indeed, it doesn't

15 13:32:18    categorize assignment completed as a termination at all.

16 13:32:21    It's an action code but not a termination.

17 13:32:26    Q. Was return home a termination code?

18 13:32:29    A. No, return home was not a termination code.

19 13:32:33    Q. Did you prepare an analysis of bench termination codes?

20 13:32:37    A. Yes, I did.

21 13:32:38    Q. If you could look at tab 10, Exhibit 407-F.  Is that a

22 13:32:44    summary you prepared of that analysis?

23 13:32:46    A. Yes, it is.

24 13:32:48    Q. Does it fairly and accurately summarize your analysis of

25 13:32:53    the data?

14:43:25  A. I'm not sure to what extent the data shows that those

14:43:30  were departures or not, but they were not coded.  The

14:43:34  questions were about involuntary terminations, and those were

14:43:38  not coded by Cognizant as involuntary terminations.

14:43:40  Q. So you did not take assignment completions into account

14:43:44  in any way, correct?

14:43:45  A. They did not -- they were not classified according -- in

14:43:54  that way by Cognizant, so they did not factor into that

14:43:57  analysis.

14:43:57  Q. They did not factor into your analysis, correct?

14:43:59  A. They were not --

14:43:59  Q. Sir --

14:44:00  A. -- part of the set of employees who Cognizant coded as

14:44:04  involuntarily terminated, so, no, they were not part of the

14:44:09  analysis of involuntary terminations.

14:44:11  Q. Thank you.  Thank you.

14:44:12        And in conducting your analysis, you calculated that

14:44:16  between 2013 and 2020 the total number of bench terminations

14:44:20  in the class bands were about 3,500, correct?

14:44:24  A. I'm not recalling the specific number off the top of my

14:44:27  head.  That --

14:44:30  Q. Several thousand?

14:44:32  A. Yeah.

14:44:32  Q. South Asian and non-South Asian together, several

14:44:35  thousand, correct?

1  15:16:17          MR. DOREN:  Your Honor, the question here is whether

2  15:16:19  he was asked to give any consideration --

3  15:16:21          THE COURT:  You don't need to say it.  Just tell

4  15:16:23  me --

5  15:16:24          MR. DOREN:  Apologies, Your Honor.  83, lines 6 to

6  15:16:27  11.

7  15:16:29          THE COURT:  And, Mr. Low, pull the microphone closer

8  15:16:32  to you when you are speaking, please.

9  15:16:34          MR. LOW:  Yes, Your Honor.

10  15:16:48          THE COURT:  You may read it.

11  15:16:50          MR. DOREN:  Thank you, Your Honor.

12  15:16:50   Q. And, sir, in your deposition, you were asked, "So just to

13  15:16:54  be clear, you understood it was outside of the scope of your

14  15:16:57  assignment to give any consideration to what might be causing

15  15:17:00  the disparities that you observed?

16  15:17:02          And you answered, "Yes.  I wasn't asked to address

17  15:17:06  the causal factors of the disparities."

18  15:17:10          MR. DOREN:  Thank you, Dr. Johnson.  It's a pleasure

19  15:17:11  meeting you.  I have no further questions.

20  15:17:13          THE COURT:  Redirect?

21  15:17:25          MR. LOW:  Just a few questions, Your Honor.

22  15:17:25                    REDIRECT-EXAMINATION

23  15:17:18  BY MR. LOW:

24  15:17:18   Q. Dr. Johnson, if someone was coded as an assignment

25  15:17:32  completion but was also coded as an involuntary termination,

108:19:15

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

CHRISTY PALMER, et al.,          )
                                 )
          Plaintiffs,            )
                                 )
              vs.                )
                                 )  2:17-CV-6848-DMG
COGNIZANT TECHNOLOGY SOLUTIONS    )
CORPORATION, et al.,             )
                                 )
          Defendants.            )
_____  )

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME III

Los Angeles, California

Thursday, June 15, 2023

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

09:24:57  1                MS. MARYOTT:  Objection, leading.

09:24:58  2                THE COURT:  Sustained.

09:25:01  3                MR. HAMMERVOLD:  Okay.

09:25:01  4     Q. All right.  What did your analysis generally reflect to

09:25:14  5     you, without describing what those specific results were?

09:25:17  6                MS. MARYOTT:  Objection, Your Honor, privilege.

09:25:18  7                THE COURT:  Overruled.

09:25:22  8     Q. Okay.  Did you have concerns?

09:25:25  9     A. Yes.

09:25:26  10    Q. Oh, sorry.  Go ahead and answer.

09:25:28  11    A. So the bench studies that I would have conducted would

09:25:33  12    have showed that there would have been some adverse impact of

09:25:39  13    females and non -- especially non-Asian employees who were

09:25:44  14    being terminated from the bench, so typically White, Hispanic

09:25:48  15    or Black.

09:25:49  16    Q. And did you communicate those concerns to management at

09:25:52  17    Cognizant?

09:25:53  18    A. Yes.

09:25:54  19    Q. Okay.  And how was that received?

09:25:57  20                MS. MARYOTT:  Objection, lacks foundation.

09:26:00  21                THE COURT:  Overruled.

09:26:01  22                THE WITNESS:  They just thanked me for my analysis.

09:26:04  23    Q. Okay.  Did you ever look into whether adverse impact was

09:26:18  24    driven by location preference?

09:26:19  25                MS. MARYOTT:  Objection, leading.

1  13:13:13   presentation, both to Warner Brothers and Disney, I mean,

2  13:13:16   independently, but they were targeting the entertainment

3  13:13:19   business.  So things like that.  So productive work.

4  13:13:21   Q. Okay.  And I want to talk about the first time you were

5  13:13:24   on the bench in 2014.  Were you able to find a project from

6  13:13:32   the bench?

7  13:13:32   A. Yes.  Yes.

8  13:13:33   Q. Okay.  And how were you able to do that?

9  13:13:36   A. By personal networking.  My boss, Mr. Singh, he was

10 13:13:43   actually -- like I said, we got along really well.  He helped

11 13:13:46   me.  He just introduced me to people and said, you know, call

12 13:13:48   this guy, e-mail this guy, and eventually I found a project.

13 13:13:51   Q. Was there some entity in Cognizant whose role it was to

14 13:13:57   provide support for an employee like you trying to find a

15 13:14:00   job?

16 13:14:00   A. Yes.  So Global Workforce Management was the name that I

17 13:14:08   always saw on the e-mails, but that was their job.  You would

18 13:14:11   put in your availability on a website and check your

19 13:14:14   preferences, and they try to skills match and things like

20 13:14:19   that.

21 13:14:19   Q. And I just want to make sure we are talking about the

22 13:14:21   same thing.  Is that the same entity as the Talent Supply

23 13:14:25   Chain?

24 13:14:25   A. Yes.  Sorry, yeah.

25 13:14:25   Q. And did you have a lot of contact with Global Workforce

1 13:29:07    Mr. Franchitti to someone else?

2 13:29:09    A. Yes.  So Mr. Franchitti had a lot of people reporting to

3 13:29:15    him, so he created an additional layer of management.  So he

4 13:29:19    was at the VP level, and he was, you know, extremely involved

5 13:29:22    in very large client pursuits and things, so he didn't have

6 13:29:26    time to do, you know, 350 performance evaluations every year.

7 13:29:29         So my new manager became Mr. Purna Roy, and he

8 13:29:37    reported to Mr. Franchitti.

9 13:29:38    Q. Okay.  While you were at Cognizant, did you ever complain

10 13:29:41    to either Mr. Franchitti or Mr. Pernaroy about experiencing

11 13:29:47    discrimination?

12 13:29:47    A. Both of them, actually, yes.

13 13:29:48    Q. And how was it received by Mr. Pernaroy?

14 13:29:54    A. He was very dismissive, and I'm going to use the term

15 13:30:01    passive aggressive.  He would kind of just try to make it

16 13:30:06    look like it was my fault, like I had these egregious

17 13:30:10    shortcomings in my ability to understand what clients wanted

18 13:30:13    and communication skills, things like that.

19 13:30:18    Q. Okay.  And when you complained to Mr. Franchitti, how was

20 13:30:22    it received?

21 13:30:22    A. Well, he -- he told me, he says, yes, I am having some

22 13:30:29    problems with him and I'll speak to him.  So he was very

23 13:30:34    receptive and acknowledged it and even revealed that he

24 13:30:37    himself was having trouble managing Mr. Roy just because

25 13:30:41    of -- I mean, for whatever reason, you know, personality or

1 13:30:45  whatever.  He didn't elaborate that, but --

2 13:30:48   Q. Okay.  And did Mr. Franchitti stop being your

3 13:30:52  second-level manager at some point?

4 13:30:54   A. Yes.  He was fired from the company.

5 13:30:58   Q. Okay.  And how did you find out?

6 13:31:00   A. Well, his boss, a gentleman named Mr. Raj Bala, who was

7 13:31:06  in India, I mean, 99 percent of the time, except once in a

8 13:31:10  while he made a trip to the U.S., he just sent out a two-line

9 13:31:14  e-mail saying, Jean-Claude is no longer with the company.  We

10 13:31:19  wish him well, you know, end of message.

11 13:31:21        And I mean, everybody was talking about how, oh, no,

12 13:31:27  something really bad must have happened.  That's -- you know,

13 13:31:30  so -- but we found out through the e-mail sent to our CBC-GTO

14 13:31:37  distribution list.

15 13:31:38   Q. Okay.

16 13:31:39        MR. HAMMERVOLD:  And can we put on the screen what's

17 13:31:42  already been admitted as 148, and specifically, page 7.

18 13:31:49        MR. DOREN:  I'm sorry, that is not in the binder.

19 13:31:53        MR. HAMMERVOLD:  It's tab 4.

20 13:31:54        MR. DOREN:  Thank you.

21 13:31:58        MR. HAMMERVOLD:  Page 7.

22 13:32:03        THE COURT:  What is this?

23 13:32:04        MR. HAMMERVOLD:  This is Exhibit 148.  This has

24 13:32:06  already been admitted.

25 13:32:07        THE COURT:  That doesn't look like what I looked at.

1 13:32:09  Can you take it off the screen?

2 13:32:11          MR. DOREN:  Yes, please.

3 13:32:12          MR. HAMMERVOLD:  Okay, take it off.

4 13:32:13          THE COURT:  I thought I looked at a right to sue

5 13:32:16  letter with a very brief one-paragraph description.

6 13:32:20          MR. HAMMERVOLD:  Yeah.  This was admitted day one in

7 13:32:22  the trial.

8 13:32:23          THE COURT:  Oh, okay.  Was there no objection to

9 13:32:28  this?

10 13:32:28          MR. DOREN:  Your Honor, if it's in evidence, but I

11 13:32:32  don't have any foundation with this witness at this point.

12 13:32:37          MR. HAMMERVOLD:  I'm only going to ask him a

13 13:32:39  question that he knows the answer to.

14 13:32:40          THE COURT:  All right.  Well, you can ask him a

15 13:32:42  question, but I don't know why you are showing him this

16 13:32:46  document.

17 13:32:47          MR. HAMMERVOLD:  Okay.  Well, it was going to be in

18 13:32:49  reference to the document.

19 13:32:51          THE COURT:  Is this a document that he is involved

20 13:32:53  with?

21 13:32:54          MR. HAMMERVOLD:  Not directly.

22 13:32:57          THE COURT:  Well, you can ask your question, but you

23 13:32:59  don't need to use the document.

24 13:33:00          MR. HAMMERVOLD:  Okay.

25 13:33:00   Q. Do you know who made the decision to terminate

1 13:33:07    Mr. Franchitti?

2 13:33:08    A. It was Mr. Raj Bala.

3 13:33:11    Q. Okay.  At the same time that Mr. Franchitti was fired,

4 13:33:17    had you complained about national origin discrimination?

5 13:33:21    A. Yes.

6 13:33:22    Q. Okay.  And what happened to your chain of command when

7 13:33:28    Mr. Franchitti was fired?

8 13:33:29    A. Well, my entire chain of management, chain of command,

9 13:33:36    from my first-level manager, Mr. Roy, all the way up to the

10 13:33:39   CEO was all Indian nationals.

11 13:33:42   Q. Okay.  Did Mr. Ragballa become part of your chain of

12 13:33:50   command?

13 13:33:50   A. Well, he became my second-level manager.

14 13:33:53   Q. Did you receive a performance review from Mr. Purna in

15 13:34:01   2015?

16 13:34:02   A. Yes.

17 13:34:02   Q. Okay.  Could I get you, please, to turn to tab 5 of the

18 13:34:09   exhibit folder.

19 13:34:11   A. Okay.  Um-hum.

20 13:34:12   Q. Are you able to identify this document?

21 13:34:15   A. Yes.  This is Mr. Roy's annual performance evaluation for

22 13:34:23   me for 2015-calendar year.

23 13:34:26   Q. Okay.

24 13:34:27            MR. HAMMERVOLD:  Can we put this up on the screen?

25 13:34:29            Oh, I move to admit this document into evidence.

1 13:34:32          MR. DOREN:  No objection.

2 13:34:33          THE COURT:  It is admitted.  It's Exhibit 98.

3 13:34:36          (Exhibit 98 received in evidence.)

4 13:34:36          MR. HAMMERVOLD:  Yup.

5 13:34:45     Q. And can you turn to the last page of this?  What was the

6 13:34:55     overall score you received from Mr. Purna in your 2015

7 13:34:58     review?

8 13:34:58     A. Manager rating is, meets all expectations.

9 13:35:03     Q. Okay.  Was this a lower rating than you had received from

10 13:35:07     your other two managers in the previous two years?

11 13:35:09     A. Yes.  This is really equivalent to a 3 out of 5, 5 being

12 13:35:12     best.

13 13:35:13     Q. And what did that mean at Cognizant, in your

14 13:35:16     understanding?

15 13:35:16     A. It wasn't bad, but it -- it wasn't great.  In other

16 13:35:27     words, you'd strive for a 4 as a way of saying, you know, you

17 13:35:30     are doing better than expected, but this just means, well,

18 13:35:33     you just met expectations.  So you are kind of performing as

19 13:35:37     one would expect for your role and skills and experience.

20 13:35:40     Q. Okay.  And did you think that the 2015 review from

21 13:35:45     Mr. Roy was fair?

22 13:35:46     A. No.  I thought it was unfair.

23 13:35:49     Q. Why?

24 13:35:50     A. Well, I mean, just given the work I had done during the

25 13:35:55     year and the fact that I thought some of the aforementioned

13:36:00  1   criticisms, you know, when I said he was kind of being

13:36:04  2   passive aggressive and criticizing me, I just thought they

13:36:07  3   were unfounded and very subjective.  And he -- he -- he never

13:36:15  4   addressed them with me when I asked for some kind of

13:36:18  5   explanation or meeting to address them.

13:36:20  6    Q. Had you complained about discrimination before you

13:36:23  7   received this review?

13:36:23  8    A. Well, yes, I -- in e-mails to Mr. Franchitti, definitely,

13:36:32  9   and to Mr. Roy as well in e-mail.

13:36:34  10   Q. Okay.  While you were at Cognizant, did you ever file a

13:36:39  11  formal charge of discrimination with the EEOC?

13:36:42  12   A. Yes, while I was still employed, yes.

13:36:44  13   Q. And could I get you to turn to Exhibit 6 of your exhibit

13:36:48  14  folder?

13:36:51  15   A. 6.  Okay.  Yes.  Um-hum.

13:36:53  16   Q. Are you able to identify this document?

13:36:59  17   A. Yes.  This is the notice of right to sue that the EEOC

13:37:07  18  issued to me.

13:37:08  19   Q. Okay.  And is there other parts of this document, as

13:37:15  20  well?

13:37:15  21   A. Oh.  Yes.  Well, the second page in my folder, it's

13:37:23  22  basically instructions saying that I'm required by law

13:37:28  23  basically to keep all evidence; electronic, paper,

13:37:32  24  everything.

13:37:33  25   Q. And are there any other parts of this exhibit?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 14:36:37              THE CLERK:  Ready.

2 14:36:41    Q. And, Mr. Piroumian, we'll scroll this by you and stop at

3 14:36:48    the last page, which will be the first e-mail in the string,

4 14:36:51    and I will ask you if you recognize this as an e-mail string

5 14:36:55    with you and some colleagues from Cognizant from December and

6 14:36:59    early -- December 2013 and early January 2014?

7 14:37:07    A. I mean, I don't contest that it's authentic.  I can't say

8 14:37:11    I remember all this, but yes.

9 14:37:13    Q. Oh, no.  That's why we have documents, sir.

10 14:37:14    A. Yeah, yeah, it's fine.

11 14:37:16              MR. DOREN:  Move to admit Exhibit 640, Your Honor.

12 14:37:19              MR. HAMMERVOLD:  No objection.

13 14:37:20              THE COURT:  It is admitted.

14 14:37:20              (Exhibit 640 received in evidence.)

15 14:37:20    Q. So, Mr. Piroumian --

16 14:37:24              MR. DOREN:  If we can publish that to the jury,

17 14:37:28    please.

18 14:37:28    Q. -- the first e-mail in the chain is from December 16,

19 14:37:32    2013.  You see that?

20 14:37:33    A. Yes.

21 14:37:34    Q. And at this point you knew that you were going to be on

22 14:37:36    the corporate deployable pool effective January 1st, and so

23 14:37:41    you were -- you were, as you put it earlier, kind of doing

24 14:37:44    your networking, doing your outreach to find a project,

25 14:37:47    correct?

14:37:47  A. Yes.

14:37:47  Q. And that is what folks on the bench at Cognizant are

14:37:52  expected to do and really need to do to pursue projects when

14:37:55  they are on the CDP, correct?

14:37:57  A. Yeah, I think so.  I don't think you can really rely on

14:38:02  Workforce Management doing enough to get you the project, so

14:38:06  I always assumed I had to do a lot of work on my own.

14:38:10  Q. Okay.  Thank you.

14:38:11       And in this case, you were corresponding with Basant

14:38:15  Kumar, correct, about a possible project related to an Oracle

14:38:21  project, correct?

14:38:21  A. Yes.

14:38:22  Q. And Mr. Kumar writes to you and says, "I came to know

14:38:27  that you are getting released from the project.  I've tried

14:38:29  to reach you.  Please give me a call or let me know your best

14:38:31  time," right?

14:38:32  A. Yes.

14:38:32  Q. And Mr. Kumar was Indian?

14:38:37  A. I -- I assume so from his name.  I don't remember

14:38:41  speaking to him, really, honestly --

14:38:43  Q. Sure?

14:38:43  A. -- but I mean...

14:38:44  Q. Okay.  Let's go one up on page 4 to the next e-mail in

14:38:47  the string, which was from December 16th, same day, and

14:38:54  Mr. Kumar sends you another note.  He says, "Hi Vartan, It

114:50:25   one-page profile because you would like him to put you up for

214:50:28   a position, correct?

314:50:29   A. Yes.  I don't actually remember what the position was of

414:50:35   the client, but, yes, that is --

514:50:38   Q. And on May 8th, Mr. Hukkeri writes back and he says,

614:50:41   "Sorry for the delayed response.  After our discussion, I

714:50:44   tried matching your profile with the requirement and found

814:50:48   that the position was not the right fit for you."

914:50:51        And that is -- that is something that happens,

1014:50:54   right, where the skill set of different people at Cognizant

1114:50:57   doesn't match the needs of particular projects, correct?

1214:50:59   A. Happens everywhere, yeah.

1314:51:01   Q. And he then goes on to say, "I'm working with my client

1414:51:05   partner and other account managers to leverage your

1514:51:08   architecture expertise."  And what is a client partner?

1614:51:12   A. You know, honestly, it's been a few years, I'm not sure

1714:51:21   my recollection is correct, but I believe that there is a

1814:51:23   liaison for each client that Cognizant has.  But, honestly,

1914:51:28   it's been six years or seven, well, actually more, and I'm --

2014:51:32   Q. Well, I was going to ask you about your French

2114:51:34   citizenship, but now I don't have to.  You know how to say

2214:51:37   liaison.

2314:51:38   A. Okay.

2414:51:38   Q. All right, sir, so we go on here, and so Mr. Hukkeri

2514:51:47   offered to help you out in terms of trying to leverage your

09:09:25

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

CHRISTY PALMER, et al.,           )
                                  )
          Plaintiffs,             )
                                  )
          vs.                     )
                                  )  2:17-CV-6848-DMG
COGNIZANT TECHNOLOGY SOLUTIONS     )
CORPORATION, et al.,              )
                                  )
          Defendants.             )
_____   )

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME IV

Los Angeles, California

Friday, June 16, 2023

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

1 11:14:01   allocated to CDP?

