RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
KATHERINE V.A. SMITH, SBN 247866
  ksmith@gibsondunn.com
LAUREN M. BLAS, SBN 296823
  lblas@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071
Telephone:  213.229.7000
Facsimile:   213.229.7520

MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
ELIZABETH A. DOOLEY, SBN 292358
  edooley@gibsondunn.com
MATTHEW T. SESSIONS, SBN 307098
  msessions@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California  92612
Telephone:  949.451.3800
Facsimile:   949.451.4220

Attorneys for Defendants
COGNIZANT TECHNOLOGY SOLUTIONS
CORPORATION and COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CHRISTY PALMER, VARTAN PIROUMIAN, BRIAN COX and JEAN-CLAUDE FRANCHITTI,<br><br>Plaintiffs,<br><br>v.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION and COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION,<br><br>Defendants. | CASE NO. 2:17-CV-06848 DMG (GJSx)<br><br>**DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(B)**<br><br>Hearing:     December 13, 2024<br>Time:        9:30 a.m.<br>Place:       Courtroom 8C<br>Judge:       Hon. Dolly M. Gee |

Gibson, Dunn & Crutcher LLP

**TO THE COURT AND ALL PARTIES AND COUNSEL OF RECORD**:

PLEASE TAKE NOTICE THAT on December 13, 2024 at 9:30 a.m., or as soon thereafter as they may be heard, in Courtroom 8C of this Court, located at 350 West First Street, Los Angeles, California, Defendants Cognizant Technology Solutions Corporation and Cognizant Technology Solutions U.S. Corporation (together, "Cognizant") will and hereby do move this Court for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on Plaintiffs' disparate treatment claims and request for punitive damages

Cognizant is entitled to JMOL on Plaintiffs' disparate treatment claims because Plaintiffs failed to present sufficient evidence to support a conclusion that Cognizant engaged in a pattern or practice of intentional discrimination in bench terminations. Cognizant is also entitled to JMOL on Plaintiffs' request for punitive damages because there is not substantial evidence in the trial record from which a reasonable jury could conclude that Cognizant acted with malice or reckless indifference to the federally protected rights of any class members.

Counsel met and conferred regarding this Motion on October 25, 2024, as required by Local Rule 7-3. Counsel for Cognizant notified counsel for Plaintiffs that Cognizant intended to file a renewed motion for judgment as a matter of law based on the same grounds as Cognizant's motion for judgment as a matter of law under Rule 50(a). Counsel for Plaintiffs indicated they would oppose the Motion.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all cited authorities, all pleadings and papers on file in this action, and such oral argument and other evidence as the Court shall consider prior to or at the time of hearing on this Motion.

1    DATED: November 1, 2024                GIBSON, DUNN & CRUTCHER LLP

2

3                                           By:  /s/ Michele L. Maryott
                                                 Michele L. Maryott

4

5                                           Attorneys for Defendants
                                            COGNIZANT TECHNOLOGY
6                                           SOLUTIONS CORPORATION and
                                            COGNIZANT TECHNOLOGY
7                                           SOLUTIONS U.S. CORPORATION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD .......................................................................................... 1

ARGUMENT ....................................................................................................... 2

    A.    Cognizant Is Entitled to Judgment as a Matter of Law on Plaintiffs' Disparate Treatment Claims ................................................ 2

    B.    Cognizant Is Entitled to Judgment on Plaintiffs' Request for Punitive Damages ...................................................................... 15

    C.    Cognizant Is Entitled to Judgment on Its Good Faith Defense.............. 17

CONCLUSION ................................................................................................... 19

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Becerra v. Dr Pepper/Seven Up, Inc.*,
2018 WL 3995832 (N.D. Cal. Aug. 21, 2018), *aff'd*, 945 F.3d 1225
(9th Cir. 2019) ........................................................................................ 10

*C.R. v. PLB Mgmt. LLC*,
2023 WL 3868353 (C.D. Cal. June 7, 2023) ................................... 2, 7, 10

*EEOC v. McDonnell Douglas Corp.*,
191 F.3d 948 (8th Cir. 1999) .................................................................. 13

*Ellis v. Elgin Riverboat Resort*,
217 F.R.D. 415 (N.D. Ill. 2003) ............................................................. 14

*Escriba v. Foster Poultry Farms, Inc.*,
743 F.3d 1236 (9th Cir. 2014) ................................................................. 1

*Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*,
694 F.2d 531 (9th Cir. 1982) .................................................................... 2

*Goff v. Continental Oil Co.*,
678 F.2d 593 (5th Cir. 1982), *overruled on other grounds by Carter v.
S. Cent. Bell*, 912 F.2d 832 (5th Cir. 1990) ....................................... 7, 12

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) ............................................................................... 10

*Kolstad v. Am. Dental Ass'n*,
527 U.S. 526 (1999) .......................................................................... 15, 17

*Lakeside-Scott v. Multnomah Cnty.*,
556 F.3d 797 (9th Cir. 2009) .......................................................... 2, 4, 17

*Monster Energy Co. v. Vital Pharms., Inc.*,
2023 WL 8168854 (C.D. Cal. Oct. 6, 2023) ............................................. 1

*Ngo v. Reno Hilton Resort Corp.*,
140 F.3d 1299 (9th Cir. 1998) ................................................................ 15

*Pers. Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979) ................................................................................. 2

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ................................................................................. 2

*Robin v. City of Monrovia*,
2010 WL 11506880 (C.D. Cal. Dec. 3, 2010), *aff'd*, 520 F. App'x 496
(9th Cir. 2013) ......................................................................................... 8

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

*Robinson v. Adams,*
    847 F.2d 1315 (9th Cir. 1987)........................................................................... 2

