KOTCHEN & LOW LLP
DANIEL LOW, SBN 218387
dlow@kotchen.com
DANIEL KOTCHEN (*pro hac vice*)
dkotchen@kotchen.com
LINDSEY GRUNERT (*pro hac vice*)
lgrunert@kotchen.com
MARK HAMMERVOLD (*pro hac vice*)
mhammervold@kotchen.com
1918 New Hampshire Ave. NW
Washington, DC 20009
Telephone: 202.471.1995
Facsimile: 202.280.1128

YADEGAR, MINOOFAR &
SOLEYMANI LLP
NAVID SOLEYMANI, SBN 219190
soleymani@ymsllp.com
NAVID YADEGAR, SBN 205315
navid@ymsllp.com
1875 Century Park East
Suite 1240
Los Angeles, CA 90067
Telephone: 310.499.0140
Facsimile: 888.667.9576

Attorneys for Plaintiffs and the Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

CHRISTY PALMER, VARTAN
PIROUMIAN, BRIAN COX, and
JEAN-CLAUDE FRANCHITTI,

　　　　Plaintiffs,

　　v.

COGNIZANT TECHNOLOGY
SOLUTIONS CORPORATION and
COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION,

　　　　Defendants.

CASE NO. 17-CV-6848 DMG (GJS)

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' RENEWED MOTION
FOR JUDGMENT AS A MATTER OF
LAW PURSUANT TO F.R.C.P. 50(b)**

Hearing: December 13, 2024
Time: 9:30 a.m.
Place: Courtroom 8C
Judge: Hon. Dolly M. Gee

# <u>**TABLE OF CONTENTS**</u>

I.    LEGAL STANDARD ...............................................................................1

II.   ARGUMENT ........................................................................................1

     A.    Plaintiffs Put Forth Ample Evidence that Cognizant Engaged in a Pattern-
          or-Practice of Intentional Discrimination in Bench Terminations.............2

         1.    Cognizant Engaged in Intentional Discrimination. ...............2

         2.    Discrimination Was Cognizant's Standard Operating
             Procedure. ............................................................14

     B.    Plaintiffs Proffered Sufficient Evidence Supporting a Punitive Damages
          Award. ....................................................................16

     C.    Cognizant's "Good Faith" Defense Falls Short. ......................18

III.  CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*C.R. v. PLB Mgmt. LLC*, No. 2:21-cv-03275-OD W(JEMx), 2023 U.S. Dist. LEXIS 99278 (C.D. Cal. June 7, 2023) ................................................................ 11

*Castaneda v. Partida*, 430 U.S. 482 (1977) ............................................................. 3

*Costa v. Desert Palace*, 299 F.3d 838 (9th Cir. 2002) ............................................. 1

*EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951 (9th Cir. 2009) ........................... 1

*Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531 (9th Cir. 1982) ......... 2, 3

*Gilchrist v. Jim Slemons Imps., Inc.*, 803 F.2d 1488 (9th Cir. 1986) ....................... 9

*Goff v. Continental Oil Co.*, 678 F.2d 593 (5th Cir. 1982) ..................................... 12

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) ................................... 3

*Helicopters, Inc. v. Alexair, Inc.*, No. 10-00346, at 2012 U.S. Dist. LEXIS 73713 (D. Haw. May 29, 2012) ............................................................................ 1

*Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324 (1977) .......................... passim

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) ........................................... 16, 18

*Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797 (9th Cir. 2009) ......................... 18

*Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495 (9th Cir. 2015) ................................. 5

*Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493 (9th Cir. 2000) ................................................................................................................... 19

*Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502 (9th Cir. 1981) ......................... 8

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ................................... 1

*Reynolds v. Barrett*, 685 F.3d 193 (2d Cir. 2012) ................................................... 3

*Slaight v. Tata Consultancy Servs., Ltd.*, 842 F. App'x 66 (9th Cir. 2021) .............. 3

*Smith v. Union Oil Co. of Cal.*, No. C-73-1636, 1977 U.S. Dist. LEXIS 14354 (N.D. Cal. Aug. 22, 1977) ...................................................................... 3, 5

*Smith v. Universal Servs., Inc.*, 454 F.2d 154 (5th Cir. 1972) ................................. 8

iii

*Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511 (10th Cir. 1987)............ 14, 15

*Tuffa v. Flight Servs. & Sys., Inc.*, 644 F. App'x 853 (10th Cir. 2016) ........................ 9

*Valdez v. City of San Jose*, No. C 09-0176 CW, 2013 U.S. Dist. LEXIS 27101
    (C.D. Cal. Feb. 27, 2013)............................................................................. 4

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)............ 2, 3

*Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276 (9th Cir. 2001) ........ 1

**Statutes**

42 U.S.C. § 1981a ................................................................................................ 16

This Court should again deny Cognizant's Motion for Judgment as a Matter of Law (Dkt. 683) as it did previously following last year's mistrial (where the jury voted 6-2[1] in Plaintiffs' favor). Dkt. 568; Dkt. 636 (denying Cognizant's JMOL). At the re-trial, Plaintiffs presented even stronger evidence in support of their discrimination claims, and the jury quickly—and appropriately—found in favor of Plaintiffs with respect to disparate treatment and the availability of punitive damages. Dkt. 666.

## I.    **LEGAL STANDARD**

To obtain judgment as a matter of law, a movant must satisfy a "very high" standard, and demonstrate that "'there is no legally sufficient basis for a reasonable jury'" to find for the opposing party on the disputed issue. *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000)). When deciding such a motion, "a court 'must view the evidence in the light most favorable to the nonmoving party[,] ... draw all reasonable inferences in that party's favor[,]" and "'must accept the jury's credibility findings consistent with the verdict.'" Dkt. 636 at 9 (quoting *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001)). "Where there is sufficient conflicting evidence, or if reasonable minds could differ over the verdict, judgment as a matter of law is improper." *Sunrise Helicopters, Inc. v. Alexair, Inc.*, No. 10-00346, 2012 U.S. Dist. LEXIS 73713, at *12 (D. Haw. May 29, 2012).