2 11:14:02    A. Well, that is the date on the e-mail, so I accept it as.

3 11:14:06    Q. And the e-mail says, hi, Vartan.  Welcome to corporate

4 11:14:09   deployment pool.  Tried reaching you on your phone and left a

5 11:14:13   voice mail with regards to your release to CDP.  Do you see

6 11:14:16   that?

7 11:14:16    A. Yes.  Um-hum.

8 11:14:17    Q. So beginning on June 19th, 2017, you had at least five

9 11:14:27   weeks to find a new position, correct?

10 11:14:29    A. Yes.

11 11:14:29    Q. And you had five weeks to find a new position anywhere in

12 11:14:34   the company doing anything employing your skills, correct?

13 11:14:37    A. I'm not sure, I think anywhere in U.S. operations.  But,

14 11:14:45   for example, I don't think they would have let me say, there

15 11:14:48   is a project in Europe and you can go, because I think it was

16 11:14:51   a different entity, business entity, Cognizant Europe versus

17 11:14:57   Cognizant U.S.  But I think within the U.S. that is probably

18 11:15:00   accurate.

19 11:15:01    Q. Within the work environment of the 43,000 U.S. employees

20 11:15:07   of Cognizant, you could -- you were available to anyone in

21 11:15:12   that company for any project, correct?

22 11:15:14    A. Yes.  I mean, I would have -- I expressed my interest to

23 11:15:21   be considered for any project.

24 11:15:23    Q. And when you were on the bench in January 2014, you had

25 11:15:27   proactively sought out opportunities, worked your network,

1  11:15:31  contacted people regularly, and found a new position,

2  11:15:35  correct?

3  11:15:35   A. I'm sorry, what were the dates?

4  11:15:37   Q. January 2014.

5  11:15:41   A. Yes.  I think that was after the Ithaca project, right.

6  11:15:44   Q. It was.  It was as you were leaving IME, and your first

7  11:15:48  project in January 2014 was Optum RX.  Do you recall that,

8  11:15:55  sir?

9  11:15:55   A. Yes.

10 11:15:56   Q. And do you recall your testimony yesterday about working

11 11:15:58  your personal network and reaching out to people you knew

12 11:16:00  about possible projects, correct?

13 11:16:03   A. Yes.

14 11:16:03   Q. And we saw some e-mails that reflected those efforts,

15 11:16:08  correct?

16 11:16:09   A. Yes.

17 11:16:09   Q. And when you were on the bench in May 2004, you also had

18 11:16:13  proactively sought out new opportunities, correct?

19 11:16:15   A. Yes.

20 11:16:15   Q. Once again, you had reached out to your contacts, you had

21 11:16:19  been proactive about finding out what was out there, correct?

22 11:16:22   A. Yes.

23 11:16:22   Q. And we saw quite a few e-mails that reflected those

24 11:16:25  efforts on your behalf -- or by you, correct?

25 11:16:28   A. Yes.

11:16:29    Q. And -- but we haven't seen any e-mails, certainly none

11:16:34    were shown in your direct exam, reflecting any effort by you

11:16:38    to find a new position in June 2017, have we?

11:16:41    A. I don't recall that any were presented, no.

11:16:44    Q. In fact, the only record of your activities we have seen

11:16:48    from the time you were put on the bench in 2017 is trial

11:16:54    Exhibit 691, which I would ask be published.

11:17:04         And, sir, you recall this e-mail to you from -- to

11:17:08    Ms. -- excuse me -- there is two e-mails on here, the first

11:17:12    of which is from you to Ms. Sarah Blackwell, correct?

11:17:16    A. Yes.

11:17:16    Q. And you identified Ms. Sarah Blackwell as a critic of the

11:17:21    H1-B Visa program, correct?

11:17:24    A. I don't recall how I characterized it, but I believe that

11:17:27    is --

11:17:28    Q. True?

11:17:28    A. Yeah.  Yes.

11:17:30    Q. And she gives speeches and holds rallies and all manner

11:17:33    of things as part of her being a critic of the H1-B program,

11:17:39    correct?

11:17:39    A. Yes.  And I believe she was a litigation attorney against

11:17:43    some big cases such as Disney and a few others.

11:17:46    Q. So this is June 20th that you are writing to her,

11:17:49    correct?

11:17:49    A. Yes.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:56:39  would actually populate those projects, or talk to the client

2 13:56:42  partners and send his own people, I think when I say from,

3 13:56:45  you know, the GTO Labs to work on those projects.  So it

4 13:56:49  would be direct competition for us.

5 13:56:51  Q. Approximately how many employees did Mr. Bala oversee as

6 13:56:55  part of GTO Labs in the United States?

7 13:56:57  A. Hard to tell.  I can't remember exactly.  But I think it

8 13:57:01  was probably the whole size of GTO was probably something

9 13:57:04  maybe like 500 people, and probably we had probably like, you

10 13:57:09  know, 100 consultants in -- maybe less.  But it was kind of

11 13:57:14  that size on that size.

12 13:57:16  Q. How would you describe the experience of his team members

13 13:57:19  in GTO Labs?

14 13:57:21  A. I would say junior people, like senior managers,

15 13:57:24  manager-type of folks, with obviously a lot less skills than

16 13:57:28  the folks we had in the U.S. who were not South Asian.

17 13:57:31  Q. I was going to ask, what was the racial demographics of

18 13:57:34  his team?

19 13:57:35  A. These were all folks from, you know, South Asia, India.

20 13:57:40  Q. Do you have an understanding as to why Mr. Bala's team

21 13:57:43  was only comprised of South Asians from India?

22 13:57:48  A. Which team in particular?

23 13:57:49  Q. GTO Labs.

24 13:57:50  A. Well, first, I mean, obviously these people were in India

25 13:57:55  at the time trying to -- but I think he also had cultural

1 13:58:00  preference for Indian people.  I think I started discovering

2 13:58:03  at some point that -- in conversations that he made very

3 13:58:07  discriminatory type of comments about Americans, Europeans

4 13:58:11  and things like that.

5 13:58:12  Q. Can you describe some of the comments that he made?

6 13:58:14  A. Yeah.  I think he had -- you know, he had things on the

7 13:58:17  Internet that he said.  He also had conversations I had with

8 13:58:20  him, where he would say things like South Asians are

9 13:58:25  technologically superior to Americans and Europeans.  And so

10 13:58:29  it was a lot of these things basically would come out of his

11 13:58:33  mouth.

12 13:58:34        And I basically, obviously, didn't agree with that.

13 13:58:36  And I told him that I disagreed with that, that it was

14 13:58:40  actually illegal to make these type of statements.  We had a

15 13:58:43  lot of conversations about this.

16 13:58:44  Q. Do you recall him making any of those conversations while

17 13:58:46  you were face to face?

18 13:58:48  A. Yeah.  There were conversations on the phone, there was

19 13:58:51  also conversations when we met.  I think there was a meeting

20 13:58:55  in 2014, I think he came to the office that was closer to me

21 13:59:01  in Teaneck.  I think it was kind of the same place where you

22 13:59:05  have the Marriott hotel there.

23 13:59:07        So we met in the lobby of the hotel, there was a

24 13:59:09  place we could sit together.  We talked about various things.

25 13:59:11  And he made a lot of his comments in that meeting.  This was

1 13:59:16  2014.

2 13:59:17          Then towards I think the end of 2014, I met with him

3 13:59:20  in -- we had like yearly, I would say -- I forgot the name of

4 13:59:26  these meetings we had.  But we would meet every year, like

5 13:59:28  the top executives would meet in Florida, and I think Orlando

6 13:59:34  or Miami sometimes.  And we would plan for the year.  I met

7 13:59:37  him at that location in the hotel there, another Marriott

8 13:59:42  hotel there.

9 13:59:42          And I think he made some comments about things like

10 13:59:46  we don't need heavyweights in the company, we should get rid

11 13:59:51  of them, things like that.  Heavyweights were basically

12 13:59:55  Americans, Europeans that were technically inferior to South

13 14:00:02  Asians.

14 14:00:02  Q. What was your reaction to these comments?

15 14:00:14  A. Well, I just -- I just -- I told him face to face this

16 14:00:18  was wrong.  I mean, I just -- I was kind of almost ashamed to

17 14:00:22  sit next to him when he made these comments.  I think, just I

18 14:00:26  told him I didn't concur at all.  But I didn't see -- you

19 14:00:30  know, it was discrimination against Americans and the other

20 14:00:35  nationalities.

21 14:00:36  Q. You mentioned heavyweights.  Can you explain in more

22 14:00:39  detail what you believe he meant by someone who is a

23 14:00:41  heavyweight?

24 14:00:42  A. Yeah, I think heavyweights in his mind people with skills

25 14:00:45  in technology, that were, you know, non-South Asian people.

114:00:50   That was kind of the -- and maybe it was in relation to what
214:00:55   they were paid, maybe, I'm not sure.

314:00:57   Q. Using his language, how many heavyweights did you have on
414:01:02   your team that directly reported to you?

514:01:03   A. In my team, I think the top part of my team was pretty
614:01:07   much like senior directors, directors, and heavyweights in
714:01:12   that sense.

814:01:12   Q. Did you receive any instructions from Mr. Bala regarding
914:01:16   heavyweights on your team?

1014:01:20   A. Yeah, I think sometime towards the end of 2015, he
1114:01:23   started asking to offload some of the heavyweights to -- to
1214:01:30   what we called CDP at the time, which was Cognizant
1314:01:34   Deployment Pool, which was basically a place where people
1414:01:38   would sit for 60 days, and they would be fired.

1514:01:41   Q. Is the corporate deployable pool the same as the bench at
1614:01:45   Cognizant?

1714:01:45   A. No, it's not.  The bench is a different concept.  We have
1814:01:50   a bench in every business unit, and we typically budget for
1914:01:54   bench.  So we say, for example, if you have a consultant who
2014:01:57   is going to work, we predict is going to work 80 percent of
2114:02:01   his time, we predict, but 20 percent of the time is going to
2214:02:06   be bench time, so we budget that.  If we run out of budget,
2314:02:09   then, of course, these folks have to go to CDP at some point.

2414:02:12   Q. What is your understanding as to what happens to
2514:02:17   employees who are on CDP?

1 14:02:19   A. Nothing good.  That's all I can tell you from what I

2 14:02:23   remember.

3 14:02:24        What happens is that they go to this CDP, they are

4 14:02:27   supposed to find a position within Cognizant.  And they, you

5 14:02:31   know, they can't talk to some of the leads in the CDP

6 14:02:36   organization, I think there is a hierarchy of people there.

7 14:02:42   I don't know how the hierarchy is organized.  So they have a

8 14:02:43   point of contact, typically a South Asian point of contact.

9 14:02:46   They can talk to them.  And they are told that they would --

10 14:02:50   they would try to find projects for them.  And from talking

11 14:02:55   to a lot of the CDP employees, they never got back to them.

12 14:02:59        So that was my experience with that.

13 14:03:01   Q. What actions did Mr. Bala take with respect to his own

14 14:03:05   heavyweights?

15 14:03:06   A. So what Mr. Bala did, he took like -- I think we had like

16 14:03:12   two of South Asian heavyweights, and he decided to not put

17 14:03:17   them on CDP.  He actually pulled them back into GTO.  And I

18 14:03:22   questioned that.  And I just asked him, well, why are we

19 14:03:25   doing this?  And not -- why don't we put everyone into GTO?

20 14:03:28   And then he said that, oh, no, I want these particular people

21 14:03:32   to come to my team until we can find something for them.  So

22 14:03:35   they will not considered to be on CDP and possibly discharged

23 14:03:40   from Cognizant.

24 14:03:40   Q. Okay.  When did you first begin complaining to Cognizant

25 14:04:01   regarding the manager letters and its staffing practices?

1 15:23:15   A. I remember this, yes.

2 15:23:16   Q. And Mr. Azar was not South Asian, correct?

3 15:23:20   A. Yeah, that was the whole point.  I mean, I was asked to

4 15:23:23   send non-Asian people to the bench, to CDP.

5 15:23:26   Q. But Mr. Azar was not terminated from the CDP, was he?

6 15:23:30   A. He just happened to be pulled by an organization that I

7 15:23:33   talked to, which was the MedXL organization.  So I spoke to

8 15:23:37   the head of that organization and they pulled him out of CDP,

9 15:23:39   because I wanted him to be doing something other than lose

10 15:23:42   his job.

11 15:23:42   Q. So Mr. Azar went to the bench, went to CDP, and with your

12 15:23:49   help, you made a phone call or two, and I'm sure he did as

13 15:23:52   well, he was assigned to a project for MedXL, correct?

14 15:23:56   A. I believe that is correct, yes.

15 15:23:58   Q. White man, CDP, got a new position, correct?

16 15:24:03   A. Yeah, that's one of the only examples I heard about.

17 15:24:08   Q. Sure.  Because another employee you sent to the bench was

18 15:24:10   a man named Jeff Brock, correct?

19 15:24:12   A. I think I remember Jeff, yes.

20 15:24:14   Q. And Mr. Brock was not South Asian, was he?

21 15:24:16   A. I think he was American, yes, White, American.

22 15:24:19   Q. Well, you can be American and of South Asian descent.

23 15:24:23   A. In this case, he was.

24 15:24:25   Q. Two different things.

25 15:24:26        Now, Mr. Brock, you are saying, was both White and

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

15:24:28 1  American, correct?

15:24:29 2   A. That's what I remember, yes.  That's what I'm telling you

15:24:33 3  I remember from him.

15:24:33 4   Q. And he was not terminated from the bench, either, was he?

15:24:35 5   A. I do not recall what happened to him.

15:24:37 6   Q. Do you recall that Mr. Brock was picked up by the health

15:24:41 7  care account team and went to work on the Walgreen's team?

15:24:44 8   A. I'm not sure what happened to him.  What I know is that I

15:24:46 9  received a call from TCS, Technical Consulting, shortly

15:24:50 10  after, and they actually picked him up, and he left

15:24:53 11  Cognizant.  That is what I remember.

15:24:54 12   Q. Sir, do you know whether Mr. Brock was picked up off of

15:25:00 13  the bench to work for the Walgreen's team?

15:25:02 14   A. I do not recall.  I just told you.

15:25:04 15   Q. So when you said that people go to the bench, wait for

15:25:06 16  60 days, and then get fired, you said that without knowing

15:25:10 17  what happened when Mr. Brock got sent to the bench, correct?

15:25:13 18   A. Well, look, these were my people, so I was trying to save

15:25:15 19  some of them.  I think I made a general statement of what I

15:25:18 20  know about CDP and the way it works.  And I was actually

15:25:21 21  helping these people, so that it didn't happen to them.

15:25:24 22       The statement I made about CDP before was absolutely

15:25:26 23  correct, sir.  This is what happens.

15:25:28 24   Q. You are the only person in the company who has ever made

15:25:31 25  sure -- has ever seen that people on CDP did not get

15:25:35    terminated after 60 days, is that right?  Thanks to you, the

15:25:38    three or four people made it through the CDP without being

15:25:42    terminated, is that your testimony?

15:25:43    A. I think you are changing my testimony, sir.  I think what

15:25:45    I said is that these people that didn't get terminated just

15:25:49    happened to be people that were from my group, and that I

15:25:51    helped some of them to actually not be terminated.

15:25:53    Q. Do you know that Mr. Piroumian was on the bench twice and

15:25:57    managed to find new jobs, new projects both times, prior to

15:26:00    2017?  Did you know that?

15:26:01    A. I'm not sure what happened to Mr. Piroumian.

15:26:03    Q. So your general description of your understanding of the

15:26:07    CDP is without any knowledge of what happened to

15:26:10    Mr. Piroumian, without any knowledge of what happened to

15:26:11    Mr. Brock, or whatever -- without any knowledge of what

15:26:14    happened to the vast majority of people that ever went to

15:26:19    CDP, correct?

15:26:20    A. No, I think that is incorrect, sir.  I'm saying that you

15:26:21    know about three people -- and, I mean, my testimony earlier

15:26:24    was about what I know from having talked to a large number of

15:26:27    people who went to CDP.  So it's incorrect to include

15:26:30    everyone.

15:26:30    Q. Do you know, sir, that over 75 percent of the people that

15:26:33    go to CDP find new positions from there?

15:26:35    A. I do not know that.  And I believe that --

1 15:26:37   Q. If that were true, you would be wrong, wouldn't you?

2 15:26:39   A. I may, but I would have to see the numbers.

3 15:26:42   Q. Sure.  One should look at the numbers on how many people

4 15:26:45   get jobs off of CDP before making broad, sweeping statements

5 15:26:49   that you go there to get terminated, correct?

6 15:26:52   A. I was asked about my experience with CDP.

7 15:26:54   Q. Another employee -- another employee you sent to the

8 15:26:56   bench was a man named Frank Chen.  Do you remember Mr. Chen?

9 15:26:59   A. Yes, I do.

10 15:27:00  Q. Mr. Chen was not South Asian, but I'm betting he was

11 15:27:03  Asian, correct?

12 15:27:05  A. He was from China, I believe, like North Asia.

13 15:27:08  Q. And he was not terminated from the bench, either,

14 15:27:10  correct?

15 15:27:11  A. I think he left -- I mean, he was fired out of Cognizant.

16 15:27:15  I think he was terminated from CDP.

17 15:27:17  Q. That is what you think?

18 15:27:18  A. I believe so, because he didn't -- I mean, at some point

19 15:27:21  I checked and he was out.

20 15:27:22  Q. So you don't know that Mr. Chen was selected from the

21 15:27:25  bench for a project with the University of Chicago Medical

22 15:27:28  Center, correct?

23 15:27:28  A. I have no idea about this.  What I know is that he left

24 15:27:32  Cognizant soon after he was put on CDP.  So that I know.

25 15:27:36  Q. Let's talk about manager letters, sir.

109:05:06

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

CHRISTY PALMER, et al.,              )
                                     )
          Plaintiffs,                )
                                     )
               vs.                   )
                                     )   2:17-CV-6848-DMG
COGNIZANT TECHNOLOGY SOLUTIONS        )
CORPORATION, et al.,                 )
                                     )
          Defendants.                )
_____

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME V

Los Angeles, California

Tuesday, June 20, 2023

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  10:59:53  they wanted to -- someone to come in and write macros, and

2  10:59:57  create tables and reporting out.  So that is what I was

3  11:00:03  doing.

4  11:00:03         But he -- he didn't know how to -- and I only

5  11:00:08  remember, because when I came on the project I was asked

6  11:00:13  about my Excel experience and how to write -- if I knew how

7  11:00:17  to write macros, create pivot tables and stuff.  But he did

8  11:00:21  not know how to create pivot tables, and I didn't understand

9  11:00:23  that until one day he asked me how I was getting the data.

10 11:00:27  And I said, well, in your pivot table just filter on I

11 11:00:32  believe location or NPI or whatever it was.  And he didn't

12 11:00:36  know how to create the pivot table.

13 11:00:37  Q. And would you say that knowledge was a required skill for

14 11:00:40  the position?

15 11:00:41  A. Yes.

16 11:00:43  Q. And did you want to stay on the CareMore project at the

17 11:00:47  time you were removed?

18 11:00:47  A. I did.  My husband and I had just went and looked at

19 11:00:50  apartments the weekend before I was asked to go home.

20 11:00:56  Q. And did you want to stay on the UHC project at the time

21 11:01:00  you were removed?

22 11:01:00  A. Yeah.  I liked my day-to-day.

23 11:01:05  Q. And were you ever on the bench at Cognizant?

24 11:01:07  A. I was.

25 11:01:07  Q. Approximately how many times?

11:01:09  1   A. I -- between all projects.

11:01:15  2   Q. Are you familiar with Global Workforce Management?

11:01:19  3   A. I am.

11:01:19  4   Q. And what was their role at Cognizant?

11:01:21  5   A. They were supposed to contact me when I went on the

11:01:27  6   bench, and help me find a project with my skill set.

11:01:30  7   Q. How did you come to understand that that was their role?

11:01:34  8   A. When I was asked to go home from CareMore, I said, so

11:01:40  9   what do I do?  I was brand new to Cognizant.  And they said,

11:01:45  10  just go home, and Global Workforce will contact you and help

11:01:52  11  you locate a project.

11:01:55  12  Q. Did anyone from Global Workforce contact you?

11:01:59  13  A. Not that I recall.

11:02:00  14  Q. Did anyone from Cognizant staffing ever reach out to you

11:02:03  15  when you were on the bench about open positions?

11:02:05  16  A. Not that I recall.