*Sunward Corp. v. Dun & Bradstreet, Inc.,*
    811 F.2d 511 (10th Cir. 1987)................................................................. 10, 12

*Torres v. Nutrisystem, Inc.,*
    289 F.R.D. 587 (C.D. Cal. 2013)................................................................ 12

*Tuffa v. Flight Servs. & Sys., Inc.,*
    644 F. App'x 853 (10th Cir. 2016) ........................................................... 8, 9

*Valdez v. City of San Jose,*
    2013 WL 752498 (N.D. Cal. Feb. 27, 2023)............................................... 5

**Rules**

Fed. R. Civ. P. 50(b) .................................................................................. 1

v

# INTRODUCTION

Cognizant renews its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on Plaintiffs' disparate treatment class claims (Section 1981 (race) and Title VII (race/national origin)) and request for punitive damages, and on Cognizant's affirmative defense of good faith. Fed. R. Civ. P. 50(b)(1). After the first trial, the Court denied Cognizant's Rule 50(b) motion, concluding that "a reasonable jury could find that Cognizant engaged in a pattern-or-practice of discrimination." Dkt. 636 at 9. The Court further found that Cognizant wasn't entitled to judgment as a matter of law on Plaintiffs' request for punitive damages or on Cognizant's affirmative defenses. *Id.* at 11-12. This re-trial, however, brought critical deficiencies in Plaintiffs' case to the fore. Taken as a whole, the record does not contain "substantial evidence" supporting the jury's verdict, and the trial made clear that the key inferences needed to support the jury's findings relied primarily on speculation and conjecture rather than sufficiently probative evidence. Accordingly, Cognizant is entitled to judgment as a matter of law and the Court should grant its Rule 50(b) motion.

# LEGAL STANDARD

The Court deferred ruling on Cognizant's Rule 50(a) motion.[1] 10/3 Final Tr. 3294:5-16. "If the court denies or defers ruling on [a] motion for judgement as a matter of law" under Rule 50(a), "and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 8168854, at *4 (C.D. Cal. Oct. 6, 2023). "A renewed motion for judgment as a matter of law is properly granted 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Escriba v. Foster Poultry Farms, Inc.*,

---

[1] On October 24, 2024, three weeks after the jury returned its verdict against Cognizant, Plaintiffs filed an opposition to Cognizant's Rule 50(a) motion. Dkt. 681. In light of the jury's verdict and Cognizant's renewal of its motion for judgment as a matter of law under Rule 50(b), Cognizant submits that the pending Rule 50(a) motion (Dkt. 657) is now moot.

743 F.3d 1236, 1242 (9th Cir. 2014) (citing *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2022)).

In ruling on a renewed motion for JMOL, the court should review "all of the evidence in the record," not just "evidence favorable to the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-150 (2000).  And although the court draws all reasonable inferences in favor of the nonmoving party, a reasonable inference cannot be supported by only "conclusory statements instead of significant probative evidence." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009).  When the trial record lacks "substantial evidence" to support the jury's verdict, the court should render judgment as a matter of law.  *C.R. v. PLB Mgmt. LLC*, 2023 WL 3868353, at *2 (C.D. Cal. June 7, 2023).

## ARGUMENT

### A.    Cognizant Is Entitled to Judgment as a Matter of Law on Plaintiffs' Disparate Treatment Claims

#### 1.    There Is Insufficient Evidence Cognizant Engaged in Intentional Discrimination

To establish a claim of intentional discrimination under Title VII or section 1981, "a plaintiff must prove intentional discrimination." *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987).  Discriminatory intent is not proved simply by establishing a decisionmaker's "awareness of consequences"; rather, "[i]t implies that the decisionmaker selected a particular course of action at least in part '***because of***' not merely 'in spite of,' its adverse effects upon an identifiable group." *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 552 (9th Cir. 1982) (cleaned up, emphasis added) (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)).  Thus, the fact "[t]hat an employer was aware of, or totally indifferent to the racially discriminatory impact of its [] policies is not of itself sufficient to establish a prima facie case and shift the burden of explanation to the defendant." *Id.*; *see also* Dkt. 660 at 29 (Jury Instruction No. 23, explaining that "discriminatory intent" can be

inferred from evidence of a pattern or practice "only where there is a stark or clear pattern, unexplainable on grounds other than race or national origin"). Plaintiffs' evidence—which consisted principally of statistics, so-called "policies," anecdotes about a supposed "cultural preference" for people of Indian race or national origin, and the EEOC's letter of determination—is not sufficient to support the jury's determination that Cognizant engaged in *intentional* discrimination.

**First**, Plaintiffs' evidence—purported Cognizant "policies"; an incomplete statistical analysis by Dr. Johnson; claims of an alleged "cultural preference" for people of Indian national origin; and the EEOC's letter of determination—is insufficient to prove up a claim for disparate treatment.

Cognizant "Policies." With respect to their first category of evidence, Plaintiffs leaned heavily on testimony by their expert, Dr. Ronil Hira, that Cognizant supposedly has a business model centered on two "policies" that prioritized building up a reserve of H-1B visa holders in India ("visa readiness"), deploying those visa holders to the United States for staffing ("visa utilization"), and then rotating U.S. workers off of projects. 9/26 Final Tr. 2234:21-2235:24, 2241:23-2242:10, 2260:2-7. Dr. Hira testified that, in his opinion, these policies reflect Cognizant's "cultural preference" for Indian workers, citing in support the fact that 99 percent of Cognizant's visa holders are from India. 9/26 Final Tr. 2229:10-25, 2275:16-2276:10. Cognizant's former Senior Director for Equal Employment Opportunity, Abigail Israel, also testified that, in her opinion, the company's hiring managers naturally defaulted to hiring visa holders as a matter of general practice. 9/25 Final Tr. 1908:4-1909:5. And Shane Gundlach, a senior director who worked for Cognizant for approximately six months, testified that, in his view, Cognizant's staffing model was "to utilize people with H-1B visas . . . from the offshore team in India to fulfill" roles in the U.S. 9/25 Final Tr. 1987:25-1988:22.