## II.    **ARGUMENT**

This Court should deny Cognizant's Renewed Motion for Judgment as a Matter of Law because Plaintiffs presented substantial evidence that provided a legally sufficient basis for the jury to find that: (A) Cognizant engaged in a pattern-or-practice of intentional discrimination in its bench terminations, and (B) Cognizant's conduct meets the standard for punitive damages. Cognizant is also not entitled to judgment as a matter of law on its

---

[1] The two jurors who favored Cognizant "weren't being responsive to the evidence," and one "'put his head down … [and] wouldn't [even] look at the evidence.'" *See* https://shorturl.at/1VdsB.

"good faith" defense because the evidence demonstrated that Cognizant did not implement an EEO/affirmative action policy in good faith, nor did it undertake good faith efforts to redress the company's cultural bias and stark disparities in bench termination rates.

## A.    Plaintiffs Put Forth Ample Evidence that Cognizant Engaged in a Pattern-or-Practice of Intentional Discrimination in Bench Terminations.

Cognizant claims that Plaintiffs failed to proffer sufficient evidence at trial (1) that Cognizant engaged in intentional discrimination and (2) that intentional discrimination in bench terminations was Cognizant's standard operating procedure. Both arguments fail.

### 1.    Cognizant Engaged in Intentional Discrimination.

At the re-trial, Plaintiffs presented significant statistical, documentary, and testimonial evidence that Cognizant engaged in a pattern-or-practice of discrimination, such that the jury found in favor of Plaintiffs. *See Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 552-53 (9th Cir. 1982) (plaintiff may "establish a prima facie case of disparate treatment based solely on statistical evidence" or through "a combination of direct, circumstantial and statistical evidence of discrimination") (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Plaintiffs' evidence fell into four categories: (1) stark statistical disparities in Cognizant's bench terminations rates; (2) the EEOC's Letter of Determination; (3) Cognizant policies and practices that favored Indian visa employees; and (4) anecdotal evidence of Cognizant's cultural preference for South Asian/Indians that brought Plaintiffs' statistics "convincingly to life."[2] And, contrary to Cognizant's argument, Plaintiffs specifically linked this evidence to Cognizant's disparate bench termination rates.

#### a.    Statistical Evidence.

Statistical evidence lies at the heart of pattern-or-practice claims. *See id.* at 339-40 & n.20. "In order to establish a prima facie case of disparate treatment based solely on statistical evidence, the plaintiff must produce statistics showing 'a clear pattern, unexplainable on grounds other than race [or national origin].'" *Gay*, 694 F.2d at 552

---

[2] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977).

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

(quoting *Arlington Heights*, 429 U.S. at 266); *Reynolds v. Barrett*, 685 F.3d 193, 203 (2d Cir. 2012) ("'Statistics alone can make out a prima facie case of discrimination [in a pattern-or-practice suit] if the statistics reveal a gross disparity in the treatment of workers based on race.'") (quotation omitted); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) (same). When "a disparity is sufficiently large, [] it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process." *Castaneda v. Partida*, 430 U.S. 482, 494 n.13 (1977).

The extremity of disparate employment outcomes is typically measured in standard deviations. Disparities of two to three standard deviations are "statistically significant" in social science, but only "suspect" in a courtroom—meaning a plaintiff must "bolster" those statistics with other circumstantial evidence of intentional discrimination. *Gay,* 694 F.2d at 551-52. Statistical disparities of five or more standard deviations are "considerably more stark" and can support an inference of intentional discrimination without other evidence. *Id.*; *Slaight v. Tata Consultancy Servs., Ltd.*, 842 F. App'x 66, 68 (9th Cir. 2021) ("It would have been error for [jury] instructions to state that statistics alone could *not* be sufficient to satisfy the plaintiffs' burden as to intentional discrimination").

Once a plaintiff presents statistical evidence of a substantial disparity reflective of a pattern-or-practice of discrimination, the burden of production shifts to the employer to demonstrate that such "proof is either inaccurate or insignificant" or to "provide a nondiscriminatory explanation for the apparently discriminatory result." *Teamsters*, 431 U.S. at 360-61 & n.46. "However, [a] defendant's burden may not normally be met solely by general statements that no one was denied equal employment opportunities solely because of race, [or] by general statements that the company hired only the best qualified applicants[.]" *Smith v. Union Oil Co. of Cal.*, No. C-73-1636, 1977 U.S. Dist. LEXIS 14354, at *99 (N.D. Cal. Aug. 22, 1977).

At the re-trial, Plaintiffs presented statistical evidence of a stark and clear pattern of discrimination.[3] Plaintiffs' expert, Dr. Johnson, testified that non-South Asian employees at Cognizant were 8.4 times more likely to be terminated from the bench than South Asian employees. Trial Tr. 2047:25-2048:21; TX-407A (4.1% non-South Asian bench termination rate vs. 0.5% for South Asians).[4] This corresponds to racial disparities in bench termination of 75.12 standard deviations, meaning there is less than a 1 in a billion chance that such disparities occurred by chance. Trial Tr. 2044:11-2045:7, 2057:24-2058:3 ("[I]f you were looking for a particular grain of sand on the beach and picked one up and got it on the first chance, … [there would] probably still be a bigger chance of that happening than something with a 75 standard deviation"); TX-407A. Dr. Johnson found that "there were clear and stark disparities in the rates of termination that substantially disfavored non[-]South Asian employees" and that he had "not seen anything that indicates [the disparities are explainable on grounds other than race or national origin]." Trial Tr. 2032:23-25, 2133:22-25. And Dr. Johnson testified that these disparities persisted each year during the class period, continuing in 2021 and 2022. Trial Tr. 2048:15-2049:1 ("the disparities continued"); TX-407M.