11:02:05  17  Q. And how did you generally find jobs when you were on the

11:02:09  18  bench?

11:02:09  19  A. I would reach out to people that I had worked on projects

11:02:13  20  with or -- yeah, pretty much, I would just work through my

11:02:19  21  network.

11:02:19  22  Q. In your experience, approximately what percentage of

11:02:24  23  Cognizant employees on your projects were South Asian?

11:02:26  24  A. Well, I don't know the percentage, but I know that it

11:02:35  25  was -- I -- I was an anomaly in many meetings.

11:17:44    1    A. That's right.

11:17:45    2    Q. And when you made those recommendations, would you

11:17:50    3    work -- recommend somebody you had worked with before and you

11:17:53    4    knew would be good at what they did?

11:17:55    5    A. That's right.  If there was somebody that was available

11:17:58    6    that I knew, or I would call them and ask them if they were

11:18:02    7    available, or if they knew somebody.  So it wasn't maybe

11:18:06    8    necessarily somebody that I had worked with, maybe it was

11:18:08    9    somebody somebody else worked with.  If there was nobody

11:18:11    10    available, Global Workforce Management always got an rec.

11:18:17    11    Q. So Global Workforce Management would assist when you

11:18:22    12    needed to find replacements on projects?

11:18:24    13    A. I don't remember them ever sending anyone to any of my

11:18:29    14    projects.

11:18:30    15    Q. And when you were looking to replace someone on a project

11:18:34    16    with someone else, you were focused on making sure the person

11:18:37    17    that you were adding to the team had the right skill set,

11:18:40    18    right?

11:18:41    19    A. Absolutely.

11:18:41    20    Q. And experience, right?

11:18:43    21    A. Absolutely.

11:18:44    22    Q. And certainly industry expertise helped as well, right?

11:18:48    23    A. Absolutely.

11:18:49    24    Q. And then, of course, there was a question of who is

11:18:52    25    available?

1 11:28:59    Q. Well, you understood that United Health said your

2 11:29:02    contract wasn't being renewed?

3 11:29:04    A. That is what I was told.

4 11:29:05    Q. And as for the person who replaced you, you didn't know

5 11:29:17    who made the decision to bring that person in, right?

6 11:29:19    A. No.

7 11:29:21    Q. And you don't know anything about that person's

8 11:29:25    qualifications, right?

9 11:29:27    A. I know they didn't know how to use Excel very well.

10 11:29:30    Q. And you don't know if that person had worked on any other

11 11:29:34    projects for United Health, isn't that right?

12 11:29:38    A. I don't believe they -- no.  I don't know.

13 11:29:43    Q. You don't know.  Okay.

14 11:29:47            Now, between your five to 20 projects, you worked

15 11:29:52    for about 10 different clients, is that right?

16 11:29:54    A. Each project was a new client.  So if it's 10, then -- 10

17 11:30:00    clients, then I worked on 10 projects.

18 11:30:02    Q. And you mentioned that you went to the bench every time,

19 11:30:06    but -- between projects, but sometimes you went to the

20 11:30:09    practice bench, right?

21 11:30:14    A. Right.  Once I went to the Horizontal Business Unit.

22 11:30:17    It's a little bit different over there.  But in the vertical,

23 11:30:20    I went to -- when I was in healthcare vertical, I went to the

24 11:30:24    bench.

25 11:30:25    Q. Okay.  And when you say the bench, you mean the corporate

1 11:30:30  bench?

2 11:30:30  A. I believe so.

3 11:30:31  Q. So you went to the corporate bench a couple of times, and

4 11:30:34  the rest of the times were on the practice bench, right?

5 11:30:36  A. I believe so.

6 11:30:41  Q. And you mentioned travel and relocation.  So your work

7 11:30:47  for Cognizant's clients required you to travel sometimes,

8 11:30:49  right?

9 11:30:50  A. A lot.

10 11:30:52  Q. Fair enough.  A lot.

11 11:30:55          And your work for Cognizant's clients sometimes

12 11:30:58  required you to relocate as well?

13 11:31:00  A. Only -- yes, for the first two projects.  One was, I was

14 11:31:05  supposed to relocate to Cerritos.  And then one was I

15 11:31:11  relocated from -- we actually relocated from Tucson to

16 11:31:17  Phoenix.

17 11:31:20  Q. And you had to relocate one time to Thousand Oaks for a

18 11:31:23  client project, is that right?

19 11:31:25  A. Yeah.  I didn't relocate there, I just stayed in the

20 11:31:31  Residence Inn for the duration of the discovery.

21 11:31:41  Q. And you were on the bench when you accepted the Thousand

22 11:31:44  Oaks project, right?

23 11:31:45  A. Right.  That is when I moved from healthcare to

24 11:31:47  horizontal.

25 11:31:48  Q. And just so we are all clear, when you say "horizontal,"

1 11:31:53  you are referring to moving into a group that was focused on

2 11:31:57  a certain technology?

3 11:31:58   A. Right.  So the vertical, the healthcare -- verticals go

4 11:32:05  this way, so they would be healthcare, financial, life

5 11:32:08  science, whatever.  And horizontals go across, and they work

6 11:32:11  on all verticals.  They could work on all verticals, which I

7 11:32:16  did.  But we were creating an offering called the Cognizant

8 11:32:21  Application Led Migration Program, and that is what the team

9 11:32:26  that I was on did.  We did it for manufacturing, we did it

10 11:32:28  for financial, we did it for -- at Thousand Oaks, it was

11 11:32:35  Amgen, which is a life science.  We did it for healthcare.

12 11:32:40  It was a process of migrating data centers from one to

13 11:32:46  another.

14 11:32:46   Q. It sounds like you were in high demand.  Fair to say?

15 11:32:50   A. Once I got my footing and understood what I was supposed

16 11:32:53  to be doing.

17 11:32:54   Q. And before we move on from the bench, while you were on

18 11:32:57  the bench, you received your full salary, right?

19 11:32:59   A. I did.

20 11:33:00   Q. And you also mentioned finding your own projects, and

21 11:33:06  that was because you had coworkers who would invite you to

22 11:33:09  join a new project sometimes before your current project

23 11:33:12  ended, right?

24 11:33:13   A. They would.

25 11:33:24   Q. Now, you are aware that there were occasions when you

1 11:33:26  were rolled off a project because of budget, right?

2 11:33:32   A. Yeah.   It's part of consulting.

3 11:33:35   Q. Okay.   And one occasion when you were rolled off of a

4 11:33:42  project, you already had another project lined up, right?

5 11:33:46   A. Okay.

6 11:33:50   Q. So, for example, when you rolled off of PHH, because of

7 11:33:54  budget, you already had another project lined up at Toyota?

8 11:33:59   A. You have those records.   I'm going to -- I'm going to

9 11:34:03  believe you when you say that that is true.

10 11:34:08   Q. That will save us a lot of time going through documents.

11 11:34:12           Now, you resigned from Cognizant in December of

12 11:34:16  2016?

13 11:34:17   A. I did.

14 11:34:18   Q. You weren't terminated?

15 11:34:19   A. No.

16 11:34:20   Q. And you weren't on the bench when you left?

17 11:34:23   A. No.

18 11:34:23   Q. And you resigned from Cognizant after you found a higher

19 11:34:26  paying job, right?

20 11:34:27   A. Nope.

21 11:34:31   Q. It wasn't a higher paying job that you went to?

22 11:34:33   A. It was a higher paying job.   It was also a career

23 11:34:36  limiting job.   So I did take a higher salary.   However, there

24 11:34:40  was no future in that.   I was hired to put together a data

25 11:34:44  center migration, they were moving from an NTT data center

1 11:56:43   Q. And the primary function of Talent Supply Chain is to

2 11:56:47   staff open positions at Cognizant, right?

3 11:56:50   A. With internal staff.

4 11:56:54   Q. And Talent Supply Chain is also responsible for placing

5 11:56:57   individuals who are on the bench?

6 11:57:00   A. Yes.

7 11:57:00   Q. Okay.  And are there individuals employed within Talent

8 11:57:07   Supply Chain other than yourself whose responsibility it is

9 11:57:09   to locate prospective positions for individuals who are

10 11:57:13  benched?

11 11:57:13  A. Yes.

12 11:57:14  Q. Okay.  But Talent Supply Chain isn't actually the

13 11:57:22  decision maker with respect to whether someone will be placed

14 11:57:24  on a project, right?

15 11:57:26  A. Talent Supply Chain facilitates the process.  The hiring

16 11:57:30  manager or in many instances the client interviews the

17 11:57:36  candidates to make a selection for their project.

18 11:57:38  Q. And when you say "hiring manager," that is someone who is

19 11:57:42  a Cognizant employee?

20 11:57:43  A. The hiring manager is a Cognizant employee.  Since a lot

21 11:57:48  of our associates work at client locations, the client is

22 11:57:53  involved in interviewing and selecting, because they would

23 11:57:55  like to know who they are getting on board their projects.

24 11:57:58  Q. Okay.  And would a hiring manager be someone who is on a

25 11:58:05  count team?

1  12:06:47          When we look at opportunities for people, there are

2  12:06:50    three dimensions we look at.  We look at where the client is

3  12:06:55    expecting the employee to be placed, okay?  We expect whether

4  12:07:00    they match the skill set that is required of the client

5  12:07:04    project or not.  And we look at whether they have the

6  12:07:08    requisite experience.

7  12:07:09          So all three things have to align.  So it will be

8  12:07:15    difficult to answer that question unless we look at the

9  12:07:18    underlying data.

10 12:07:19    Q. Well, I want to ask you, if we are talking about a whole

11 12:07:21    group of people, the entire group of benched associates who

12 12:07:24    are from the U.S. workers, and the entire group that are Visa

13 12:07:27    workers, wouldn't you expect those individual differences

14 12:07:31    about their experiences to kind of even out a bit?

15 12:07:34    A. It can, provided the skills match.

16 12:07:37          So that type of statistical analysis I feel, in my

17 12:07:41    opinion, will be meaningful only if you are able to look at

18 12:07:45    whether the skills matched or not.

19 12:07:46    Q. You are not saying just as a class of people the Visa

20 12:07:50    employees are just more skilled than U.S. workers, are you?

21 12:07:53    A. Not at all.

22 12:07:59          MR. HAMMERVOLD:  I'm about to move into another

23 12:08:01    section, I just wanted to notify the Court.

24 12:08:04          THE COURT:  All right.  Let's take our lunch break.

25 12:08:06    We will return at 1:30.

13:44:59   A. Yeah.

13:45:00   Q. Okay.   This page?

13:45:02   A. Yes.

13:45:04        Unfortunately the color coding of this is sort of

13:45:07   off.

13:45:14        So what I was trying to point out here is, U.S.

13:45:17   workers in general also get a lot more time on the bench than

13:45:22   Visa holders.

13:45:23        Then if you go on to the following page, it goes

13:45:26   back to the explanation I gave earlier in the next page.

13:45:31        So when people are on the bench and they are looking

13:45:37   for opportunities, there are three dimensions that come into

13:45:40   play.   What is the location in which that opportunity exists

13:45:45   at that point in time, and if the person is willing to

13:45:48   relocate, and then there is skill matching, okay, and their

13:45:53   experience level.   All these three dimensions come into play.

13:45:56        So the willingness to relocate plays an important

13:46:01   part in someone's ability to get redeployed while on the

13:46:05   bench.

13:46:06        It's the same example, I lived for 21 years in

13:46:09   Bergen County.   Thankfully, I didn't have to relocate.   If I

13:46:13   were asked to relocate, I might have said no.

13:46:15   Q. Okay.

13:46:15   A. Which will have diminished my opportunities which are

13:46:19   available in other parts of the U.S. at Cognizant.

14:06:09  1    that on the acceleration wheel?

14:06:11  2    A. I can guess that it refers to hiring people from campus.

14:06:19  3    Q. Okay.  Do you see there is a few bullet points under the

14:06:27  4    3 by 3 by 3 policy, all under the heading.  The 3 by 3 policy

14:06:32  5    entails that accounts do not hold associates that are

14:06:36  6    continuously unbilled for three more months -- for more than

14:06:39  7    three months.  Do you see that?

14:06:40  8    A. Yes.

14:06:41  9    Q. And was -- was this -- what you were talking about

14:06:43  10   earlier with respect to identifying people that were

14:06:47  11   essentially costing the company money, and releasing them to

14:06:50  12   the bench?

14:06:51  13   A. So can you repeat that question?  I don't understand how

14:06:58  14   you are connecting this document to what I said earlier.

14:07:01  15   Q. Well, I said it in a different way.  I had asked you

14:07:03  16   about the OE programs, and you mentioned that part of the

14:07:06  17   reason that it was attributed to the increased attrition, the

14:07:11  18   terminations from the bench, was that there are certain

14:07:13  19   people that were being identified for layoff in these

14:07:17  20   programs.

14:07:17  21   A. I -- I'm so sorry, I didn't use any of those words.

14:07:20  22   Q. Okay.  Well, I'm trying to get you back on track of what

14:07:23  23   we were talking about, and obviously use your own words to

14:07:26  24   explain it.

14:07:26  25   A. Thank you, sir.

14:07:27          So all that I said was, I was defining what an OE

14:07:30    program means, my recollection.  And I was saying that as a

14:07:34    company that wants to be profitable, if the project pyramid,

14:07:38    meaning the number of staff are excessive in a particular

14:07:43    project, then we tried to rotate them out to other projects,

14:07:49    because that particular customer project is not profitable.

14:07:52    Q. With Cognizant's staffing model, the way that someone who

14:07:54    has an established job would be rotated would be put him to

14:07:57    the bench, right?

14:07:58    A. They could be.

14:07:59    Q. Okay.  And when you are talking about getting them in a

14:08:02    better position, some of the -- some of the result may just

14:08:05    be that they end up getting terminated from the bench, right?

14:08:08    A. It is a possible outcome.

14:08:09    Q. Okay.  And the people that are identified in this 3 by 3

14:08:13    policy as candidates for rotation, there is three different

14:08:18    categories here, right?

14:08:19    A. That's what this document says.

14:08:21    Q. Okay.  And one of the -- the last category here is

14:08:24    someone that has been stuck in the same account and location

14:08:26    for consecutive three years?

14:08:28    A. Yes.

14:08:28    Q. See that?

14:08:29          That is some -- that is someone that you would

14:08:31    recognize as being identified for rotation?

1 14:08:34    A. See, this document seems like a planning document that we

2 14:08:38    use towards the end of the year.  If you don't mind, if you

3 14:08:41    go to the title of the document, it's called GAP, the first

4 14:08:45    page will show GAP.  It's the Global Account Planning Summit

5 14:08:49    of Cognizant that happens, or used to happen annually, okay?

6 14:08:53        So this seems like a discussion document.  Like I

7 14:08:57    said, I have no recollection of the -- so you see GAPS

8 14:09:01    December, global account, planning summit, December of 2015.

9 14:09:06    Q. Okay.

10 14:09:07    A. So it seems to me more like a discussion document that

11 14:09:11    our account teams would have wanted to discuss when they

12 14:09:14    congregated in December.  I don't have any recollection of

13 14:09:18    the 3 policy that you are referencing.  So beyond the point,

14 14:09:25    I'm unable to speak confidentially to it.

15 14:09:29    Q. And before we even got this to document, you couldn't

16 14:09:31    even remember what the OE program was at all, right?

17 14:09:33    A. So the OE terminology, or operational excellence, is a

18 14:09:40    broad word that has been used over the years in the company.

19 14:09:43        So I was not specifically referencing to what

20 14:09:46    happened in December 2015, but I was trying to say that ops

21 14:09:50    excellence is something that the company tries to follow in

22 14:09:53    order to be profitable in the market.

23 14:09:54        MR. HAMMERVOLD:  Can we go back to page 12?  Okay.

24 14:09:54    BY MR. HAMMERVOLD:

25 14:09:57    Q. And with respect to number -- this number 2 -- and I'm

14:10:03   just talking more broadly than this one specific timeframe.

14:10:06   Are you generally familiar with OE policies targeting these

14:10:10   groups of people for rotation?

14:10:12    A. I may have come across such documents in the past.

14:10:17    Q. Okay.  And one of the -- the one category in the middle,

14:10:27   that refers to somebody who is actually not in the United

14:10:31   States, right?

14:10:31    A. That is correct.

14:10:32    Q. Okay.  So the first and third category are people that

14:10:36   are in the United States, right, at an account currently,

14:10:42   right?

14:10:42    A. This is a global planning summit.  This could refer to

14:10:45   the United States, United Kingdom, Australia, wherever we had

14:10:49   business.

14:10:49    Q. Okay.  But point number 2 specifically refers

14:10:52   specifically to a valid U.S. Visa, right?

14:10:54    A. That is correct.

14:10:54    Q. Okay.  And would somebody with a valid U.S. Visa be

14:10:58   traveling to any other country?

14:10:59    A. If they had a Visa for any other country, then they could

14:11:03   be.

14:11:03    Q. Okay.  To refocus on this, the first and third categories

14:11:07   are people that have roles on site, right?

14:11:11    A. Like I said, that could apply to somebody in India, it

14:11:16   could apply to somebody in the U.K., it could apply to

1 14:11:19   somebody anywhere else that Cognizant has presence across

2 14:11:24   like 35, 45 countries.

3 14:11:26   Q. Okay.  And the first and third category are people that

4 14:11:28   were rotated out of their roles, right?

5 14:11:31   A. This document suggests that we could rotate them out.

6 14:11:38   But like I said, it's part of an account summit, it looks

7 14:11:41   like a discussion document to me.

8 14:11:43   Q. And the middle category of people that are off -- that

9 14:11:47   are offshore, that are holding a U.S. Visa, that -- with

10 14:11:51   respect to U.S. workforce, that would be talking about

11 14:11:53   rotating them in to the U.S. workforce, right?

12 14:11:56   A. So these were legitimately procured U.S. Visas, and this

13 14:12:03   does talk about using that skill in the U.S.

14 14:12:06   Q. So this OE program is about rotating certain people out

15 14:12:11   of roles and rotating people with valid Visas in to roles,

16 14:12:17   right?

17 14:12:17   A. I do not see it that way, only because the points 1 and 3

18 14:12:24   apply globally.  So they are not tied to each other.

19 14:12:32           MR. HAMMERVOLD:  Can we go to page 13?

20 14:12:32   BY MR. HAMMERVOLD:

21 14:12:37   Q. Okay.  Now, there is a lot of text here.  And one thing

22 14:12:40   that I want to just circle for you -- all right, do you see

23 14:12:46   what I circled here, it says, PAQ improvement 333 policy?

24 14:12:51   A. I see it.

25 14:12:51   Q. And do you see it has October 13, 2013, onwards?

14:12:56    A. I see that.

14:12:57    Q. Would that be a -- would that reflect the implementation

14:13:01    date for this policy?

14:13:02    A. I have no recollection of an implementation of this type

14:13:07    of policy.

14:13:07    Q. Okay.  But based on your familiarity with dealing with

14:13:10    these types of things, identifying a date right after the

14:13:14    policy, would that suggest the implementation date?

14:13:18    A. I'm sorry.  Because it's a large, complex organization,

14:13:23    you know, there are discussions at any point in time.  This

14:13:26    could equally refer to a discussion in October.  And, you

14:13:31    know, audit could refer to something that did not materialize

14:13:36    and they are discussing in December.  Because if they

14:13:37    implemented it in October, I don't know why they are

14:13:40    discussing it in December in the planning summit.

14:13:43    Q. And then the next line after that actually mentions the 3

14:13:45    by 3 policy was formulated with a dual focus on people

14:13:49    enablement and margin optimization.  Do you see that?

14:13:52    A. It says it was formulated, it doesn't say it was

14:13:56    executed.

14:13:57    Q. Okay.  Was there a 3 by 3 policy that was implemented?

14:14:01    A. Not to my recollection.

14:14:09         MR. HAMMERVOLD:  Can we go to 23, page 23.

14:14:09    BY MR. HAMMERVOLD:

14:14:14    Q. Okay.  Now, there is a lot of -- this is the conclusion

1 14:14:21  page, right?

2 14:14:22   A. Is that a question, sir?

3 14:14:25   Q. Well, that is what it says on the top left, right?

4 14:14:27   A. Okay.  That is what it says, absolutely.

5 14:14:30   Q. And it looks like there is a lot of buzz words here, like

6 14:14:33  digital, zero surprises, do you see here on the right side

7 14:14:37  there is a reference that says, cut fat, build muscle?

8 14:14:40   A. Yes.

9 14:14:40   Q. Isn't that exactly what we were just talking about with

10 14:14:43  the 3 by 3 policy, where certain people are the fat and they

11 14:14:47  are being cut, and others are the muscle, and they are being

12 14:14:50  built?