No reasonable juror could find that this "policy" evidence is probative of a pattern or practice of intentional discrimination. Dr. Hira did not speak to or interview *anyone* at Cognizant in the course of forming his opinions regarding Cognizant's "policies."

9/26 Final Tr. 2277:22-25, 2278:25-2279:12. Instead, his conclusions were based on a small set of documents cherry-picked by Plaintiffs' counsel, dating from the period between 2012 and 2016, and none of which had anything to do with the bench. 9/26 Final Tr. 2286:21-2287:10. Not surprisingly, his opinions were wholly contradicted by the Cognizant employees who testified. They explained that the so-called "visa utilization" policy was meant to discourage Cognizant business units from seeking unnecessary visas, not to stockpile visas (10/2 Final Tr. 3074:16-3075:5); that the "rotation" concept was meant to offer growth opportunities to employees and prevent them from stagnating at the same client, not to replace U.S. workers (10/2 Final Tr. 3076:16-3077:16); and that the 3x3x3 "policy," to the extent it was ever implemented, didn't apply to non-billable roles, like Ed Cox's (9/30 Final Tr. 2618:14-24, 2620:19-2621:12). And of course, Plaintiffs' entire theory of replacement was belied by the evidence showing the percentage of visa-holders at Cognizant went *down* over the course of the class period (*see* TX-407B), while the percentage of non-Asian employees went up (10/2 Final Tr. 2998:2-5, 3155:4-6). Ms. Israel similarly lacked any relevant knowledge about any "policy" relating to visas or staffing: she was not on Cognizant's recruiting or mobility team (9/25 Final Tr. 1976:18-1977:2, 1978:8-10), and did not have any responsibility for staffing client projects from the bench or otherwise (9/25 Final Tr. 1979:3-5, 1980:10-13). Shane Gundlach's knowledge was limited to his Dynamics AX practice group, which had exactly one U.S. employee (him)—he had no direct experience with any staffing policy in any other business unit. 9/25 Final Tr. 2022:20-2023:6. On this record, no reasonable jury could conclude that Cognizant's visa "policies"—which none of the relevant witnesses could define with sufficient clarity—effectuated a pattern or practice of intentional discrimination, much less discrimination in *bench terminations*. *See Lakeside-Scott*, 556 F.3d at 802 (inferences supporting a jury's verdict cannot be supported by "conclusory statements instead of significant probative evidence").

Plaintiffs also emphasized an email from Phillip Saint to Jean-Claude Franchitti

and another Cognizant manager regarding a supposed visa-readiness "strategy" as evidence of "Cognizant staffing practices" that negatively impacted non-South Asians on the bench. 9/27 Final Tr. (PM) 2407:15-2409:14; TX-1. This email was cited in the order denying Cognizant's Rule 50(b) motion after the first trial. Dkt. 636 at 10. But as Mr. Franchitti's testimony and the document itself make clear, the strategy being discussed concerned "potential US opportunities" for Cognizant associates in the *United Kingdom* (TX-1)—no part of the document states that the strategy had anything to do with "staffing visa employees from India in the U.S." (9/27 Final Tr. (PM) 2408:20-2409:3). This UK-focused evidence is not probative of a pattern or practice of favoring visa-holding Indian nationals over non-South Asians.

Statistics. Nor do Dr. Johnson's statistics materially bolster Plaintiffs' case-in-chief. Dr. Johnson testified that non-South Asians were more than eight times more likely than South Asians to be terminated from the bench (9/25 Final Tr. 2044:19-2045:7), and that non-South Asians who were "willing to relocate" were more than ten times more likely than South Asians who were willing to relocate to be terminated from the bench (9/25 Final Tr. 2064:13-23). Plaintiffs' counsel, during his exam of Mr. Westphal, tried to suggest more than a dozen times that another spreadsheet (TX-245) showing various "disparities" constituted a "pattern" of discrimination. *See, e.g.*, TX-245; 10/2 Final Tr. 3020:16-3021:3, 3089:5-8, 3091:7-11, 3092:6-7, 3100:7-9, 3109:1-10, 3111:20-25, 3112:19-23, 3115:7-11, 3116:14-19, 3118:18-23, 3119:22-25, 3128:13-21. But Dr. Johnson didn't rely on TX 245, and offered no affirmative opinion on the cause of those disparities other than ruling out "chance" and critiquing Dr. McCrary's regression. *See Valdez v. City of San Jose*, 2013 WL 752498, at *12 (N.D. Cal. Feb. 27, 2023) (statistical analysis ruling out "chance" is, without more, "insufficient to demonstrate discriminatory intent"). Other witnesses confirmed that a variety of race-neutral factors contribute to bench terminations, including an employee's location preference, niche skill set, billing rate, and client input. 9/30 Final Tr. 2661:4-17; 9/30 Final Tr. 2693:10-17; 9/30 Final Tr. 2733:8-18; 10/2 Final Tr. 3051:21-3052:24,

3053:11-16, 3136:17-23; *see also* 10/2 Final Tr. 3088:24-25 ("You need to look at the individual associates for reasons of termination.").