Cognizant presented no statistical evidence at trial rebutting the stark disparities or demonstrating that Plaintiffs' "proof [wa]s either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360.[5] Instead, Cognizant relies only on the self-serving testimony of current

---

[3] As described further below, Dr. Johnson did more than simply "ruling out 'chance.'" Mot. at 5 (citing *Valdez v. City of San Jose*, No. C 09-0176 CW, 2013 U.S. Dist. LEXIS 27101, at *38 (C.D. Cal. Feb. 27, 2013) (expert's "analysis suffer[ed] from . . . critical defects," including selecting an improper baseline for the comparison and relying on "second-hand data" that "offer[ed] no guarantee of accuracy")).

[4] The same disparities hold true for Indian and non-Indian bench terminations, given that 94% of South Asian employees at Cognizant are Indian. Trial Tr. 2050:25-2051:13 (discussing demonstrative Exhibit 822).

[5] Cognizant retained its own economic expert, Dr. Justin McCrary, but ultimately chose not to have him testify at trial, presumably because Dr. McCrary's own analysis,

employees to claim that race-neutral factors impacted its bench terminations, such as employees' location preference, skills, billing rate, and/or client input. Mot. at 5-6. But such "broad," "general statements" are insufficient to show that Cognizant had a "legitimate, nondiscriminatory reason[] for [the] proven disparities." *Smith*, 1977 U.S. Dist. LEXIS 14354, at *99; *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 499 (9th Cir. 2015) (employee's "self-serving … testimony … absent corroboration ... may have limited weight"). And Dr. Johnson performed a regression analysis to consider whether certain factors other than race or national origin could explain the disparities in bench terminations and concluded that no other factor could explain such disparities. Trial Tr. 2054:17-2065:9; TX-409F (controlling for education, hire year, experience in U.S., and business unit, and still finding 31.93 standard deviations).

Dr. Johnson also specifically considered an employees' willingness to relocate, and found that this factor did not explain the disparity in bench terminations between South Asians and non-South Asians. Trial Tr. 2065:5-9; TX-408A; TX-409G.[6] Non-South Asians who were unwilling to relocate were five times more likely to be terminated from the bench than South Asians (40.0% vs. 7.7%), a difference of 42.65 standard deviations. Trial Tr. 2063:9-2064:12; TX-408A. And non-South Asians who were willing to relocate were ten times more likely to be terminated due to a location preference than South Asians (22.4% vs. 1.7%), 38.48 standard deviations. Trial Tr. 2064:13-23; TX-408A. In fact, "non-South Asians who said they were willing to relocate were terminated at a higher percentage than South Asians who said they were not willing to relocate." Trial Tr. 2064:24-2065:4. Dr. Johnson's findings were confirmed by internal Cognizant documents and the EEOC's determination. TX-43 at 5 (25% of U.S. citizens unwilling to relocate were terminated vs. 3% of visa holders, and 17% of U.S. citizens who were willing to

---

while flawed, still showed clear and stark racial disparities in Cognizant's bench terminations (19.75 standard deviations). Trial Ex. 409F.

[6] Cognizant calls Dr. Johnson's analysis "binary" and "superficial," Mot. at 6, but puts forth no evidence discrediting the analysis.

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

relocate were terminated vs. 0% of visa holders); TX-245 (stark disparities in involuntary termination rates by race in FY 2018); TX-38 at 3 (2017 bench outcomes showing 28% of U.S. workers vs. 2.5% of visa holders were terminated from the bench).[7] Exemplifying this disparity, both Plaintiff Piroumian and Edward Cox were willing to relocate, yet still were terminated from the bench. TX-271.

While Cognizant criticizes Dr. Johnson for failing to consider whether benched employees who were listed as "willing to relocate" had a "location preference," Mot. at 6, the evidence at trial demonstrated that a "location preference" simply denoted an employee's preferred work location and not that the employee was unwilling to relocate or travel (which was captured by Cognizant's data and analyzed by Dr. Johnson). Trial Tr. 2054:13-16, 2181:18-24, 2182:6-11, 2200:22-24. Moreover, Cognizant's own expert, Dr. McCrary, performed the same analysis that Cognizant now calls "superficial," and did not control for the number of locations to which an employee was willing to relocate, *id.* 2208:9-21, and Cognizant presented no evidence that accounting for those numbers would have changed the disparities. Indeed, Plaintiff Piroumian listed as his "location preference" every state, Canada, and the Virgin Islands, but was offered *no job proposals* during his time on the bench. TX-271.

With respect to employee skills, Cognizant itself agreed that "as a class of people, Cognizant's visa workers"—who are 99% Indian—"are [not] more skilled than Cognizant's U.S. workers," and documents showed that Cognizant was more willing to train its Indian visa employees than non-Indian local hires when there was a "skill mismatch." Trial Tr. 2883:12-15 (Padmanabhan, V.), 2050:15-20 (Johnson, J.); *compare* TX-310 at 4 ("Utilize the approx. 1000 travel ready associates for immediate requirements in Q4 2016; Cross-skill associates in case of a skill set mismatch"), *with* TX-205 at 13 ("Hiring Managers are not willing to hire diverse candidates who match 80% of skills required for roles. Do not want to invest in training/upskilling"). The evidence at trial also

---

[7] TX-148 at 11-12 ("There is no evidence that Charging Party was unable or unwilling to work outside of his current locality.").

demonstrated that "the more experienced employees [at Cognizant] have a higher chance of termination." Trial Tr. 2061:20-23 (Johnson, P.), 2643:13-2647:1 (Ms. Palmer provided knowledge transfers/trained Indian workers who replaced her on projects). Further, Cognizant did not present evidence that it preferred South Asian employees (primarily those on visas) because they were cheaper, as underpayment of visa workers is illegal.[8]

And with respect to "client input," witnesses on both sides testified that Cognizant's hiring managers (who were predominantly Indian) served as gatekeepers, determining who was presented for client interviews. Trial Tr. 2863:1-10 (Padmanabhan, V.) (Q. "But the employees wouldn't be placed before the client without approval from the hiring managers?" A. "No. The hiring manager definitely has to take a look at who is being put in front of the client."), 195:6-19 (Israel, A.), 2410:4-7 (Franchitti, J.).