13 14:14:51   A. So it's an unfortunate choice of words, but like I

14 14:14:57  acknowledged not so long ago, Cognizant does review projects

15 14:15:02  and customer accounts for profitability.  If you are not

16 14:15:06  profitable because there is excess capacity in a project,

17 14:15:09  then we try to rotate that talent to another project, to

18 14:15:14  continue to be profitable, and to sustain ourselves as a

19 14:15:17  company.

20 14:15:17        But I know sort of, you know, the choice of words is

21 14:15:21  somewhat unfortunate.

22 14:15:22   Q. Okay.  Now, if we were talking about the effects of a

23 14:15:25  policy like this, would you expect it to increase or decrease

24 14:15:31  the representation of U.S. citizens in Cognizant's workforce?

25 14:15:34   A. I cannot -- I'm unable to answer that question, because I

1 14:15:37  do not know how it has a bearing.  Forgive my accent.

2 14:15:47  B-E-A-R-I-N-G.

3 14:15:55          MR. HAMMERVOLD:  Could we please turn to tab 5?

4 14:15:58          THE COURT:  Mr. Hammervold, is Exhibit 12 an

5 14:16:00  attachment to Exhibit 11?

6 14:16:02          MR. HAMMERVOLD:  Yes.

7 14:16:03          THE COURT:  You are seeking to admit 12?

8 14:16:06          MR. HAMMERVOLD:  I thought it was admitted.  Thank

9 14:16:07  you, Your Honor.  I would like to admit 12 as well.

10 14:16:12          THE COURT:  It is admitted.

11 14:16:12          (Exhibit 12 received in evidence.)

12 14:16:12  BY MR. HAMMERVOLD:

13 14:16:13   Q. Could we next have you turn to tab 5 of your exhibit

14 14:16:18  binder?  This is Exhibit 29 and 30.

15 14:16:27   A. Tab 5, right?

16 14:16:30   Q. Tab 5, it should be.

17 14:16:31   A. Okay.  Yes, I see it.

18 14:16:44          MR. HAMMERVOLD:  I think this has actually already

19 14:16:45  admitted.  Can I just put Exhibit 30 on the screen?

20 14:16:45  BY MR. HAMMERVOLD:

21 14:17:06   Q. Now, this is a word that I already heard you say as well,

22 14:17:08  rotation policy.  Are you familiar with a rotation policy

23 14:17:11  that existed at Cognizant?

24 14:17:14   A. There is no -- I mean, the most recent recollection that

25 14:17:18  I have of a rotation policy is what we call as the job most

14:17:22  program.  That employees who are not on the bench, or even on

14:17:27  the bench, can apply for higher order roles.

14:17:41   Q. Do you see in this section there is a business case for

14:17:45  the rotation policy?

14:17:47   A. Yes.

14:17:47   Q. Are you familiar with the business case for the rotation

14:17:50  policy?

14:17:50   A. I don't recall this policy being implemented, so it may

14:17:58  have been another draft discussion document.

14:18:00   Q. Okay.  So according to your recollection, this is just

14:18:03  something that was discussed and put in a slide deck, and

14:18:07  made the case for, but then we never actually did this?

14:18:10   A. Yeah, because about two or three years back we

14:18:14  implemented the job most program in the company.  Where

14:18:17  people could apply for higher roles and get promoted, and go

14:18:21  on to take on that job.

14:18:22        That is the culmination of, you know, many of these

14:18:27  discussions from the past.  But that is a very progressive

14:18:30  program that promotes people from one grade to another,

14:18:35  getting them higher compensation and benefits.  This was

14:18:38  implemented two or three years ago.

14:18:40   Q. But the business case for this policy, part of it is to

14:18:44  rotate associates up the value chain and replace with a lower

14:18:48  grade and experience, right?

14:18:50   A. Correct.

14:18:50    Q. Okay.  I'm just speaking generally.  Was this a model

14:18:55    that was part of Cognizant's talent model, rotating

14:18:58    associates up the value chain, and replacing them with lower

14:19:01    grade and lower experience?

14:19:04    A. Yeah, that sounds familiar.  And it's consistent with the

14:19:09    description that I provided earlier.  It speaks to the

14:19:14    profitability point that I made.  It also speaks to getting

14:19:18    promoted to higher roles point that I made.

14:19:23    Q. One thing that we heard from you and at other points in

14:19:26    this case, is you've got to have the exact right experience

14:19:29    level for this job, otherwise, it's not available to you and

14:19:33    skill mismatch.  Is that -- did I get that right?

14:19:37    A. You are saying it that way.  If I may be permitted, it's

14:19:42    clients who want particular sets of experience.  We have

14:19:46    clients across banks, insurance industries, pharmaceuticals,

14:19:51    and they are all very highly demanding clients.  They expect

14:19:55    very specific talent.

14:19:56            I apologize.  Go ahead.

14:19:57    Q. I didn't mean to speak over you.  I apologize for that.

14:20:00            Do clients demand Cognizant employees with lower

14:20:04    grade and experience?

14:20:05    A. Now, when we are able to control the project outcomes,

14:20:11    and the client has gained our confidence -- or we have gained

14:20:15    the client's confidence, we are able to manage the team in a

14:20:19    way that, you know, they don't have a say, so to speak, in

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

14:33:20  most, and going forward we need to leverage offshore travel

14:33:23  ready resources more.  Do you see that?

14:33:26  A. Yes.

14:33:26  Q. Does that indicate to you that the causal relationship

14:33:28  may be the other way around, that Cognizant is preferring to

14:33:32  use travel ready resources and not -- instead of U.S.

14:33:39  citizens not being willing to relocate?

14:33:41  A. This may be a mistake, because it's the opposite way.

14:33:45  Q. Okay.  Okay.  And item number 5 says, making the PA minus

14:34:01  billable.  Do you see that?

14:34:03  A. Yes.

14:34:03  Q. What is a PA minus?

14:34:04  A. PA is a grade, programmer analyst, it's a junior level

14:34:11  grade.  So PA minus refers to people at programmer analyst

14:34:16  grade and below.

14:34:17  Q. So this is the same type of thing we were looking at

14:34:20  before, rotate in lower grade employees, right?

14:34:24  A. That is what it states.

14:34:26  Q. Okay.  Is that another mistake here?

14:34:28  A. No, it's not a mistake.  But like I said, clients want

14:34:32  experience.  We would love to be very profitable by placing

14:34:36  junior associates in front of our banking clients, but they

14:34:41  won't accept them.

14:34:41  Q. And this says, too, in the same thought, We need to

14:34:45  execute on that either by replacing senior folks or making

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

14:34:49    them billable on new engagements.  Do you see that?

14:34:51    A. I see that.  And that is a statement that applies

14:34:55    worldwide.

14:34:56             MR. HAMMERVOLD:  Okay.  Can we go to item number 7?

14:34:56    BY MR. HAMMERVOLD:

14:35:05    Q. And here, this Cognizant high-up executive is talking

14:35:08    about Cognizant's resourcing strategy, right?

14:35:12    A. Sure.

14:35:13    Q. Okay.  And again, he mentions the idea of swapping --

14:35:17    swap senior resources within the account for now OPPNs, and

14:35:21    backfill with PA minus?

14:35:23    A. Yes.

14:35:23    Q. Okay.  And that is a reference to the same thing that we

14:35:27    were talking about, right?

14:35:29    A. It -- it's something that we are unable to execute in the

14:35:34    U.S., but more successfully in India.

14:35:36    Q. Okay.  Why can't you execute this in the U.S.?

14:35:39    A. Because of our clients have very sophisticated projects

14:35:46    running, and our employees work in client locations, and they

14:35:49    expect a lot of seniority and expertise, you know, of people

14:35:53    working in front of them and collaborating with them.

14:35:55    Whereas at offshore, you could have junior resources who are

14:35:58    doing the programming work, supporting the high-end

14:36:02    architects that we have in front of clients, as an example.

14:36:07    Q. So if Cognizant's staffing program and documents

1 14:36:10   indicates that it is actually implementing this, it's not

2 14:36:14   because of any client demand for it, right?

3 14:36:16   A. Unless we stay profitable in our client projects like I

4 14:36:19   originally stated, how would we remain in business.

5 14:36:23   Q. Okay.  And right after this mentions swapping out senior

6 14:36:25   resources and replacing them with -- backfilling them with PA

7 14:36:27   minus, what does the next bullet point say of this resourcing

8 14:36:30   strategy?

9 14:36:31   A. Use travel ready offshore associates with valid SID's to

10 14:36:36   avoid holding costs.

11 14:36:37   Q. To be clear, this is talking about the pool of Visa ready

12 14:36:41   employees in India, right?

13 14:36:42   A. This is talking about Visas legitimately procured by

14 14:36:47   Cognizant, but because of the time involved in using them --

15 14:36:50   procuring them and then using them, right, there is a holding

16 14:36:54   cost to it, thousands of dollars that are spent on Visas.

17 14:36:58   And they are legitimately procured.  So the company expects

18 14:37:01   to use them appropriately.  That is all.

19 14:37:04   Q. Okay.  Once they have them, they expect to use them,

20 14:37:08   right?

21 14:37:08   A. For the role that they got the Visa for, sure.

22 14:37:17          MR. HAMMERVOLD:  Okay.  Can we go back to

23 14:37:26   Exhibit 30?

24 14:37:33          Can we go to page 3?  Page 4, maybe.

25 14:37:33   BY MR. HAMMERVOLD:

1 14:37:41    Q. Okay.  Now, this is a -- we already talked about some of

2 14:37:47    the rotation criteria.  Do you remember that?

3 14:37:51         Are you familiar with an order of precedence with

4 14:37:54    respect to rotation?

5 14:37:56    A. I'm sorry, I don't understand the question.

6 14:38:00         Like I said, I don't recall any of the rotation

7 14:38:05    policy being implemented, other than the job most program, a

8 14:38:09    couple of years ago, which talks about people getting

9 14:38:12    promoted to higher roles.

10 14:38:14   Q. You don't know anything about an order of precedence for

11 14:38:16   inclusion in the rotation list?

12 14:38:17   A. I don't recall implementing something like this.

13 14:38:20         MR. HAMMERVOLD:  Okay.  Can we go to page 6?  Can we

14 14:38:43   go to page 7, maybe?  8, I think it's 8, sorry.  Okay.

15 14:38:53         THE COURT:  While you are looking for the page,

16 14:38:55   we'll have our afternoon break.  And we will return at 3:00.

17 14:38:59         (Thereupon, the jury retired from the courtroom.)

18 14:39:13         (Thereupon, there was a brief recess.)

19 15:01:26         (Thereupon, the jury returned to the courtroom.)

20 15:02:50         THE COURT:  Mr. Hammervold?

21 15:02:51         MR. HAMMERVOLD:  Yes.

22 15:02:51   BY MR. HAMMERVOLD:

23 15:02:54    Q. Mr. Padmanabhan, we are actually going to move to another

24 15:02:58   exhibit altogether.

25 15:02:59         Could I get you to turn to your second number 10 tab

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

15:03:04    in your binder?

15:03:05    A. Okay.  Yes.

15:03:16    Q. Okay.  And this is two exhibits, it's Exhibit 470 and

15:03:21    471.  The first one is an August 31, 2015 e-mail.  Do you see

15:03:26    that?

15:03:26    A. Yes.

15:03:27    Q. And then the document behind it is the attachment to it.

15:03:32    Do you see that, it's another slide deck?

15:03:34    A. Yes.

15:03:34    Q. Okay.  Now, this is an e-mail that you received from

15:03:39    James Lennox, is that right?

15:03:41    A. Yes, I'm on the e-mail.

15:03:47    Q. Okay.  And I think James goes by Jim Lennox, is that

15:03:51    right?

15:03:51    A. Yes.

15:03:52    Q. And he was the chief people officer at Cognizant?  Did I

15:03:56    get that right?

15:03:57    A. At that time.

15:03:57    Q. Okay.

15:04:00         MR. HAMMERVOLD:  At this time I move to admit 470

15:04:02    and 471 into evidence.

15:04:03         MS. MARYOTT:  No objection.

15:04:04         THE COURT:  They are admitted.

15:04:04         (Exhibits 470 and 471 received in evidence.)

15:04:04    BY MR. HAMMERVOLD:

15:04:05    Q. Okay.  If we could -- okay.  And just to quickly go over

15:04:13    470, this is a -- the attachment appears to be prepared by

15:04:17    the chief people officer of Cognizant, right?

15:04:19    A. It's not prepared by him.

15:04:23    Q. Okay.

15:04:24    A. It looks like he's the recipient.

15:04:26    Q. Well, he's the last one to respond to this, right?

15:04:28    A. That's correct.

15:04:29    Q. And he's the one that attaches it?

15:04:32    A. Yes.

15:04:33    Q. And it reflects that he made some tweaks, is that right?

15:04:36    A. Yes.

15:04:37    Q. So he has modified it to his satisfaction, right?

15:04:40    A. Sure.

15:04:41         MR. HAMMERVOLD:  Okay.  Could we go to Exhibit 471

15:04:44    on the screen?  All right.  And can we go to the next page?

15:04:44    BY MR. HAMMERVOLD:

15:04:54    Q. Okay.  All right.  Do you see the second point here?  It

15:05:01    says, during margin years, our full-year attrition seems to

15:05:06    go up by 100 basis points.  You see that?

15:05:09    A. Yes.

15:05:09    Q. Does that reflect that these margin optimization policies

15:05:14    increase terminations?

15:05:17    A. I do not know if the correlation is made, but I can see

15:05:23    the statement there.

15:05:24    Q. Okay.  The margin year, do you know what that means?

15:05:27    A. I believe it's a reference to years where Cognizant was

15:05:35    pressured to improve its profitability in the marketplace.

15:05:37    Q. Years that Cognizant implemented margin optimization

15:05:40    initiatives, right?

15:05:41    A. Yes.

15:05:43         MR. HAMMERVOLD:  Can we go to the next page?  Can we

15:05:49    go to the next page?  Sorry.

15:05:49    BY MR. HAMMERVOLD:

15:05:57    Q. And do you see this second bullet point, it refers to

15:06:01    margin optimization, right?  That was the policies that I was

15:06:04    just talking about?

15:06:04    A. Yes.

15:06:05    Q. This is driven exits from the bench, forced and

15:06:09    voluntary, right?

15:06:09    A. Yes.

15:06:11    Q. Okay.  And it says that it also has driven an increase in

15:06:16    attrition.  This happened in 2013 as well.  Right?

15:06:19    A. Yes.

15:06:20         MR. HAMMERVOLD:  Okay.  Can we go to page 4?

15:06:20    BY MR. HAMMERVOLD:

15:06:28    Q. And in his summary he says, 2015 was a margin year.  We

15:06:32    squeezed our supply and put pressure on our internal

15:06:34    resources to become billable.  This spiked our attrition.  Do

15:06:38    you see that?

15:06:38  A. Yes.

15:06:39  Q. Okay.  And it also indicates that an additional 2,088

15:06:45  associates exited from our bench, right?

15:06:47  A. That is correct.  And all of these are global numbers, I

15:06:51  believe.

15:06:51  Q. Okay.

15:06:54  A. Not just the U.S.

15:06:55       MR. HAMMERVOLD:  Okay.  And could we turn to page 5?

15:06:55  BY MR. HAMMERVOLD:

15:07:00  Q. All right.  And this is an actual graph showing the

15:07:02  impact of the margin optimization policies, right?  You can

15:07:07  see the spikes in attrition?

15:07:09  A. There are two arrows pointing to map impact.

15:07:16  Q. Yeah.  That is talking about the margin optimization

15:07:19  impact, right?

15:07:19  A. Yes.  That is the reference.

15:07:21  Q. Okay.  And that is -- that is a way to illustrate the

15:07:24  point that we just saw on the summary, that margin

15:07:26  optimization policies -- and this is a way to illustrate the

15:07:36  point that these margin optimization policies are driving

15:07:40  exits from the bench, right?

15:07:43  A. That's what this document is saying.

15:07:46       MR. HAMMERVOLD:  Okay.  Could we go to page 8?

15:07:46  BY MR. HAMMERVOLD:

15:07:54  Q. All right.  Now, this is an analysis that was performed

15:07:59  of glassdoor.com.  Do you see that?

15:08:02   A. Sure.

15:08:03   Q. Okay.  And does this reflect that there were 584 comments

15:08:08  regarding discrimination on that site?

15:08:16   A. Yes.  I can see that.

15:08:17   Q. Okay.  And glassdoor.com is a website where former and

15:08:23  current employees can go to make comments about their

15:08:25  employer, right?

15:08:26   A. I'm not -- I have not used that site, so I'm not familiar

15:08:29  with it.

15:08:29   Q. Is that a site that is primarily used in the United

15:08:32  States or globally?

15:08:33   A. I don't know.

15:08:34   Q. Okay.

15:08:37   A. I know these stats are global.

15:08:39   Q. I'm sorry?

15:08:40   A. I know these statistics are global, these statistics --

15:08:43   Q. Okay.

15:08:44   A. -- in these pages.

15:08:45   Q. All right.  And do you see, too, that 76 percent of the

15:08:50  comments on the topic of discrimination are negative

15:08:53  comments?

15:08:56   A. I apologize, I'm seeing this for the first time -- or I

15:09:00  may have seen it in the past, but -- so the color coding is a

15:09:05  little bit troublesome for me.

1  15:09:07         Which one are you referencing?

2  15:09:08    Q. The last one, where there is the most negative.

3  15:09:11    A. Right.  Yeah.

4  15:09:22    Q. Okay.  Was there a joint effort between global mobility,

5  15:09:34  Talent Supply Chain, and the BU operations teams to drive

6  15:09:38  utilization of Visa employees which resulted in a significant

7  15:09:41  increase?

8  15:09:44    A. There have always been a Visa utilization.  So Cognizant

9  15:09:51  procures legitimate Visas across the world.  So we invest

10 15:09:56  time and money to procure those Visas to fill skill GAPS.

11 15:10:00  So, yes, Cognizant wants to use them.

12 15:10:03    Q. Okay.  And there was a joint effort that included Talent

13 15:10:06  Supply Chain to push for the increase of utilization of the

14 15:10:12  travel ready Visas, right?

15 15:10:14    A. There may have been.

16 15:10:16    Q. You don't recall?

17 15:10:17    A. I don't recall active participation, but I'm sure I'm

18 15:10:21  copied on e-mails, things like that.

19 15:10:23    Q. But you were the head of Talent Supply Chain, either

20 15:10:26  globally or in North America during the time, at least that

21 15:10:29  is relevant to this case, right?

22 15:10:31    A. Yes, at various points, I have held different roles,

23 15:10:34  that's correct.

24 15:10:34    Q. And are you telling us you don't know whether there was

25 15:10:36  an effort to increase utilization of Visas?

15:10:38  A. No.  I'm acknowledging there was always an effort,

15:10:41  because they are legitimately procured Visas to fill skill

15:10:45  GAPS.  And there is a lot of money spent on them.  So, yes,

15:10:48  the corporation wants to use them.  So it's logical.

15:10:51  Q. Okay.  Could I get you to turn to -- you know what?

15:11:02  Actually, this one is not in your binder.  I apologize.

15:11:04          MR. HAMMERVOLD:  Could we have a blackout screen?

15:11:06          THE CLERK:  Ready.

15:11:10          MR. HAMMERVOLD:  Could you put -- actually, I'm

15:11:17  going to change the order of it.  Could you put Exhibit 219

15:11:21  on the screen, which has already been admitted?  Okay.

15:11:21  BY MR. HAMMERVOLD:

15:11:40  Q. This is an October 15, 2016 slide deck by Mr. R. Mohan on

15:11:49  Visa utilization and travel ready status.  Do you see that?

15:11:52  A. Yes.

15:11:52          MR. HAMMERVOLD:  Okay.  And could we put page 5 on

15:11:55  the screen?

15:11:55  BY MR. HAMMERVOLD:

15:12:00  Q. Okay.  Now this slide deck indicates that there is a

15:12:04  joint effort between global mobility, Talent Supply Chain,

15:12:08  and the BU ops teams to drive Visa utilization, which has

15:12:13  resulted in this significant increase.

15:12:14  A. Yes, it says that.

15:12:15  Q. Okay.  Now, that statement is accurate, right?

15:12:21  A. It could be.  Like I said, I never denied that Cognizant

1 15:25:12  Visa comes through, then you file an amendment for the new

2 15:25:18  location that they have to go to.