More fundamentally—and in an important difference from the prior trial when the Court described Dr. Johnson's statistics as "stark" when denying Cognizant's Rule 50(b) motion (Dkt. 636 at 10)—the evidence showed Dr. Johnson's statistics were deficient on their own terms because he failed to properly analyze "location preference," the termination code that he said accounted for more than 82 percent of bench terminations. TX-407F; *see also* 10/2 Final Tr. 3065:25-3066:3 (Padmanabhan) (testifying that "the principal reason" employees "do not get redeployed from the bench" "is inability to relocate"). In his analysis, Dr. Johnson linked an employee's "willingness to relocate" to whether the employee was terminated from the bench due to a "location preference." But in doing so, he did not account for differences in the *degree* to which an employee may have been willing to relocate. For example, when Cognizant's counsel showed him examples of non-South Asian employees who were "willing to relocate" only to a single city or state, and asked Dr. Johnson whether he took those limitations into account in his analysis, Dr. Johnson confirmed that he "did not consider whether . . . a South Asian or a non-South Asian would be more likely to be terminated if they were not willing to go [to] as many places as others." 9/26 Final Tr. 2179:3-7. Instead, he conducted a basic "binary analysis" that simply asked "yes [or] no" on willingness to relocate and then examined whether the employee "was terminated for location preference." 9/26 Final Tr. 2169:7-19. No reasonable juror could find that Dr. Johnson's superficial analysis of what Mr. Padmanabhan testified was a primary factor in bench terminations permits the conclusion that Cognizant had a pattern or practice of discrimination. *See* 10/2 Final Tr. 3066:5-15 ("If someone is not willing to relocate, it diminishes their chances [of getting staffed from the bench] significantly."). In fact, it doesn't even support Dr. Johnson's own opinion that "the disparity continues . . . irrespective of what [terminated employees] said about their willingness to relocate" because Dr. Johnson *never took into account that information when conducting his analysis.*

<u>Anecdotes of "Cultural Preference."</u>  Plaintiffs' evidence that Cognizant had a so-called "cultural preference" for Indian employees is also legally insufficient to establish a classwide pattern or practice of intentional discrimination.  For example, Ms. Israel testified that she believed a "cultural bias or favoritism" helped to determine differences in who stayed and who left Cognizant (9/25 Final Tr. 1931:9-23); Mr. Piroumian testified that because his Indian colleagues didn't invite him to "lunches" or "dinners" he "pretty much felt unwanted like they didn't want [him] there" (9/27 Final Tr. (PM) 2487:17-2488:7).  Ms. Palmer offered similar testimony. 9/30 Final Tr. 2650:14-2651:2.  Mr. Gundlach testified that "Indian nationalism" was to blame for the lack of respect he received from "the offshore team" when trying to work with them on business planning (9/25 Final Tr. 1996:17-18, 1998:17-1999:7); Mr. Franchitti made similar claims (9/27 Final Tr. (PM) 2401:4-13).  This evidence (which is either secondhand, isolated, or otherwise of questionable value) cannot support the jury's verdict.  *PLB Mgmt.*, 2023 WL 3868353, at *2 (jury's verdict must be supported by "substantial evidence," that is "such reasonable evidence as a reasonable mind might accept as adequate to support a conclusion").  Ms. Israel—who "met very few people" (9/25 Final Tr. 1967:15)—testified that her understanding of Cognizant's culture came largely from what she "heard through the grapevine" about people "not feeling included."  9/25 Final Tr. 1905:4-8; *see also* 9/25 Final Tr. 1902:5-16 (Israel) (testifying that she "kept abreast of cultural sensitivity or diversity issues" partly by employees spilling "the tea").  Mr. Piroumian complained of Indian colleagues not inviting him to lunch, but also testified that the Indian manager who hired him allowed him to avoid the bench for *nine months* even though he wasn't on a billable client matter (9/27 Final Tr. (PM) 2505:13-19, 2506:12-19), and that other Indian employees throughout the company actively helped him find new opportunities (9/30 Final Tr. 2691:8-13, 2692:21-2693:23, 2700:16-2702:5; *see also* TX-634, TX-640).  And for all of Mr. Gundlach's contentions about Cognizant's alleged discriminatory preference, the evidence showed that at bottom, he simply had a business disagreement with his boss about how to grow the Dynamics AX

practice and the only discrimination he could point to concerned his "[ability] to build a team."  9/25 Final Tr. 2017:2-2018:2, 2027:8-13.  Ms. Palmer and Mr. Franchitti also made various claims about supposed bias by Indian co-workers, but the evidence revealed their claims to be overstated, outright false, or otherwise lacking in credibility.  9/27 Final Tr. (PM) 2456:10-2457:18; 9/30 Final Tr. 2666:16-2668:5, 2670:1-6.

In any event, even giving Plaintiffs the benefit of the doubt, what's plain is that this evidence is all *individualized*: none of Plaintiffs' anecdotal, "cultural preference" evidence rises to the level of *classwide* proof.  *See Goff v. Continental Oil Co.*, 678 F.2d 593, 597 (5th Cir. 1982), *overruled on other grounds by Carter v. S. Cent. Bell*, 912 F.2d 832 (5th Cir. 1990) (three witnesses' accounts of racial discrimination in various "departments within the company," even if true, could not establish a pattern or practice of company-wide discrimination).  The same is true of the documents they claimed evidenced a supposed cultural preference (e.g., TX-86, TX-204, TX-205): they were based on anecdotes and, far from showing a company that doesn't wish to engage with issues of inclusion and diversity, showed that the company was tackling those issues with vigor.  10/2 Final Tr. 3020:16-24 (company "was [t]aking an honest interest" in addressing perceived bias against non-Indians); 10/2 Final Tr. 3023:22-3024:15 (Cognizant was making affirmative efforts to address "cultural issues").