Plaintiffs' statistical evidence of the stark pattern of racial and national origin disparities in Cognizant's bench terminations provided a legally sufficient basis for the jury to find that Cognizant engaged in a pattern-or-practice of intentional discrimination.

### b.    The EEOC's Determination Letter.

After a five-year investigation of Cognizant's hiring and staffing practices, on February 5, 2020, the EEOC issued a "final" "determination on the merits" that Cognizant had violated Title VII. TX-148. The EEOC found that "[s]tatistical analysis shows significant short falls of non-Indian employees within [Cognizant's] work force" and that "there is reasonable cause to believe that since December 4, 2014, [Cognizant] discriminated against … a nation-wide class of non-Indian employees on the basis of race and national origin by removing them from assignments that they were qualified for, refusing to assign them to new projects, and terminating them when they remained unassigned." *Id.* at 1. The EEOC's letters resolved the Commissioner's Charge initiated by Chai Feldblum, along with at least six discrimination charges filed against Cognizant. TX-148; Trial Tr. 2216:7-2220:19 (Hira, R.). In the individual determination letters, the

---

[8] Trial Tr. 2225:15-2226:23 (Hira, R.) (H-1B visa workers must be paid the same as "similarly-employed U.S. workers").

1  EEOC summarized each terminated employee's individual allegations and Cognizant's

2  responses, provided its assessment as to why "[Cognizant]'s defense does not withstand

3  scrutiny," and in each case found that "[c]redible evidence supports the Charging Party's

4  contention." TX-148. Notably, in each letter, "the Commission . . determined that there

5  [wa]s a violation of the statute." *Id.* That language was redacted from the letters at the first

6  trial. Dkt. 532 at 7.

7        The EEOC's findings are "highly probative" because they were prepared by

8  professional investigators on behalf of an impartial agency. *Plummer v. Western Int'l*

9  *Hotels Co.*, 656 F.2d 502, 505 (9th Cir. 1981). "The fact that an investigator, trained and

10  experienced in the area of discriminatory practices and the various methods by which they

11  can be secreted, has found that it is likely that such an unlawful practice has occurred, is

12  highly probative of the ultimate issue involved in such cases." *Smith v. Universal Servs.,*

13  *Inc.*, 454 F.2d 154, 157 (5th Cir. 1972). The EEOC's final determination of discrimination

14  in bench terminations is also especially probative because it goes to the "very heart" of

15  Plaintiffs' case against Cognizant and is directly on-point with the key issue decided by

16  the jury. *Hakanson-Black v. United Pac. Ins. Co.*, No. 87-4252, 1988 U.S. App. LEXIS

17  21337, at *7-8 (9th Cir. 1988); TX-148 (finding "[Cognizant] discriminated against … a

18  nation-wide class of non-Indian employees on the basis of race and national origin by

19  removing them from assignments that they were qualified for, refusing to assign them to

20  new projects, and terminating them when they remained unassigned.").

21        While Cognizant argues that the EEOC Letters of Determination are not probative,

22  as they do not detail the statistical analyses and data analyzed by the EEOC, Mot. at 8,

23  this Court has already rejected that argument. Dkt. 532 at 6.[9] Cognizant also claims that

24  the letters' reference to "terminating [non-Indian employees] when they remained

25  unassigned" lacks probative value solely because, it says, the EEOC did not speak to one

26  _____

27        [9] The structure of the EEOC's determination letter mirrors a plaintiff's typical
   *prima facie* case in a pattern-or-practice cases, including both a statistical finding and
28  anecdotal evidence of the charging party's experience with the respondent. TX-148.

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

of Cognizant's witnesses (Mr. Padmanabhan) before issuing its finding, and Mr. Padmanabhan answered "No" when asked whether an employee's national origin plays a role in staffing. Mot. at 9. But Cognizant offered no evidence indicating that the EEOC did not speak to others in Talent Supply Chain. Cognizant further claims that the letters apply a lower "reasonable cause to believe" standard of proof rather than the "preponderance of the evidence" standard that applied at trial,[10] but the EEOC made a "final" "determination on the merits" "that there [wa]s a violation of the statute," and not just a "reasonable cause" determination. TX-148 at 1; *see also Gilchrist v. Jim Slemons Imps., Inc.*, 803 F.2d 1488, 1500 (9th Cir. 1986) ("A letter of violation, however, represents a determination by the EEOC that a violation of the Act has occurred . . . ."). Moreover, Plaintiffs did not rely solely on the EEOC's letters in meeting their burden of proof.

### c.    Cognizant's Policies and Practices.

At trial, Plaintiffs presented proof of Cognizant' visa readiness, visa utilization, and rotation policies/practices, along with its operational excellence and margin optimization initiatives. TX-261; TX-219; TX-320; TX-321; TX-294; TX-52; TX-47; TX-39; TX-30; TX-12; TX-1. These initiatives were designed to build a reserve of "visa ready" employees in India who Cognizant then prioritized for placement into its mid-level U.S. roles, resulting in disproportionate terminations of non-Indians from the bench (who were not prioritized for roles). TX-407A. Cognizant did not—and cannot—defend these discriminatory policies on their merits. Trial Tr. 3161:2-5 (Westphal, E.) (admitting that a preference for staffing Indian visa workers in U.S. positions is discriminatory). Instead, Cognizant attempted to justify its policies by proffering—by way of self-serving testimony only—a non-discriminatory rationale underlying each policy, which was directly contradicted by the evidence at trial. *Compare* Mot. at 4 (visa utilization policy

---

[10] *Tuffa v. Flight Services & Systems, Inc.*, 644 F. App'x 853, 856 (10th Cir. 2016) concerned the *exclusion* of an EEOC letter from trial, and is inapplicable given that the EEOC's unredacted letters were admitted here.