3 15:25:21  Q. I just want to make sure, the workforce strategy is,

4 15:25:24  guess what jobs you might need, and then when we get the

5 15:25:27  Visas, amend them, and put them in the jobs as they arise,

6 15:25:31  right?

7 15:25:32  A. That is your characterization.  I have told you all I

8 15:25:36  know.

9 15:25:37  Q. Are you familiar with a Visa chargeback policy?

10 15:26:08  A. I have heard of it.  And, you know, I have -- I have no

11 15:26:16  recollection of it getting implemented.

12 15:26:17  Q. Okay.  Well, let's just talk about what it is before we

13 15:26:21  get into whether it was implemented.

14 15:26:23       What is a Visa chargeback policy?

15 15:26:25  A. I don't know.  Like I said, I've heard of it.  But I

16 15:26:30  don't have any recollection of what it is, because I don't

17 15:26:33  have any recollection of it being implemented.

18 15:26:35  Q. And we'll talk about whether it's implemented or not.

19 15:26:39  Are you familiar with a policy to charge business units if

20 15:26:44  they don't use their Visas in a timely manner?

21 15:26:48  A. That sounds familiar.

22 15:26:50  Q. Okay.  And the idea is to impose a fine to get them to

23 15:26:56  use their Visas, right?

24 15:26:57  A. It's not so much as a fine, as making the business unit

25 15:27:06  applicant accountable.  Very simply put, if you are traveling

15:54:39   1   recall implementing the 3 by 3 policy.

15:54:42   2   Q. Okay.  Well, does the information that we just looked at

15:54:45   3   indicate that Mr. Cox was chosen to be rotated out of his

15:54:48   4   role exactly three years after his start date?

15:54:52   5   A. That may be a coincidence.  But I did admit that

15:54:57   6   Cognizant tries to keep its client projects profitable.  If

15:55:00   7   there is excess capacity, then they have to be used somewhere

15:55:03   8   else.

15:55:04   9   Q. Okay.  And is the -- does the exhibit that we are looking

15:55:08  10   at indicate that Mr. Cox was put in the CDP pool from that

15:55:13  11   rotation out?

15:55:13  12   A. I see the reference to CDP here, yes.

15:55:29  13   Q. Okay.  And I think we talked about this earlier, but I

15:55:34  14   just want to connect this back to this.  When someone like

15:55:37  15   Mr. Cox is chosen to be rotated out of their position as part

15:55:40  16   of an operational excellence project, that was no assessment

15:55:43  17   of their performance in the role, right?

15:55:44  18   A. Like I said, in order to remain profitable, we have to

15:55:51  19   review wherever client profitability is, and if we have the

15:55:57  20   right, you know, pyramid, the right hierarchy in the project,

15:56:00  21   so --

15:56:01  22          MR. HAMMERVOLD:  Okay.  Could we go back to

15:56:22  23   document -- Exhibit 30?  And could we go to page 8 of this

15:56:41  24   document?

15:56:41  25   BY MR. HAMMERVOLD:

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

10:38:38

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

CHRISTY PALMER, et al.,          )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )   2:17-CV-6848-DMG
COGNIZANT TECHNOLOGY SOLUTIONS   )
CORPORATION, et al.,             )
                                 )
          Defendants.            )
_____ )

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME VI

Los Angeles, California

Wednesday, June 21, 2023

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

11:05:10  1   Q. This person doesn't come on to the bench until June 30th,

11:05:13  2   right?

11:05:15  3   A. Okay.  Sure.

11:05:16  4   Q. Okay.  And this person also has Java skills, right?

11:05:23  5   A. Yes.

11:05:23  6   Q. Okay.  But this person actually is put on a project

11:05:27  7   July 5th of 2017, right?

11:05:29  8   A. That's what the data says, yes.

11:05:33  9   Q. And this person received three proposals and two soft

11:05:38  10  blocks, is that right?

11:05:39  11  A. Yes.

11:05:39  12  Q. Okay.  Would you be surprised if there were a bunch of

11:05:57  13  other individuals within the same timeframe that were senior

11:06:01  14  architects that had similar skills and that received quite a

11:06:07  15  few offers for projects?

11:06:10  16  A. I wouldn't be surprised, because the client also looks at

11:06:13  17  the industries that they are from.

11:06:14  18       So, for example, in this that you showed, the person

11:06:19  19  was from Comtech, so I do not know if they got selected to a

11:06:23  20  similar industry.

11:06:24  21       So the selection of our associates to projects has

11:06:32  22  technology skill sets, which location, what industries that

11:06:37  23  they are experienced in, and most importantly, like I said,

11:06:42  24  this shows an abstracted skill family class.  Unless we look

11:06:46  25  at the entire skill record of the individual, we won't be

1  11:06:50  able to say, you know, what happened here.

2  11:06:57          MR. HAMMERVOLD:  Okay.  And let's see, while we are

3  11:07:00  on this line, can we look at -- can you scroll to the right?

4  11:07:00  BY MR. HAMMERVOLD:

5  11:07:08  Q. All right.  And who -- let's see, who is the person that

6  11:07:11  proposed this?  Can you see the name, is it AP?  Who is the

7  11:07:19  person that proposed this?  Can you read that?

8  11:07:22  A. Column AP?

9  11:07:26  Q. Yeah.  Column AP.

10  11:07:28  A. It's a little bit -- the font is very small.  I'm not

11  11:07:33  able to see.

12  11:07:34  Q. Okay.

13  11:07:35  A. Now that has gone off page.

14  11:07:37          MR. HAMMERVOLD:  Okay.  Clear this.

15  11:07:37  BY MR. HAMMERVOLD:

16  11:07:42  Q. Are you able to see, who was it in the staffing team that

17  11:07:46  proposed this person?

18  11:07:46  A. Saravana Kumar.

19  11:07:49  Q. And who is the hiring manager in column AM?

20  11:07:52  A. Arun Prasad.

21  11:07:57          MR. HAMMERVOLD:  Can we go to line 2705?

22  11:07:57  BY MR. HAMMERVOLD:

23  11:08:11  Q. Now, this person is also a senior architect in their

24  11:08:16  role, right?

25  11:08:17  A. According to column H, yes.

11:15:17    Chain, and in a nutshell what Talent Supply Chain does.

11:15:21    A. So Talent Supply Chain, that is my team, is the first

11:15:27    recipient of information on staffing demand from our clients

11:15:32    and client facing teams.

11:15:34    Basically, let's say we win a new project with a

11:15:38    client, and the client needs, you know, 10 resources, 10

11:15:42    folks to run the project, including architects, project

11:15:47    managers, what not.  My team gets the first information on

11:15:50    what that particular project needs.

11:15:55    My team's goal is to ensure that the project is

11:15:58    staffed with Cognizant talent to begin with.  If you don't

11:16:04    find the talent in the timeframe that we have, then we head

11:16:07    to external market to hire from the market.

11:16:10    But as such, to use Cognizant talent doesn't stop

11:16:14    there, because sometimes, you know, what is not available

11:16:17    today becomes available a couple of weeks down the line, and

11:16:21    then we are able to leverage their skill set for the project

11:16:25    that we won with the client.

11:16:27    So the primary goal is to ensure that our internal

11:16:32    Cognizant staff get opportunities to be staffed to new client

11:16:38    projects.  That is -- the internal fulfillment is Talent

11:16:43    Supply Chain's first goal.

11:16:43    Q. How many employees work in Talent Supply Chain in the

11:16:46    United States?

11:16:46    A. Approximately 30 to 35.

11:16:49   Q. And are there Talent Supply Chain employees in India?

11:16:53   A. Yes.

11:16:53   Q. How many?

11:16:54   A. Roughly 250.

11:16:57   Q. Are there Talent Supply Chain members in other countries?

11:17:01   A. Yes.  It's a global team.  We have about 35 employees

11:17:06   spread across Europe, Asia Pacific, South America, and then

11:17:14   in the United States and Canada.

11:17:16   Q. And what is the Talent Supply Chain team in the United

11:17:21   States focused on?

11:17:22   A. It has the same focus.  But its first and primary pool of

11:17:31   talent is associates in the United States.  So the Talent

11:17:38   Supply Chain in the U.S. focuses on U.S. talent to be used to

11:17:44   staff the projects.

11:17:45          Like I mentioned earlier, as an IT services company,

11:17:49   projects begin and end, and that is a daily affair.  So as

11:17:54   people roll out projects, we look for opportunities for them

11:17:58   for the next project that we have won with a client.  Could

11:18:03   be a new client, it could be an existing client where there

11:18:05   are openings.

11:18:06          So the U.S. Talent Supply Chain focuses on getting

11:18:13   U.S. employees of Cognizant placed in new projects.

11:18:16   Q. How many projects would you say begin every year?

11:18:19   A. They run in the thousands.

11:18:21   Q. And how many end each year?

11:18:23    A. Again, thousands.

11:18:24    Q. Now, as vice president of Talent Supply Chain, do you get

11:18:31    involved much in the day-to-day staffing?

11:18:36    A. Not in the day-to-day.  But I am involved more in, you

11:18:41    know, either designer policy positions or escalations that

11:18:47    come to me.  You know, escalations could be client's request

11:18:54    for resources on an expedient basis.  Because technology

11:19:03    keeps evolving, the requirements and demands of our clients

11:19:07    also keep evolving.  So I get escalations around need for

11:19:12    associates that can keep pace with the latest technologies

11:19:15    that our clients expect to be executed in their projects.

11:19:19    Q. Could you tell us a little bit about your educational

11:19:23    background?

11:19:24    A. I have a bachelor's in physics, and a master's in social

11:19:28    work.

11:19:29    Q. Do you hold any technical degrees?

11:19:31    A. I do not.

11:19:31    Q. So I would like to talk about Cognizant's project-based

11:19:37    business model.  We have talked a lot about projects.  But

11:19:41    could you explain briefly for the jury how the project based

11:19:44    model works?

11:19:45    A. Sure.  So Cognizant operates across various industries,

11:19:51    from banking financial services, insurance, health care

11:19:55    clients, technology clients, media clients, across the United

11:20:02    States and across the world.

11:20:03      Now, for all of those clients, we also offer

11:20:08   technology services.  We offer services in enterprise

11:20:14   software for the IT infrastructure.  We offer services in

11:20:19   data.  The primary Cognizant businesses custom software

11:20:25   services for all of these clients, so we have focus on the

11:20:30   industries that our clients operate in.  And then we offer

11:20:33   them the technology services that cuts across those

11:20:36   industries.

11:20:37      The basic operating unit under a client is a

11:20:42   project.  So a client, let's say a bank, may have hundred

11:20:48   projects that Cognizant is running for them at any point in

11:20:51   time, as an example.  And those projects will cut across

11:20:58   several technologies, like the ones that I mentioned.

11:21:00      So project is the smallest unit of operation, and an

11:21:04   aggregation of projects are the services that we offer to a

11:21:08   client.

11:21:08   Q. Generally speaking, how long do client projects last?

11:21:13   A. It's very difficult to say.  They can -- client projects

11:21:18   can last from weeks to months to several years.

11:21:23   Q. Do they sometimes occur in phases?

11:21:26   A. Absolutely.  Clients have, you know, particular project

11:21:31   milestones.  And the duration of those milestones can also

11:21:35   vary over time.

11:21:36   Q. Are there particular groups of people who are responsible

11:21:41   for getting business from clients?

1 11:21:44   A. Yes.  We have dedicated sales teams who are tasked to get

2 11:21:50   new business for the company.  We also have commercial teams

3 11:21:54   working with existing clients of the company who are, you

4 11:21:59   know, delivering services for them, as well as consulting

5 11:22:02   them to transform their technologies and win new business

6 11:22:07   with a client also as a result.

7 11:22:09   Q. And are the sales folks typically in billable roles?

8 11:22:14   A. No.  They are typically in nonbillable roles.  Their task

9 11:22:17   is to sell the company's services.

10 11:22:20   Q. Are there staffing considerations when Cognizant is

11 11:22:24   trying to get hired for projects?

12 11:22:26   A. Most definitely.  So the clients usually look for two

13 11:22:31   outcomes.  One is, what is their technology landscape and

14 11:22:35   what kind of transformation they want to do.  Let's say they

15 11:22:38   are involved in legacy technologies, okay, I want to move

16 11:22:41   to -- you know, into the digital age.

17 11:22:44           So that is one outcome that they expect, that we

18 11:22:47   transform and maintain their technology infrastructure.

19 11:22:52           The second, they are very interested in knowing the

20 11:22:55   staffing schedule and the talent that Cognizant brings to the

21 11:22:59   table.  Like I said, a lot of our associates in the United

22 11:23:06   States work closely with clients in client offices.  So our

23 11:23:10   clients are very interested in knowing and selecting who

24 11:23:14   those associates are who will be working with their own

25 11:23:18   staff.

1 11:23:19    Q. I was actually going to ask you next, who determines how

2 11:23:23    many people and skills are needed for a project?

3 11:23:25    A. That is usually a collaborative effort.  Once the

4 11:23:29    technology outcomes are determined, it's a collaborative

5 11:23:37    effort between the client and Cognizant's client phasing

6 11:23:40    delivery team.

7 11:23:43    Q. Now, some projects are large and some are small.  Are all

8 11:23:56    projects staffing needs on a project the same in terms of the

9 11:24:00    types of skills you need?

10 11:24:03    A. They are very diverse.

11 11:24:06    Q. What's the longest project you have ever been familiar

12 11:24:10    with?

13 11:24:11    A. I'm unable to say, because some projects can run into

14 11:24:15    years.  Client engagements run into years.  And like I

15 11:24:19    mentioned before, they also have different phases.  And, you

16 11:24:24    know, clients may transform from one technology to another,

17 11:24:28    but to keep pace, they may decide to go in a different

18 11:24:32    direction.

19 11:24:32         So there is not one single answer for that question.

20 11:24:36         Besides, a lot of our clients, although they may be

21 11:24:41    in banking or, you know, financial, health care services,

22 11:24:44    whatever, different industries, but a lot of our clients are

23 11:24:48    now recognizing that technology is actually a core

24 11:24:52    composition of their business.  That is the fuel that gets

25 11:24:56    them more revenue and makes them successful.  That is -- I

1  11:24:59  mean our clients, not Cognizant.

2  11:25:02      As a result, they want to keep pace with a diverse

3  11:25:04  set of options in front of them.  And we are trying to keep

4  11:25:07  pace with where they are moving from a technology standpoint.

5  11:25:11  Q. Thank you.

6  11:25:12      You mentioned a few minutes ago that there are

7  11:25:15  milestones on a project.  Does Cognizant know what the

8  11:25:20  milestones are in advance of starting the project?

9  11:25:23  A. There is definitely a plan.  And then, you know, there

10  11:25:31  are statements of work that are agreed upon between the

11  11:25:35  client and the Cognizant employees, the delivery leadership.

12  11:25:42      So that is -- that is a path forward, but that path

13  11:25:46  forward can change.

14  11:25:48  Q. Can you explain what you mean by that?

15  11:25:50  A. So project schedules can change because, as the

16  11:25:58  programmers develop the technology outcomes that our clients

17  11:26:03  are expecting, there may be unforeseen events that may shift

18  11:26:08  the schedule of a project.  There may be events where, let's

19  11:26:13  say, it's a two- or three-year engagement with a client, but

20  11:26:17  the client runs out of budget dollars, the discretionary

21  11:26:22  spending on year two.  Then the projects and their -- you

22  11:26:27  know, what they expect from us can change.

23  11:26:29      There are any number of factors that could lead to a

24  11:26:35  project or an engagement schedule changing from what was

25  11:26:38  originally decided and planned or laid out.

11:26:42  1  Q. Thank you for explaining that.

11:26:43  2         Now, you've mentioned the client playing a role --

11:26:47  3  clients playing a role in staffing.  In your experience, what

11:26:51  4  do clients consider when they are deciding whether to accept

11:26:54  5  Cognizant employees on to their projects?

11:26:56  6  A. So clients, in the interest of their own success, the

11:27:01  7  only thing that they are interested in is what that

11:27:04  8  particular associate of Cognizant brings to the table, brings

11:27:07  9  to the project, and whether it will lead to a successful

11:27:10  10 outcome for them or not.

11:27:11  11        Basically, they are looking for whether this person

11:27:14  12 has the requisite skill set.

11:27:18  13 Q. In addition to approving Cognizant employees for

11:27:26  14 projects, can clients also release employees from projects?

11:27:28  15 A. They can.  The decisions that clients make with respect

11:27:34  16 to project schedules -- I was talking about examples where,

11:27:38  17 you know, the schedule changes or the budgetary spend

11:27:44  18 changes.  So if the client organization decides that a

11:27:50  19 project has to go either a different way, or a project has to

11:27:55  20 be canceled, then that will lead to those employees rolling

11:27:59  21 off a project.

11:28:01  22        And then we will have to figure out what their next

11:28:04  23 project should be.

11:28:04  24 Q. Have you personally encountered circumstances where a

11:28:11  25 client wants to roll someone off a project because they don't

1 11:28:13  get along with the client?

2 11:28:15              MR. HAMMERVOLD:  Objection.  Leading.

3 11:28:16              THE COURT:  Sustained.

4 11:28:16  BY MS. MARYOTT:

5 11:28:19   Q. Are there any other reasons why individuals might be

6 11:28:21  released at the client's request?

7 11:28:24   A. We have seen instances where, you know, someone doesn't

8 11:28:29  make the performance cut, is not able to, you know, perform

9 11:28:34  up to expectations, up the client's expectations, up to our

10 11:28:39  expectations in the company.  And as a result, you know,

11 11:28:41  sometimes, you know, we have seen in very rare situations

12 11:28:45  where there are disciplinary issues, things like that.

13 11:28:50              So it could be any number of reasons that could lead

14 11:28:51  to that.

15 11:28:52   Q. So we've heard some about the bench in this case.  Can

16 11:28:56  you walk us through, in your own words, what the bench is?

17 11:28:59   A. So we think of bench as a transitory period between

18 11:29:07  projects.  So since the projects that we do for our customers

19 11:29:15  can be of varying duration, one second their schedule or

20 11:29:22  budget may change, or projects may come to successful

21 11:29:25  conclusion, right, three simple scenarios.  In any of these

22 11:29:32  scenarios, some, many, or all of the employees in the project

23 11:29:36  may have their project event ending.

24 11:29:39              Then they have to go through a transitory period

25 11:29:42  called the bench.  It's two plus five, plus seven weeks in

11:29:49  1    the U.S., where the employee, my team, and the hiring

11:29:54  2    managers collaborate to get their next assignment in the

11:29:58  3    company.

11:30:00  4      Q. You just said two plus five.  Can you explain what the

11:30:06  5    two-week period is?

11:30:08  6      A. Yes.  Generally we have a two-week notice.  So let's say

11:30:16  7    I am working for a client, and I'm going to be released

11:30:21  8    because the project is canceled, my manager has to provide

11:30:25  9    two weeks' notice before I hit the bench.

11:30:27  10            So, essentially, I can start looking for new

11:30:32  11   opportunities, the Talent Supply Chain team will start

11:30:36  12   looking for new opportunities for me.  I can update my skill

11:30:39  13   sets in the system -- in the company system.

11:30:42  14            And therefore, from the time I get to know that I'm

11:30:47  15   going to be released and the bench time, it's two plus five,

11:30:51  16   seven weeks.

11:30:52  17     Q. We've also heard some references to practice bench.

11:30:56  18   What's a practice bench?

11:30:58  19     A. So like I mentioned, Cognizant is divided by service

11:31:03  20   lines and industries.  They have their bench project code,

11:31:11  21   which is called a project bench.  So the practice bench is a

11:31:15  22   reference to the benches that are crossed over to those

11:31:20  23   service lines.

11:31:22  24     Q. And Talent Supply Chain, do they deal with the practice

11:31:25  25   bench or the corporate bench or both?

11:31:26  A. Both.

11:31:30  Q. Was there a period of time when employees could stay on a

11:31:34  practice bench longer than -- well, is there a timeline on a

11:31:37  practice bench?

11:31:38  A. It is the same timeline.  But in the past, employees have

11:31:42  spent time on the practice bench, and then subsequently on

11:31:45  the corporate bench as well.  Giving them additional time to

11:31:51  look for opportunities in the company.

11:31:52  Q. And while the company is giving individuals time to look

11:31:59  for opportunities in the company, are they receiving their

11:32:01  full salary?

11:32:02  A. Their salary, their benefits, all of it is kept whole in

11:32:07  the two plus five weeks, including any additional time that

11:32:11  they get, let's say, two or three months, they are paid full

11:32:14  salary and benefits.