EEOC Letter.  Plaintiffs showed and read the EEOC letter of determination to nearly every witness, but that letter is no more probative of intentional discrimination in this trial than it was in the first and cannot sustain the jury's verdict.  The letter discusses, with no specifics, statistics that the EEOC believed suggested an adverse impact on non-Indian employees through Cognizant's refusal to assign non-Indian employees to new projects and its termination of those employees when they remained unassigned.  TX-148.  But without any details regarding the "statistical analysis" or "data" involved, this letter has "little or no probative value" on the question of whether a pattern or practice of discrimination has been proven.  *Robin v. City of Monrovia*, 2010 WL 11506880, at *5 (C.D. Cal. Dec. 3, 2010) (an EEOC reasonable cause letter that contains "bare

8

Gibson, Dunn &
Crutcher LLP

conclusions … has little or no probative value"), *aff'd*, 520 F. App'x 496 (9th Cir. 2013). Plaintiffs attempted to emphasize a line in the letter referencing discrimination in "terminating [non-Indian employees] when they remained unassigned," but the Cognizant Talent Supply Chain executive who deals with the bench on the regular (and who the EEOC never spoke to) testified to the contrary.  10/2 Final Tr. 3065:16-18 (Padmanabhan) (Q. "In your experience, does an employee's national origin play a role in staffing?" A. "No.").  Whatever limited relevance the letter had is further diminished by the fact that it applies a lower "reasonable cause to believe" standard of proof, rather than proof by a "preponderance of evidence." *Cf. Tuffa v. Flight Servs. & Sys., Inc.*, 644 F. App'x 853, 856 (10th Cir. 2016) (excluding EEOC letter of determination because the "EEOC applied a different standard of proof than the standard to be applied by the jury").  The EEOC letter, therefore, does not supply the necessary link between Cognizant's general "policies" or cultural "preference" and intentional discrimination in bench terminations.

  ***Second***, even if Plaintiffs had presented sufficient evidence of the foregoing "policies" and "cultural preference," there is insufficient evidence linking these visa policies to *bench terminations*.  For example, Dr. Hira testified that Cognizant's supposed "rotation policy"—a policy purportedly designed to rotate visa-holding employees from offshore to onsite opportunities—was "consistent with" the EEOC's letter finding a "reasonable cause to believe" Cognizant discriminated against non-Indians in bench terminations (TX-148 at 1). 9/26 Final Tr. 2263:14-15. Similarly, Dr. Hira opined that Cognizant's 3x3x3 "policy"—which Mr. Padmanabhan testified was never implemented (10/1 Final Tr. 2890:19-2891:9)—was "logically consistent" with non-South Asians being terminated at higher rates than South Asian visa-holders. 9/26 Final Tr. 2270:12-19.  But Dr. Hira's opinions never address the critical question of whether the supposed "rotation" was done at the expense of non-visa holders, nor did he otherwise draw any causal connection. Moreover, Cognizant witnesses testified to the contrary.  10/1 Final Tr. 2888:16-25; 10/2 Final Tr. 3076:19-3077:16.  Dr. Hira's

Gibson, Dunn & Crutcher LLP

testimony, then, at most could support a correlation between Cognizant's policies and disparities in bench terminations. But "correlation is not causation," and Dr. Hira offered no evidence connecting Cognizant's supposed "preference" for, and utilization of, visa holders to a pattern or practice of intentional discrimination in bench terminations. *Becerra v. Dr Pepper/Seven Up, Inc.*, 2018 WL 3995832, at *8 (N.D. Cal. Aug. 21, 2018), *aff'd*, 945 F.3d 1225 (9th Cir. 2019).

Plaintiffs' other evidence of a purported causal link between so-called visa and rotation policies and bench terminations was similarly wanting. For example, Mr. Piroumian and Ms. Palmer testified that they were sent to the bench after being "replaced" by Indian nationals (9/30 Final Tr. 2644:6-20, 2665:21-24, 9/27 Final Tr. (PM) 2481:23-2482:8, 2504:7-11). But Ms. Palmer was *never* terminated from the bench—indeed, she went to the bench repeatedly and always found a new project. 9/30 Final Tr. 2670:15-23. The evidence also indicates Mr. Piroumian previously had success with the bench, but was terminated from the bench in 2017 because he made no effort to find a new project and instead planned to join a lawsuit. 10/1 Final Tr. 2818:18-2820:10; TX-691. Plaintiffs also presented Cognizant business documents stating that the company's "margin optimization initiatives" (10/1 Final Tr. 2911:2-21) had "driven exits from the bench (forced and voluntary)" (TX-471 at 3), including as to Ed Cox. Again, though, "margin optimization" was a business initiative to improve the company's profitability. 9/30 Final Tr. 2606:9-14. There was no evidence that the initiative itself was discriminatory. Even if bench terminations increased as a result, the mere existence of that initiative cannot constitute "substantial evidence" of intentional discrimination in those terminations. *PLB Mgmt.*, 2023 WL 3868353, at *2. In short, Plaintiffs' purported link between visa policies and bench terminations consists of little more than threads, and no reasonable juror, even viewing the evidence in the light favorable to Plaintiffs, could find otherwise. *See Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 519 (10th Cir. 1987) (jury not permitted to rely "more on speculation than evidence and reasonable inference" in reaching its verdict).