intended to discourage stockpiling visas, rotation policy meant to offer employees growth opportunities, and 3x3x3 policy either never implemented or only applied to billable roles), *with* TX-321 at 2 (Visa Utilization policy's "[p]urpose" to "ensure[] efficient and timely use of visas" "[t]o minimize Revenue leakages"), *and* TX-261 at 8 ("We are looking to create an additional pool of visa ready associates by increasing L visa associates and identifying potential non-HCAP associates in India"), *and id.* at 11 ("There are over 6000 potential US Travel Ready resources offshore"), *and* TX-39 at 13 ("Strict rotation policy for US visa-holding resources deployed in offshore projects" allowing accounts 1 month "for placing resource onsite"), *and* TX-30 at 4 ("order of precedence for inclusion in Rotation List" prioritizing visa holders as 1 and 2, and unbilled, benched associates last), *and* TX-12 at 12-13 (3-3-3 Policy in effect "Oct 2013 onwards" and no mention of applicability only to billable roles).[11]

Cognizant argues that the decrease in its percentage of visa employees and Asians in its U.S. workforce during the class period "belie[s]" Plaintiffs' theory that non-Indians were replaced by visa workers, Mot. at 4, but this argument is discredited by the fact that the bench termination disparities *persisted throughout the class period*—an assessment that Cognizant did not even attempt to rebut. Trial Tr. 2048:15-21 (Johnson, P.). Cognizant also attempts to minimize the persuasiveness of Ms. Israel and Mr. Gundlach's testimony that Cognizant preferred to hire and staff Indians (including those on visas) in U.S. roles, but similar testimony was offered by Mr. Franchitti, Ms. Palmer, and Mr. Piroumian, confirming that Cognizant's discriminatory practices were implemented company-wide,

---

[11] *See also* Trial Tr. 2251:9-15 (Hira, R.) ("the talent supply chain -- team is trying to drive visa utilization numbers and so they have a preference for pushing visa workers in billable roles."). Cognizant claims Dr. Hira's opinions are based on "a small set of documents cherry-picked by Plaintiffs' counsel," Mot. at 4, but Dr. Hira relied also on publicly available information (including information published by the government and Cognizant's financial filings), his 25 years of expertise in the industry, and other experts. Trial Tr. 2215:1-10.

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

and the policies themselves were not limited to any specific group or Business Unit.[12]
Cognizant further claims that TX-1, which reflects Cognizant's visa readiness strategy,
related to associates in the United Kingdom (and not India), but as Mr. Franchitti testified,
this document "was the same concept [he] explained earlier, which is, ... if you are visa
ready and you're an Indian worker, you could actually quickly come to the U.S. to get a
job or to work on a project," and just because a visa worker is located in the U.K., it does
not mean he or she is not Indian. Trial Tr. 2408:15-25; TX-1.

### d. Cognizant's Cultural Preference.

Plaintiffs also presented significant testimonial and documentary evidence
demonstrating Cognizant's cultural preference for South Asians and Indians. *See* Mot. at
7 (citing certain testimony);[13] Trial Tr. 2229:14-25, 2230:6-10 (Hira, R.) (the fact that
99% of Cognizant's visa employees are from India and 35% of its visa employees are
hired in the U.S. "shows that there is a cultural preference for Indian nationals"); TX-254
at 1, 5 ("hiring managers select from the 'comfort zone'" and hire visa employees due to
"Culture match, muscle memory"); TX-86 at 5 ("Cultural Sensitivity Training Project"
PowerPoint for "Business Challenge" of "Excessive escalations ... relating to issues
described as lack of cultural sensitivity when off-shore leaders are managing North
American associates"); TX-258 at 1 (answer to question "why are people not
successful[?]" is "because the culture here..EAS and CIS is 99 percent Indian"); TX-62 at

---

[12] Trial Tr. 2406:4-10, 2412:6-9 (Franchitti, J.) (proactive filing of visa
applications and employees becoming visa ready to then be placed in U.S. roles was
"common among the business units at Cognizant"), 2643:13-2646:19 (Ms. Palmer's
assignments typically ended with her being replaced by less qualified Indians), 2481:23-
2482:8, 2488:8-17 (Mr. Piroumian repeatedly replaced by Indians on client projects).

[13] Citing *C.R. v. PLB Management LLC*, Cognizant claims this testimony was
insufficient to support the jury's verdict, but Plaintiffs are not relying on witness
testimony alone, and have presented "'substantial evidence that is adequate to support
the jury's findings,'" including Dr. Hira's expert testimony and the documentary
evidence cited herein. Mot. at 7 (citing No. 2:21-cv-03275-OD W(JEMx), 2023 U.S.
Dist. LEXIS 99278, at *5 (C.D. Cal. June 7, 2023) (quotation omitted)).

---

11

1 (discussing "blatant discrimination in the form of racism, … and Indian Nationalism as part of the staffing mantra"); TX-205 at 13 ("Hiring Managers are not willing to hire diverse candidates"); TX-274 at 5 ("The company's workforce representation is the result of Cognizant's current business model … this has been a systemic issue since 2001").

Cognizant claims this wealth of evidence cannot "establish a classwide pattern or practice [finding]," Mot. at 7, but Plaintiffs are not relying on anecdotal evidence of Cognizant's cultural preference alone, and instead have used this evidence to bolster their overwhelming statistical evidence. *Teamsters*, 431 U.S. at 339 ("[T]his was not a case in which the Government relied on 'statistics alone.' The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life."); Dkt. 636 at 10 (making same determination on prior JMOL). *Goff v. Continental Oil Co.* is inapposite because the plaintiff in that case relied exclusively on the testimony of just three employee witnesses to attempt to establish the existence of a pattern-or-practice. 678 F.2d 593, 596-97 (5th Cir. 1982).[14]

### e.   Plaintiffs Presented Significant Evidence Linking Cognizant's Policies and Cultural Preference to its Bench Terminations.