11:32:19  Q. Are there circumstances where employees who are not on

11:32:22  the bench and who are actually on projects are able to look

11:32:24  for other projects?

11:32:25  A. They can.

11:32:25  Q. How does that work?

11:32:26  A. They can come on to a virtual bench pool.  You know, they

11:32:32  don't get a timeline.  So I'm working for a bank or let's say

11:32:41  a media company, client, but I want to move to some other

11:32:46  industry or I want to work in another technology.  I can come

11:32:50  on to the virtual bench and look for new options.

1  11:32:59  Q. So we've heard a lot about the five weeks, but I think we

2  11:33:02  are going to call it seven weeks now.

3  11:33:05      So are there any exceptions to the seven-week period

4  11:33:10  for individuals who are on the bench?

5  11:33:12  A. If an employee, let's say at the end of the two plus five

6  11:33:18  weeks, has a pending interview with a client, or is close to

7  11:33:22  getting another opportunity, you know, we will extend the

8  11:33:26  timeline so that that opportunity or that job opportunity

9  11:33:30  comes to fruition.

10  11:33:32  Q. If an associate is released from the bench, are they able

11  11:33:44  to come back to Cognizant if a new position that matches

12  11:33:47  their skill set and experience and availability arises?

13  11:33:50  A. Sorry.  Is your question can they be rehired?

14  11:33:54  Q. Yeah.  That would have been a better question.

15  11:33:56      Can they be rehired?

16  11:33:57  A. Yes, to my knowledge.

17  11:33:58  Q. Can you explain to us why Cognizant has a bench?

18  11:34:09  A. See, Cognizant is a profitable business, and seeks to be

19  11:34:16  one.  And Cognizant wants to use its employees and their

20  11:34:25  talent.  Just because one project ends doesn't mean that we

21  11:34:31  no longer have use for that employee or associate.

22  11:34:35      We want to give them a new project.  It's a win/win,

23  11:34:39  both for the associate and the company, because the company

24  11:34:44  has invested time, effort and training, and the rich

25  11:34:48  knowledge that they have gained from working for a prior

11:34:53  client.  That is why Cognizant wants to utilize that talent,

11:34:58  so the bench, what I call as a transition time, allows those

11:35:03  associates to get into new projects working with new clients.

11:35:08       That is the purpose of the bench.

11:35:11  Q. You mentioned that it's a win/win for the associate and

11:35:14  the company.  How does it benefit the employees to have a

11:35:18  bench?

11:35:19  A. Because it gives them the period of time to look for

11:35:23  options.  Instead of saying, we no longer have a job role for

11:35:29  you in that project, we would like to say, you know, we have

11:35:33  several opportunities in front that you could apply for.

11:35:38  Q. And you mentioned the knowledge of the client.  Does the

11:35:42  client also benefit from the bench?

11:35:43  A. The client greatly benefits from the bench because, like

11:35:49  I said, the primary purpose of my team is to ensure that

11:35:54  incumbent existing Cognizant talent is reused for new client

11:35:59  projects.

11:36:00       Why the client benefits, is they get someone pretty

11:36:05  quickly, because this person is already available and fits

11:36:09  their skill set, instead of hiring from the market that can

11:36:14  take weeks, months.

11:36:16       Plus, this person already has worked for Cognizant,

11:36:20  and the client is already working with Cognizant, so they

11:36:24  have familiarity with our project methodology, the deep

11:36:29  subject matter knowledge.  So it's a win/win for the client

11:36:32    as well.

11:36:32    Q. Now, you mentioned wanting to keep the employees and give

11:36:37    them opportunities.  Why is there a two plus five-week

11:36:42    timeline on the bench?

11:36:44    A. See, the two plus five-week timeline sets a guideline or

11:36:52    a limitation to which somebody, you know, is under -- is not

11:37:00    on a client project.  As a corporation, we expect that we

11:37:06    provide folks a reasonable amount of time to get their next

11:37:09    job within the company with our support.

11:37:11         But at the same time, the company cannot afford

11:37:15    unlimited time when somebody does not have a role in the

11:37:18    company.

11:37:24    Q. Now, what is an employee expected to do while they are on

11:37:27    the bench?

11:37:28    A. The basic expectation that we have from our associates

11:37:33    while on the bench is to be available for interviews.  If

11:37:39    they have any clarifications, you know, ask our team, you

11:37:43    know, hey, how do I update my skill set in the system, as an

11:37:47    example.

11:37:47         But the primary expectation is to be available for

11:37:51    interviews.  And we also tell them up front that your chances

11:37:56    of -- because we operate all across the United States, your

11:38:00    chances of getting an opportunity within Cognizant increases

11:38:05    if you are willing to move to the places where the

11:38:08    opportunities exist at that point in time.

1 11:42:54    hey, you know, can we get these employees placed for the open

2 11:42:58    demands that we have.

3 11:42:59          So it's a -- it's a -- and the associate themselves

4 11:43:07    can raise their hand and apply to opportunities like

5 11:43:13    jobs.com.  You know, I'm just giving an example of an

6 11:43:16    external website.  So they can apply for opportunities

7 11:43:18    themselves.

8 11:43:19          So it's a three-way collaborative effort.

9 11:43:21    Q. And in terms of raising their hand and expressing

10 11:43:26    interest, is there a portal they can go to to do that?

11 11:43:29    A. Yes.  We have an internal portal called talent

12 11:43:34    marketplace.  So it has three different modules that speaks

13 11:43:39    to this collaborative effort that I was talking of.

14 11:43:44          There is an iAspire module that employees go to

15 11:43:51    where they can raise their hand and apply for jobs.  There is

16 11:43:54    an iSEEK module, where hiring managers can look at who those

17 11:43:59    associates available for the job and also they have.  And

18 11:44:03    then there is an iFacilitate module available for my team to

19 11:44:08    do the matching.

20 11:44:08    Q. So let's talk for a minute about iAspire, so -- where the

21 11:44:13    employees can go in.  What time of -- what type of

22 11:44:16    information do they see when they go into iAspire?

23 11:44:20    A. So they are able to see what jobs are available at that

24 11:44:26    point in time.  They are able to search based on skill set,

25 11:44:30    location, experience, et cetera.

14:16:58   aware of that.

14:16:59   Q. Do you know if they were made aware of it?

14:17:01   A. I do not.

14:17:01   Q. Have you seen any changes being made since the

14:17:04   determination?

14:17:05   A. I was not aware of the determination, so I can't connect

14:17:09   changes that have occurred in the organization throughout

14:17:12   those years.

14:17:12   Q. Since you have been sitting here in this case, have you

14:17:30   learned some things about Cognizant staffing practices?

14:17:35   A. Have I learned things about the staffing -- I think I

14:17:40   have been aware of various documents and seeing different

14:17:46   perspectives about our staffing practices, yes, I would agree

14:17:48   with that.

14:17:48   Q. The Visa utilization practice, did you learn about that

14:17:50   here?

14:17:51   A. No, I was aware of Visa utilization.

14:17:53   Q. Okay.  What about the three by three BU policy, were you

14:18:00   aware of that?

14:18:00   A. No, sir.

14:18:00   Q. The rotation policy, were you aware of that?

14:18:03   A. I'm not aware of the policy, but I'm familiar with the

14:18:06   rotation efforts.

14:18:10   Q. As the former chief operating officer of legal, are you

14:18:24   aware of Cognizant's obligation to preserve documents?

1 14:28:22  point would engage our travel ready resources to fill that

2 14:28:25  skills gap.

3 14:28:26   Q. And what steps are taken in terms of, first of all,

4 14:28:29  identifying internal resources when trying to staff a

5 14:28:32  project?

6 14:28:32   A. So we are always trying to do that proactively, at

7 14:28:37  looking at the skills demand ahead, to constantly look at our

8 14:28:41  skills, what we call a skills inventory within the

9 14:28:44  organization.  So associates are maintaining their profiles

10 14:28:49  and updating their skills as they take new trainings, we are

11 14:28:53  able to see that and see where we maybe have some gaps and

12 14:28:55  investing in the training, as I mentioned.

13 14:28:57       So that is one way we can proactively look at all of

14 14:29:00  the talent that is out there.

15 14:29:01       The other is to look at the talent marketplace, and

16 14:29:04  see which resources are readily available that are

17 14:29:07  unallocated to projects that could be deployed.

18 14:29:13   Q. And if you are unable to identify the resources

19 14:29:16  internally and have to look to external hiring, how is that

20 14:29:18  done?

21 14:29:19   A. At that point it is moved into an external requisition,

22 14:29:26  or external posting, and those positions are posted out on

23 14:29:30  job boards like Indeed and Monster and others.  It's really

24 14:29:34  broadcast a lot across a number of these job boards, as well

25 14:29:40  as our own job board that sits on our site.

15:05:17    Q. Mr. Westphal, has Cognizant invested in initiatives to

15:05:21    increase the number of American technology workers?

15:05:25    A. Yes, we have.

15:05:26    Q. And have you personally participated in those efforts?

15:05:30    A. Yes, I have.

15:05:32    Q. And does Cognizant provide preemployment programs as one

15:05:36    of those initiatives?

15:05:37    A. Yes.  I was responsible for creating the preemployment

15:05:42    program.

15:05:42    Q. Can you describe that program, please?

15:05:45    A. Sure.  The intention of the preemployment program was

15:05:47    essentially to provide training and education to -- mainly

15:05:52    focused on those that were maybe career switchers, some that

15:05:57    had some experience in stem, some that had no experience in

15:06:01    any technology role, and mainly in underserved and

15:06:05    underrepresented communities around the U.S.  And we were

15:06:10    training them for opportunities to work at Cognizant.

15:06:12    Q. And how many of those courses or programs has Cognizant

15:06:17    run since you initiated the program?

15:06:19    A. Hundreds of programs, and thousands of students.

15:06:25    Q. And when did those programs -- when did that initiative

15:06:28    begin?

15:06:29    A. We began in early 2016.

15:06:33    Q. And does Cognizant partner with any state or local

15:06:37    governments to put on some of those programs?

1 15:06:39    A. Yes, we do.

2 15:06:40    Q. And are those training programs available to Visa

3 15:06:44    holders?

4 15:06:45    A. No, they are not.

5 15:06:46    Q. And why not?

6 15:06:47    A. The intention of those programs was to upscale and

7 15:06:51    rescale American workers in the U.S.

8 15:06:53    Q. And how much money has Cognizant spent on those programs?

9 15:06:57    A. Millions of dollars.

10 15:06:59    Q. Now, do the students who attend those programs pay

11 15:07:03    anything?

12 15:07:03    A. It's at no cost to the students.

13 15:07:05    Q. And when Cognizant -- for those programs where Cognizant

14 15:07:10    enters into a partnership with a state or local government,

15 15:07:13    does it commit to creating local jobs?

16 15:07:16    A. Yes.  Hundreds, if not in some cases thousand of jobs.

17 15:07:20    Q. Can you explain how that works, kind of what the deal is?

18 15:07:22    A. Various states have programs that are called -- they may

19 15:07:28    be called job creation grants.  And they are partnerships

20 15:07:31    that we enter into with the government committing to creating

21 15:07:36    jobs.  And for that commitment, they help to make investments

22 15:07:40    into the training programs that we are running.

23 15:07:43    Q. And is Cognizant still paying money out of its own funds

24 15:07:46    for those programs?

25 15:07:47    A. Yes.  Those investments from government entities are just

15:07:52  1  a small portion of the required investment.

15:07:54  2  Q. And you mentioned that there are thousands of graduates

15:07:58  3  from these programs.  Does Cognizant hire any of those

15:08:01  4  graduates?

15:08:02  5  A. Yes, we've hired thousands.

15:08:04  6  Q. And for those who choose not to hire -- or to come to

15:08:08  7  work for Cognizant, what do they do?

15:08:10  8  A. Many of them go work for our competitors.

15:08:16  9  Q. Now, has Cognizant also created a foundation?

15:08:19  10  A. Yes.  I proposed the creation of a foundation.

15:08:22  11  Q. And when was the foundation created?

15:08:24  12  A. We began working on the foundation in 2017.  And in 2018

15:08:31  13  we launched a separate 501(c)(3) separate nonprofit entity

15:08:37  14  called Cognizant Foundation.

15:08:38  15  Q. And does that -- does that charitable effort continue

15:08:43  16  today in some form?

15:08:44  17  A. Yes, it does.

15:08:45  18  Q. And you said that you were personally involved in its

15:08:49  19  creation?

15:08:49  20  A. Yes.  I was extremely passionate about that.

15:08:53  21  Q. And what was the purpose of the foundation?

15:08:55  22  A. To provide technology, education, foundational training

15:09:01  23  to underserved and underrepresented individuals across the

15:09:05  24  U.S.

15:09:05  25  Q. And was this also technology related?

115:09:08   A. Very much focused on technology.

215:09:12   Q. And how much did Cognizant contribute to the foundation?

315:09:16   A. $100 million.

415:09:17   Q. And you've talked about it at a high level, but can you

515:09:21   describe kind of generally what that money went to in terms

615:09:24   of specific initiatives?

715:09:25   A. So, for the first year, I was the acting managing

815:09:28   director of the foundation, and we made about $12 million in

915:09:35   investments in the first year in programs that supported

1015:09:38   women in training, the women's international training

1115:09:45   council.  We made investments in Wounded Warriors to help

1215:09:50   support veterans returning home and reentering the workforce.

1315:09:54   We made investments in to programs in New York City that were

1415:09:59   building out training centers to support underserved and

1515:10:02   underrepresented.

1615:10:03        So mainly those kinds of areas.

1715:10:05   Q. Thank you.  Thank you.

1815:10:06        Now, does Cognizant recruit at U.S. universities?

1915:10:10   A. Yes, we do.

2015:10:11   Q. And I heard some questions asked about a document.  There

2115:10:15   might have been a little bit of a sneer about Cognizant

2215:10:18   saying that it would recruit at second tier schools.  Do you

2315:10:23   recall that discussion generally?

2415:10:24   A. Yes, I do.

2515:10:25   Q. Can you name some of the schools that Cognizant currently

15:10:28  recruits at and it has?  Go ahead.

15:10:31  A. Arizona State University, Syracuse, Texas A&M, just to

15:10:37  name a few.

15:10:37  Q. Does Cognizant recruit at the ivy leagues or Stanford?

15:10:41  A. We do not.

15:10:42  Q. And why not?

15:10:42  A. We can't compete on the expected salary of those ivy

15:10:49  league graduates.

15:10:50  Q. And when did Cognizant begin recruiting on U.S. campuses?

15:10:55  A. I believe it was a few years prior to me joining in 2011.

15:11:00  Q. And how many people does Cognizant hire through that --

15:11:05  those on-campus programs?

15:11:07  A. Several hundred a year.

15:11:08  Q. Now, does Cognizant lose any of its employees to its

15:11:15  competitors?

15:11:16  A. Unfortunately, yes.

15:11:20  Q. Can you describe how that works?

15:11:21  A. So very often, as we discussed throughout the trial, the

15:11:26  associates are working on client engagement sites.  They are

15:11:28  working alongside, in collaboration with clients, and very

15:11:34  often in the agreements, it doesn't -- we don't prohibit

15:11:38  clients from hiring our associates.  In fact, sometimes it's

15:11:42  not a bad thing, it helps to strengthen the relationship that

15:11:46  we have with those clients.  But it does happen, they see --

15:11:49  they see them as very highly valuable resources, and

15:31:36    Q. Your testimony was not based on the actual programs and

15:31:41    policies in place, correct?

15:31:44    A. My testimony is based on my current experience in my

15:31:46    role.

15:31:46    Q. No.  My question is different.  Your testimony was not

15:31:49    based on the programs and policies in place as reflected in

15:31:52    the documents?

15:31:53    A. It is not based on this policy you are showing me, I'm

15:31:56    unfamiliar with it.

15:31:57    Q. What about the 3 by 3 BU policy?

15:31:59    A. Again, I was not in my role at that time.  I believe that

15:32:02    was 2017 or '16 that you showed it.  I was not familiar with

15:32:05    it.

15:32:14        MR. KOTCHEN:  Go to Exhibit 12.  Let's pull up the 3

15:32:22    by 3 BU policy.  If we can go to page 12.

15:32:22    BY MR. KOTCHEN:

15:32:46    Q. Okay.  Now, you have not seen this document, correct?

15:32:51    A. Not prior to this trial.

15:32:52    Q. Okay.  Based on your belief, and your opinion, that if

15:32:58    there is a preference for Visa employees, that would, in

15:33:01    fact, constitute discrimination, are you concerned that there

15:33:07    is a staffing -- one of the folks who are rotated in roles

15:33:14    would be individuals who have a valid U.S. Visa, doesn't that

15:33:17    suggest that there is a prioritization for -- to move folks

15:33:21    into roles with Visas?

15:54:59   1   which is the end of the class period, we should look at the

15:55:02   2   disparities over that period of time to see if those

15:55:04   3   improvements benefited the class that we are representing,

15:55:07   4   correct?

15:55:08   5    A. And understand all the causes of that disparity.  That

15:55:11   6   was my point earlier when you brought it out, that there were

15:55:13   7   other factors that are involved in that.

15:55:15   8    Q. But the -- the improvement you are testifying to, we

15:55:20   9   should see the disparities go down, right?

15:55:22  10    A. Again, I would want to see that complete data and I would

15:55:25  11   want to understand the other factors that are influencing

15:55:27  12   that.

15:55:28  13    Q. So you can't speak to the actual results of what the

15:55:30  14   efforts were as it pertains to the class we are representing,

15:55:33  15   correct?

15:55:34  16    A. I can't unless I perform that analysis.

15:55:36  17    Q. And you can't speak to the actual programs or policies

15:55:38  18   that were in place specifically about use of Visa folks

15:55:43  19   during the class period?

15:55:44  20    A. I'm not responsible for creating the policy or know if

15:55:47  21   those policies were ever implemented.

15:55:49  22           MR. KOTCHEN:  Okay.  Thank you.

15:55:52  23           THE COURT:  All right.

15:55:52  24                    REDIRECT-EXAMINATION

15:55:56  25   BY MR. DOREN:

108:47:29                    UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3               HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

4

5

CHRISTY PALMER, et al.,              )
6                                    )
               Plaintiffs,           )
7                                    )
                    vs.              )
8                                    )   2:17-CV-6848-DMG
COGNIZANT TECHNOLOGY SOLUTIONS       )
9  CORPORATION, et al.,              )
                                     )
10             Defendants.           )
   _____)

11

12

13                 REPORTER'S TRANSCRIPT OF JURY TRIAL

14                            VOLUME VII

15                       Los Angeles, California

16                       Thursday, June 22, 2023

17

18

19            _____

20

21

22

23                   AMY DIAZ, RPR, CRR, FCRR
                     Federal Official Reporter
                     350 West 1st Street, #4455
24                   Los Angeles, CA 90012

25

          *Please order court transcripts here:  www.amydiazfedreporter.com*

09:39:55  they have things, you know, where they have other priorities?

09:39:58  You know, did we do a good job or not a good job of actually

09:40:02  selling work for these individuals to be on?

09:40:05          It could also be dependent on their particular

09:40:07  timing of when they rolled off of one project or if they were

09:40:11  being extended on a project.

09:40:14          It could also depend on the client.  So if the

09:40:16  client actually, you know, was starting the project later or

09:40:20  sooner, that would impact the people on the bench.  Or even

09:40:24  if the client, you know, no longer wanted a person to be on

09:40:27  their account, they could ask for them to be rolled off onto

09:40:30  the bench.  So there were many different factors.

09:40:33  Q. How did you personally help people get staffed off the

09:40:37  bench?

09:40:38  A. So personally, I would spend time with the different

09:40:42  client partners and the client relationship managers.  Those

09:40:45  are the people that are closest to the clients.  They know

09:40:48  the -- most of the work that is going on.  And so I would

09:40:51  spend time trying to connect different skills that the people

09:40:54  on the bench had with the different work that was available

09:40:58  to be filled.