2.      **There Is Insufficient Evidence That Intentional Discrimination in Bench Terminations Was Cognizant's "Standard Operating Procedure"**

In addition to falling short of showing intent, Plaintiffs' evidence is also insufficient for a reasonable jury to conclude that Cognizant engaged in a routine, companywide "pattern or practice" of intentional discrimination in bench terminations. A pattern-or-practice case cannot rest on "the mere occurrence of isolated or accidental or sporadic discriminatory acts." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 337 (1977) (internal quotation omitted). Rather, Plaintiffs must establish that intentional discrimination "was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* The evidence at trial does not support a reasonable conclusion that Cognizant's bench termination decisions occurred pursuant to a uniform, companywide procedure or that discrimination was a "regular practice."

***First***, there is insufficient evidence that terminations from the bench happened in a uniform way. To be sure, Cognizant employees on the bench were eligible to be terminated after five weeks if they did not find a new billable assignment. But whether any employee was ultimately terminated depended on a multitude of unique, individualized factors, including the effort the employee put into finding a new assignment using company resources and their own internal networks and personal initiative. *See* 9/30 Final Tr. 2670:9-23, 2679:1-10, 2681:2-8; 10/2 Final Tr. 3062:5-17, 3063:4-12. As Mr. Padmanabhan's testimony makes clear, there is no singular design to the bench process—people come to the bench based on the timing of when client projects end, get canceled, or change scope (10/2 Final Tr. 3060:20-3061:3), and they get assigned from the bench (or not) based on the relevance of their skill set, experience, location preference, and client input (10/2 Final Tr. 3051:21-3052:24, 3061:8-21). *See* 10/2 Final Tr. 3053:13-16 (Mr. Padmanabhan testifying that Cognizant's "[c]lients are extremely picky"); *see also* 9/30 Final Tr. 2568:16-2569:3, 2571:1-18; 9/30 Final Tr. 2733:8-18; 10/1 Final Tr. 2787:2-6. And Plaintiffs offered only one witness (Mr.

Gibson, Dunn & Crutcher LLP

Piroumian) who was in a billable role (for which the bench was intended), and was then terminated. That individual experience cannot prove a "standard operating procedure."

Plaintiffs' witnesses likewise emphasized that getting off the bench depended on a number of race-neutral factors. On multiple occasions, Mr. Piroumian and Ms. Palmer both leveraged their internal networks to find assignments while on the bench (9/30 Final Tr. 2679:1-10, 2699:18-22, 2709:10-2710:11; 9/30 Final Tr. 2670:9-23), something that Mr. Piroumian admitted was "expected" of Cognizant employees (9/30 Final Tr. 2681:2-8). Both also testified to the importance of having the relevant skill set and experience needed for a particular project opening (9/30 Final Tr. 2661:8-23; 9/30 Final Tr. 2693:10-17), something Cognizant's witness Ms. Swallows also testified to (9/30 Final Tr. 2573:1-10). Plaintiffs offered no evidence that Cognizant deprived its non-South Asian employees of resources to move off the bench, or that non-South Asians had inferior or smaller networks to reach out to when they were on the bench; quite the contrary, as Mr. Piroumian and Ms. Palmer's experiences showed. TX-462, TX-432, TX-631, TX-643; 9/30 Final Tr. 2679:1-10, 2695:11-2697:3; 9/30 Final Tr. 2670:9-2671:6. Location preference and the fit between an employee's skills and open client projects at a point in time also played key roles. 9/30 Final Tr. 2573:1-10; 9/30 Final Tr. 2693:10-17, 2707:7-25, 2732:1-4, 2739:6-11. No reasonable jury could conclude that the bench process—something that Mr. Padmanabhan testified represented an "investment" in existing associates who Cognizant "[doesn't] want to lose" (10/2 Final Tr. 3059:24-3060:17), and one that is impacted by a multitude of unique factors (10/2 Final Tr. 3051:21-3052:24)—amounts to a "regular practice" of discrimination—and certainly not on a classwide basis. *See Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 594 (C.D. Cal. 2013) (predominance not satisfied when "[t]he issues … central to the claims … will require individualized factual inquiries"); *Sunward*, 811 F.2d at 521 ("Although a jury is entitled to draw reasonable inferences from circumstantial evidence, reasonable inferences themselves must be more than speculation and conjecture.").

As noted above, there was some testimony from witnesses regarding a handful of

Cognizant employees who allegedly made discriminatory comments or who were critical of the company's business model. *See supra* pp. 6-8. Hardly any of this testimony had anything to do with discrimination in bench terminations and is therefore irrelevant. Even if it had some marginal relevance, these anecdotes are, at best, isolated opinions or experiences relating to teams within Cognizant—an organization with tens of thousands of employees—at specific points in time. *See, e.g.*, 10/2 Final Tr. 3018:17-23 (Padmanabhan) ("[G]iven the size and scale of the organization, I have seen issues, but I have never seen it as a pattern."). They, too, cannot possibly be probative of a companywide "pattern or practice" of discrimination. *See Goff*, 678 F.2d at 597. At most, this evidence demonstrates "isolated discriminatory acts on the part of certain managers"; well short of substantial evidence that racial discrimination was Cognizant's "standard operating procedure." *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 952-53 (8th Cir. 1999) ("isolated discriminatory acts on the part of certain managers" "insufficient evidence from which a reasonable jury could conclude that McDonnell Douglas engaged in a pattern or practice of … discrimination").