Cognizant argues that "even if Plaintiffs had presented sufficient evidence of … 'policies' and 'cultural preference,' there is insufficient evidence linking these visa policies to *bench terminations*." Mot. at 9-10. But Cognizant's argument—which focuses almost exclusively on the testimony of Dr. Hira, Mr. Piroumian, and Ms. Palmer—defies common sense and overlooks key evidence. There is a straightforward link between (1) Cognizant's policies/practices designed to create an inventory of "visa ready" workers in India who can be quickly slotted into U.S. roles in accordance with the company's

---

[14] Cognizant claims that TX-86—the "Cultural Sensitivity Training Project" PowerPoint—reflected an effort by the company to tackle "with vigor" its cultural preference, Mot. at 8, but as Ms. Israel testified, "[s]ome ways to combat this would be to create, … a diverse panel of interviewers and not let the hiring manager make th[e] final [hiring or staffing] decision[, b]ut at Cognizant, the hiring managers made the final decision." Trial Tr. 1906:2-10 (Israel, A.). And the bench termination disparities at Cognizant did not improve during the class period. *Id.* 2048:15-21 (Johnson, P.).

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

business model, cultural preference, and margin optimization initiatives, and (2) non-South Asian and non-Indian employees' removal from projects and/or inability to find new projects from the bench and ultimate termination.[15] Cognizant itself admitted that a rotation policy would increase attrition in the U.S. (disputing only whether one was implemented),[16] and internal documents acknowledge that margin optimization initiatives (which included employee rotations) resulted in higher attrition. Trial Tr. 2904:8-11 (Padmanabhan, V.); TX-471 at 2 ("During margin years our full year attrition seems to go up by 100 basis points"), 3 ("Margin optimization has driven exits from the bench (forced and voluntary)"). Cognizant claims that the margin optimization initiative was not discriminatory and was designed to improve the company's profitability. But it resulted in increased bench terminations, as intended, including in the case of Mr. Cox. TX-471 at 2-3; TX-12 at 12; Trial Tr. 2605:25-2606:18 (Swallows, G.) (admitting that Mr. Cox was benched after 3 years in his role and that part of the margin optimization initiative "was to take people out of roles, and put them on the bench"). And because Cognizant had sufficient unbilled and bench resources to cover 2.5 times its staffing demand, a cultural preference by hiring managers to hire and staff Indians for U.S. roles, and the rotation of visa employees from India into roles, by its very nature results in non-Indians being

---

[15] *See e.g.*, pp. 9-10, *supra* (citing policy documents); TX-407A; Trial Tr. 2409:1-17 (Franchitti, J.) (testifying to non-Indians in the U.S. being replaced by Indian visa employees and Cognizant's staffing practices having "a very negative impact" on benched U.S. employees who were not staffed to roles and were fired), 2261:16-2262:15 (Hira, R.) (testifying that rotating Indian visa employees into roles and non-Indians out of roles will lead to the benching and termination of those who cannot find a billable project); TX-148 at 3 (after complaining, Ms. Albright's "job duties were taken away and given to a male Indian employee" and she was benched and fired), 10 (available remote positions "all … given to Indian employees" and Ms. Rowland was benched and fired); TX-30 at 4 ("order of precedence for inclusion in Rotation List" prioritizing visa holders as 1 and 2, and unbilled, benched associates at 3, who are fired if they remain on the bench for too long).

[16] Plaintiffs introduced contrary evidence at trial, and for the purposes of this motion, all inferences must be drawn in Plaintiffs' favor. *See* Section II(A)(1)(c), *supra.*

---

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

disproportionately terminated by Cognizant from the bench. TX-20 at 3. As such, Cognizant's reliance on *Sunward Corp. v. Dun & Bradstreet, Inc.* is unavailing, as the jury's verdict was not based on mere speculation, but rather, on concrete evidence linking Cognizant's policies and practices to the disparities in bench terminations. Mot. at 10 (citing 811 F.2d 511, 519 (10th Cir. 1987)).

While Cognizant claims that Dr. Hira only testified to a "correlation" between Cognizant's policies and the bench terminations disparities, Mot. at 9-10, this is untrue. *See*, *e.g.*, Trial Tr. 2229:8-2230:23, 2251:9-2252:3, 2261:16-2262:17, 2265:20-2266:3, 2270:12-19 (Hira, R.).

Cognizant also claims that Ms. Palmer's testimony did not show a causal link between Cognizant's policies and bench terminations because she was not terminated from the bench, *id.* at 9, but Ms. Palmer testified to having been repeatedly rotated out of roles prematurely, replaced by Indians, and relegated to the bench, where she received no help from Talent Supply Chain. Trial Tr. 2643:13-2646:19, 2647:24-2648:12. The obvious practical effect of the policies Ms. Palmer described being subjected to would be to increase bench terminations of non-Indians, and the fact that she ultimately resigned rather than waiting to be terminated is relevant only to her individual case. Cognizant also claims that Mr. Piroumian was ultimately fired from the bench in 2017 because he "made no effort to find a new project," Mot. at 10, but this is belied by the record, and Cognizant offered Mr. Piroumian no roles during his final bench period, despite his willingness to travel and relocate. TX-271.