09:40:59          So I would spend time doing that with the account

09:41:03  teams.  I would certainly look at our bench.  I would look at

09:41:06  the broader consulting bench to see, were there people that

09:41:11  maybe were in Communications, Media, and Technology before,

```
1 09:41:14   and they went to Retail, and then maybe pull them back in

2 09:41:18   because they had the core skills.

3 09:41:20           And then I would look even broader to the corporate

4 09:41:23   deployable pool to see, were there people that had been in

5 09:41:26   the practice before that had the skills, maybe did something

6 09:41:29   similar in a different industry, and they could be leveraged

7 09:41:34   in CMT.

8 09:41:35   Q. For someone who found themselves on your practice group's

9 09:41:39   bench, who was involved in helping place them in new

10 09:41:42  projects?

11 09:41:43  A. So outside of kind of myself, it was the rest of the

12 09:41:47  leaders, we had a pyramid approach, so my direct reports, we

13 09:41:52  would actually have staffing discussions of the people that

14 09:41:55  were coming available and rolling off of projects.

15 09:42:00          We would also engage the supply chain -- the Talent

16 09:42:05  Supply Chain team, to see who is -- here's the people that

17 09:42:08  are coming available.  Are there opportunities to staff them

18 09:42:11  elsewhere?

19 09:42:11          It was also their responsibility to reach out to the

20 09:42:14  networks and the people that they knew, so that they could

21 09:42:19  get staffed.  But there were lots of people involved in

22 09:42:22  trying to find people the right next role.

23 09:42:25  Q. Was it up to you as to whether an individual would be put

24 09:42:29  on the corporate bench, the corporate deployable pool?

25 09:42:33  A. No, it was not up to me solely.  As I mentioned, there
```

09:49:19    A. Yes.  And we would have considered seniority because if

09:49:22    you are matching up someone that is strategic with, you know,

09:49:27    the executive vice president of field services, then you need

09:49:30    to make sure that you are not partnering a junior person that

09:49:33    maybe they haven't done this as many times.

09:49:36    Q. And we talked about this a bit already, but when you are

09:49:40    looking to staff, can you walk us through the process of

09:49:43    where you look first, next, next, to fill a role?

09:49:47    A. Yes.  So in staffing a project, you would look -- I would

09:49:51    look first at my consulting CMT bench.  So I would look at

09:49:55    the bench and then determine, you know, who is rolling off of

09:49:59    their current project, when, or do we already have people

09:50:03    that are on the bench that are available that can immediately

09:50:06    come and work on the project.

09:50:07        If not, then we would look at the consulting broader

09:50:12    bench.  So this could be multiple verticals or horizontals in

09:50:17    consulting.

09:50:17        We would evaluate what their timing was, what skills

09:50:20    they had, you know, when they were available to actually meet

09:50:25    the project needs.  And then we would move to the broader

09:50:29    corporate deployment bench to see, are there people that are

09:50:33    available right now that we can either train up or close the

09:50:37    skills gap and help them move into this role so that we could

09:50:42    actually get ready and start it with a client as quickly as

09:50:44    possible.

1 09:52:02    Q. You mentioned the client.  How involved is the client in

2 09:52:05    the staffing and screening process?

3 09:52:07    A. It really does depend on the project and the account.

4 09:52:12    Some clients are extremely involved, in that they have

5 09:52:16    multiple interviews, you know, for the roles that they want

6 09:52:20    us to staff and engage in.  And then some clients, you know,

7 09:52:24    want to see the specifications and the profiles and the

8 09:52:27    résumés of the individual as part of the proposal process.

9 09:52:32    Q. You said multiple interviews.  Is that multiple

10 09:52:35    interviews for one person?

11 09:52:36    A. So it could be multiple interviews or, you know, from

12 09:52:41    multiple people at the client site.  In some cases our

13 09:52:44    individuals, even after we've validated that they have the

14 09:52:47    right skills to move forward, the client may want to have

15 09:52:49    them connect with two or three different people to see, will

16 09:52:54    they fit with their team, will they engage with their team

17 09:52:56    well, do they have the skills that they actually want to

18 09:52:59    bring on to the project.

19 09:53:00    Q. And are these meet-and-greet interviews or are they

20 09:53:05    technical?

21 09:53:05    A. These are primarily technical.  I would not say

22 09:53:09    meet-and-greet at all.  I would say they are pretty, you

23 09:53:12    know, specific in, you know, explain to me where you've done

24 09:53:16    these kind of skills and help me understand how you'd think

25 09:53:18    through this problem or this type of code, how you would

1  10:05:54   A. I do.  They gave me some feedback, and they said the

2  10:05:58   reason I was selected over a couple of the other individuals

3  10:06:02   is because of my business background.  So what they were very

4  10:06:06   conscious of is they did not want D&I to be a program that

5  10:06:10   was led by HR, with only an HR lens, but that you really have

6  10:06:16   to understand how to integrate it into the business if you

7  10:06:19   want to make it work.

8  10:06:20        And so the best way to do that is to understand the

9  10:06:23   business, be part of the business, and know the business

10 10:06:26   challenges in order to integrate it.

11 10:06:28   Q. Before 2020, when you took this new position, are you

12 10:06:34   aware of any diversity initiatives that existed at Cognizant?

13 10:06:38   A. Yes, I am.  So as part of even me jumping into the role,

14 10:06:45   I was always engaged in some of the diversity initiatives.  A

15 10:06:48   lot of the work was around just events.

16 10:06:51        So it was partnering with clients, it was panel

17 10:06:55   events, it was having speakers come.  And really across the

18 10:07:00   globe, there were people in pockets of business leaders, HR

19 10:07:04   business partners, others kind of standing up panels and

20 10:07:09   events in order to drive greater diversity and inclusion

21 10:07:12   across the organization.

22 10:07:13   Q. What about diversity-centered trainings, did those exist

23 10:07:17   before 2020?

24 10:07:17   A. They did.  We had trainings, such as unconscious bias

25 10:07:21   training.  That was one that was consistently there.  We

| | |
|---|---|
| 1 10:07:24 | also, within just our standard ethics and compliance and |
| 2 10:07:29 | sexual harassment training, we did have sections that were |
| 3 10:07:33 | focused on diversity and inclusion, and just working across |
| 4 10:07:37 | cultures, respectful behavior.  But things that were aligned |
| 5 10:07:41 | to, you know, diverse and inclusive workforce, so people with |
| 6 10:07:46 | different backgrounds. |
| 7 10:07:47 | Q. How did your work for eight years in consulting at |
| 8 10:07:52 | Cognizant inform that next step into D&I? |
| 9 10:07:55 | A. Yeah.  I think that was -- I mean, it was super helpful |
| 10 10:07:58 | to be in the business for eight years, knowing the different |
| 11 10:08:02 | business counterparts, because these would be the people that |
| 12 10:08:05 | I would then go and work to integrate D&I solutions. |
| 13 10:08:09 | So for me, leveraging that consulting expertise of, |
| 14 10:08:14 | you know, you have to do the assessment.  You have to do the |
| 15 10:08:17 | benchmark.  You assess where we are today.  You talk to |
| 16 10:08:20 | people that are in the field.  You talk to peers across, you |
| 17 10:08:24 | know, Fortune 500 companies, which I did.  You look at what |
| 18 10:08:28 | are the best practices to start from, how you accelerate some |
| 19 10:08:33 | of those components. |
| 20 10:08:34 | And so that was extremely influential in how I went |
| 21 10:08:39 | about shaping what we needed to do next and what our overall |
| 22 10:08:43 | strategy would be. |
| 23 10:08:43 | Q. So you just mentioned that you were out there serving |
| 24 10:08:47 | your peers.  After you did that, what was the lesson learned |
| 25 10:08:50 | from that work? |

1 10:30:35    A. I am only given the results of the plans, and the actions

2 10:30:39    that need to be taken next.

3 10:30:40    Q. Do you know who those results are shared with beyond

4 10:30:44    yourself?

5 10:30:45    A. Yes.  Those results are shared with the legal team, and

6 10:30:49    they are also shared with the HR business partners.

7 10:30:52    Q. What's the purpose of sharing them with the HR business

8 10:30:55    partners?

9 10:30:55    A. The purpose for the HR business partners is because the

10 10:31:00    HR team then works with the business team, and so then they

11 10:31:04    can inform the business leaders of what opportunities we have

12 10:31:09    to then fill specific roles.

13 10:31:10    Q. In your role as global head of Diversity and Inclusion,

14 10:31:16    does your team -- do you and your team ever conduct analyses

15 10:31:20    regarding bench terminations?

16 10:31:22    A. No, we do not.

17 10:31:23    Q. This case is, as you know, about terminations from the

18 10:31:30    bench.

19 10:31:31        Who decides if someone is going to be terminated

20 10:31:35    from the bench?

21 10:31:36    A. As I mentioned before, I mean, there are many people that

22 10:31:39    are involved in people being put onto the bench and how that

23 10:31:43    process works.

24 10:31:44        I mean, it's literally thousands of people that go

25 10:31:48    through the process and, you know, decide who gets put on the

1 10:31:52  bench.

2 10:31:52  Q. Are some of those people clients?

3 10:31:54  A. They are.  Because a client can decide that they no

4 10:31:58  longer want an associate to be on a project and request

5 10:32:01  them to be exited.

6 10:32:02  Q. Have you seen that happen?

7 10:32:04  A. I have.

8 10:32:04  Q. Do clients ever specifically request individuals?

9 10:32:09  A. They do.  So if they have people on their projects that

10 10:32:11  have maybe worked there for a long time, they know the

11 10:32:14  history, they will ask for them to stay on.

12 10:32:17  Q. Ms. Young, is there a standard operating procedure when

13 10:32:22  it comes to bench terminations?

14 10:32:24  A. There really is not, because other than the CDP timeframe

15 10:32:29  starting at five weeks, there is not, because it depends on

16 10:32:33  the demand that is going on.  And what I mean by that is, if

17 10:32:38  we have sold a lot of work at that time, then there will be

18 10:32:42  lots of opportunity for people to move, you know, from the

19 10:32:45  bench to projects.  If we haven't, there is less opportunity.

20 10:32:50        It's also depending on the skill.  So even if I had

21 10:32:54  50 people on my bench and I have, you know, a project for

22 10:32:59  50 people, the skills don't always match.  So if I need,

23 10:33:03  you know, a person that has field services communications

24 10:33:07  experience, but I'm not doing a field services role, then

25 10:33:12  that person unfortunately wouldn't be able to join the

1 11:20:18  to correct that?

2 11:20:18  A. Yes, that's correct.

3 11:20:19  Q. And who would be responsible for creating those action

4 11:20:22  items?

5 11:20:22  A. I don't know who would have been responsible at that

6 11:20:25  time.  If it were today, I would help to solve for that.

7 11:20:29  Q. Would it be the Affirmative Action team perhaps?

8 11:20:32  A. They could be one part of the puzzle, yes.

9 11:20:35  Q. Okay.  If you could turn to slide 15 of the document.

10 11:20:47  The third bullet down on slide 15 reads:  We will need a

11 11:20:50  changed management strategy to assist the hiring managers who

12 11:20:54  may be resisting diversity hiring.

13 11:20:58          Do you see that is the case for change?

14 11:20:59  A. Um-hum.

15 11:20:59  Q. Do you have an understanding as to what that means?

16 11:21:02  A. Yes.  It means that they would try to draw up a plan in

17 11:21:10  order to have more improvement for the hiring managers.

18 11:21:13  Q. And the hiring managers are the individuals responsible

19 11:21:16  for placing people in roles, correct?

20 11:21:19  A. The hiring managers are not completely responsible for

21 11:21:22  placing people in roles.

22 11:21:23  Q. But they have a part in that process, correct?

23 11:21:26  A. Yes.

24 11:21:26  Q. Okay.  And that is folks from the bench, as well as

25 11:21:29  hires, correct?

11:21:31  A. I -- I don't know.  It depends on the practice.  Some

11:21:35  hiring managers don't do placements at all.

11:21:38  Q. The next bullet down reads:  Increasingly, our current

11:21:43  customers are asking for more diversity on their accounts,

11:21:46  as well as on RFPs.

11:21:48      Do you know what that means?

11:21:49  A. Yes, I do.

11:21:49  Q. What does that mean?

11:21:50  A. So that means that customers are looking for more

11:21:58  diverse -- diverse and inclusive kind of programs and

11:22:00  partners.

11:22:01  Q. That has been a consistent push from the customers since

11:22:06  at least 2015, correct?

11:22:09      MS. SMITH:  Objection, foundation.

11:22:13      THE COURT:  She can answer if she knows.

11:22:15      THE WITNESS:  I don't know across, like, the whole

11:22:19  organization.  Just when I could see -- when I joined my

11:22:22  role, I could see the customer request.

11:22:24  Q. Okay.  And so in your role, that has been a consistent --

11:22:28  A. That has, in my role.

11:22:29  Q. The next bullet reads:  Our current state will not be

11:22:32  acceptable as we come under closer scrutiny by the Federal

11:22:36  Government.

11:22:37      Do you know what that refers to?

11:22:38  A. I do not specifically.

1  11:40:34  Q. Have you heard of something called a 3 by 3 BU policy?

2  11:40:38  A. No, I haven't.

3  11:40:39  Q. Are you aware of rotation policies that -- a rotation

4  11:40:43  policy?

5  11:40:43  A. No.

6  11:40:57        MR. KOTCHEN:  If we could, on blackout screen, pull

7  11:41:00  up Exhibit 769.

8  11:41:03        THE CLERK:  Ready.

9  11:41:07  Q. So Ms. Young, Exhibit 769 is an e-mail chain that --

10 11:41:13  well, I'll wait for it to -- for you to see it.

11 11:41:16  A. Okay.

12 11:41:16  Q. That includes you.  Have you seen this?

13 11:41:18  A. Yes, I have.

14 11:41:24  Q. Okay.  If we can go to slide 4, please.

15 11:41:46        Actually, I take it that -- do you remember this --

16 11:41:50  this e-mail?

17 11:41:50  A. I do.

18 11:41:52        MR. KOTCHEN:  Okay.  I would like to move for

19 11:41:54  Exhibit 769 to be admitted.

20 11:41:56        MS. SMITH:  No objection.

21 11:41:56        THE COURT:  It is admitted.

22 11:41:59        (Exhibit 769 received in evidence.)

23 11:41:59  Q. The bottom of slide -- page 4 there is a reference to

24 11:42:09  Cognizant Tech Solutions' racial and ethnic workforce

25 11:42:14  demographic data or EEO-1 form.

13:58:22    managers know if an employee is willing to relocate?

13:58:25    A. If an associate or an employee of Cognizant is in between

13:58:29    projects, he's released to the bench.  There is a release

13:58:31    that happens from an active project into a North America

13:58:35    bench.

13:58:35        And when that happens, an associate has a landing

13:58:38    page where he could update, not just his resume, as well as

13:58:41    his current competencies, functionalities, and technical

13:58:46    skill set, but also if he is willing to travel, and willing

13:58:49    to relocate.

13:58:50    Q. And in Talent Marketplace, can employees change their

13:58:56    selection regarding whether they are willing to relocate?

13:58:59    A. It happens often.

13:59:00    Q. And can an employee who is on the bench switch their

13:59:04    location preference to willing to relocate at any time while

13:59:09    they are on the bench?

13:59:09    A. They can.

13:59:10    Q. Have you ever encountered a situation where an employee

13:59:16    may have noted in talent marketplace that they are willing to

13:59:21    relocate, but you find out they are not?

13:59:23    A. It does happen.  Many a times, the associates first would

13:59:27    prefer a location which they are closer to.  There are

13:59:32    preferences such as they are able to either commute or they

13:59:35    are able to reach a client offices.  They are also -- they

13:59:38    also understand that the bench time comes with a specific

1 13:59:40    timeline.  So they are more open about it a little later part

2 13:59:45    of the date, as they near closer to the date of their bench

3 13:59:51    timeline.

4 13:59:52         Associates are also keen to understand a lot more

5 13:59:54    about the role and what client preferences are, because many

6 13:59:57    of our clients have more than one offices for a specific

7 14:00:01    account.  So in that case, if there is something which is

8 14:00:03    close by, then they would prefer to do so.

9 14:00:05    Q. Thank you.

10 14:00:07        We are going to go to Exhibit 271, which is already

11 14:00:13    in evidence.

12 14:00:40         Okay.  Ms. Anand, do you recognize this as a bench

13 14:00:44    report?

14 14:00:47    A. Yes, I do.

15 14:00:49    Q. Okay.  I wanted to go to the tab -- we are already there,

16 14:00:53    the exit report.  That shows when people came to and exited

17 14:00:56    the bench; is that right?

18 14:00:57    A. That is right.

19 14:00:58    Q. Okay.  Let's go to row 367, please.  And highlight that,

20 14:01:09    please.

21 14:01:10         And do you see the associate name referenced on

22 14:01:14    row 367?

23 14:01:15    A. I do.

24 14:01:15    Q. And who is it?

25 14:01:16    A. He's Edward Cox.

1 14:01:18    Q. Okay.  Now, if we take a look at column O, we see the

2 14:01:24    Release Date.  What does that tell you?

3 14:01:25    A. 23rd January 2017, he was released from a project on to

4 14:01:29    the North America bench.

5 14:01:31    Q. Okay.  And if we scroll over to column AE, that is Exit

6 14:01:41    Date.  What does that tell you about when Mr. Cox exited?

7 14:01:45    A. 3rd of April 2017, he had to be separated from the bench.

8 14:01:51    Q. And Mr. Cox was on the bench for 10 weeks?

9 14:01:54    A. That is correct.

10 14:01:56    Q. Okay.  And if we look at column U, which is Termination

11 14:02:01    Reason, what does it say for Mr. Cox?

12 14:02:03    A. He had a location preference.

13 14:02:08    Q. Can you tell from the data when he -- oh, strike that.

14 14:02:12    I'm sorry.

15 14:02:13            If you look at column AA, it says:  Willing to

16 14:02:17    relocate.  Do you see that?

17 14:02:18    A. Yes, I do.

18 14:02:19    Q. Can you tell from the data when he might have noted

19 14:02:23    willing to relocate?

20 14:02:24    A. At any given point of time during the bench period, they

21 14:02:28    do have an option to update their willingness to relocate or

22 14:02:32    not to relocate.  So it would be hard to call out a specific

23 14:02:36    date.

24 14:02:37    Q. Thank you.  We can take that down.

25 14:02:41            Do people who leave Cognizant come back to the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

114:02:47  company sometimes?

214:02:48   A. Yes, they do.

314:02:49   Q. And does that include people who were terminated from the

414:02:52  bench?

514:02:53   A. Yes.

614:02:53   Q. Let's take a look at a couple of examples.  Let's turn to

714:03:00  Trial Exhibit 184.  Actually, I'm not sure this one has been

814:03:14  admitted, so could we do that on blackout, please?

914:03:23        THE CLERK:  Ready.

1014:03:24   Q. Okay.  Ms. Anand, do you recognize Trial Exhibit 184 as

1114:03:31  PeopleSoft data?

1214:03:32   A. Yes, it is.

1314:03:33   Q. Okay.  And PeopleSoft data, is that something that you

1414:03:35  are familiar with in your employment?

1514:03:37   A. Yes.  It is the entire PeopleSoft data of Cognizant.

1614:03:41   Q. Okay.  Let's filter column B, which is the Name column,

1714:03:47  to Schneider, Leslie.

1814:03:57        MS. MARYOTT:  I would seek admission, Your Honor, of

1914:04:01  Trial Exhibit 184.

2014:04:03        THE COURT:  It is admitted.

2114:04:06        (Exhibit 184 received in evidence.)

2214:04:06        MS. MARYOTT:  And may we publish?

2314:04:07        THE COURT:  You may.

2414:04:14   Q. So do you see Leslie Schneider represented on your

2514:04:18  screen, Ms. Anand?

14:04:22  A. I do.

14:04:22  Q. Let's go to column F, which is Effective Date, and sort

14:04:27  that from oldest to newest.  That's been done.

14:04:36      Now, looking at row 173644, which we'll highlight,

14:04:45  and specifically column K, what action description do you see

14:04:49  there?

14:04:49  A. It says:  Termination.

14:04:53  Q. And if you look at column F, can you tell us what the

14:04:57  date of the termination was?

14:04:58  A. It was 6-22-2017.

14:05:01  Q. Okay.  And let's take a look at column M for the Reason

14:05:08  Code.  What is the reason code reflected there for

14:05:12  Ms. Schneider?

14:05:13  A. She had a location constraint.  So CDP location

14:05:18  preference.

14:05:20  Q. Now let's look at row 173646.  And what is the action

14:05:32  reflected in column K?

14:05:34  A. Rehire.

14:05:35  Q. And can you tell from the data what that date was of

14:05:39  rehire?

14:05:39  A. 11-27-2017.

14:05:42  Q. So five months later?

14:05:44  A. Five months later, yes.

14:05:45  Q. And let's take a look at the location shown in column S.

14:05:52  May have to expand that a little.  There we go.

114:05:55    A. That would be Englewood, Colorado.

214:05:58    Q. Yes.  So Ms. Schneider was in Englewood when she was

314:06:03    terminated for location preference, and then rehired in

414:06:07    Englewood?

514:06:07    A. That is correct.