**Second**, even those aspects of the bench that seemed standardized—e.g., the amount of time on the bench and the initial placement on the bench after the conclusion of a project—were anything but. For example, although employees were allowed to spend five weeks on the bench before termination (9/30 Final Tr. 2556:9-13), there were circumstance-specific variations. 10/2 Final Tr. 3147:10-16 (Westphal) ("The bench timeline is very fluid."). Mr. Franchitti testified that employees could spend "60 days" on the bench before facing termination. 9/27 Final Tr. (PM) 2402:10-17. Mr. Piroumian testified that in 2017 he spent more than six weeks on the bench before being terminated. 10/1 Final Tr. 2824:21-2825:2. And Mr. Cox was on the bench for ten weeks before being terminated. 9/30 Final Tr. 2582:2-4. There were also differences among business units in how quickly they sent employees to the bench after a project ended. 9/30 Final Tr. 2734:5-11 (Piroumian) (Q. "[S]o you didn't have client billable work for the first five months that you were at GTO, correct? A. "Sounds about right." Q. "But you were

not sent to the CDP, correct? A. "Correct."). For a portion of the class period, business units at Cognizant could place employees in that unit's "practice" bench before releasing them to the "corporate" bench that required them to find a new project assignment. 9/30 Final Tr. 2702:17-2703:8. For example, the evidence showed that when Mr. Piroumian was part of the IME business unit, he earned a full salary and benefits for *nine months* after completing a client project before he was finally sent to the "corporate" bench. 9/27 Final Tr. (PM) 2504:19-2505:24, 2506:14-19. Later, Mr. Piroumian transferred to a different business unit, CBC GTO, that had a policy of *not* sending employees immediately to the bench, which allowed him to avoid the bench for long stretches of time. 9/30 Final Tr. 2734:5-20. The bottom line is that the bench process was an inherently individual and context-dependent experience, the outcome of which was determined by a combination of business unit practices, employee skills and preferences, client input, and individual initiative. *See Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 424 (N.D. Ill. 2003) (a "decentralized" procedure "cuts against the assertion that an employer engaged in a pattern or practice of discriminatory [bench] hiring as a standard operating procedure"). With these variations in the process, no reasonable juror could find that purported discrimination in bench terminations was a "standard operating procedure" affecting the class in a uniform way.

In denying Cognizant's Rule 50(b) motion after the first trial, the Court noted that "Plaintiffs presented evidence at trial that Cognizant's margin optimization and 3x3 BU policies drove visa utilization and supported staffing Indian visa employee over non-South Asian and non-Indian employees." Dkt. 636 at 11. The evidence presented in this trial conclusively broke any linkage. Among other things, Mr. Padmanabhan testified that the 3x3 "policy" was never implemented. 10/1 Final Tr. 2890:19-2891:9. And he also testified that to the extent any rotation policies fell under the broad umbrella of "operational excellence programs," they were intended to promote career development for all employees, not to rotate visa holders into the United States to replace U.S. workers. 10/2 Final Tr. 3042:1-22, 3076:19-3077:16. On this record, margin

optimization and 3x3 "policies" cannot provide "substantial evidence" of a pattern or practice of intentional discrimination.

### B.    Cognizant Is Entitled to Judgment on Plaintiffs' Request for Punitive Damages

Plaintiffs failed to prove they are entitled to punitive damages.  "Punitive damages are limited … to cases in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999) (internal quotations and citation omitted).  Although the Court determined the evidence was sufficient to support the jury's verdict on punitive damages during the first trial (Dkt. 636 at 11), the evidence presented during the re-trial, taken as a whole, did not clear the bar.  To start, Plaintiffs failed to present sufficient evidence of any standard policy or practice of discrimination, and absent that, no reasonable jury could conclude that Cognizant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad*, 527 U.S. at 529-30; *Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir. 1998).  And even if a reasonable jury could debate the existence of a pattern or practice of discrimination, no reasonable jury could conclude, based on the record in this trial, that Cognizant's acts rose to the level of "malice."  "Malice" or "reckless indifference" requires that the employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Kolstad*, 527 U.S. at 536.  On this point, Plaintiffs put forth evidence that they claimed showed Cognizant responded to employees' concerns about discrimination with indifference (9/25 Final Tr. 1952:12-1953:1, 1953:9-13), by retaliating against them (9/27 Final Tr. (PM) 2417:10-22), or, in the case of Ms. Israel, discouraging her from sharing affirmative action plan data widely outside of HR (9/25 Final Tr. 1936:3-14). The order denying Cognizant's Rule 50(b) after the first trial referenced similar evidence.  Dkt. 636 at 11.  But the record in *this* trial refuted all of this evidence. Suggestions that Cognizant was "indifferent" in the face of demographic disparities in

15

its workforce were belied by uncontradicted testimony and documents showing that the company was invested in local hiring, recruiting, and diversity and inclusion, and was transparent about the steps it wished to take to continue to improve in that area. 10/2 Final Tr. 3103:11-16, 3158:22-3159:1 (Westphal) (noting his pride leading initiatives and programs "to increase [Cognizant's] local hiring or reducing [Cognizant's] dependency on visas"); TX-205 at 8 (noting that a Cognizant-wide imperative is to "[d]iversify NA talent pool, focus on local hiring and reduce visa dependency"); TX-770; TX-781; 10/2 Final Tr. 3020:4-24, 3024:8-15 (noting Cognizant was making an affirmative effort to address issues of perceived bias against non-Indians). Allegations by Mr. Franchitti that he was "retaliated" against are irrelevant in the context of this case, as Mr. Franchitti did not testify he made any complaints about the treatment of employees on the bench. And Cognizant executives' supposed "preference" that Ms. Israel not "widely distribute" affirmative action plan results was not at all indicative of "reckless indifference" to federally protected rights—indeed, Ms. Israel *continued* to share that data with HR business partners and the leadership team in the legal department (9/25 Final Tr. 1976:5-10), and, unlike in the first trial, her testimony made clear that that level of sharing was not unusual. 9/25 Final Tr. 1969:1-5 (Q. "[T]heir experiences varied, right?" A. "Every company is different." Q. "Some shared it more broadly and some shared it more narrowly, right?" A. "Depending on what their answer was, correct.").