### 2.      Discrimination Was Cognizant's Standard Operating Procedure.

Cognizant argues that bench terminations are highly individualized and not a "uniform, companywide procedure" at Cognizant. Mot. at 11-15. But the individualized factors Cognizant cites—employees' skills, experience, location, and client input, were all disproven to impact bench terminations at trial. *See* Section II(A)(1)(a), *supra*. Contrary to Cognizant's argument, the evidence proved that Cognizant's internal staffing group—the Talent Supply Chain—consistently and uniformly prioritized Indian visa employees

for roles and offered little help to benched local employees who were ultimately fired. TX-219 at 5 ("There is a joint effort between Global Mobility, TSC and the BU Ops teams to drive visa utilization which has resulted in [its] significant increase" from 64% in 2012 to 87% in 2016); Trial Tr. 1931:14-15 (Israel, A.) ("[T]he non[-South] Asians on the bench very rarely came off the bench. So it was an easy way to terminate employees."); TX-148 at 1 (finding that Cognizant engaged in a pattern-or-practice of discrimination against non-Indian employees in bench terminations), 12 ("Charging Party was not provided assistance by Respondent's Talent Supply Chain, and correspondence regarding open positions were met with non-response."); TX-271 (0 proposals made to Mr. Piroumian by TSC prior to his termination from the bench).[17]

While Cognizant claims that witness testimony, including that of Mr. Piroumian, is insufficient to meet Plaintiffs' burden, Cognizant ignores the wealth of statistical, documentary, and anecdotal evidence introduced at trial, which the jury found proved, by a preponderance of the evidence, that Cognizant engaged in a pattern or practice of discrimination on the basis of race and national origin in its bench terminations. *See* Section II(A)(1), *supra* (detailing evidence); Dkt. 666; *Teamsters*, 431 U.S. at 339 ("existence of a pattern or practice of discrimination" established by statistical and anecdotal evidence). Given this wealth of evidence, it is clear that unlike in *Sunward*, the jury's decision was not based on "speculation and conjecture," 811 F.2d at 521, but rather, overwhelming evidence that discrimination was Cognizant's "standard operating procedure – the regular rather than the usual practice." *Teamsters*, 431 U.S. at 336.

Cognizant also argues that employees' varying amount of time spent on the bench prior to termination proves that the bench process is "inherently individual," Mot. at 13-

---

[17] *Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 594 (C.D. Cal. 2013), cited by Cognizant, concerned Rule 23's predominance standard, not the standard for a motion for judgment as a matter of law where all inferences are drawn in Plaintiffs' favor. Mot. at 12. And this Court already considered and rejected Cognizant's predominance argument when granting class certification (Dkt. 384) and denying Cognizant's motion for decertification (Dkt. 636).

14, but this does not change the fact that all class members were uniformly placed on the
bench, not staffed to a new role by Cognizant, and fired. *See* TX-148 at 1 (finding this
nation-wide practice to have occurred since at least December 4, 2014); TX-407A; TX-
407K. Whether an employee is staffed to a new role off the bench is not decentralized as
Cognizant claims; rather that decision is entrusted to Cognizant's hiring managers, who
work in tandem with Talent Supply Chain and Cognizant's immigration group to staff
U.S. roles. *See* Section II(A)(2), *supra*; TX-219 at 5.[18]

## B. Plaintiffs Proffered Sufficient Evidence Supporting a Punitive Damages Award.

The jury has already correctly decided that Cognizant's conduct meets the standard
for punitive damages. Dkt. 666. This Court should reject Cognizant's argument on this
issue as it did before. Dkt. 636 at 11.

In establishing that Cognizant acted with "'malice or with reckless indifference to
[Plaintiffs and the class'] federally protected rights,'"[19] Plaintiffs presented significant
proof at trial of Cognizant's awareness of racial disparities in its workforce and bench
termination rates, and the discriminatory impact its staffing model had on non-Indians
(*e.g.*, TX-245, TX-274, TX-476), and also that complaints raised by employees to
management, Human Resources, and even Cognizant's CEO regarding the discrimination
and disparities went unredressed and were even met by retaliation (*e.g.*, TX-62; TX-63;
TX-82; TX-148). Ms. Israel specifically testified that when she raised concerns about
Cognizant's workforce representation and adverse impact, she was told to stop sharing the
data. TX-241; TX-243; Trial Tr. 1931:24-1933:10 (Israel, A.).[20] Cognizant had previously

---

[18] Plaintiffs have already discredited Cognizant's argument that the 3-3-3 policy
was never implemented and that rotation policies were intended to promote career
development. *See* pp. 9-10, *supra*.

[19] *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999) (quoting 42 U.S.C.
§ 1981a(b)(1)).

[20] Cognizant argues that the re-trial was "different," because, it claims, Ms. Israel
testified that she continued to share the data with certain Cognizant employees and "her

---

16

been warned by Ms. Israel's predecessor that these workforce disparities "h[ad] been a systemic issue since 2001" and were the result of "Cognizant's current business model." TX-274 at 5. Mr. Gundlach, who escalated his complaints regarding Cognizant's "mandate" that he only staff Indian visa workers in U.S. positions to the CEO, was forced to resign from Cognizant's inaction. TX-62; TX-63, TX-82; Trial Tr. 2008:25-2009:18. And the EEOC conclusively found that Mr. Franchitti was "discharged in retaliation for his complaints regarding national origin discrimination." TX-148 at 7; Trial Tr. 2414:21-2416:11 (raising complaints to his manager, other members of Cognizant management, and HR). Yet Cognizant *never shared* the EEOCs finding with key members of leadership, "the only people that can change the demographic makeup of an organization." Trial Tr. 184:1-2, 198:8-22, 1953:3-11 (9/255/24) (Ms. Israel, Cognizant's Senior Director of EEO/AA was never informed of the EEOC's determination, nor did she see any change to Cognizant's staffing practices after the determination was issued), 2844:20-21, 3030:20-21 (Mr. Padmanabhan, VP of Talent Supply Chain, was never informed of the EEOC's investigation), 3083:1-18, 3121:10-15 (Cognizant's former COO for its legal and corporate affairs group and Senior Director/AVP of Workforce Strategy had no "personal knowledge" of the EEOC's investigation and finding).