614:06:08    Q. Great.  Let's take a look at just one more.  And we'll

714:06:13    have to clear the filters and start again.  Just give this a

814:06:16    second.  And this time we are going to look for Greenwalt,

914:06:25    Rebecca Ann?

1014:06:36         And do you see that we have now isolated for

1114:06:39    Ms. Greenwalt?

1214:06:40    A. Yes, I do.

1314:06:41    Q. All right.  And we are going to sort column F from oldest

1414:06:44    to newest to get that history.  And then let's look at

1514:06:51    row 184568.

1614:06:56         And what do you see as the action code there?

1714:07:01    A. Termination.

1814:07:04    Q. And what was the date of termination?

1914:07:05    A. 6-13-2017.

2014:07:07    Q. Okay.  And looking at column M, what was the Reason Code?

2114:07:12    A. The associate had a CDP location preference.

2214:07:15    Q. Okay.  And what is the location in column S?

2314:07:20    A. That was Festus, Missouri, I guess.

2414:07:26    Q. Okay.  Now looking at row 184570, can you tell us what

2514:07:35    the action was in column K?

14:07:37    1  A. Rehire.

14:07:39    2  Q. And what was the date of rehire?

14:07:41    3  A. 8-31-2017.

14:07:45    4  Q. So just over two months after her termination?

14:07:47    5  A. Just over two months.

14:07:49    6  Q. And then what was her location when she was rehired?

14:07:52    7  A. It was Festus, Missouri.

14:07:56    8  Q. Same location?

14:07:57    9  A. That's right.

14:08:03   10  Q. Okay.  We can go ahead and take that down.

14:08:07   11        All right.  So I would like to shift gears now and

14:08:12   12  let's pull up Trial Exhibit 181.

14:08:24   13        THE CLERK:  I don't think this one is admitted yet.

14:08:24   14        MS. MARYOTT:  My apologies.  Let's do that on

14:08:26   15  blackout.

14:08:28   16        THE CLERK:  Ready.

14:08:30   17        MS. MARYOTT:  Thank you.

14:08:31   18  Q. Let's now go ahead and put that on the screen.  Okay.

14:08:41   19        Ms. Anand, do you recognize Trial Exhibit 181 to be

14:08:45   20  a subset of Cognizant's United States PeopleSoft jobs data?

14:08:51   21  A. That is correct, yes.

14:08:52   22  Q. Okay.  So let's take a look at column K.  Do you see

14:08:59   23  column K?

14:08:59   24  A. I do.

14:09:00   25  Q. Okay.  What is the first action description in this

14:09:04  column?

14:09:05  A. Assignment completion.

14:09:07        MS. MARYOTT:  Oh, and may I move to admit 181 into

14:09:12  evidence?

14:09:12        THE COURT:  It is admitted.

14:09:15        (Exhibit 181 received in evidence.)

14:09:15        MS. MARYOTT:  Okay.  And please publish.

14:09:16  Q. Sorry.  The first row there, what is the action?

14:09:37  A. Assignment completion.

14:09:39  Q. What does "assignment completion" mean?

14:09:41  A. Assignment completion is when associates move from a host

14:09:45  country to move back to their home country, or to another

14:09:49  host country.

14:09:50  Q. Okay.  So let's filter column K to show only assignment

14:09:56  completion.

14:10:01        MR. HAMMERVOLD:  Your Honor, I object to this line

14:10:04  of questioning.

14:10:05        THE COURT:  I'll give her some leeway to explain

14:10:06  what that is, if she is able.

14:10:12        MS. MARYOTT:  I think they were objecting to me

14:10:13  pointing to it.

14:10:16        THE COURT:  Well, you have to figure out how to show

14:10:19  her what she's supposed to look at.

14:10:22        MS. MARYOTT:  I do.  Thank you, Your Honor.

14:10:24  Q. Let's look at rows 140 and 143, and tell us what you see

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  14:21:32          (Exhibit 817 received in evidence.)

2  14:21:32    Q. Okay.  We heard testimony from Mr. Franchitti about three

3  14:21:37    people who went to the bench from GTO, so I want to close out

4  14:21:41    by talking about those folks.

5  14:21:52          Actually, before I go there, I just want to ask

6  14:21:54    you one question.  You had mentioned earlier regarding the

7  14:21:57    assignment completion code that folks would transfer back to

8  14:22:00    their country of origin.  Does Cognizant pay for that trip?

9  14:22:03    A. It does.

10 14:22:06    Q. Okay.  So let's pull up Trial Exhibit 124, which is in

11 14:22:10    evidence.

12 14:22:15          Okay.  And this time we are going to look at the

13 14:22:17    tab with employee ID beginning with a 3.  New territory.

14 14:22:23          Okay.  So to make this easier to read, we are going

15 14:22:27    to filter for column B, which is Employee Name, to Jeff

16 14:22:35    Brock.

17 14:22:45          And Ms. Anand, do you see that Jeff Brock is now

18 14:22:49    reflected in column B?

19 14:22:51    A. Yes, I do.

20 14:22:52    Q. Okay.  So we would like to sort column G, which is

21 14:22:57    Assignment Start Date, to go from oldest to newest to make

22 14:23:05    this easier.

23 14:23:06          And take a look at row 663 -- I'm sorry -- 66653,

24 14:23:10    which we'll highlight.  And can you tell us what the project

25 14:23:15    name is under column F in that row?

1 14:23:17    A. GTO Consulting U.S.

2 14:23:19    Q. Okay.  And that references that this individual was

3 14:23:22    working in GTO Consulting?

4 14:23:23    A. Yes.

5 14:23:24    Q. Okay.  Now, look at the Assignment End Date, which is

6 14:23:28    column H.

7 14:23:28         Can you tell me what the last day was that Mr. Brock

8 14:23:32    was in GTO?

9 14:23:33    A. 11-29-2015.

10 14:23:36    Q. Okay.  Now let's look at row 66655 and highlight that.

11 14:23:46         So he's in GTO on November 29, 2015, and then where

12 14:23:51    is he as of November 30th, 2015, the next day?

13 14:23:55    A. The GWFM CDP U.S., which is the NA bench.

14 14:24:00    Q. And looking at columns G and H, how long was Mr. Brock

15 14:24:04    on the bench for?

16 14:24:05    A. He was there for about a month.

17 14:24:08    Q. And where did --

18 14:24:10    A. 12-13-2015.

19 14:24:12    Q. Thank you.

20 14:24:13         Where did he go next?

21 14:24:15    A. He moved to TRG Cloud Engagement on 12-14-2015.

22 14:24:23    Q. How long was he on that engagement?

23 14:24:24    A. 1-3-2016.

24 14:24:28    Q. So from December 14 of 2015 to January 3, 2016?

25 14:24:35    A. About two weeks.

14:24:37   Q. And what happened next?

14:24:39   A. He was released on 1-14 -- 1-4-2016 to GWFM CDP project,

14:24:49   and he was in that project from 1-12-20- -- until 1-12-2016.

14:24:56   Q. So he went back to the bench for about eight days, and

14:24:59   then he went to a new project for Walgreens?

14:25:02   A. Yes.

14:25:03   Q. Okay.  Let's remove all filters and sorting, and go back

14:25:12   to the first tab, which is employee ID, beginning with 1.

14:25:20        Let's filter for column B and search for Chen,

14:25:30   Xijia, X-I-J-I-A.

14:25:30        Ms. Anand, does Xijia Chen also go by another name?

14:25:40   A. Yes, he does.

14:25:41   Q. What is it?

14:25:42   A. Frank Chen.

14:25:43   Q. Let's sort Mr. Chen's assignment start dates in column G

14:25:48   from oldest to newest.  And let's take a look at row 436126.

14:25:58        Could you tell us where Mr. Chen was allocated until

14:26:01   October 1, 2015?

14:26:02   A. GTO Consulting U.S.

14:26:04   Q. Okay.  And then looking at the next row, it looks like

14:26:11   he went to the bench, yes?

14:26:12   A. He did, on 10-2-2015.

14:26:15   Q. Okay.  And where did he go next?

14:26:18   A. He moved to UMC Staff-Up Project on 2-8-2016.

14:26:23   Q. That was a project for the University of Chicago Medical

14:26:26  1  Center?

14:26:26  2   A. That's right.

14:26:28  3   Q. Okay.  Okay.  Let's do one more.  This is the last of the

14:26:34  4  folks Mr. Franchitti had mentioned.  And we are still in this

14:26:38  5  document.  Let's sort instead for Azar, Chris.  A-Z-A-R.

14:27:09  6  There we go.  And we'll find Mr. Azar.

14:27:20  7        Okay.  I think we are having a little trouble with

14:27:31  8  the filtering, but it looks like it might be sorted in the

14:27:34  9  right order.

14:27:37  10        Okay.  We just need one second.  All right.  We are

14:28:12  11  going to try this again.

14:28:27  12        Okay.  All right.  We now have Mr. Azar on the

14:28:31  13  screen, and we are going to sort the assignment start date

14:28:34  14  in column G from oldest to newest.  And let's take a look at

14:28:39  15  row 214486.

14:28:43  16        Can you tell us where Mr. Azar was allocated there?

14:28:49  17   A. GTO Consulting U.S.

14:28:52  18   Q. Okay.

14:28:53  19   A. From 8-1-2015 to 11-29-2015.

14:28:57  20   Q. Okay.  And then let's take a look at row 214489.

14:29:08  21        And where did Mr. Azar go on November 30th, 2015?

14:29:16  22   A. He moved to Med Excel Discovery and Design Project under

14:29:24  23  Ascension Health.

14:29:25  24   Q. And looking at this data after Mr. Azar left GTO, did he

14:29:30  25  ever go to the bench?

1 14:34:22   and matching suitable opportunities would have been offered

2 14:34:26   to him.

3 14:34:26   Q. Okay.  Now, you had -- I thought there was a -- were you

4 14:34:32   suggesting that Mr. Cox had somehow changed his data for his

5 14:34:36   relocation preference sometime when he was on the bench?

6 14:34:40   A. What normally happens is usually the discussion of what

7 14:34:45   the job requirements are, the job role, the suitability of

8 14:34:50   a job role totally depends on a client interview.

9 14:34:54       So many a times, the business managers also call

10 14:34:56   out, because a client may have more than one offices and they

11 14:35:00   may have projects that is being done in various offices.  So

12 14:35:05   while there is a preference for a specific location, the

13 14:35:10   conversation typically goes where the business manager or

14 14:35:13   the client will call out where the job is located, and the

15 14:35:18   associates say yes or no then.  So these are discussions that

16 14:35:22   happen between a hiring manager, as well as the associate.

17 14:35:26   Q. Okay.  So you are talking right now about the explanation

18 14:35:31   that is provided as to why a particular individual is now

19 14:35:36   placed at one of these proposals; is that right?

20 14:35:38   A. About the location preferences, that if client has more

21 14:35:41   than one location preference, then it is very difficult

22 14:35:44   to indicate which location was proposed across to the

23 14:35:47   individual.

24 14:35:47   Q. Okay.  So from the data that we have, we can't even

25 14:35:51   verify that the -- that these people were not going along

114:35:56   with projects in other locations?

214:36:00    A. I'm afraid you have --

314:36:06    Q. We may not be understanding each other, and I appreciate

414:36:08   you letting me know.

514:36:09          If you look at the -- for example, the SO proposal

614:36:16   report, if we can switch to that tab.  Okay.

714:36:20          Can we just control F the first instance for

814:36:23   Mr. Cox?  Okay.  Search Edward Cox.

914:36:36          Okay.  Now, this tab, the SO Proposal Report, that

1014:36:42   is a listing of the proposals that each person was considered

1114:36:47   for, right?

1214:36:47    A. Yes.

1314:36:49    Q. Okay.  And is that what you were talking about with

1414:36:53   respect to trying to get to the bottom of whether there was

1514:36:56   a rejection based on the location preference?

1614:36:59    A. While a specific job role comes with a location when jobs

1714:37:06   are posted, the client discussions typically talk about if

1814:37:09   that particular job is in that location or they have other

1914:37:12   roles as well.

2014:37:12          So, yes, in this case the person -- Edward Cox was

2114:37:17   proposed for a job opportunity for 351801.

2214:37:22    Q. All right.  And that -- and the proposal type in

2314:37:26   column T, that indicates that the staffing team, so TSC, was

2414:37:30   the one that proposed that person for the opportunity, right?

2514:37:33    A. We facilitate those discussions.  So there is a system

1 14:37:37   that we use to propose.  So this particular staffing member

2 14:37:41   would have proposed across to the business manager who is

3 14:37:45   hiring for the client.

4 14:37:46   Q. Okay.  And the hiring manager, is that person identified

5 14:37:53   for this role?

6 14:37:54   A. Hiring managers are those who basically have a technical

7 14:37:57   assessment.  They are expert in that area, so they would --

8 14:38:03   they may not be the final decision maker for the role, but

9 14:38:07   they would be assessing the individual to see whether they

10 14:38:10  have the primary and the secondary skill set.  They suit the

11 14:38:13  role, which is years of experience and likewise.  And then

12 14:38:15  there is a client submission that goes to a customer.

13 14:38:18  Q. Okay.  So the hiring manager is almost like a gatekeeper

14 14:38:20  in a way?

15 14:38:21  A. No, but he's -- he's a technical manager, so he would

16 14:38:26  know exactly the area in which to assess or evaluate an

17 14:38:29  individual who is coming from the bench for the role.

18 14:38:31  Q. But if, for example, somebody -- the hiring manager

19 14:38:35  doesn't like that person or doesn't want to use that person,

20 14:38:37  then it ends there usually, right?

21 14:38:40  A. If the -- technically, the individual does not meet the

22 14:38:43  role or the qualification, then there is a rejection.

23 14:38:46  Q. Okay.  Could I get you to put 273 on the screen?

24 14:38:54           Now, this has already been admitted into evidence.

25 14:38:57  This is the 2018 bench policy.  Can we go to page 4?

1 14:39:33          And I think you are familiar with the bench policy,

2 14:39:36    right?

3 14:39:36    A. Yes, I am.

4 14:39:36    Q. Okay.  I want to ask you about this section at the

5 14:39:41    bottom, 2. -- 4.2.7, and the first subsection of it at the

6 14:39:48    very bottom, 4.2.7.

7 14:40:07          Okay.  So do you see -- are you able to read the

8 14:40:10    4.2.7 regarding location?

9 14:40:12    A. Yes, I am.

10 14:40:12    Q. Okay.  And does Cognizant's bench policy require

11 14:40:17    associates to accept a new role from the bench at any

12 14:40:20    location?

13 14:40:21    A. Yes.  There are multiple opportunities offered to

14 14:40:25    them, depending on the suitability of their skills, their

15 14:40:28    competencies, and the experience they bring on to the job.

16 14:40:31    Accordingly, they would be offered those or presented to

17 14:40:34    those.

18 14:40:34    Q. Okay.  And in section 4.2.7.3, regarding Technology

19 14:40:40    Domain, it goes on to the next -- I think it may go on to the

20 14:40:44    next page, but it says here that an associate also may be

21 14:40:46    required by Cognizant to take on a project outside of their

22 14:40:50    domain; is that right?

23 14:40:52    A. Yes, that is possible.

24 14:40:53    Q. Okay.  Could we go to the next page?  At the top.

25 14:41:03          And Cognizant also requires that an associate on the

14:41:06   bench be willing to accept a role even whenever it's outside

14:41:12   of their preferred role or delivery methodology; is that

14:41:16   right?

14:41:16   A. It is completely an associate choice to accept a specific

14:41:20   role.  There are opportunities available which comes from

14:41:25   various clients at any given point of time.  If the skills

14:41:28   and competencies match the associate then, those projects are

14:41:33   offered to them and presented to them.

14:41:35   Q. Okay.  But this policy indicates that they are required

14:41:41   to take it, right, if it's presented to them, even though

14:41:43   it's outside their role or methodology?

14:41:46   A. So IT sector is fairly large and wide.  So there are

14:41:52   environments in which they work in different skill set and

14:41:55   technologies.  There are always opportunities which is

14:41:57   available where they may not have a hands-on experience in a

14:42:00   specific technical skill set; however, they desire to work

14:42:04   in that space or an area.

14:42:06   So as -- again, as I said, it is an associate choice

14:42:09   to accept a specific role, which is offered to them if they

14:42:13   desire to do so.

14:42:13   Q. Okay.  And could we go to the kind of mid-top of page 6

14:42:19   of this policy?  Section 5.

14:42:27   And you are familiar with this section here about

14:42:28   the consequence management?

14:42:30   A. Yes.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

14:42:31    Q. Okay.

14:42:32    A. I am.

14:42:32    Q. And there we can read the exact language, but I'll

14:42:37    summarize it my best, and then you tell me what I got wrong.

14:42:40         Essentially, if the benched employee doesn't go

14:42:44    along with one of the required opportunities, they

14:42:48    essentially get -- they can say one time, if it's reasonable,

14:42:52    I don't want to do this.  But after that, they have to do

14:42:55    the opportunity or they will be terminated; is that right?

14:42:59    A. They have five weeks on the bench and multiple

14:43:02    opportunities are offered to them while they are on the

14:43:05    bench.  So it is not limiting to just one opportunity.

14:43:08         However, if they -- they do have -- we do let them

14:43:13    know during Associate Connect that it is good to have -- you

14:43:17    know, before attending a client interview or an assessment or

14:43:21    an evaluation, if they would -- they would be -- they have

14:43:24    understood the job role as well as what is required for them.

14:43:27         However, yes, they do have one definitive "no" that

14:43:31    they could go ahead and say so during the bench time.

14:43:33    Q. Okay.  And on your second strike, if you are presented

14:43:39    with something that you say no to, then there is -- they can

14:43:42    be terminated for failure to accept job opportunities, right?

14:43:45    A. We haven't had that much at all, I could tell you that,

14:43:49    because there are associates who are very much aware when

14:43:53    they are on the bench that they would like to take up the

14:43:56  next available opportunity.  Their aspirations to find roles

14:44:00  is pretty much high.  So they do make sure that they are more

14:44:05  flexible to take up and be open to discussions which comes

14:44:07  their way.

14:44:08  Q. Well, I'm glad you agree with that, because that saves

14:44:10  one more document.  But I just want to make sure that I get

14:44:13  clarification on one point.

14:44:15       There is a specific bench termination code for when

14:44:20  an associate does not accept an opportunity that is presented

14:44:23  to them, right?

14:44:24  A. Could you repeat again, please?

14:44:27  Q. There is a bench termination code called CDP Declined Job

14:44:32  Opportunity?

14:44:33  A. CDP Declined Job Opportunity is there, yeah.

14:44:33  Q. And that --

14:44:36  A. It's a slightly older policy.  Sorry.  We don't have that

14:44:39  anymore.

14:44:39  Q. And that's what we are talking about here where they

14:44:41  declined, I guess the second time, an opportunity that was

14:44:45  presented to them?

14:44:46  A. Yes.  It is a code.

14:44:48  Q. Okay.  And so if somebody was terminated for a reason

14:44:52  other than "declined job opportunity," can we infer that

14:44:56  they didn't decline two opportunities presented to them?

14:44:59  A. It would not be so, because they could -- they could

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

14:45:04  1   have -- they could have several other reasons why they may

14:45:07  2   have been separated from the bench, right?  So it could be

14:45:12  3   because their opportunities was limiting because of the

14:45:16  4   location and likewise.

14:45:17  5   Q. Okay.  Now, does -- would your name appear in those bench

14:45:22  6   reports anywhere?

14:45:23  7   A. It would.

14:45:26  8   Q. Okay.  For -- primarily for presenting for someone from

14:45:32  9   an opportunity?

14:45:32  10  A. No, no, not at all.  If it's a bench report, you said, so

14:45:35  11  it could be a weekly or a monthly report which comes from the

14:45:40  12  bench, something that I could go ahead and take, that is

14:45:42  13  where my name would appear.

14:45:45  14  Q. So there may -- would your name appear in the Hiring

14:45:48  15  Manager column for anyone?

14:45:49  16  A. It would not, because I'm not directly assessing --

14:45:53  17  unless I have a demand on my own within Talent Supply Chain

14:45:56  18  where I would be called as a hiring manager for my

14:45:59  19  organization.

14:45:59  20  Q. Okay.  So it may appear, but it would be very infrequent?

14:46:02  21  A. Talent Supply Chain basically is facilitating the

14:46:05  22  discussion between associates on the bench and an actual

14:46:09  23  hiring manager who is technically a subject matter expert and

14:46:13  24  knows where and what to evaluate the associate on the bench.

14:46:17  25  So they would be the hiring manager.