Plaintiffs also introduced the EEOC's February 2020 letters of determination—in which the Commission stated it had "reasonable cause to believe" Cognizant violated Title VII by discriminating against non-Indian employees in bench terminations—and tried to argue that Cognizant did nothing after the letters were issued. TX-148; 9/25 9/25 Final Tr. 1953:7-13; 9/24 Final Tr. 1791:11-14. The order denying Cognizant's Rule 50(b) motion after the first trial cited this evidence as well. Dkt. 636 at 11. But Plaintiffs did not call a single witness with personal knowledge of these letters or offer any evidence that the company in fact did nothing. To the contrary, Mr. Westphal's

testimony established that the company had been invested in diversity and inclusion during his entire tenure at the company (2011 and later—well before the EEOC letter), including by helping to train thousands of individuals in underserved communities at the cost of tens of thousands of dollars to Cognizant per trainer.  10/2 Final Tr. 3137:22-3140:2.  He also testified that the employee demographics had shifted over the course of that period, and that the workforce was now evenly divided between Asian and non-Asian employees (10/2 Final Tr. 3155:4-6).  *See also* TX-407B.  Nor did Plaintiffs establish that Cognizant persisted in discriminating after the letters were issued, as much of Plaintiffs' evidence—both testimony and documentary—involves events from 2017 or earlier, which is obviously years before the EEOC letters supposedly put Cognizant on notice that it was violating the law.  Even Ms. Israel's testimony that nothing seemed to change following the EEOC's February 2020 letter of determination can't be probative of malice given that she left Cognizant mere months later.  9/25 Final Tr. 1930:23-24, 1953:7-13.  *See Lakeside-Scott*, 556 F.3d at 802 (inferences supporting a jury's verdict cannot be supported by "conclusory statements instead of significant probative evidence").

### C.    Cognizant Is Entitled to Judgment on Its Good Faith Defense

Even if Plaintiffs had presented sufficient and substantial evidence to support their disparate treatment claims (they did not), the evidence at trial demonstrates that judgment should be entered in Cognizant's favor as to Plaintiffs' request for punitive damages because the evidence in support of Cognizant's good faith defense was substantial and uncontroverted.  "Where an employer has undertaken such good faith efforts at Title VII compliance, it 'demonstrates that it never acted in reckless disregard of federally protected rights."  *Kolstad*, 527 U.S. at 544; *see also* Dkt. 660 at 34 (Jury Instruction No. 28: "A defendant is not liable for punitive damages if the discriminatory decisions were . . . contrary to the employer's good faith efforts to comply with federal anti-discrimination laws.").

Overall, the evidence presented at trial showed that Cognizant has, in good faith

and with the reasonable belief that it did not violate Plaintiffs' rights, adopted and implemented initiatives aimed at prohibiting discrimination. Cognizant has an affirmative action/EEO policy pursuant to which it commits to securing equal employment opportunity for all Cognizant employees. *See, e.g.*, TX-518. The company also undertook to address, among other things, reports of issues of perceived bias towards non-Indians. 10/2 Final Tr. 3018:17-23, 3024:8-15. And the company holds anti-discrimination training every year to promote fairness and equitable treatment of not only employees throughout the company, but also in dealings with vendors and clients. *See* 10/2 Final Tr. 3016:4-12. Ms. Palmer's own experiences at Cognizant were consistent with this—after an Indian colleague disrespected her during a meeting, Ms. Palmer's supervisor called her the next morning to discuss the issue (9/30 Final Tr. 2653:22-2654:19), and there is no indication in the record of such mistreatment occurring again.

The record is also undisputed that Cognizant has pursued multiple outreach, diversity, and inclusion programs over several years to address demographic imbalances in the workforce. For example, Mr. Westphal testified that Cognizant has invested millions of dollars in initiatives to increase the number of its U.S. employees, including hundreds of preemployment programs involving thousands of students (at no cost to them). *See* 10/2 Final Tr. 3138:3-3141:3. He also testified that he helped create the Cognizant Foundation in 2017 to provide foundational information technology training to underserved and underrepresented individuals across the U.S. so that students who lacked a technology background could acquire those fundamental skills and then advance to a Cognizant program or other advanced training program. 10/2 Final Tr. 3141:24-3142:8. Mr. Westphal also discussed the creation of various "regional delivery centers" to bolster Cognizant's campus recruiting efforts and strengthen the company's pipeline of U.S. workers. 10/2 Final Tr. 3143:7-19. And he made clear that the company's diversity and anti-discrimination efforts have been ongoing since at least 2011, when he joined the company. *See* 10/2 Final Tr. 3135:5-25, 3158:18-3159:1. This

evidence, which Plaintiffs did nothing to rebut, entitles Cognizant to judgment as a matter of law on its good faith defense.

## CONCLUSION

For the foregoing reasons, Cognizant is entitled to judgment on Plaintiffs' disparate treatment claims and request for punitive damages, and on Cognizant's good faith defense.

DATED: November 1, 2024                Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: _/s/ Michele L. Maryott_
        Michele L. Maryott


Attorneys for Defendants
COGNIZANT TECHNOLOGY
SOLUTIONS CORPORATION and
COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION


### Local Rule 11-6.2 Certificate of Compliance

The undersigned, counsel of record for Cognizant, certifies that this brief contains 6,298 words, which complies with the word limit of L.R. 11-6.1.


Dated: November 1, 2024                _/s/ Michele L. Maryott_
                                        Michele L. Maryott