While Cognizant touts its diversity efforts, Mot. at 15-16, none of those "efforts" addressed the persistent racial disparities in its bench terminations or the advancement of non-Indians within the company, *id.*, and Cognizant's local hiring (which included increasing its percentage of locally hired Indian green card holders) was motivated by increased public scrutiny of visa usage and proposed legislation restricting visas, rather

---

testimony made clear that that level of sharing was not unusual," Mot. at 16, but Cognizant cites only Ms. Israel's testimony that there was some variation in how widely data was shared (as she never testified that Cognizant's practices were not unusual). *Id*. And Ms. Israel testified that she was required, by law, to share the data broadly with leadership, but after voicing concerns, was allowed to share only high-level, "basic AAP" data with HR leadership (whereas she had previously shared it with HR, Legal, and Talent Acquisition). Trial Tr.1931:24-1933:10,1936:3-14.

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

than a good faith effort to increase its diversity. TX-261 at 9 ("filing around 15,000 petitions may prompt external reaction"); TX-225 at 2 ("Last year we stated our intent to be majority local in U.S. in response to proposed H-1B legislations."); TX-10 at 3 ("Given the current business and political climate we need to consider moving the needle to 50/50 mix at an accelerate rate" including by converting visa employees to green card holders); Trial Tr. 2239:13-2241:22, 2271:16-2272:18, 2273:2-16 (Hira, R.) ("So the majority would be local, meaning non-visa holders. So let's be clear though, that doesn't mean non-Indian, it just means non-visa holders. It doesn't mean non-South Asian, it just means non-visa holders.").

Even after this lawsuit was filed in 2017 (Dkt. 1), after Ms. Israel shared her concerns regarding racial disparities in 2018, and after the EEOC made its discrimination determination in 2020, Cognizant's disparities in bench terminations continued, despite its "knowledge that it [was] acting in violation of federal law." *Kolstad*, 527 U.S. at 535; Trial Tr. 2048:15-21 (Johnson, P.). Cognizant does not dispute this, nor did it proffer evidence at trial that its "diversity" efforts were in any way targeted to the EEOC's determination or the stark disparities in the company's bench terminations. Mot. at 16-17.[21] And while Plaintiffs' evidence at trial established that the policies at issue were implemented uniformly and company-wide by management, and that members of leadership, including the CEO, were on notice of Cognizant's discriminatory employment practices, but took no action, Cognizant introduced no evidence to the contrary. *See* Sections II(A)(1)(c), (A)(2), pp. 16-17, *supra*; TX-148; TX-324 at 2; Dkt. 636 at 12.

## C. Cognizant's "Good Faith" Defense Falls Short.

Cognizant claims to have made good faith efforts to prohibit discrimination, Mot. at 17-19, but the evidence presented at trial persuades otherwise. This Court should again reject Cognizant's argument on this issue. Dkt. 636 at 11-12.

---

[21] *Lakeside-Scott v. Multnomah County* is distinguishable as there is no question that the jury's finding was based on "significant probative evidence," rather than inferences based on "conclusory statements." 556 F.3d 797, 802 (9th Cir. 2009).

PLS.' OPP'N TO DEFS.' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 17-CV-6848 DMG (GJSx)

Cognizant's "good faith" affirmative defense is inapplicable if "an individual sufficiently senior in the corporation" directed or participated in the pattern or practice of discrimination. *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 516 (9th Cir. 2000). At trial, Plaintiffs presented evidence that Cognizant's pattern-or-practice of discrimination is fundamentally intertwined with Cognizant's business model, and was implemented company-wide. *See, e.g.*, TX-274 at 5 ("The company's workforce representation is the result of Cognizant's current business model, and I have no authority to resolve this issue."); TX-324 at 2 ("As per Corporate: Visa Ready Associates should travel"); TX-219 at 5 ("There is a joint effort between Global Mobility, TSC and the BU Ops teams to drive visa utilization which has resulted in this significant increase."); *see* Sections II(A)(1)(c), (A)(2), pp. 17-18.

In order to prevail on its "good faith" defense, Cognizant must not only have adopted a non-discrimination policy, but *implemented* it in good faith. *Passantino*, 212 F.3d at 517 ("Although the purpose of Title VII is served by rewarding employers who adopt anti-discrimination policies, … it would be undermined if those policies were not implemented, and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of their managerial employees."). Cognizant has not presented any meaningful evidence of good faith efforts to implement a non-discrimination policy, and any such good faith attempts are belied by the stark racial disparities in its bench termination rates and lack of action by Cognizant to address employee complaints of discrimination. TX-407A; *see* Section II(B), *supra*. And while Cognizant claims to have undertaken a number of diversity efforts, Mot. at 18-19, it failed to inform key members of leadership regarding the EEOC's investigation and final determination, and Cognizant presented no evidence at trial concerning any diversity efforts to address its bench termination disparities or to retain non-Indians and non-South Asians in the workforce. As such, Cognizant's claim that it has undertaken good faith efforts for Title VII compliance is unsupported by the record and punitive damages are appropriate.

1

### III.   CONCLUSION

2

       For the foregoing reasons, Plaintiffs respectfully request that the Court deny

3

Cognizant's Renewed Motion for Judgment as a Matter of Law.

4

5

DATED: November 22, 2024          **KOTCHEN & LOW LLP**

6

                                         By: /s/Daniel Low

7

                                         Daniel Low, SBN 218387

8

                                         Daniel Kotchen (*pro hac vice*)
                                         Lindsey Grunert (*pro hac vice*)

9

                                         Mark Hammervold (*pro hac vice*)

10

                                         Attorneys for Plaintiffs and the Class

11

12

### LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

13

       The undersigned, counsel of record for Plaintiffs and the Class, certifies that this

14

brief contains 6,710 words, which complies with the word limit of L.R. 11-6.1.

15

16

DATED:  November 22, 2024          By: /s/Daniel Low

17

                                         Daniel Low

18

19

20

### CERTIFICATE OF SERVICE

21

       I hereby certify that a true and correct copy of the foregoing was served on all

22

counsel of record by electronic service through the Court's CM/ECF system.

23

24

DATED:  November 22, 2024          By: /s/Daniel Low

25

                                         Daniel Low

26

27

28